Jeffrey D. Isaacs, M.D.
11482 Key Deer Circle
Wellington, FL 33449
212-257-0737
jeffreydi@gmail.com



FILED BY _MEG_ D.C.

APR 0 1 2024

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. – W.P.B.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| DR JEFF ISAACS | Case No. 24-cv- |
| Plaintiff, | PATENT INFRINGEMENT |
| vs. | |
| GOOGLE LLC | **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** |
| Defendant. | |
| | DEMAND FOR JURY TRIAL |

## PLAINTIFFS' COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

## I.     INTRODUCTION

1. In 2012, during his medical residency at Dartmouth-Hitchcock Hospital in New Hampshire, Dr. Jeff Isaacs faced a life-altering challenge when he became disabled. Undeterred by this setback on his goal to be a neurosurgeon, and determined not to rely indefinitely on Dartmouth's own-occupation long-term disability benefit, Dr. Isaacs founded OkCaller.com in 2013. This initiative led to the awarding of U.S. Patent (Exhibit A – USPTO RE48847) for the groundbreaking reverse phone search technology the website utilized. Google, recognizing the significance of Dr. Isaacs' contribution, quickly elevated OkCaller to a premier position among reverse phone search sites:



2.

3.  By Google's own Analytics records, OkCaller garnered 293 million new users since launch and 605 million pageviews, positioning it among the top 2000 websites on Google, comparable to established brand sites like Jeep.com. Dr. Isaacs' site was operated by Greenflight Venture Corporation, a Florida C Corporation which he serves as CEO. Regular communications between Google, Greenflight, and Dr. Isaacs underscored a partnership marked as highlighted in a 2015 email from Google:

> "You are one of the few partners who we have invited for Enhanced Support and Optimization. Thank you for working with us! We are grateful to count you as a trusted partner, and we hope to continue improving our relationship to suit your business needs."

4.  This "trusted partnership" transcended mere algorithmic website ranking, making OkCaller a Google success story and facilitated Dr. Isaacs' participation in workshops with senior Google personnel in their Miami office, significantly contributing to Google's AdSense revenue. Working with independent sites like OkCaller fundamentally allowed Google to reach the success it enjoys today.

5.  Because Dr. Isaacs ran the site efficiently, he gave away his patent for free, which allowed customers to save 90% on phone searches. Dr. Isaacs' invention saved US consumers over $100 million. Phone searches are a lucrative and substantial part of search engine revenues. Historically they were an early, even perhaps the first major profit center for Google.

6.  Unlike nearly every competitor, Greenflight never sold information about its users to third-parties. Moreover, OkCaller was a decade early to implement privacy controls that the US Marshal service now asks all phone directories to do, to protect Federal Court personnel's residence data. That is because Dr. Isaacs vision in 2013 to prevent forward

lookups of confidential information, like phone numbers and addresses. OkCaller only permits "called parties" who received a text or phone call from an unknown "calling party" to look up the name of the person. The functionality of traditional Caller-ID over the web was novel and worthy of a patent, as it helped hundreds of millions safely find out, under "natural law," who communicated with them (See Exhibit B - OKCaller Terms).

7.   In sum, OkCaller was a successful Florida-based internet startup that offered the ideal phone directory: it worked, it didn't sell user data to anyone, it was free, and it prevented safety risks associated with forward-lookup caching (e.g. Daniel's Law concerns). It was also a successful outcome of the disability system, allowing Dr. Isaacs to promptly get back on his feet and serve others.

*A Convergence of Complex Litigation Emerges*

8.   OkCaller faced considerable legal obstacles in the effort to bring free caller ID to the general public. As OkCaller gained market share, competitors took note and began to infringe upon Dr. Isaacs' patent. Within six months of Apple Inc. learning that Isaacs' desired to give away his patent for free and prevent high-grossing apps like Whitepages from charging for the same information, Apple dropped OkCaller from their Top 10 ranked phone apps to an unranked position. Whitepages simultaneously commenced a lawsuit to invalidate the patent under the controversial Alice IP case law.  The patent went back to the drawing board, and the USPTO spent several years reviewing Federal Circuit findings while corresponding with Greenflight's MIT-trained intellectual property attorney to reissue the patent. Hence today, the reissue patent again enjoys presumption of validity, having survived double scrutiny by the USPTO and Federal Circuit Appeals Court.

