**EXHIBIT A**



US00RE48847E

## (19) United States
## (12) Reissued Patent
Isaacs

(10) Patent Number: **US RE48,847 E**
(45) Date of Reissued Patent: Dec. 7, 2021

(54) **POST-PAGE CALLER NAME IDENTIFICATION SYSTEM**

(71) Applicant: **Greenflight Venture Corporation,** West Palm Beach, FL (US)

(72) Inventor: **Jeffrey D. Isaacs**, Fort Washington, PA (US)

(21) Appl. No.: **15/289,905**

(22) Filed: **Oct. 10, 2016**

### Related U.S. Patent Documents
Reissue of:
(64) Patent No.: **8,861,698**
   Issued: **Oct. 14, 2014**
   Appl. No.: **14/174,724**
   Filed: **Feb. 6, 2014**

(51) Int. Cl.
   H04M 1/56   (2006.01)
   H04M 15/06  (2006.01)
   H04M 7/00   (2006.01)
   H04M 3/42   (2006.01)

(52) U.S. Cl.
   CPC ..... **H04M 7/0033** (2013.01); **H04M 3/42042** (2013.01); **H04M 2201/38** (2013.01)

(58) Field of Classification Search
   CPC ......... H04M 3/42059; H04M 3/42042; H04M 7/0033; H04M 2201/38
   USPC ................................ 379/142.1, 142.15
   See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,457,738 A * | 10/1995 | Sylvan | | 379/93.23 |
| 5,903,636 A * | 5/1999 | Malik | | H04M 3/42042 |
| | | | | 379/142.01 |
| 6,782,086 B2 * | 8/2004 | Clapper | | H04M 1/575 |
| | | | | 379/142.06 |
| 6,954,526 B1 * | 10/2005 | Glenn | | H04Q 3/0025 |
| | | | | 379/207.15 |
| 7,308,408 B1 * | 12/2007 | Stifelman | | G10L 15/22 |
| | | | | 704/266 |
| 7,839,987 B1 * | 11/2010 | Kirchhoff | | H04M 1/575 |
| | | | | 379/142.02 |
| 8,155,287 B2 * | 4/2012 | Woodring | | H04M 3/42 |
| | | | | 379/142.05 |
| 8,358,766 B1 * | 1/2013 | Denenberg | | H04M 3/42042 |
| | | | | 379/201.01 |
| 8,447,285 B1 * | 5/2013 | Bladon | | H04M 3/53341 |
| | | | | 455/414.4 |
| 8,625,762 B1 * | 1/2014 | White et al. | | 379/142.06 |

(Continued)

OTHER PUBLICATIONS

Kessler, "In Apps For Mobile Advertising, Brands Pay You To Listen" fastcompany.com, Sarah Kessler, Aug. 15, 2013, (pp. 1-10) (Hereinafter Kessler).*

3:16-cv-00175-RS *Greenflight Venture Corporation et al. v. Whitepages, Inc. et.*, "Order Granting Defendant's Motion for Judgment on the Pleadings," issued on Jul. 25, 2016.

(Continued)

*Primary Examiner* — Ovidio Escalante
(74) *Attorney, Agent, or Firm* — Edward C. Kwok; VLP Law Group, LLP

(57) **ABSTRACT**

Caller Name Identification, or CNAM Caller ID, is a telecommunication end-user feature that appeared for PSTN landline customers in the late 1980s. The rapid development of cellular mobile and VOIP telephony systems lead to the frequent omission of the CNAM Caller ID feature. Described is an independent end-user system that obtains the CNAM Caller ID after the call page transmission. The system operates on the user's smartphone or on a TCP/IP connected computer. A user with multiple telephone devices (i.e. a smartphone, landline, and VOIP line) may share use of this system between all devices.

**4 Claims, 4 Drawing Sheets**



(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 8,644,470 | B2* | 2/2014 | Gosselin | H04M 3/42042 379/142.06 |
| 8,699,682 | B2* | 4/2014 | Nguyen | H04Q 3/0016 379/114.03 |
| 9,641,663 | B2* | 5/2017 | Rincon | H04M 1/72561 |
| 2002/0099720 | A1* | 7/2002 | Bansal | 707/104.1 |
| 2008/0037764 | A1* | 2/2008 | Lee | H04M 3/12 379/266.01 |
| 2008/0052372 | A1* | 2/2008 | Weber | G06F 16/58 709/217 |
| 2008/0147771 | A1* | 6/2008 | Bertolino | 709/201 |
| 2008/0222144 | A1* | 9/2008 | Backer et al. | 707/5 |
| 2008/0240383 | A1* | 10/2008 | Fronczak et al. | 379/88.19 |
| 2009/0158367 | A1* | 6/2009 | Myers | H04N 21/25833 725/109 |
| 2009/0257575 | A1* | 10/2009 | Gosselin | H04M 3/42042 379/142.06 |
| 2009/0328118 | A1* | 12/2009 | Ravishankar et al. | 725/106 |
| 2010/0254524 | A1* | 10/2010 | Kim | H04Q 3/76 379/201.02 |
| 2011/0013755 | A1* | 1/2011 | Martino | H04M 1/578 379/88.2 |
| 2011/0081911 | A1* | 4/2011 | Silver | H04M 5/12 455/445 |
| 2013/0287196 | A1* | 10/2013 | Zerillo | 379/142.06 |