9. Despite these obstacles, Google notably continued to support Dr. Isaacs' work, significantly aiding him in his endeavor to bring free caller ID services to the general public. As Dr. Isaacs recently stated to the Ninth Circuit Court of Appeals, he widely credited Google with "saving his life." This is because Google's recognition of his invention gave him a second career chance; Dr. Isaacs has faced nineteen years of federal litigation surrounding his medical credentials, and he believed he was improperly blacklisted from the federally-funded residency system. Google allowed Dr. Isaacs to work from home, as he dealt with the worsening health issues and complex federal litigation to enforce the clearing of his name.

10. Between 2014-2022, a former Assistant United States Attorney[1] who specialized in complex health care matters worked tirelessly to help Dr. Isaacs return to active medical practice. In reviewing years of federal discovery files, AUSA Mark Josephs identified evidence that a California university was publishing false disciplinary records on national academic clearinghouses about Dr. Isaacs. The university had previously agreed, via two court-ordered federal settlement agreements, to acquit Isaacs of any controversies and seal the acquitted records. Two competent authorities, the American Academy of Medical Colleges, and a New Hampshire Employment Tribunal, both determined that the records had been expunged. Nonetheless, "leaked" records prevent Dr. Isaacs from practicing neurosurgery. Mr. Josephs sought declaratory action with the Department of Education and the California university. Both were blocked, due to statute of limitations and jurisdictional defenses raised by law firm Gibson Dunn. In 2020, The Ninth Circuit had a divided ruling

---

[1] Former AUSA Mark Josephs, who spent almost a decade on a *pro bono* effort to reinstate what he called Dr. Isaacs' promising neurosurgery career, tragically passed away last year.

with a stark dissent on the matter. This lawsuit will also seek the same declaratory judgment.

11. Recognizing that his clinical medical career was indefinitely delayed, in February 2020 Plaintiff partnered with the inventor of the gold-standard test for heart attacks to develop a Coronavirus tracking app. Apple rejected the app "Coronavirus Reporter," the first of its kind, in March 2020. Plaintiff subsequently became a lead witness in Apple antitrust matters concerning App censorship which are ongoing and have received considerable media attention.

12. On the day Dr. Isaacs tendered a Closing Brief to the Ninth Circuit in the Apple antitrust lawsuit, Google abruptly terminated the OkCaller partnership without any prior notice. Other competitors in Reverse Phone Search were unaffected, including blatant copycat sites which infringe upon the reissue patent. Plaintiff, through his legal counsel, has spent the past year asking Google to investigate any link the aforementioned litigation, only to be stonewalled.

13. Google has refused to answer "yes or no" to Plaintiff's legal counsel as to whether the termination of OkCaller's SERP listings had any relation to Plaintiff's litigation history. Plaintiff's legal counsel has determined that substantiated concerns exist that Google violated witness retaliation laws, such as Section 1512. A subpoena was issued to Google in a related lawsuit to seek information and evidence about the reasons for OkCaller's termination by Google.

14. Hence it appears Google dropped OkCaller's rankings after learning about his key role in antitrust litigation against Big Tech. It also appears Google knew about all of Dr. Isaacs'

prior, highly contested litigation. Google has not denied that these events were related to their terminating OkCaller's critical mass of users.

15. The day after the sudden termination of his professional affiliation with Google, Dr. Isaacs experienced significant, unexplained medical issues. With the financial insecurity from his sudden OkCaller career termination and Google's ongoing subversion of his IP, Google placed Dr. Isaacs under duress, and he placed his primary home for sale with Defendant Keller Williams. Dr. Isaacs signed a sale agreement with KW just two weeks after the loss of OkCaller, believing he would never have a career again due to never-ending witness retaliation.

## Current Status of Complex Litigation

16. Dr. Isaacs has been a witness to approximately twenty years of federal litigation. As he remarked in a Supreme Court petition, his "entire adult life" has been immersed in litigation. Public documents and legal pleadings surrounding this litigation approximate a hundred thousand pages. This has resulted in a "run-away train" effect where these pleadings are re-combined and misconstrued by an ever-expanding list of entities which now includes Google[2]. The net result, as Dr. Isaacs stated to the Ninth Circuit, is that he has become a neurosurgeon forced to learn complex litigation to defend his day-to-day livelihood and health.

17. Of the voluminous pleadings, they all pertain to two fundamental matters: 1) Dr. Isaacs' two-decade effort to obtain a uniform enforcement of a court-ordered federal settlement

---

[2] Google would not voluntarily agree to subpoena compliance limited to a twenty minute "credible explanation" about any OkCaller termination motive distinct from Isaacs' prior litigation.

agreement that acquitted, annulled, and sealed a controversy[3] in 2006, and 2) a four-year effort to invoke a unique theory he developed to prohibit Apple Inc from censoring free apps by tying iPhone devices to notary stamps and App Store usage.