OTHER PUBLICATIONS

3:16-cv-00175-RS *Greenflight Venture Corporation et al. v. Whitepages, Inc. et.*, "Order Denying Applicant's Motion For Reconsideration," issued on Aug. 16, 2016.
Zhang, "The Line Information Database (LIDB) and Wireless Services," Telcordia Technologies, Inc., White Paper Analysis, Dec. 2001.
"OSSGR Section 22.3: Line Information Database," Telcordia, Apr. 2009, Issue 8 (GR-1158).
3:16-cv-00175-RS *Greenflight Venture Corporation et al. v. Whitepages, Inc. et.*, "Defendant Whitepages, Inc.'s Reply in Support of Its Motion for Judgment on the Pleadings of Invalidity under 35 USC 101," filed on Jun. 13, 2016.
3:16-cv-00175-RS *Greenflight Venture Corporation et al. v. Whitepages, Inc. et.*, "Whitepages, Inc.'s Opposition to Defendants' Motion for Reconsideration," filed on Aug. 9, 2016.
3:16-cv-00175-RS *Greenflight Venture Corporation et al. v. Whitepages, Inc. et.*, "Defendant Whitepages, Inc.'s Notice of Motion and Motion for Judgment on the Pleadings of Invalidity under 35 USC 101," filed on May 23, 2016.
3:16-cv-00175-RS *Greenflight Venture Corporation et al. v. Whitepages, Inc. et.*, "Defendants Greenflight Venture Corporation and Jeffrey Isaacs' Opposition to Motion for Judgment on the Pleadings of Invalidity under 35 USC 101," filed on Jun. 6, 2016.
3:16-cv-00175-RS *Greenflight Venture Corporation et al. v. Whitepages, Inc. et.*, "Defendants' Notice of Motion and Motion for Leave to File Motion for Reconsideration," filed on Jul. 29, 2016.

* cited by examiner



FIG. 1A -Prior Art-

SS7 call provisioning to CNAM Caller ID landline phone

FIG. 1B -Prior Art-

SS7 call provisioning to non-CNAM Caller ID mobile phone

FIG. 1C -Prior Art-

SS7 call provisioning to non-CNAM Caller ID VOIP phone

FIG. 2



FIG. 3

Start
Called party receives calling party CID (phone number) on phone without CNAM Caller ID functionality
100
Called party enters CID into the CID entry interface
101
The CID is checked against the system opt-out database
102
An SS7 session is initated if not already open
103
A Global Title Translation is performed via SS7 to locate the calling party's carrier CNAM database, if not known
104
An SS7 query containing the CID is sent via GR-1188 or equivalent to the CNAM database
105
The calling party's CNAM is returned to the SS7 requesting session
106
The CNAM information is presented to the user
107
End



Fig. 4



# POST-PAGE CALLER NAME IDENTIFICATION SYSTEM

Matter enclosed in heavy brackets [ ] appears in the original patent but forms no part of this reissue specification; matter printed in italics indicates the additions made by reissue; a claim printed with strikethrough indicates that the claim was canceled, disclaimed, or held invalid by a prior post-patent action or proceeding.

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates generally to caller identification systems. More specifically, it relates to a post-page caller name identification system that bridges SS7 retrievable caller data with a user-accessible IP interface. Carrier implementation of caller name identification has become increasingly complicated due to the fragmentation of service providers on the North American Public-Switched Telephone Network (PSTN). The present invention restores functionality of this important SS7/PSTN capability, caller name identification, to the increasing number of telecommunications end-users left without this feature.

2. Description of the Prior Art

To place a call using the earliest long-distance telephone systems, a calling party initiated a request with the local switchboard operator. The calling party's local operator would connect to the inward operator, and specify the called party. The inward operator would identify the calling party to the called party, then coordinate the completed telephone circuit with the originating local operator.

Direct dial systems using automated protocols over the Public Switched Telephone Network eventually phased out the operator switchboard system by the 1960's. Unlike the system utilizing human operators, the direct dial networks did not readily identify the calling party to the called party. The relative anonymity of automated PSTN systems created both inconvenience and the potential for abuse. The invention of what became known as caller identification addressed these shortfalls. Between 1969 and 1975, Mr. Theodore Paraskevakos successfully claimed twenty separate patents related to automatic telephone line identification. By 1989, Bell Atlantic, BellSouth, and U.S. West Communications had implemented caller identification in their consumer service offerings.