18. In a related lawsuit, Google opposed the subpoena on the basis it improperly emphasizes "failed litigation" against Apple. That litigation is ongoing and Google's efforts to render perception of it as failed represents evidence of underlying retaliatory intent. Dr. Isaacs, after spending twenty years in multi-disciplinary complex litigation to enforce the acquittal, felt he could contribute his knowledge to the important public matter of Big Tech antitrust, which has also stalled enforcement for over a decade. His free app and tying theories – representing a pattern of a disabled person being denied valid access to the Courts – were laughed out of the Northern California District Court at Apple Inc and Gibson Dunn's request, purportedly "untethered" to economic reality.

19. But the reality is, Dr. Isaacs' Sherman Act theory was reasonable and threatened Apple as well as Google's duopoly business models.

20. Dr. Isaacs justifiably fears that in December 2022 his second career as a computer developer, was again blacklisted in violation of Section 1512, the same way his neurosurgery career had been wrongfully halted. Dr. Isaacs, with stellar medical credentials and absolutely no criminal record, has been prevented from practicing medicine, largely

---

[3] Dr. Isaacs' allegation in 2005 was essentially that NIH funds were misused to secure the admission of a problem student at a California medical school, and that Isaacs became entwined in an anti-Semitic bullying episode with the student and Deans, who had been awarded $40m in NIH funding from the student's father, an NIH director. He also alleged the NIH dean showed unusual interest in him and was biased in the entire matter; it is now undisputed that three USC medical deans in a row had improper relations with teenagers and students involving crack-cocaine, abuse of authority, and other aggravating factors. Realizing the improbability that someone in 2005 would believe that a major USC university permitted anti-Semitism, that NIH funds could be misused by elite Directors, or that a medical school dean had corrupt behavior, Isaacs settled the claim for a mere acquittal and annulment of his matriculation at the university. In short, if Google has retaliated against Isaacs for prior litigation, then it is on the basis of Isaacs' subjection to anti-Semitic and other prohibited conduct.

due to aforementioned legal pleadings being weaponized against him. That weaponization, Dr. Isaacs fears, spread to Google LLC around Thanksgiving 2022. As the subpoena instructions unequivocally state, Dr. Isaacs was in severe distress in the days and weeks following Google's adverse termination event.

21. Dr. Isaacs practiced his invention through intricate collaboration with Google. The compensation he received from them, in part, reflected payment of patent royalties. Upon their termination of OKCaller, Dr. Isaacs requested Google reimburse him directly for infringing conduct. Google refused to pay patent royalties owed to Isaacs. Hence this is not a patent case brought by a non-practicing entity; it is a case brought by a previously compensated inventor, who was potentially subjected to witness retaliation that resulted in total cessation of patent royalty payments by Google.

## VENUE

22. Venue in the United States District Court for the Southern District of Florida is proper under 28 U.S.C. § 1391(b) and 28 U.S.C. § 1400(b) for patent infringement cases. Defendant Google LLC ("Google") has committed acts of patent infringement within this district, including, but not limited to, offering for sale and selling infringing products and services to Florida citizens and maintaining a business presence. Google engaged directly with Plaintiff, for years, hosting meetings and events in Miami, Florida. Such activities demonstrate that Google LLC has a substantial and continuous presence within this district, making it a proper venue for this litigation.

23. Furthermore, considering Plaintiff Dr. Jeff Isaacs' documented disability, which has rendered him unable to fly for the past six years, pursuing litigation in this district would

impose significantly less hardship on Dr. Isaacs than requiring him to litigate in a more distant forum. The Southern District of Florida is the most convenient and appropriate venue for this matter, as it minimizes the logistical and health-related challenges Dr. Isaacs would face if forced to travel extensively

24. This Honorable Court has personal jurisdiction over Defendant Google LLC because Google engages in continuous and systematic business operations in the State of Florida and particularly within this district. Google's activities include, but are not limited to, selling apps and advertisements directly to Florida residents, and conducting business meetings and events in Miami, Florida, as evidenced by Google's invitations to Dr. Isaacs for meetings related to their business relationship. These activities constitute a substantial part of Google's business, thereby warranting the exercise of personal jurisdiction.

25. Additionally, Google's engagement in patent infringing activities that have affected Dr. Isaacs, a resident of this district, further supports the assertion of personal jurisdiction. Similarly, a Florida Corporation Greenflight Venture Corporation, has been impacted by non-payment of royalties. Google has derived substantial revenue from its interactions and transactions with Florida residents, including those activities directly related to the allegations contained within this complaint.