Caller identification, or Caller ID, may colloquially refer to the presentation of either the calling party's telephone number, or name, to the called party. The initial caller identification systems transmitted only the calling party's phone number to the called party. By their rollout in the late 1980's, or shortly thereafter, the "Baby Bell" Caller ID service offerings typically included both CID and CNAM functionality. These services grew in popularity, with tens of millions of subscribers by the late 1990's. For this specification, caller identification, or CID, refers to the presentation of the calling party's phone number to the called party. Caller name identification, or CNAM Caller ID, shall refer to the presentation of the calling party's name to the called party.

The technical protocols for Caller ID evolved since Mr. Paraskevakos' invention, to what is now industry-standard implementation over the PSTN SS7 network. Despite the standardization of the protocol, telephone line portability deregulation significantly increased the complexity and cost of a CNAM Caller ID query. CNAM information previously held in a few databases of the Baby Bells increased to hundreds, if not thousands, of databases operated by the emerging telephone companies.

At the time of filing, a complete CID & CNAM Caller ID query typically involved the following steps: 1) the CID is transmitted from the calling party to the called party during SS7 call circuit provisioning (the network "page"), 2) a Global Title Translation (GTT) is initiated from the called party's SS7 signaling transfer point (STP) to determine which CNAM database and telephone carrier represents the calling party CID, 3) a GR-1188 CNAM query is relayed via SS7 to the service control point (SCP) for the respective CNAM database, and 4) the GR-1188 CNAM query result is presented to the called party. The exact sequence of events may vary depending upon the called and calling party's intercarrier agreements and SS7 implementation. Characteristic of the prior art implementations, the entire sequence of events takes place during the ringing or network page, and prior to the call completion.

As mobile phones and voice-over-IP telephony (VOIP) proliferated over the past decade, many providers never implemented full CNAM Caller ID to their mobile or VOIP end-users. Those that did implement CNAM Caller ID usually charge a monthly fee for CNAM Caller ID. For example, a major American wireless carrier recently began offering "Caller Name ID" as a premium monthly feature. Furthermore, individuals now may own several phone numbers, including a home land-line, a personal cellular mobile, and a VOIP line at work. Subscribing to a monthly CNAM service on multiple lines, if the feature is even available, is costly. As a result, CNAM Caller ID prevalence is trending backwards.

## SUMMARY OF THE INVENTION

In view of the foregoing limitations inherent in the known types of caller identification systems present in the prior art, the present invention provides a post-page caller name identification system. This standalone system may function for multiple telephone devices owned or operated by the end-user. The system is independent of the end-user's carrier implementation (or lack thereof) of CNAM Caller ID.

The utility of the present invention, which shall be described subsequently in greater detail, is to identify the calling party's name when only the CID is known. This is typically the case with most modern cellular mobile and VOIP systems. The present invention's post-page functionality complements the prior art. In an ideal telephony network, CNAM Caller ID would be transmitted during the page, or ring. As described above, CNAM implementation has been declining for a decade due to increasing complexity of carriers. This necessitates the present invention as the next-best solution for an end-user wishing to identify a calling party.

To attain this, the present invention comprises a system that interfaces the user directly with the calling party's SS7 SCP-connected CNAM database. After a call or page terminates, the user accesses the present invention via the user terminal, which may operate on a mobile phone application or via direct HTML web access. The user inputs the CID information relayed from the calling party to the end-user. The system then performs a Global Title Translation (GTT) query using its SS7 node. The GTT lookup returns the respective phone carrier and CNAM database applicable to the CID. The system then performs a GR-1188 CNAM query via SS7 to the service control point (SCP) for the

respective CNAM database. Finally, the CNAM query result is presented on the user-interface.

By utilizing the present invention, the end-user consolidates CNAM services and enjoys significant cost savings. At time of filing, a commercial implementation of the present invention was offered free-of-charge to the user via either a smartphone applications or direct web access. As stated above, the CNAM functionality offered by the present invention is often unavailable, even as a premium service, on many VOIP and cellular carriers.

The calling party may opt-out from this process at three points. First, the calling party may opt-out from CID transmission on a per-call basis, which is typically known as "*67 Caller ID Block." Second, the calling party may inform his/her carrier to remove his information from their CNAM database. Third, the calling party may opt-out using a form implemented on the privacy policy page of the present invention.

BRIEF DESCRIPTION OF THE DRAWINGS

Features of the exemplary implementations of the invention will become apparent from the description, the claims, and the drawings in which:

FIG. 1 identified as subparts 1A, 1B, & 1C, represents three typical variations of the caller identification prior art;

FIG. 2 is a graphical depiction of the core system components and their interactions;

FIG. 3 is a flow diagram enumerating each possible step the system performs to process a user query for caller name identification; and

FIG. 4 depicts two additional embodiments of the user interface.