26. The combination of Google's targeted business activities within the State of Florida, its direct interactions with Dr. Isaacs within this jurisdiction, and the impacts of its alleged patent infringement on a Florida resident, collectively establish that exercising personal jurisdiction over Google LLC in the Southern District of Florida is fair, reasonable, and consistent with the principles of due process. Alternatively, Delaware would be the next-best forum under 28 U.S.C. § 1400(b).

## II.   **PARTIES**

27. Plaintiff Dr. Jeff Isaacs is a United States citizen. Dr. Isaacs is the sole inventor of the reissue patent. He holds a substantial percentage of ownership in the reissue patent. Dr. Isaacs developed the software for OKCaller.com, and owns the domain name rights and goodwill associated with the domain. Dr Jeffrey D. Isaacs is a Dartmouth-trained medical doctor (M.D) and computer scientist (A.B., *hons)*. Dr. Isaacs additionally holds an MBA in international studies from Wharton and INSEAD. At University of Pennsylvania's School of Engineering, he was a Benjamin Franklin Scholar. Before medical school, he matriculated at the Vanderbilt Law JD program for almost two years, where he had been awarded a full scholarship. Dr. Isaacs aspires to complete medical residency, should his health improve and blacklisting cease, having attained a 99/99 score above the average neurosurgeon on the USMLE National Medical Boards.

28. Defendant Google LLC is a limited liability company organized and existing under the laws of the State of Delaware, and is headquartered in Mountain View, California. Google is owned by Alphabet Inc., a publicly traded company incorporated and existing under the laws of the State of Delaware and headquartered in Mountain View, California. Google engages in, and its activities substantially affect, interstate trade and commerce. Google provides a range of products and services that are marketed, distributed, and offered to consumers throughout the United States, across state lines, and internationally. Today, Google is a monopoly gatekeeper of the internet, controlling around 95% of every query for information. The Department of Justice has filed at least two pending antitrust lawsuits against Google. As a result of its market power, Google is able to fully control how the majority of US customers look up phone numbers, by directing them to sites like OKCaller

or competitors. Google profits from these queries through advertisements on websites, and/or a 30% share of phone directory app purchase commissions.

### III.   FACTUAL HISTORY

29. The emergence of the reverse phone search industry largely coincided with the initial growth of Defendant Google's search engine monopoly in the early 2000s. Prior to internet search engine availability, it was simply impractical to look up a phone number to see the corresponding name of the owner. Phone companies offered rudimentary services such physical reverse phone books and operator assisted phone queries, but these were highly specialized and localized, and for the most part, not used by the general population. They also typically only referenced landline numbers. The first dedicated online internet-based reverse phone search engines also suffered such limitations, derived from landline data and limited public records.

30. As mobile phones overtook landlines, the consumer demand for reverse phone search grew exponentially. Most consumers did not subscribe to Caller Name ID, which presented the name of an individual who called them from a wireless or landline phone. Text messages, even for those who could afford Caller Name ID, often didn't implement the service, and still don't, to this day. As our culture shifted to online transactions on services like AirBnB, eBay, etc with strangers across the country – or the globe – knowing the identity of an incoming call or text message evolved from being a luxury convenience to a matter of safety.

31. Despite the need for such Caller Name ID, a complete void existed until 2013 whenever consumers would "Google someone" or "Google a number" to perform a reverse phone

search. But until 2013, a typical reverse search query on Google's engine was plagued with inaccuracy and subscription-service scams.[4] The results presented to an end-user searching for a phone number would be lists of "keyword stuffed" mathematics lists, such as prime numbers, random numbers, and Fibonacci number lists, masquerading as phone numbers, directing them to an affiliate subscription, or presenting them with a Google advertisement.

32. While Google doesn't publish the number of phone and people searches conducted on its general search engine, the numbers are significant. Upon information and belief, in Google's early days over 25% of internet searches were simply phone or people searches. Today these numbers may be similar. Google knowingly ranked phone search spam in its results, such as prime number lists, as a way to monetize a large part of its search queries. Hence Google's early profitability as they grew their monopoly was built, at least in large part, on exploiting phone and people searches to unsuspecting users.

33. In 2013, recognizing this problem, Dr. Isaacs developed a method and technique to bridge the telecommunications Caller Name ID system with the internet IP web protocols. In simple terms, Dr. Isaacs invented and patented "Web Caller Name ID," and has spent the last decade on a mission to make the invention free to users.