DETAILED DESCRIPTION

From FIG. 1, three scenarios are identified which represent the current prior art of caller identification systems. Scenario 1A represents the ideal provisioning of a call where the called party receives both the name and phone number of the calling. In this case, the CID and CNAM are 617-555-1212 and "Smith, Robert," respectively. Scenario 1B, the middle illustration, only provides the calling party phone number. This scenario is typical of most cellular mobile carriers. In lieu of the CNAM, the cellular carrier will approximate the location of the calling party, although this is frequently subject to error. Scenario 1C, illustrated at the bottom of FIG. 1, depicts a typical VOIP caller identification presentation, which only includes the calling party number (CID).

Having understood the possible combinations of CID and/or CNAM presentations possible on a caller identification system, FIG. 2 embodies the components of the present invention utilized in the context of the scenario depicted in FIG. 1B. The calling party has placed a call (1) over the PSTN, and the carrier has provisioned for the CID and estimated location to be presented on the end-user's telephone screen (2) during the network page.

The end-user initiates use of the system by accessing the user terminal. The user enters the CID from (2) into the CID entry field (3) of the user terminal. After entering a valid CID, the user (4) submits the query to the system. The system then initiates the "CNAM database query" (5) via the SS7 network.

There exist several methodologies to obtain a CNAM database result via SS7, and the exact implementation depends upon the calling party's carrier, the system's carrier,

and any contractual relationships between the two carriers. Exemplified in FIG. 2, and most typical, the system performs a Global Title Translation (6) using various Line Information Databases (LIDBs) to determine the calling party's carrier. In some cases, the system will already know the calling party's carrier (e.g. if they are the same as the called party), and this step will be unnecessary. Once the carrier is known, the system is able to route a CNAM query using GR-1188 (7) to the appropriate SS7 signal control point (SCP). The SCP controls CNAM database access for a given phone carrier. For the purposes of this invention, the entire process is referred to as "CNAM Database Query" (5) and refers to any of the proper SS7 methods to retrieve CNAM information.

Upon successful CNAM database query, the CNAM Caller ID is relayed back to the user terminal. The caller name identification is displayed on the appropriate user interface element, thereby completing the process.

FIG. 3 serves as a flow diagram enumerating all possible steps for the system, as embodied, to carry out its function. The utilization of this system commences upon end-user receipt of a CID page (100). The user then activates the system by entering the page CID into the CID entry interface (101). Before the system proceeds, it first validates that the CID is not listed within the system's opt-out privacy database (102). At this stage, the system may also ask the user to confirm the CID had been transmitted to a telephone device they own or operate.

The system then instructs the SS7 interfacing node to initiate an SS7 session, if one is not already active (103). The exact state or instructions relayed to the SS7 switch/node varies depending upon carrier implementation. Once the SS7 session is active, a Global Title Translation (GTT) is performed using the CID from the CID entry interface. (104). The GTT returns the calling party carrier information necessary to locate the carrier's CNAM database on the SS7 network. A query is thereafter sent, usually via the GR-1188 protocol, to the signal control point (SCP) for the calling carrier CNAM database (105). Assuming the calling party didn't opt-out from its carrier CNAM database, the calling party's CNAM is returned to the system's SS7 node (106). Then, the CNAM database query result is displayed on the user interface (107).

FIG. 4 depicts additional embodiments of the system relating to its user interface. In this illustration, the system's SS7 interface (200) is physically separated from its user interface. The user interface is implemented on either another computer linked via the TCP/IP (204), or the end-user's telephone that received the initial call page (203). The SS7 interface communicates (201 or 202) with the user interface via an industry standard API protocol such as JSON.

I claim:

[1. A system, functioning independently of a called party's telephone carrier and device, provides a calling party's CNAM after entry of the calling party's telephone number CID, comprising:

a) an entry field, within a HTML web or mobile phone application, permitting the called party to input a query, post-page, specifying the CID;

b) an SS7 interfacing node permitting real-time access to the SS7 network;

c) a function serving as a direct interface between the called party's query and the calling party carrier's respective CNAM database;

d) within the HTML web or mobile phone application, a display of the successfully queried calling party CNAM.]

[2. The system of claim 1, wherein the web or mobile phone application provides free-of-charge CNAM resolution for any of the end-user's multiple telephony devices, thereby permitting cost-savings.]

[3. The system of claim 1, wherein the called party enjoys significant cost savings and free-of-charge CNAM querying through an advertising display within the user interface.]

[4. The system of claim 1, wherein component function (c) additionally:
  confirms that the CID is not subject to system opt-out privacy controls; and
  confirms that the CID paged a telephonic device owned or operated by the called party.]