34. In 2014, Google sent Dr. Isaacs a letter informing him that he was one of a few strategic partner sites. For the better part of the past decade, Isaacs would be invited to annual Google events that would provide advice as to best-practices and suggested improvements to his website. Dr. Isaacs always followed Google's recommendations and was appreciative for their ongoing assistance in making free Web Caller-ID a reality.

---

[4] In fact, this industry pioneered internet subscriptions, which are, of course, now commonplace.

35. In 2022, Dr. Isaacs served as a witness in an antitrust proceeding against Apple Computer. In that proceeding, he asserted that his Web Caller Name ID invention had yielded at least $100million in economic savings.[5]

36. Later in 2022, for undisclosed reasons, Google entirely removed Dr. Isaacs' Web Caller Name ID from their search index. His previous contacts, who for a decade were happy to provide Dr. Isaacs with consultation, suddenly went silent. Similarly, no meaningful response was to be found on the Webmaster Forum, which had previously garnered a response from Google Executive Mr. Mueller worthy of news coverage by a major SEO blog.

37. OkCaller.com had been consistently ranked as a top provider in its field by web analysis firms such as SimilarWeb and Alexa. His reverse phone search services platform ranked in the top few thousand websites in the United States. The platform ranked first among small-medium publishers; only Whitepages, Spokeo, and several other large corporations ranked higher.

38. Plaintiff's search platform was efficient to consumers. Plaintiff spent a decade trying to ensure his Caller Name ID technology was offered free to end-users. Google recognized the novel value and directed a significant share of their search traffic to Plaintiff's platform.

39. When Dr. Isaacs first submitted Web Caller Name ID to Google, the company flagged it as spam. Trying several different improvements, the Defendant repeatedly accused Dr. Isaacs of "keyword stuffing," when in fact, he had a website that was a *solution* to keyword stuffing. He submitted a question to Google's "Webmaster Forum," which eventually

---

[5] Dr. Isaacs' service was the top-ranked reverse phone app on Apple's App Store for from 2013-2017, which is the subject of that proceeding.

attracted the attention of Senior Executive Mueller. Mueller advised Isaacs to keep working on the interface, and that eventually, he would gain a userbase of organic Google traffic.

40. In fact, the reason the site was flagged as SPAM was because Plaintiff took measures to ensure the safe use of Caller ID data. That meant he didn't allow Google bots to cache the "Caller Name ID," but only the phone number. That meant Google saw large lists of phone numbers, without associated data, and incorrectly assumed it was SPAM.

41. Google eventually realized that OkCaller was not spamming them, but in fact, was trying to ethically and safely implement web caller ID.

42. Copycats weren't so careful, and allowed name search of Caller Name ID to phone numbers. These sites violate the intent and spirit and literal statute of "Daniel's Law" and other phone safety regulations. Were Google to block infringing websites, the web would be safer and there would be fewer "Daniel's Law" violations. That is because Plaintiff would only license Web Caller ID to sites that shared opt-out information, and that didn't publish Caller Name ID's on SERPs for forward-lookup.

43. In other words, enforcement of the '847 patent is a matter of public safety and in the interest of public policy. It would ensure that a large source of phone data (Caller ID PSTN databases) is used responsibly, with no forward-lookup, and coordinated opt-out. Google's decision to subvert the patent holder is flagrantly in violation of Daniel's Law and other public policy.

44. The other major source of phone ownership data is credit bureau records. Those are regulated by the credit bureaus for responsible use. Google (and Apple's) failure to recognize the '847 patent, for retaliatory reasons, ultimately harms the public and must be enjoined by this lawsuit.

45. As Google recognized with Mr. Mueller's assistance, pairing Web Caller Name ID with user-vetted Spam reports provided a powerful combination. In one single screen, an end-user could see the name associated with a phone number, and submit or view crowdsourced reports pertaining to that number. Google recognized the potential of this novel combination as well, and the critical mass necessary to make its implementation successful. Almost overnight, Dr. Isaacs' reverse search service went from zero to approximately a half million user sessions a day.

46. The success of the site was immediately noted and emulated literally around the web. Within a year, dozens of phone websites all utilized the simple "Safe" and "Not Safe" user interface Dr. Isaacs pioneered as "SafeCaller" adjacent to the Web Caller Name ID. Effectively, Dr. Isaacs set a user interface standard for phone search that replaced the prime number and Fibonacci number sites, which largely disappeared within a year. The "look and feel" of the SafeCaller interface remains, to this day, a common interface standard for reverse phone search.