[5. A method for providing a called party with the calling party's CNAM after a network page, independent of interaction with the carrier or device receiving the page, comprising the following steps:
  a) entering of the calling party's telephone number CID into a web HTML or mobile phone application query field;
  b) connecting to the PSTN via an SS7 interfacing node;
  c) directly querying the calling party carrier CNAM database with the CID query entry;
  d) displaying the successfully queried calling party CNAM on the HTML web or mobile phone application user interface.]

[6. The method of claim 5, further comprising a step to display advertising sponsorship on the web or mobile phone application interface, thereby achieving significant user cost savings and free-of-charge CNAM querying.]

7. An SS7 interfacing node connected to both a TCP/IP network and an SS7 communication network, comprising:
  a TCP/IP network interface configured to provide a connection to a user terminal, the connection being configurable over an application program interface (API) using an industry standard protocol; and
  an SS7 communication network interface configured to communicate with signal control points (SCPs) on the SS7 communication network;
  wherein the SS7 interfacing node is configured (a) to receive from the user terminal over the TCP/IP network interface a query of a caller name identification (CNAM) database for a CNAM based on a telephone number obtained from a paging signal of an SS7 call, (b) to transmit the telephone number in a carrier identity request over the SS7 communication network interface to one or more line information databases (LIDBs); (c) to receive a carrier identity from the LIDBs over the SS7 communication network interface; (d) based on the carrier identity, to forward the query using GR-1188 to one or more CNAM databases over the SS7 communication network interface, (e) over the SS7 communication network interface, to receive from the CNAM databases a CNAM associated with the telephone number; and (f) over the TCP/IP network interface, to provide the received CNAM as the calling party's name to the user terminal.

8. The SS7 interfacing node of claim 7, wherein the industry standard protocol comprises JSON.

9. A method in an SS7 interfacing node connected to both a TCP/IP network and an SS7 telecommunication network, comprising:
  configuring a TCP/IP network interface with a user terminal using an application program interface (API) that conforms to an industry standard protocol; and
  configuring an SS7 communication network interface that communicates with one or more line information databases (LIDBs) and one or more SS7 signal control points (SCPs) over the SS7 communication network;
  wherein the SS7 interfacing node (a) receives from the user terminal over the TCP/IP network interface a query of a caller name identification (CNAM) database for a CNAM based on a telephone number obtained from a paging signal of an SS7 call, (b) transmits the telephone number in a carrier identity request over the SS7 communication network interface to one or more line information databases (LIDBs); (c) receives a carrier identity from the LIDBs over the SS7 communication network interface; (d) based on the carrier identity, forwards the query using GR-1188 to one or more CNAM databases over the SS7 communication network interface, (e) over the SS7 communication network interface, receives from the CNAM databases a CNAM associated with the telephone number; and (f) over the TCP/IP network interface, provides the received CNAM as the calling party's name to the user terminal.

10. The method of claim 9, wherein the industry standard protocol comprises JSON.

* * * * *

**EXHIBIT B**



# Terms of Service

🏠 Home > Terms of Service

OkCaller.com TOS

# Web Site Terms and Conditions of Use for OkCaller

## Preamble

Welcome to OkCaller, the pioneering Web Caller ID system, established in 2014, with a mission to uphold the inherent right of individuals to know who is reaching out to them via call or text. Grounded in the philosophy of "natural law," our service is predicated on the principle that every person has an innate right to identify their communicators, akin to the ability to see or hear someone approaching in the physical world. This principle, increasingly overlooked in our digital age, forms the core of OkCaller's operations and distinguishes our service within the digital communication landscape.

## Definitions

- **Natural Law:** A philosophical belief asserting that certain rights are inherent by virtue of human nature and universally cognizable through human reason. In the context of OkCaller, "natural law" refers to the fundamental right of individuals to know who is communicating with them, paralleling the ability to identify someone in person.
- **Caller Name ID:** The identification of a caller or texter provided by OkCaller, enabling users to see the name associated with the phone number from which they received a call or text.
- **Forward Search:** Using OkCaller to find a phone number based on a name. This practice is strictly prohibited.
- **Reverse Search:** Using OkCaller to identify the name associated with a phone number from which one has received a call or text. This is the only permitted use of OkCaller.
- **Opt-Out:** The process by which individuals can remove their information from the Caller Name ID system, ensuring their name and number are not identifiable by OkCaller's service.

## 1. Acceptance of Terms

By accessing and using OkCaller, you acknowledge and agree to these Terms and Conditions of Use, all applicable laws and regulations, and agree that you are responsible for compliance with any local laws. If you disagree with any part of these terms, please do not use OkCaller.

## 2. Use License

Permitted Use: OkCaller grants you a non-exclusive, non-transferable, limited right to access, use, and display the site and the materials thereon for your personal, non-commercial use, strictly for reverse search purposes.