47. Nonetheless, Google has increasingly desired to fragment reverse search, and there are antitrust concerns that may be ascertained during discovery. Around 2017, a near-identical copycat of Plaintiff's platform was awarded almost half of Plaintiff's pre-2017 traffic. Plaintiff notified Google of the matter in 2017 but never regained the pre-2017 traffic level. Nonetheless, Google kept OkCaller in a competitive position that was valuable and reflected ongoing recognition of the patent validity and royalties owed.

48. Plaintiff tried to improve his platform over the years, but was never awarded increased traffic despite significant investments in platform improvement. For example, Plaintiff developed a global reverse phone search platform with significant international

telecommunication standards capability. Google awarded the international version effectively zero traffic.

49. Similarly, OkCaller was limited in improvement capability by Defendant Google. Google requested he transition his website to AMP technology, which Google had strategic interests in as a developer of AMP. Plaintiff did so, which meant foregoing other tools like Javascript to add functionality he had invested for the international version. In short, Plaintiff sought to innovate phone search, but his new platforms were ignored by Google. Ongoing fragmentation from domestic and international copycats often presented fake Caller-Name data and had generally low quality control and risked public safety.

50. Plaintiff's reverse search services platform nonetheless maintained significant market share on Google until Thanksgiving Eve 2022. The service was effectively shut down by Google with no warning or explanation, and for no good reason, but for Defendant's anti-competitive and/or retaliatory motives. The platform stills maintains high rankings on Bing, Yahoo, DuckDuckGo, and others, but this is insufficient traffic to maintain ongoing operations going forward.

51. Google removed millions and millions of the platform's pages of Caller Name IDs and Spam reports from their rankings. In other words, they were not merely lowered in rankings; they were removed from the index and censored for undisclosed reasons.

**The Reissue '847 Patent Facts**

52. On October 14, 2014, the United States Patent and Trademark Office ("USPTO") duly and legally issued U.S. Patent No. 8,861,698 ("'698 Patent"), entitled "Post-Page Caller Name Identification System." That patent overcame substantial litigation in the Federal Circuit

and years of scrutiny by the USPTO, to resolve a common obstacle for software patents – *Alice* non-abstraction. The patent reissued on December 7, 2021 as Reissue Patent #48,847.

53. Plaintiff is the inventor and possesses majority ownership of the US Reissue Patent #48,847 directly and/or through corporate entities that he controls. The patented technology allows a mobile phone user to identify the name associated with a particular phone number through a reverse lookup. But unlike reverse phone lookup internet technology available prior to the invention, the '847 technology connects an internet search to phone carrier databases on the Public Switched Telephone Network (PSTN), to identify caller name information.

54. The '847 Reissue Patent is currently in full force and effect and is entitled to a presumption of validity under the law.

55. As an owner, Plaintiff has majority rights, title, and interest in the '847 Patent, including the right to sue for past, present, and future infringement of that patent.

56. The '847 Patent describes and claims a novel convergence of two telephone network related technologies, namely SS7 Caller Name ID ("CNAM"), and internet based reverse telephone number search.

57. Originally, the Baby Bells disbursed paper phone books to each landline customer, which served as the primary mode of looking up a phone number by the customer's name. In the 1980s, telephone companies began offering caller ID as an add-on feature for a landline telephone subscription. Caller ID was supported by CNAM, which at that time was reaching widespread use by the carries. CNAM allowed a carrier to determine the name of the calling party and display that to the called party for calls between landline phones. Prior to that time, a called party generally had no way to trace the name of a caller; calls

were anonymous.  CNAMs were stored in a relatively small number of databases managed by the Baby Bell companies.

58. Upon information and belief, in 1997, the largest competing reverse phone services copied the Baby Bell phonebooks onto their internet searchable database.  This had the effect of allowing reverse telephone number lookups via the internet by entering a phone number to search for its owner, without adding a "Caller ID" feature to a telephone subscription.  The limitation of this method, of course, was that it only included listed numbers for landlines contained in public telephone books, and did not include cell phone numbers.  It also relied on data from a single snapshot of time, and could not account for new telephone numbers or changed numbers as those additions or changes occurred.  The reverse search competitors charged for the service.  Over time, they added other data sources to its database of information, to expand its reverse phone lookup service, but what it lacked was access to a large swath of cell phone numbers and associated names.

59. Although mobile phones, and particularly smart phone technology, have proliferated in the last two decades, cell phone Caller ID technology did not, presumably because CNAM was based on the Public Switched Telephone Network (PSTN).  As a result, many mobile phones today will display "UNKNOWN CALLER", or a city name e.g., "W PALM BEACH" instead of the name of the person who owns the account for the calling number. In short, despite great advances in the past decade or so related to mobile phone technology, Caller Name ID was often left behind. Text messages almost never, to this day, contain CNAM information.