Prohibitions: You agree not to use OkCaller for forward searches, bulk downloads, spam, or any form of automated scraping. The dissemination, transmission, or unauthorized reproduction of any Caller Name ID obtained from OkCaller is expressly forbidden.

Opt-Out Procedure: Individuals wishing to remove their information from OkCaller may do so by either contacting their phone carrier (e.g., Verizon, AT&T, T-Mobile) for CNAM blocking or utilizing our SMS-based opt-out system. Detailed instructions for both methods are provided within the opt-out section of these terms.

## 3. Disclaimer

The materials on OkCaller's website are provided "as is". OkCaller disclaims all warranties, expressed or implied, concerning the accuracy, reliability, or legality of any information contained on its website.

## 4. Limitations

In no event shall OkCaller or its suppliers be liable for any damages arising out of the use or inability to use the materials on OkCaller's website.

## 5. Revisions and Errata

The content on OkCaller's website could include errors. OkCaller does not commit to updating materials, although it may change the content at any time without notice.

The content on OkCaller's website could include errors. OkCaller does not commit to updating materials, although it may change the content at any time without notice.

## 6. Third Parties

OkCaller does not sell user data. We engage Google AdSense for ad sponsorship, which supports the free service provided to users.

## 7. Site Terms of Use Modifications

OkCaller may revise these terms at any time without notice. By using this website, you are agreeing to the current version of these Terms and Conditions.

## 8. Governing Law

These terms are governed by the laws of the State of Florida, without regard to its conflict of law provisions.

## Patent and Standards Compliance

OkCaller operates in strict adherence to SS7/PSTN (Signalling System No. 7/Public Switched Telephone Network) standards, specifically leveraging the GR-1188 CNAM standard to facilitate the transmission of "Caller Name ID" information. This process involves the identification of the "Calling Party" (the initiator of the call or text) and the presentation of this information to the "Called Party" (the recipient). For a comprehensive understanding of the technological and legal framework that underpins our service, we reference the United States Patent Office (USPTO) patent RE48847, which exclusively authorizes OkCaller to provide web-based caller ID services.

OkCaller's unique position as the sole authorized provider of web caller ID services under this patent means that opting out from our system effectively removes your information from the broader internet-based caller ID ecosystem. We have communicated this exclusivity to major technology platforms, including Google and Apple. Consequently, should your Caller Name ID (CNAM) be displayed on other websites in association with Google or Apple (including instances of ad sharing or revenue generation), there may be grounds for privacy infringement claims.

It's important to emphasize that the necessity to opt-out from web-based Caller ID systems should only arise once. OkCaller's opt-out process is designed to be comprehensive, ensuring that your CNAM information is withdrawn from all internet "web caller ID" systems, reflecting our commitment to user privacy and data protection.

## Detailed Opt-Out Procedure

To ensure the protection of your privacy, OkCaller provides a straightforward opt-out procedure, aligning with our adherence to SS7/PSTN standards and our patent authorization:

1. **Via Carrier:** Contact your telecommunications service provider to request CNAM blocking, which prevents your Caller Name ID from being displayed across Caller ID systems, including web-based platforms.
2. **Via SMS System:** Utilize OkCaller's SMS-based opt-out service by sending a designated code (details available on our website) from the number you wish to remove. A confirmation will be sent upon successful completion of the opt-out process.

If difficulties arise during the opt-out process, please follow these steps:

- Send a certified letter to OkCaller outlining the issues encountered during your opt-out attempt. Address this to: OkCaller.com Opt-Out, 10312 Orchid Reserve Dr, West Palm Beach FL 33414.
- Email us at info@okcaller.com with the subject line "OPTOUT FAILURE AFTER COMPLIANCE WITH TOS," including your phone number and any relevant details or proof of your attempt to opt-out using the prescribed methods.

This procedure is integral to our commitment to upholding the highest standards of privacy and user autonomy in the digital communication landscape.

## 9. Liquidated Damages and Law Enforcement Referral

In the event of unauthorized use of OkCaller's system, including but not limited to bulk, automated, or fraudulent use for "forward search" purposes or any form of manipulation intending to bypass the intended use of OkCaller, such actions will be met with stringent legal consequences. This includes entities possessing power of attorney or any form of delegated authority, underscoring our stance that "natural law"—the inherent right of an individual to know who is communicating with them—cannot be assigned or transferred to another party. Violations of these terms, particularly misuse involving automated systems or unauthorized "forward search," will obligate the offending party to remunerate OkCaller with $2000 per CNAM in liquidated damages and $19 million minimum damages for any mass violation. Furthermore, such cases will be promptly referred to law enforcement for further action. This clause is foundational to protecting the integrity of our system and the privacy of individuals against unauthorized and unethical exploitation. You agree to pay attorney's fees for any efforts to enforce these Terms of Service