60. The lack of CNAM information on mobile phones created a less than ideal situation for the average consumer.  Mobile phone owners often do not know who is calling them, and as

noted, reverse search technology of copying phone books onto the internet suffered from the drawback of lacking mobile phone numbers.

61. As part of its mission and terms, OkCaller.com asserts that people have a right to know who is communicating with them. OkCaller calls this "Natural Identity Law" or just "Natural Law," and is akin to natural identifiers such as voice, facial/physical features, and so forth. OkCaller hence operates under stringent ethical, moral and legal foundations for safety. Natural law is particularly relevant in this early era of Artificial Intelligence, where it will become increasingly difficult to ascertain the identity of incoming communications.

62. As discussed earlier, for nearly a decade after Google's search engine launched, a large volume of search queries went to mathematical number lists, which were affiliate links to Whitepages, Spokeo, and others. In short, the '847 technique was non-obvious as a great demand for billions and billions of mobile phone number queries went unmet for a decade, until Plaintiff launched his reverse phone search services. This left reverse phone search users with little recourse for mobile telephone numbers. They responded by introducing expensive "upcharge" subscriptions to access credit report files, which include most phone numbers. The customer of such service typically agrees (whether they mean to or not) to a recurring monthly subscription of approximately $19/month.

63. In 2013, Dr Isaacs conceived of and invented a free technology that bridged the gap between CNAM and internet reverse search. He filed for and obtained a patent on his invention which is known as the Post Page Caller Name Identification System. It is described and claimed in the '847 Patent. In particular, the '847 Patent describes a system and method in which a user can input a telephone number into a webpage or mobile phone app, separate and apart from its phone carrier, and return name information associated with

the queried phone number. To accomplish this in practice, the patent licensee uses an SS7 query to a CNAM database in real time to obtain the caller name information. Hence two discrete and independent systems were linked in a novel way (the SS7 infrastructure and the TCP/IP internet) producing novel value to users. Plaintiff was the first to implement this technology, and OkCaller remains the leading example of a safe and responsible Web Caller ID directory.

64. In addition to obtaining patent protection the inventor set about to create the computer code required to make his invention work. He worked with third parties to gain access to SS7 CNAM, and with Apple, Google, and other App providers to ensure that his App was not only successful, but was implemented to protect the privacy of users and enhance their experience.

65. Hence in 2014, when it debuted, OkCaller received around a quarter million users each day. No other Web Caller ID system had anywhere close to this usage level for years to follow.

66. The inventor released his "Caller-ID" app onto the Apple iTunes App Store in the summer of 2013. The app had over ten thousand positive user reviews; representative reviews include "finally, a phone search that didn't ask for my credit card number," "the only one that works," "why wasn't this invented ten years ago" and so forth. The app was free, instead generating revenue through advertising rather than direct user payments. As a result, hundreds of millions of users avoided $19 subscriptions and obtained free caller name ID. The invention created by Dr Isaacs and specified in the '847 patent resulted in approximately $100 million in savings to the national economy. It was years ahead of its time in seeking to reduce costly subscriptions and protect public safety.

67. Over the last decade since the original patent was issued, paid services like Spokeo and Whitepages and many copycat infringers gradually implemented CNAM as part of their service offering, which had historically used credit bureau information and other public records. Google is the merchant of record for many of these apps on Google Play store. Google LLC allowed multiple competing apps on the Play Store to infringe the patent. Similarly Google LLC allows infringing websites to run Google Ads, thereby knowingly profiting from active infringement.

68. Plaintiff has informed Google LLC that such infringement takes place. The email address he informed this to notified Plaintiff they "were sorry for any inconvenience" and has since stopped responding to Plaintiff.

69. Upon information and belief, Google, de-ranked the inventor's website– the only licensee of the '847 patent to this date to self-preference their own infringing apps and related search and display advertising.

70. Numerous apps on the Google Play Store now infringe the patent.  In particular, these apps are a mobile phone application and system that functions independently of the called party's carrier and device.  A user inputs a phone number into an entry field, which could come from any device, to determine who called from that number.  When a result is found in a carrier's CNAM database, the infringing apps return a Caller Name result, identifying the name associated with the queried number.  Upon information and belief, the Caller Name result in the infringing Google Play Apps may use extra steps like caching but ultimately return CNAM database rows accessed by SS7, including an SS7 interfacing node.  In some cases, a more detailed CNAM result is obtained using LIDB, which is still an infringing behavior.