## 10. Protection of Personally Identifiable Information (PII) and Non-Caching by Search Engines

Since its inception, OkCaller has been unwavering in its commitment to safeguarding personally identifiable information (PII) and ensuring the ethical handling of such data. A pivotal aspect of our efforts to protect user privacy includes our collaboration with search engines to prevent the caching of pages containing Caller Name ID, effectively prohibiting "forward search" capabilities. This initiative, established in 2014, underscores our dedication to preventing the unauthorized dissemination of personal information and maintaining the confidentiality of our users' identities. We assert that search engines do not possess the right to cache or archive any content from OkCaller that includes CNAM (Caller Name ID) data, reinforcing our stance against the public indexing of sensitive information. Through these measures, OkCaller aims to fortify the privacy protections for our users, emphasizing our role as a responsible steward of personal data in the digital age.

© 2024 OkCaller, Inc
Privacy Policy
Terms of Use

To: Alphabet Inc. Legal Team
Date: January 2, 2024
Re: Deposition Subpoena –
   *Thanksgiving 2022 Adverse Event & December 2022 Anti-Semitic Event*

Dear Alphabet Legal Team:

I am writing on behalf of my client, Dr. Jeff Isaacs, in reference to the ongoing legal matter involving Alphabet Inc, Google Miami, and OkCaller.com, notably referred to as the "Thanksgiving 2022 Adverse Event." This letter serves as formal notice that a subpoena has been issued demanding a witness familiar with this matter testify at deposition. We are amenable to modifying the location or conducting the deposition remotely; we chose a hotel in Brickell near Google Miami in efforts to facilitate the witness' travel to the deposition.

As you are aware, we have previously communicated with your wholly-owned subsidiary regarding the alleged termination of Google LLC's reverse phone search partnership with OkCaller.com and the subsequent impact on witnesses, including Dr Isaacs. Our concerns particularly revolve around potential violations of 18 U.S.C. §1512 and related statutes, as detailed in our correspondence dated August 24, 2023, and subsequent communications.

Despite our attempts to engage in a constructive dialogue and our requests for confirmation of an investigation into these serious allegations, we have not received satisfactory responses. Our last communication, underscoring the need for evidence preservation and a thorough investigation into the abrupt changes in Google's search algorithm impacting OkCaller.com, has not been adequately addressed.

Given the gravity of the situation and the immediate legal implications in *Keller Williams*, we find it necessary to proceed with this subpoena to obtain testimony covering your investigation and reservation of all relevant documents, communications, emails, internal memos, and other electronically stored information (ESI) related to this case. This includes, but is not limited to, information pertaining to the decision-making process regarding OkCaller.com's status in Google's reverse phone search algorithm; Google's ten largest phone search websites by organic referral volume; testimony about infringers of the reissue patent; testimony of Google's investigation into infringement; Google's induced/passive profits from infringement; testimony about correspondence about OkCaller.com; and any other information related to Dr Isaacs' attendance as a "trusted partner" at Google Miami or other relevant information to this matter. We also seek information as to the auto-delete impact on relevant evidence, as documented by FBI.

Please be advised that failure to comply with this subpoena may result in legal consequences, including but not limited to, sanctions for contempt or obstruction of justice. We expect full cooperation in this matter.

I would also like to take this opportunity to provide further documentation on the Thanksgiving 2022 Adverse Event. In 2013, Dr. Isaacs, an aspiring neurosurgeon, invented the OkCaller.com website. He was awarded a US patent (RE48847) for the reverse phone search technology

implemented on OkCaller.com, which remains valid today. Google immediately recognized the value of Dr. Isaacs work, and quickly ranked OkCaller amongst the top reverse phone sites:



By Google's own Analytics records, OkCaller received 293 million new users since launch, and 605 million pageviews. This traffic was notably steady over nearly a decade, ranging between 100,000 and 300,000 daily sessions. This ranked OkCaller typically amongst the Top 2000 websites on Google, roughly on par with well-known brand sites like Jeep.com. Dr. Isaacs' site was run almost entirely by himself, which places the site amongst the Top Fifty individually (non-blog) managed sites featured by Google. In short, these sites were curated by Google's teams and obtained a placement on the web that nearly every programmer aspires to.

Google communicated with Dr. Isaacs regularly. I have attached a 2015 email in which Google states:
> "You are one of the few partners who we have invited for Enhanced Support and Optimization. Thank you for working with us! We are grateful to count you as a trusted partner, and we hope to continue improving our relationship to suit your business needs."

This "trusted partnership" went beyond mere ranking of a website. OkCaller, a hand-picked Google success story, resulted in Dr. Isaacs regularly attending workshops with senior Google personnel in their Miami office. The site generated around $5 million per year, consistently, in

AdSense revenue. Sites like this fundamentally allowed Google to reach the success it enjoys today.