71. Upon information and belief, Defendant directly infringes the '847 patent by directly selling infringing apps to consumers, as they are merchant of record for nearly all Android apps. Upon information and belief, Google's system includes a third-party CNAM query to return the calling party name requested by the user, which is implemented, used, and operated at and under Defendant's direction and control.

72. Upon information and belief, Google also induces its users to infringe at least Claims 7 & 8 of the '847 patent. In particular, Google provides the complete system for reverse phone lookup via an SS7 CNAM query to users, as described above, who place that system into use when they enter a phone number to query. Google induces infringement through a variety of anticompetitive behaviors, including pay-for-play ranking and encouraging Adwords/Ads expenditure in exchange for organic search referrals.

73. Google has alternatively infringed contributorily by providing to users a system for reverse phone lookups, described above, that has no non-infringing uses.


## IV.   VIOLATIONS ALLEGED

### COUNT I
### *35 U.S.C. § 271 PATENT INFRINGEMENT*

74. Plaintiff repeats and re-alleges each and every allegation contained herein as if fully stated under this count.

75. Google LLC has directly infringed Claims 1-10 of the '847 patent, and contributorily infringed and induced others to infringe at Claims 1-10 of the '847 Patent by making, having made, importing, using, offering for sale, and/or selling apps on the Google Play Store that are performing, implementing, and carrying out, processes and methods specified in the patent, in violation of 35 U.S.C. § 271(a), (b) and (c).

76. Indirectly, Google accepts payments for search texts ads of infringing apps and websites, and then preferences those infringing products above Plaintiff's own apps and websites. Such profiting from known infringement constitutes infringement under this statute.

77. On information and belief, Google's infringement is willful. Defendant has been made aware of the reissue patent issuance, and the underlying infringement claims, but still publishes infringing apps. In fact, Google appears to have further retaliated against the inventor for asserting patent rights, which will be elucidated in discovery and may necessitate amendment of this Complaint.

78. Plaintiff has been irreparably harmed by Defendant's acts of infringement of Claims 1-10 of the '847 Patent, and will continue to be harmed unless and until these acts of infringement are enjoined and restrained by order of this Court. Plaintiff has no other adequate remedy at law to redress Google's continuing acts of infringement. Upon information and belief, the hardships that would be imposed upon Google by an injunction are less than those faced by Plaintiff should an injunction not issue. Furthermore, the public interest would be served by issuance of an injunction. Accordingly, Plaintiff is entitled to permanent injunctive relief against such infringement pursuant to 35 U.S.C. § 283.

79. As a result of Google's acts of infringement, Plaintiff has suffered and will continue to suffer damages. Plaintiff is entitled to compensation for such damages pursuant to 35 U.S.C. § 284 in an amount to be determined at trial, estimated to exceed $50 million USD before treble damages.

WHEREFORE, The Plaintiff respectfully requests that this Honorable Court:

A. Permit trial by jury for all claims herein.

B. Issue a finding that Google LLC has infringed literally and/or under the doctrine of equivalents, Claims 1-10 of the '847 Patent;

C. Issue a finding that Google's infringement has been willful;

D. Issue a permanent injunction that Google be permanently enjoined from making, using, offering for sale, selling, profiting from advertising on infringing websites, causing to sell, importing, exporting, supplying and/or distributing within, to and/or from the United States, or over the internet or on any app, any software infringing upon the '847 patent;

E. Awarded pre-judgment interest and post-judgment interest at the maximum rate allowed by law, including an award of pre-judgment interest, pursuant to 35 U.S.C. § 284, from the date of each act of infringement of Claims 1-10 of the '847 Patent to the day a damages judgment is entered, and a further award of post-judgment interest, pursuant to 28 U.S.C. § 1961, continuing until such judgment is paid, at the maximum rate allowed by law;

F. Order an accounting for damages through judgment and post-judgment until Google is permanently enjoined from further infringing activities;

G. That the Court award enhanced damages pursuant to 35 U.S.C. § 284; the Court award supplemental damages for any continuing post-verdict infringement up until Google is permanently enjoined from further infringing activities; That the Court award a compulsory future royalty in the event an injunction is not awarded.

H. Grant any further relief as may be fair and just.

Respectfully submitted, this 31st day of March 2024.

Jeffrey D. Isaacs, M.D.
11482 Key Deer Circle
Wellington, FL 33449
212-257-0737
jeffreydi@gmail.com