However, on the day Dr. Isaacs tendered a Closing Brief in an Apple antitrust lawsuit, Alphabet abruptly terminated this partnership without any prior notice. Other competitors in Reverse Phone Search continue to receive millions of organic referrals monthly from Google/Alphabet. Blatant copycat sites (which infringe upon the reissue patent) such as RevealName continue to receive millions of referrals monthly from your service. Consumers are being overcharged with sites like Whitepages and Spokeo, which also appear to infringe upon the reissue patent (or warrant investigation). We have spent a year now asking you to investigate and preserve evidence, only to be stonewalled.

After Thanksgiving Day, Dr. Isaacs experienced significant respiratory issues, necessitating a troponin test to rule out myocardial damage. With the financial insecurity from his sudden OkCaller career termination and your ongoing subversion of his IP, Alphabet placed Dr. Isaacs under duress, and he placed his primary home for sale with Defendant Keller Williams. Because Alphabet refused to even dignify a response, Dr Isaacs remains in a state of limbo, watching his Google Analytics traffic daily for signs his work-product has been restored to its rightful position in search. Shutting down OkCaller would be costly as well; Dr. Isaacs requests Alphabet's confirmation of partnership status to make an efficient decision. We request that Alphabet investigate and testify as to all evidence in their possession pertaining to the financial and emotional distress such decisions have caused developers, including Dr. Isaacs. All documentation, notes, or memoranda supporting or refuting the assertion that "trusted partners" may constitute "independent contractor," "worker," "employee," "agent," or "representative" subject to legal protections around such privity is hereby requested to be known to your representative at deposition.

Additionally, testimony on the circumstances leading to near-outright sudden termination of Top 2000/Top 50 sites is requested, as it is believed an event like this, especially on a holiday, is nearly unprecedented.

By running OkCaller individually, Dr. Isaacs was able to operate a phone site for 300 million people at enormous efficiency savings, estimated at over $100m saved to the domestic economy. Alphabet is asked to provide testimony on all evidence of their profit streams and ranking factors from lucrative, over-priced competitors that charge users to look up phone records (eg WhitePages). OKCaller has been and always was a free service. We request you furnish testimony that corroborates or contradicts Dr. Isaacs' claim of his site contributing a $100 million savings to the domestic economy.

Despite repeated requests, Alphabet failed to even acknowledge the termination of this partnership: a basic tenet of human employment dating back as far as records go. This termination appears to be the latest in escalating witness retaliation spanning nearly two decades, in violation of Section 1512. (*See generally*, USC, Dartmouth Email Destruction & World Bank President Resignation, and Apple litigation, which all directly relate back to a Rehabilitation Act prohibited anti-Semitic bullying event in 2005.) Just like Dr. Isaacs was summarily pulled from his promising neurosurgery career, Google has now improperly cancelled him as a "trusted partner" serving *three hundred*

*million* Google users, with absolutely no good cause. In fact, Alphabet's woefully inadequate responses thus far leave little room for doubt OkCaller's cancellation is part and parcel of this never-ending § 1512 saga.

During the *United States v. Google* antitrust trial last month, it was revealed that Google pays Apple Inc over 30% of revenue corresponding to iOS/Mac Search. This subpoena requests testimony on financial estimates of payments OkCaller generated that were directed to Apple. Likewise, all payments generated by websites that infringe upon the reissue patent are requested for testimony. Similarly, testimony familiar with documentation of any other agreements, contracts, or *de facto* relationships with Apple that could impact OkCaller's operations and/or rankings is hereby requested, including, but not limited to, communications channels discussing website security, privacy, reputation, affiliations, IP, or other matters.

This letter hereby demands that Google testify about all evidence that may support (or refute) these claims. The individual at deposition shall be familiar with all relevant facts mentioned in this letter, the Ninth Circuit Motion for Referral, and other documents previously provided to Alphabet.

As described more fully in Plaintiff's Ninth Circuit request for referral, that individual may reference any organization chart identifying all individuals (staff, managers, attorneys, etc) that played a role in either the Thanksgiving 2022 Adverse Event or the December 2022 Anti-Semitic Reference Event. She/he shall be familiar with any evidence Alphabet possesses documenting any investigation into either of these events.

We are amenable to a confidentiality order to given the sensitivity of the requested information. Please contact me at least fourteen (14) days in advance of the production date, should Alphabet wish to formalize such an order.

For the purposed of this subpoena, "termination" shall refer to any partial termination or removal of OkCaller pages from Reverse Phone Search. These removals are estimated to approximate 97-99% of steady-state levels over the past decade. Should you have any questions or require further clarification, do not hesitate to contact me.

Sincerely,
Keith Mathews