Jeffrey D. Isaacs, M.D.
11482 Key Deer Circle
Wellington, FL 33449
212-257-0737
jeffreydi@gmail.com

FILED BY MEE D.C.
APR 0 1 2024
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. – W.P.B.

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| DR JEFF ISAACS<br><br>Plaintiff,<br><br>vs.<br><br>GOOGLE LLC<br><br>Defendant. | Case No. 24-cv-<br><br>PATENT INFRINGEMENT<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>DEMAND FOR JURY TRIAL |

# PLAINTIFFS' COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

## I. INTRODUCTION

1. In 2012, during his medical residency at Dartmouth-Hitchcock Hospital in New Hampshire, Dr. Jeff Isaacs faced a life-altering challenge when he became disabled. Undeterred by this setback on his goal to be a neurosurgeon, and determined not to rely indefinitely on Dartmouth's own-occupation long-term disability benefit, Dr. Isaacs founded OkCaller.com in 2013. This initiative led to the awarding of U.S. Patent (Exhibit A – USPTO RE48847) for the groundbreaking reverse phone search technology the website utilized. Google, recognizing the significance of Dr. Isaacs' contribution, quickly elevated OkCaller to a premier position among reverse phone search sites:

2.

3.  By Google's own Analytics records, OkCaller garnered 293 million new users since launch and 605 million pageviews, positioning it among the top 2000 websites on Google, comparable to established brand sites like Jeep.com. Dr. Isaacs' site was operated by Greenflight Venture Corporation, a Florida C Corporation which he serves as CEO. Regular communications between Google, Greenflight, and Dr. Isaacs underscored a partnership marked as highlighted in a 2015 email from Google:

> "You are one of the few partners who we have invited for Enhanced Support and Optimization. Thank you for working with us! We are grateful to count you as a trusted partner, and we hope to continue improving our relationship to suit your business needs."

4.  This "trusted partnership" transcended mere algorithmic website ranking, making OkCaller a Google success story and facilitated Dr. Isaacs' participation in workshops with senior Google personnel in their Miami office, significantly contributing to Google's AdSense revenue. Working with independent sites like OkCaller fundamentally allowed Google to reach the success it enjoys today.

5.  Because Dr. Isaacs ran the site efficiently, he gave away his patent for free, which allowed customers to save 90% on phone searches. Dr. Isaacs' invention saved US consumers over $100 million. Phone searches are a lucrative and substantial part of search engine revenues. Historically they were an early, even perhaps the first major profit center for Google.

6.  Unlike nearly every competitor, Greenflight never sold information about its users to third-parties. Moreover, OkCaller was a decade early to implement privacy controls that the US Marshal service now asks all phone directories to do, to protect Federal Court personnel's residence data. That is because Dr. Isaacs vision in 2013 to prevent forward

lookups of confidential information, like phone numbers and addresses. OkCaller only permits "called parties" who received a text or phone call from an unknown "calling party" to look up the name of the person. The functionality of traditional Caller-ID over the web was novel and worthy of a patent, as it helped hundreds of millions safely find out, under "natural law," who communicated with them (See Exhibit B - OKCaller Terms).

7.   In sum, OkCaller was a successful Florida-based internet startup that offered the ideal phone directory: it worked, it didn't sell user data to anyone, it was free, and it prevented safety risks associated with forward-lookup caching (e.g. Daniel's Law concerns). It was also a successful outcome of the disability system, allowing Dr. Isaacs to promptly get back on his feet and serve others.

*A Convergence of Complex Litigation Emerges*

8.  OkCaller faced considerable legal obstacles in the effort to bring free caller ID to the general public. As OkCaller gained market share, competitors took note and began to infringe upon Dr. Isaacs' patent. Within six months of Apple Inc. learning that Isaacs' desired to give away his patent for free and prevent high-grossing apps like Whitepages from charging for the same information, Apple dropped OkCaller from their Top 10 ranked phone apps to an unranked position. Whitepages simultaneously commenced a lawsuit to invalidate the patent under the controversial Alice IP case law.  The patent went back to the drawing board, and the USPTO spent several years reviewing Federal Circuit findings while corresponding with Greenflight's MIT-trained intellectual property attorney to reissue the patent. Hence today, the reissue patent again enjoys presumption of validity, having survived double scrutiny by the USPTO and Federal Circuit Appeals Court.

9. Despite these obstacles, Google notably continued to support Dr. Isaacs' work, significantly aiding him in his endeavor to bring free caller ID services to the general public. As Dr. Isaacs recently stated to the Ninth Circuit Court of Appeals, he widely credited Google with "saving his life." This is because Google's recognition of his invention gave him a second career chance; Dr. Isaacs has faced nineteen years of federal litigation surrounding his medical credentials, and he believed he was improperly blacklisted from the federally-funded residency system. Google allowed Dr. Isaacs to work from home, as he dealt with the worsening health issues and complex federal litigation to enforce the clearing of his name.

10. Between 2014-2022, a former Assistant United States Attorney[1] who specialized in complex health care matters worked tirelessly to help Dr. Isaacs return to active medical practice. In reviewing years of federal discovery files, AUSA Mark Josephs identified evidence that a California university was publishing false disciplinary records on national academic clearinghouses about Dr. Isaacs. The university had previously agreed, via two court-ordered federal settlement agreements, to acquit Isaacs of any controversies and seal the acquitted records. Two competent authorities, the American Academy of Medical Colleges, and a New Hampshire Employment Tribunal, both determined that the records had been expunged. Nonetheless, "leaked" records prevent Dr. Isaacs from practicing neurosurgery. Mr. Josephs sought declaratory action with the Department of Education and the California university. Both were blocked, due to statute of limitations and jurisdictional defenses raised by law firm Gibson Dunn. In 2020, The Ninth Circuit had a divided ruling

[1] Former AUSA Mark Josephs, who spent almost a decade on a *pro bono* effort to reinstate what he called Dr. Isaacs' promising neurosurgery career, tragically passed away last year.

with a stark dissent on the matter. This lawsuit will also seek the same declaratory judgment.

11. Recognizing that his clinical medical career was indefinitely delayed, in February 2020 Plaintiff partnered with the inventor of the gold-standard test for heart attacks to develop a Coronavirus tracking app. Apple rejected the app "Coronavirus Reporter," the first of its kind, in March 2020. Plaintiff subsequently became a lead witness in Apple antitrust matters concerning App censorship which are ongoing and have received considerable media attention.

12. On the day Dr. Isaacs tendered a Closing Brief to the Ninth Circuit in the Apple antitrust lawsuit, Google abruptly terminated the OkCaller partnership without any prior notice. Other competitors in Reverse Phone Search were unaffected, including blatant copycat sites which infringe upon the reissue patent. Plaintiff, through his legal counsel, has spent the past year asking Google to investigate any link the aforementioned litigation, only to be stonewalled.

13. Google has refused to answer "yes or no" to Plaintiff's legal counsel as to whether the termination of OkCaller's SERP listings had any relation to Plaintiff's litigation history. Plaintiff's legal counsel has determined that substantiated concerns exist that Google violated witness retaliation laws, such as Section 1512. A subpoena was issued to Google in a related lawsuit to seek information and evidence about the reasons for OkCaller's termination by Google.

14. Hence it appears Google dropped OkCaller's rankings after learning about his key role in antitrust litigation against Big Tech. It also appears Google knew about all of Dr. Isaacs'

prior, highly contested litigation. Google has not denied that these events were related to their terminating OkCaller's critical mass of users.

15. The day after the sudden termination of his professional affiliation with Google, Dr. Isaacs experienced significant, unexplained medical issues. With the financial insecurity from his sudden OkCaller career termination and Google's ongoing subversion of his IP, Google placed Dr. Isaacs under duress, and he placed his primary home for sale with Defendant Keller Williams. Dr. Isaacs signed a sale agreement with KW just two weeks after the loss of OkCaller, believing he would never have a career again due to never-ending witness retaliation.

*Current Status of Complex Litigation*

16. Dr. Isaacs has been a witness to approximately twenty years of federal litigation. As he remarked in a Supreme Court petition, his "entire adult life" has been immersed in litigation. Public documents and legal pleadings surrounding this litigation approximate a hundred thousand pages. This has resulted in a "run-away train" effect where these pleadings are re-combined and misconstrued by an ever-expanding list of entities which now includes Google[2]. The net result, as Dr. Isaacs stated to the Ninth Circuit, is that he has become a neurosurgeon forced to learn complex litigation to defend his day-to-day livelihood and health.

17. Of the voluminous pleadings, they all pertain to two fundamental matters: 1) Dr. Isaacs' two-decade effort to obtain a uniform enforcement of a court-ordered federal settlement

[2] Google would not voluntarily agree to subpoena compliance limited to a twenty minute "credible explanation" about any OkCaller termination motive distinct from Isaacs' prior litigation.

agreement that acquitted, annulled, and sealed a controversy[3] in 2006, and 2) a four-year effort to invoke a unique theory he developed to prohibit Apple Inc from censoring free apps by tying iPhone devices to notary stamps and App Store usage.

18. In a related lawsuit, Google opposed the subpoena on the basis it improperly emphasizes "failed litigation" against Apple. That litigation is ongoing and Google's efforts to render perception of it as failed represents evidence of underlying retaliatory intent. Dr. Isaacs, after spending twenty years in multi-disciplinary complex litigation to enforce the acquittal, felt he could contribute his knowledge to the important public matter of Big Tech antitrust, which has also stalled enforcement for over a decade. His free app and tying theories – representing a pattern of a disabled person being denied valid access to the Courts – were laughed out of the Northern California District Court at Apple Inc and Gibson Dunn's request, purportedly "untethered" to economic reality.

19. But the reality is, Dr. Isaacs' Sherman Act theory was reasonable and threatened Apple as well as Google's duopoly business models.

20. Dr. Isaacs justifiably fears that in December 2022 his second career as a computer developer, was again blacklisted in violation of Section 1512, the same way his neurosurgery career had been wrongfully halted. Dr. Isaacs, with stellar medical credentials and absolutely no criminal record, has been prevented from practicing medicine, largely

[3] Dr. Isaacs' allegation in 2005 was essentially that NIH funds were misused to secure the admission of a problem student at a California medical school, and that Isaacs became entwined in an anti-Semitic bullying episode with the student and Deans, who had been awarded $40m in NIH funding from the student's father, an NIH director. He also alleged the NIH dean showed unusual interest in him and was biased in the entire matter; it is now undisputed that three USC medical deans in a row had improper relations with teenagers and students involving crack-cocaine, abuse of authority, and other aggravating factors. Realizing the improbability that someone in 2005 would believe that a major USC university permitted anti-Semitism, that NIH funds could be misused by elite Directors, or that a medical school dean had corrupt behavior, Isaacs settled the claim for a mere acquittal and annulment of his matriculation at the university. In short, if Google has retaliated against Isaacs for prior litigation, then it is on the basis of Isaacs' subjection to anti-Semitic and other prohibited conduct.

due to aforementioned legal pleadings being weaponized against him. That weaponization, Dr. Isaacs fears, spread to Google LLC around Thanksgiving 2022. As the subpoena instructions unequivocally state, Dr. Isaacs was in severe distress in the days and weeks following Google's adverse termination event.

21. Dr. Isaacs practiced his invention through intricate collaboration with Google. The compensation he received from them, in part, reflected payment of patent royalties. Upon their termination of OKCaller, Dr. Isaacs requested Google reimburse him directly for infringing conduct. Google refused to pay patent royalties owed to Isaacs. Hence this is not a patent case brought by a non-practicing entity; it is a case brought by a previously compensated inventor, who was potentially subjected to witness retaliation that resulted in total cessation of patent royalty payments by Google.

**VENUE**

22. Venue in the United States District Court for the Southern District of Florida is proper under 28 U.S.C. § 1391(b) and 28 U.S.C. § 1400(b) for patent infringement cases. Defendant Google LLC ("Google") has committed acts of patent infringement within this district, including, but not limited to, offering for sale and selling infringing products and services to Florida citizens and maintaining a business presence. Google engaged directly with Plaintiff, for years, hosting meetings and events in Miami, Florida. Such activities demonstrate that Google LLC has a substantial and continuous presence within this district, making it a proper venue for this litigation.

23. Furthermore, considering Plaintiff Dr. Jeff Isaacs' documented disability, which has rendered him unable to fly for the past six years, pursuing litigation in this district would

impose significantly less hardship on Dr. Isaacs than requiring him to litigate in a more distant forum. The Southern District of Florida is the most convenient and appropriate venue for this matter, as it minimizes the logistical and health-related challenges Dr. Isaacs would face if forced to travel extensively

24. This Honorable Court has personal jurisdiction over Defendant Google LLC because Google engages in continuous and systematic business operations in the State of Florida and particularly within this district. Google's activities include, but are not limited to, selling apps and advertisements directly to Florida residents, and conducting business meetings and events in Miami, Florida, as evidenced by Google's invitations to Dr. Isaacs for meetings related to their business relationship. These activities constitute a substantial part of Google's business, thereby warranting the exercise of personal jurisdiction.

25. Additionally, Google's engagement in patent infringing activities that have affected Dr. Isaacs, a resident of this district, further supports the assertion of personal jurisdiction. Similarly, a Florida Corporation Greenflight Venture Corporation, has been impacted by non-payment of royalties. Google has derived substantial revenue from its interactions and transactions with Florida residents, including those activities directly related to the allegations contained within this complaint.

26. The combination of Google's targeted business activities within the State of Florida, its direct interactions with Dr. Isaacs within this jurisdiction, and the impacts of its alleged patent infringement on a Florida resident, collectively establish that exercising personal jurisdiction over Google LLC in the Southern District of Florida is fair, reasonable, and consistent with the principles of due process. Alternatively, Delaware would be the next-best forum under 28 U.S.C. § 1400(b).

## II. PARTIES

27. Plaintiff Dr. Jeff Isaacs is a United States citizen. Dr. Isaacs is the sole inventor of the reissue patent. He holds a substantial percentage of ownership in the reissue patent. Dr. Isaacs developed the software for OKCaller.com, and owns the domain name rights and goodwill associated with the domain. Dr Jeffrey D. Isaacs is a Dartmouth-trained medical doctor (M.D) and computer scientist (A.B., *hons)*. Dr. Isaacs additionally holds an MBA in international studies from Wharton and INSEAD. At University of Pennsylvania's School of Engineering, he was a Benjamin Franklin Scholar. Before medical school, he matriculated at the Vanderbilt Law JD program for almost two years, where he had been awarded a full scholarship. Dr. Isaacs aspires to complete medical residency, should his health improve and blacklisting cease, having attained a 99/99 score above the average neurosurgeon on the USMLE National Medical Boards.

28. Defendant Google LLC is a limited liability company organized and existing under the laws of the State of Delaware, and is headquartered in Mountain View, California. Google is owned by Alphabet Inc., a publicly traded company incorporated and existing under the laws of the State of Delaware and headquartered in Mountain View, California. Google engages in, and its activities substantially affect, interstate trade and commerce. Google provides a range of products and services that are marketed, distributed, and offered to consumers throughout the United States, across state lines, and internationally. Today, Google is a monopoly gatekeeper of the internet, controlling around 95% of every query for information. The Department of Justice has filed at least two pending antitrust lawsuits against Google. As a result of its market power, Google is able to fully control how the majority of US customers look up phone numbers, by directing them to sites like OKCaller

or competitors. Google profits from these queries through advertisements on websites, and/or a 30% share of phone directory app purchase commissions.

## III. FACTUAL HISTORY

29. The emergence of the reverse phone search industry largely coincided with the initial growth of Defendant Google's search engine monopoly in the early 2000s. Prior to internet search engine availability, it was simply impractical to look up a phone number to see the corresponding name of the owner. Phone companies offered rudimentary services such physical reverse phone books and operator assisted phone queries, but these were highly specialized and localized, and for the most part, not used by the general population. They also typically only referenced landline numbers. The first dedicated online internet-based reverse phone search engines also suffered such limitations, derived from landline data and limited public records.

30. As mobile phones overtook landlines, the consumer demand for reverse phone search grew exponentially. Most consumers did not subscribe to Caller Name ID, which presented the name of an individual who called them from a wireless or landline phone. Text messages, even for those who could afford Caller Name ID, often didn't implement the service, and still don't, to this day. As our culture shifted to online transactions on services like AirBnB, eBay, etc with strangers across the country – or the globe – knowing the identity of an incoming call or text message evolved from being a luxury convenience to a matter of safety.

31. Despite the need for such Caller Name ID, a complete void existed until 2013 whenever consumers would "Google someone" or "Google a number" to perform a reverse phone

search. But until 2013, a typical reverse search query on Google's engine was plagued with inaccuracy and subscription-service scams.[4] The results presented to an end-user searching for a phone number would be lists of "keyword stuffed" mathematics lists, such as prime numbers, random numbers, and Fibonacci number lists, masquerading as phone numbers, directing them to an affiliate subscription, or presenting them with a Google advertisement.

32. While Google doesn't publish the number of phone and people searches conducted on its general search engine, the numbers are significant. Upon information and belief, in Google's early days over 25% of internet searches were simply phone or people searches. Today these numbers may be similar. Google knowingly ranked phone search spam in its results, such as prime number lists, as a way to monetize a large part of its search queries. Hence Google's early profitability as they grew their monopoly was built, at least in large part, on exploiting phone and people searches to unsuspecting users.

33. In 2013, recognizing this problem, Dr. Isaacs developed a method and technique to bridge the telecommunications Caller Name ID system with the internet IP web protocols. In simple terms, Dr. Isaacs invented and patented "Web Caller Name ID," and has spent the last decade on a mission to make the invention free to users.

34. In 2014, Google sent Dr. Isaacs a letter informing him that he was one of a few strategic partner sites. For the better part of the past decade, Isaacs would be invited to annual Google events that would provide advice as to best-practices and suggested improvements to his website. Dr. Isaacs always followed Google's recommendations and was appreciative for their ongoing assistance in making free Web Caller-ID a reality.

[4] In fact, this industry pioneered internet subscriptions, which are, of course, now commonplace.

35. In 2022, Dr. Isaacs served as a witness in an antitrust proceeding against Apple Computer. In that proceeding, he asserted that his Web Caller Name ID invention had yielded at least $100million in economic savings.[5]

36. Later in 2022, for undisclosed reasons, Google entirely removed Dr. Isaacs' Web Caller Name ID from their search index. His previous contacts, who for a decade were happy to provide Dr. Isaacs with consultation, suddenly went silent. Similarly, no meaningful response was to be found on the Webmaster Forum, which had previously garnered a response from Google Executive Mr. Mueller worthy of news coverage by a major SEO blog.

37. OkCaller.com had been consistently ranked as a top provider in its field by web analysis firms such as SimilarWeb and Alexa. His reverse phone search services platform ranked in the top few thousand websites in the United States. The platform ranked first among small-medium publishers; only Whitepages, Spokeo, and several other large corporations ranked higher.

38. Plaintiff's search platform was efficient to consumers. Plaintiff spent a decade trying to ensure his Caller Name ID technology was offered free to end-users. Google recognized the novel value and directed a significant share of their search traffic to Plaintiff's platform.

39. When Dr. Isaacs first submitted Web Caller Name ID to Google, the company flagged it as spam. Trying several different improvements, the Defendant repeatedly accused Dr. Isaacs of "keyword stuffing," when in fact, he had a website that was a *solution* to keyword stuffing. He submitted a question to Google's "Webmaster Forum," which eventually

[5]Dr. Isaacs' service was the top-ranked reverse phone app on Apple's App Store for from 2013-2017, which is the subject of that proceeding.

attracted the attention of Senior Executive Mueller. Mueller advised Isaacs to keep working on the interface, and that eventually, he would gain a userbase of organic Google traffic.

40. In fact, the reason the site was flagged as SPAM was because Plaintiff took measures to ensure the safe use of Caller ID data. That meant he didn't allow Google bots to cache the "Caller Name ID," but only the phone number. That meant Google saw large lists of phone numbers, without associated data, and incorrectly assumed it was SPAM.

41. Google eventually realized that OkCaller was not spamming them, but in fact, was trying to ethically and safely implement web caller ID.

42. Copycats weren't so careful, and allowed name search of Caller Name ID to phone numbers. These sites violate the intent and spirit and literal statute of "Daniel's Law" and other phone safety regulations. Were Google to block infringing websites, the web would be safer and there would be fewer "Daniel's Law" violations. That is because Plaintiff would only license Web Caller ID to sites that shared opt-out information, and that didn't publish Caller Name ID's on SERPs for forward-lookup.

43. In other words, enforcement of the '847 patent is a matter of public safety and in the interest of public policy. It would ensure that a large source of phone data (Caller ID PSTN databases) is used responsibly, with no forward-lookup, and coordinated opt-out. Google's decision to subvert the patent holder is flagrantly in violation of Daniel's Law and other public policy.

44. The other major source of phone ownership data is credit bureau records. Those are regulated by the credit bureaus for responsible use. Google (and Apple's) failure to recognize the '847 patent, for retaliatory reasons, ultimately harms the public and must be enjoined by this lawsuit.

45. As Google recognized with Mr. Mueller's assistance, pairing Web Caller Name ID with user-vetted Spam reports provided a powerful combination. In one single screen, an end-user could see the name associated with a phone number, and submit or view crowdsourced reports pertaining to that number. Google recognized the potential of this novel combination as well, and the critical mass necessary to make its implementation successful. Almost overnight, Dr. Isaacs' reverse search service went from zero to approximately a half million user sessions a day.

46. The success of the site was immediately noted and emulated literally around the web. Within a year, dozens of phone websites all utilized the simple "Safe" and "Not Safe" user interface Dr. Isaacs pioneered as "SafeCaller" adjacent to the Web Caller Name ID. Effectively, Dr. Isaacs set a user interface standard for phone search that replaced the prime number and Fibonacci number sites, which largely disappeared within a year. The "look and feel" of the SafeCaller interface remains, to this day, a common interface standard for reverse phone search.

47. Nonetheless, Google has increasingly desired to fragment reverse search, and there are antitrust concerns that may be ascertained during discovery. Around 2017, a near-identical copycat of Plaintiff's platform was awarded almost half of Plaintiff's pre-2017 traffic. Plaintiff notified Google of the matter in 2017 but never regained the pre-2017 traffic level. Nonetheless, Google kept OkCaller in a competitive position that was valuable and reflected ongoing recognition of the patent validity and royalties owed.

48. Plaintiff tried to improve his platform over the years, but was never awarded increased traffic despite significant investments in platform improvement. For example, Plaintiff developed a global reverse phone search platform with significant international

telecommunication standards capability. Google awarded the international version effectively zero traffic.

49. Similarly, OkCaller was limited in improvement capability by Defendant Google. Google requested he transition his website to AMP technology, which Google had strategic interests in as a developer of AMP. Plaintiff did so, which meant foregoing other tools like Javascript to add functionality he had invested for the international version. In short, Plaintiff sought to innovate phone search, but his new platforms were ignored by Google. Ongoing fragmentation from domestic and international copycats often presented fake Caller-Name data and had generally low quality control and risked public safety.

50. Plaintiff's reverse search services platform nonetheless maintained significant market share on Google until Thanksgiving Eve 2022. The service was effectively shut down by Google with no warning or explanation, and for no good reason, but for Defendant's anti-competitive and/or retaliatory motives. The platform stills maintains high rankings on Bing, Yahoo, DuckDuckGo, and others, but this is insufficient traffic to maintain ongoing operations going forward.

51. Google removed millions and millions of the platform's pages of Caller Name IDs and Spam reports from their rankings. In other words, they were not merely lowered in rankings; they were removed from the index and censored for undisclosed reasons.

**The Reissue '847 Patent Facts**

52. On October 14, 2014, the United States Patent and Trademark Office ("USPTO") duly and legally issued U.S. Patent No. 8,861,698 ("'698 Patent"), entitled "Post-Page Caller Name Identification System." That patent overcame substantial litigation in the Federal Circuit

and years of scrutiny by the USPTO, to resolve a common obstacle for software patents –
*Alice* non-abstraction. The patent reissued on December 7, 2021 as Reissue Patent #48,847.

53. Plaintiff is the inventor and possesses majority ownership of the US Reissue Patent #48,847
directly and/or through corporate entities that he controls. The patented technology allows
a mobile phone user to identify the name associated with a particular phone number
through a reverse lookup. But unlike reverse phone lookup internet technology available
prior to the invention, the '847 technology connects an internet search to phone carrier
databases on the Public Switched Telephone Network (PSTN), to identify caller name
information.

54. The '847 Reissue Patent is currently in full force and effect and is entitled to a presumption
of validity under the law.

55. As an owner, Plaintiff has majority rights, title, and interest in the '847 Patent, including
the right to sue for past, present, and future infringement of that patent.

56. The '847 Patent describes and claims a novel convergence of two telephone network
related technologies, namely SS7 Caller Name ID ("CNAM"), and internet based reverse
telephone number search.

57. Originally, the Baby Bells disbursed paper phone books to each landline customer, which
served as the primary mode of looking up a phone number by the customer's name. In the
1980s, telephone companies began offering caller ID as an add-on feature for a landline
telephone subscription. Caller ID was supported by CNAM, which at that time was
reaching widespread use by the carries. CNAM allowed a carrier to determine the name
of the calling party and display that to the called party for calls between landline phones.
Prior to that time, a called party generally had no way to trace the name of a caller; calls

were anonymous. CNAMs were stored in a relatively small number of databases managed by the Baby Bell companies.

58. Upon information and belief, in 1997, the largest competing reverse phone services copied the Baby Bell phonebooks onto their internet searchable database. This had the effect of allowing reverse telephone number lookups via the internet by entering a phone number to search for its owner, without adding a "Caller ID" feature to a telephone subscription. The limitation of this method, of course, was that it only included listed numbers for landlines contained in public telephone books, and did not include cell phone numbers. It also relied on data from a single snapshot of time, and could not account for new telephone numbers or changed numbers as those additions or changes occurred. The reverse search competitors charged for the service. Over time, they added other data sources to its database of information, to expand its reverse phone lookup service, but what it lacked was access to a large swath of cell phone numbers and associated names.

59. Although mobile phones, and particularly smart phone technology, have proliferated in the last two decades, cell phone Caller ID technology did not, presumably because CNAM was based on the Public Switched Telephone Network (PSTN). As a result, many mobile phones today will display "UNKNOWN CALLER", or a city name e.g., "W PALM BEACH" instead of the name of the person who owns the account for the calling number. In short, despite great advances in the past decade or so related to mobile phone technology, Caller Name ID was often left behind. Text messages almost never, to this day, contain CNAM information.

60. The lack of CNAM information on mobile phones created a less than ideal situation for the average consumer. Mobile phone owners often do not know who is calling them, and as

noted, reverse search technology of copying phone books onto the internet suffered from the drawback of lacking mobile phone numbers.

61. As part of its mission and terms, OkCaller.com asserts that people have a right to know who is communicating with them. OkCaller calls this "Natural Identity Law" or just "Natural Law," and is akin to natural identifiers such as voice, facial/physical features, and so forth. OkCaller hence operates under stringent ethical, moral and legal foundations for safety. Natural law is particularly relevant in this early era of Artificial Intelligence, where it will become increasingly difficult to ascertain the identity of incoming communications.

62. As discussed earlier, for nearly a decade after Google's search engine launched, a large volume of search queries went to mathematical number lists, which were affiliate links to Whitepages, Spokeo, and others. In short, the '847 technique was non-obvious as a great demand for billions and billions of mobile phone number queries went unmet for a decade, until Plaintiff launched his reverse phone search services. This left reverse phone search users with little recourse for mobile telephone numbers.  They responded by introducing expensive "upcharge" subscriptions to access credit report files, which include most phone numbers. The customer of such service typically agrees (whether they mean to or not) to a recurring monthly subscription of approximately $19/month.

63. In 2013, Dr Isaacs conceived of and invented a free technology that bridged the gap between CNAM and internet reverse search.  He filed for and obtained a patent on his invention which is known as the Post Page Caller Name Identification System.  It is described and claimed in the '847 Patent.  In particular, the '847 Patent describes a system and method in which a user can input a telephone number into a webpage or mobile phone app, separate and apart from its phone carrier, and return name information associated with

the queried phone number. To accomplish this in practice, the patent licensee uses an SS7 query to a CNAM database in real time to obtain the caller name information. Hence two discrete and independent systems were linked in a novel way (the SS7 infrastructure and the TCP/IP internet) producing novel value to users. Plaintiff was the first to implement this technology, and OkCaller remains the leading example of a safe and responsible Web Caller ID directory.

64. In addition to obtaining patent protection the inventor set about to create the computer code required to make his invention work. He worked with third parties to gain access to SS7 CNAM, and with Apple, Google, and other App providers to ensure that his App was not only successful, but was implemented to protect the privacy of users and enhance their experience.

65. Hence in 2014, when it debuted, OkCaller received around a quarter million users each day. No other Web Caller ID system had anywhere close to this usage level for years to follow.

66. The inventor released his "Caller-ID" app onto the Apple iTunes App Store in the summer of 2013. The app had over ten thousand positive user reviews; representative reviews include "finally, a phone search that didn't ask for my credit card number," "the only one that works," "why wasn't this invented ten years ago" and so forth. The app was free, instead generating revenue through advertising rather than direct user payments. As a result, hundreds of millions of users avoided $19 subscriptions and obtained free caller name ID. The invention created by Dr Isaacs and specified in the '847 patent resulted in approximately $100 million in savings to the national economy. It was years ahead of its time in seeking to reduce costly subscriptions and protect public safety.

67. Over the last decade since the original patent was issued, paid services like Spokeo and Whitepages and many copycat infringers gradually implemented CNAM as part of their service offering, which had historically used credit bureau information and other public records. Google is the merchant of record for many of these apps on Google Play store. Google LLC allowed multiple competing apps on the Play Store to infringe the patent. Similarly Google LLC allows infringing websites to run Google Ads, thereby knowingly profiting from active infringement.

68. Plaintiff has informed Google LLC that such infringement takes place. The email address he informed this to notified Plaintiff they "were sorry for any inconvenience" and has since stopped responding to Plaintiff.

69. Upon information and belief, Google, de-ranked the inventor's website– the only licensee of the '847 patent to this date to self-preference their own infringing apps and related search and display advertising.

70. Numerous apps on the Google Play Store now infringe the patent. In particular, these apps are a mobile phone application and system that functions independently of the called party's carrier and device. A user inputs a phone number into an entry field, which could come from any device, to determine who called from that number. When a result is found in a carrier's CNAM database, the infringing apps return a Caller Name result, identifying the name associated with the queried number. Upon information and belief, the Caller Name result in the infringing Google Play Apps may use extra steps like caching but ultimately return CNAM database rows accessed by SS7, including an SS7 interfacing node. In some cases, a more detailed CNAM result is obtained using LIDB, which is still an infringing behavior.

71. Upon information and belief, Defendant directly infringes the '847 patent by directly selling infringing apps to consumers, as they are merchant of record for nearly all Android apps. Upon information and belief, Google's system includes a third-party CNAM query to return the calling party name requested by the user, which is implemented, used, and operated at and under Defendant's direction and control.

72. Upon information and belief, Google also induces its users to infringe at least Claims 7 & 8 of the '847 patent. In particular, Google provides the complete system for reverse phone lookup via an SS7 CNAM query to users, as described above, who place that system into use when they enter a phone number to query. Google induces infringement through a variety of anticompetitive behaviors, including pay-for-play ranking and encouraging Adwords/Ads expenditure in exchange for organic search referrals.

73. Google has alternatively infringed contributorily by providing to users a system for reverse phone lookups, described above, that has no non-infringing uses.

## IV. VIOLATIONS ALLEGED

### COUNT I
### *35 U.S.C. § 271 PATENT INFRINGEMENT*

74. Plaintiff repeats and re-alleges each and every allegation contained herein as if fully stated under this count.

75. Google LLC has directly infringed Claims 1-10 of the '847 patent, and contributorily infringed and induced others to infringe at Claims 1-10 of the '847 Patent by making, having made, importing, using, offering for sale, and/or selling apps on the Google Play Store that are performing, implementing, and carrying out, processes and methods specified in the patent, in violation of 35 U.S.C. § 271(a), (b) and (c).

76. Indirectly, Google accepts payments for search texts ads of infringing apps and websites, and then preferences those infringing products above Plaintiff's own apps and websites. Such profiting from known infringement constitutes infringement under this statute.

77. On information and belief, Google's infringement is willful.  Defendant has been made aware of the reissue patent issuance, and the underlying infringement claims, but still publishes infringing apps. In fact, Google appears to have further retaliated against the inventor for asserting patent rights, which will be elucidated in discovery and may necessitate amendment of this Complaint.

78. Plaintiff has been irreparably harmed by Defendant's acts of infringement of Claims 1-10 of the '847 Patent, and will continue to be harmed unless and until these acts of infringement are enjoined and restrained by order of this Court. Plaintiff has no other adequate remedy at law to redress Google's continuing acts of infringement. Upon information and belief, the hardships that would be imposed upon Google by an injunction are less than those faced by Plaintiff should an injunction not issue. Furthermore, the public interest would be served by issuance of an injunction. Accordingly, Plaintiff is entitled to permanent injunctive relief against such infringement pursuant to 35 U.S.C. § 283.

79. As a result of Google's acts of infringement, Plaintiff has suffered and will continue to suffer damages. Plaintiff is entitled to compensation for such damages pursuant to 35 U.S.C. § 284 in an amount to be determined at trial, estimated to exceed $50 million USD before treble damages.

WHEREFORE, The Plaintiff respectfully requests that this Honorable Court:

A. Permit trial by jury for all claims herein.

B. Issue a finding that Google LLC has infringed literally and/or under the doctrine of equivalents, Claims 1-10 of the '847 Patent;

C. Issue a finding that Google's infringement has been willful;

D. Issue a permanent injunction that Google be permanently enjoined from making, using, offering for sale, selling, profiting from advertising on infringing websites, causing to sell, importing, exporting, supplying and/or distributing within, to and/or from the United States, or over the internet or on any app, any software infringing upon the '847 patent;

E. Awarded pre-judgment interest and post-judgment interest at the maximum rate allowed by law, including an award of pre-judgment interest, pursuant to 35 U.S.C. § 284, from the date of each act of infringement of Claims 1-10 of the '847 Patent to the day a damages judgment is entered, and a further award of post-judgment interest, pursuant to 28 U.S.C. § 1961, continuing until such judgment is paid, at the maximum rate allowed by law;

F. Order an accounting for damages through judgment and post-judgment until Google is permanently enjoined from further infringing activities;

G. That the Court award enhanced damages pursuant to 35 U.S.C. § 284; the Court award supplemental damages for any continuing post-verdict infringement up until Google is permanently enjoined from further infringing activities; That the Court award a compulsory future royalty in the event an injunction is not awarded.

H. Grant any further relief as may be fair and just.

Respectfully submitted, this 31st day of March 2024.

Jeffrey D. Isaacs, M.D.
11482 Key Deer Circle
Wellington, FL 33449
212-257-0737
jeffreydi@gmail.com

JS 44 (Rev. 04/21) FLSD Revised 12/02/2022

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)* **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

**I. (a) PLAINTIFFS** Dr. Jeff Isaacs

**DEFENDANTS** Google LLC

(b) County of Residence of First Listed Plaintiff Palm Beach County *(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant *(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

(c) Attorneys *(Firm Name, Address, and Telephone Number)*

Pro Se, 11482 Key Deer Circle, Wellington FL 33449, (212) 257-0737

Attorneys *(If Known)*

(d) Check County Where Action Arose: ☐ MIAMI-DADE ☐ MONROE ☐ BROWARD ☒ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE ☐ HIGHLANDS

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question *(U.S. Government Not a Party)*
☐ 2 U.S. Government Defendant
☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions

**CONTRACT**
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

**REAL PROPERTY**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**TORTS**

**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Personal Injury - Med. Malpractice

**PERSONAL INJURY**
☐ 365 Personal Injury - Product Liability
☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
☐ 440 Other Civil Rights
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 445 Amer. w/Disabilities - Employment
☐ 446 Amer. w/Disabilities - Other
☐ 448 Education

**PRISONER PETITIONS**
Habeas Corpus:
☐ 463 Alien Detainee
☐ 510 Motions to Vacate Sentence
☐ 530 General
☐ 535 Death Penalty
Other:
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition
☐ 560 Civil Detainee – Conditions of Confinement

**FORFEITURE/PENALTY**
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 690 Other

**LABOR**
☐ 710 Fair Labor Standards Acts
☐ 720 Labor/Mgmt. Relations
☐ 740 Railway Labor Act
☐ 751 Family and Medical Leave Act
☐ 790 Other Labor Litigation
☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
☐ 462 Naturalization Application
☐ 465 Other Immigration Actions

**BANKRUPTCY**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**INTELLECTUAL PROPERTY RIGHTS**
☐ 820 Copyrights
☒ 830 Patent
☐ 835 Patent – Abbreviated New Drug Application
☐ 840 Trademark
☐ 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
☐ 375 False Claims Act
☐ 376 Qui Tam (31 USC 3729(a))
400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit (15 USC 1681 or 1692)
☐ 485 Telephone Consumer Protection Act (TCPA)
☐ 490 Cable/Sat TV
☐ 850 Securities/Commodities/ Exchange
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 893 Environmental Matters
☐ 895 Freedom of Information Act
☐ 896 Arbitration
☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Re-filed (See VI below) ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district *(specify)* ☐ 6 Multidistrict Litigation Transfer ☐ 7 Appeal to District Judge from Magistrate Judgment ☐ 8 Multidistrict Litigation – Direct File ☐ 9 Remanded from Appellate Court

## VI. RELATED/ RE-FILED CASE(S)

(See instructions): a) Re-filed Case ☐YES ☐NO b) Related Cases ☒YES ☐ NO

JUDGE: Honorable David S. Leibowitz DOCKET NUMBER: 23-cv-81393-DSL

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause *(Do not cite jurisdictional statutes unless diversity)*:
35 USC 271 - Infringement of Web Caller-ID Reissue Patent

LENGTH OF TRIAL via 5 days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ 150,000,00

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

DATE 4/1/2024 SIGNATURE OF ATTORNEY OF RECORD Jeffrey D. Isaacs

FOR OFFICE USE ONLY : RECEIPT # AMOUNT IFP JUDGE MAG JUDGE

**EXHIBIT A**



(19) **United States**
(12) **Reissued Patent**
**Isaacs**

(10) **Patent Number: US RE48,847 E**
(45) **Date of Reissued Patent: Dec. 7, 2021**

(54) **POST-PAGE CALLER NAME IDENTIFICATION SYSTEM**

(71) Applicant: **Greenflight Venture Corporation**, West Palm Beach, FL (US)

(72) Inventor: **Jeffrey D. Isaacs**, Fort Washington, PA (US)

(21) Appl. No.: **15/289,905**

(22) Filed: **Oct. 10, 2016**

**Related U.S. Patent Documents**

Reissue of:
(64) Patent No.: **8,861,698**
Issued: **Oct. 14, 2014**
Appl. No.: **14/174,724**
Filed: **Feb. 6, 2014**

(51) **Int. Cl.**
*H04M 1/56* (2006.01)
*H04M 15/06* (2006.01)
*H04M 7/00* (2006.01)
*H04M 3/42* (2006.01)

(52) **U.S. Cl.**
CPC ..... *H04M 7/0033* (2013.01); *H04M 3/42042* (2013.01); *H04M 2201/38* (2013.01)

(58) **Field of Classification Search**
CPC ......... H04M 3/42059; H04M 3/42042; H04M 7/0033; H04M 2201/38
USPC .......................................... 379/142.1, 142.15
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,457,738 A * 10/1995 Sylvan ...................... 379/93.23
5,903,636 A * 5/1999 Malik .............. H04M 3/42042 379/142.01
6,782,086 B2 * 8/2004 Clapper ............... H04M 1/575 379/142.06
6,954,526 B1 * 10/2005 Glenn ................. H04Q 3/0025 379/207.15
7,308,408 B1 * 12/2007 Stifelman .............. G10L 15/22 704/266
7,839,987 B1 * 11/2010 Kirchhoff ............ H04M 1/575 379/142.02
8,155,287 B2 * 4/2012 Woodring .............. H04M 3/42 379/142.05
8,358,766 B1 * 1/2013 Denenberg ........ H04M 3/42042 379/201.01
8,447,285 B1 * 5/2013 Bladon ............ H04M 3/53341 455/414.4
8,625,762 B1 * 1/2014 White et al. ............ 379/142.06
(Continued)

OTHER PUBLICATIONS

Kessler, "In Apps For Mobile Advertising, Brands Pay You To Listen" fastcompany.com, Sarah Kessler, Aug. 15, 2013, (pp. 1-10) (Hereinafter Kessler).*
3:16-cv-00175-RS *Greenflight Venture Corporation et al.* v. *Whitepages, Inc. et.*, "Order Granting Defendant's Motion for Judgment on the Pleadings," issued on Jul. 25, 2016.
(Continued)

*Primary Examiner* — Ovidio Escalante
(74) *Attorney, Agent, or Firm* — Edward C. Kwok; VLP Law Group, LLP

(57) **ABSTRACT**

Caller Name Identification, or CNAM Caller ID, is a telecommunication end-user feature that appeared for PSTN landline customers in the late 1980s. The rapid development of cellular mobile and VOIP telephony systems lead to the frequent omission of the CNAM Caller ID feature. Described is an independent end-user system that obtains the CNAM Caller ID after the call page transmission. The system operates on the user's smartphone or on a TCP/IP connected computer. A user with multiple telephone devices (i.e. a smartphone, landline, and VOIP line) may share use of this system between all devices.

**4 Claims, 4 Drawing Sheets**



(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 8,644,470 | B2 * | 2/2014 | Gosselin | H04M 3/42042 379/142.06 |
| 8,699,682 | B2 * | 4/2014 | Nguyen | H04Q 3/0016 379/114.03 |
| 9,641,663 | B2 * | 5/2017 | Rincon | H04M 1/72561 |
| 2002/0099720 | A1 * | 7/2002 | Bansal | 707/104.1 |
| 2008/0037764 | A1 * | 2/2008 | Lee | H04M 3/12 379/266.01 |
| 2008/0052372 | A1 * | 2/2008 | Weber | G06F 16/58 709/217 |
| 2008/0147771 | A1 * | 6/2008 | Bertolino | 709/201 |
| 2008/0222144 | A1 * | 9/2008 | Backer et al. | 707/5 |
| 2008/0240383 | A1 * | 10/2008 | Fronczak et al. | 379/88.19 |
| 2009/0158367 | A1 * | 6/2009 | Myers | H04N 21/25833 725/109 |
| 2009/0257575 | A1 * | 10/2009 | Gosselin | H04M 3/42042 379/142.06 |
| 2009/0328118 | A1 * | 12/2009 | Ravishankar et al. | 725/106 |
| 2010/0254524 | A1 * | 10/2010 | Kim | H04Q 3/76 379/201.02 |
| 2011/0013755 | A1 * | 1/2011 | Martino | H04M 1/578 379/88.2 |
| 2011/0081911 | A1 * | 4/2011 | Silver | H04M 5/12 455/445 |
| 2013/0287196 | A1 * | 10/2013 | Zerillo | 379/142.06 |

OTHER PUBLICATIONS

3:16-cv-00175-RS *Greenflight Venture Corporation et al.* v. *Whitepages, Inc. et.*, "Order Denying Applicant's Motion For Reconsideration," issued on Aug. 16, 2016.

Zhang, "The Line Information Database (LIDB) and Wireless Services," Telcordia Technologies, Inc., White Paper Analysis, Dec. 2001.

"OSSGR Section 22.3: Line Information Database," Telcordia, Apr. 2009, Issue 8 (GR-1158).

3:16-cv-00175-RS *Greenflight Venture Corporation et al.* v. *Whitepages, Inc. et.*, "Defendant Whitepages, Inc.'s Reply in Support of Its Motion for Judgment on the Pleadings of Invalidity under 35 USC 101," filed on Jun. 13, 2016.

3:16-cv-00175-RS *Greenflight Venture Corporation et al.* v. *Whitepages, Inc. et.*, "Whitepages, Inc.'s Opposition to Defendants' Motion for Reconsideration," filed on Aug. 9, 2016.

3:16-cv-00175-RS *Greenflight Venture Corporation et al.* v. *Whitepages, Inc. et.*, "Defendant Whitepages, Inc.'s Notice of Motion and Motion for Judgment on the Pleadings of Invalidity under 35 USC 101," filed on May 23, 2016.

3:16-cv-00175-RS *Greenflight Venture Corporation et al.* v. *Whitepages, Inc. et.*, "Defendants Greenflight Venture Corporation and Jeffrey Isaacs' Opposition to Motion for Judgment on the Pleadings of Invalidity under 35 USC 101," filed on Jun. 6, 2016.

3:16-cv-00175-RS *Greenflight Venture Corporation et al.* v. *Whitepages, Inc. et.*, "Defendants' Notice of Motion and Motion for Leave to File Motion for Reconsideration," filed on Jul. 29, 2016.

* cited by examiner

U.S. Patent Dec. 7, 2021 Sheet 1 of 4 US RE48,847 E

FIG. 1A -Prior Art-
617-555-1212
SMITH, ROB
SS7 call provisioning
to CNAM Caller ID
landline phone
FIG. 1B -Prior Art-
6175551212
BOSTON MA
SS7 call provisioning
to non-CNAM Caller ID
mobile phone
FIG. 1C -Prior Art-
INCOMING CALL
FROM
617-555-1212
SS7 call provisioning
to non-CNAM Caller ID
VOIP phone

FIG. 2

1
2
617-555-1212
BOSTON MA
Enter CID: 617-555-1212
Submit Query
5
6
GTT
LIDB Query
SS7
Interfacing
Switch
CNAM SCP &
Database
7
8
CID: 617-555-1212
CNAM: Smith, Robert



**U.S. Patent** Dec. 7, 2021 Sheet 3 of 4 US RE48,847 E

FIG. 3

Start
Called party receives calling party CID (phone number) on phone without CNAM Caller ID functionality
100
Called party enters CID into the CID entry interface
101
The CID is checked against the system opt-out database
102
An SS7 session is initated if not already open
103
A Global Title Translation is performed via SS7 to locate the calling party's carrier CNAM database, if not known
104
An SS7 query containing the CID is sent via GR-1188 or equivalent to the CNAM database
105
The calling party's CNAM is returned to the SS7 requesting session
106
The CNAM information is presented to the user
107
End



Fig. 4
200
SS7 Interface Running
JSON API To End-User
203
CID: 617-555-1212
CNAM: Smith, Robert
Query Another CID
201
202
CID: 617-555-1212
CNAM: Smith, Robert
204



# POST-PAGE CALLER NAME IDENTIFICATION SYSTEM

**Matter enclosed in heavy brackets [ ] appears in the original patent but forms no part of this reissue specification; matter printed in italics indicates the additions made by reissue; a claim printed with strikethrough indicates that the claim was canceled, disclaimed, or held invalid by a prior post-patent action or proceeding.**

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates generally to caller identification systems. More specifically, it relates to a post-page caller name identification system that bridges SS7 retrievable caller data with a user-accessible IP interface. Carrier implementation of caller name identification has become increasingly complicated due to the fragmentation of service providers on the North American Public-Switched Telephone Network (PSTN). The present invention restores functionality of this important SS7/PSTN capability, caller name identification, to the increasing number of telecommunications end-users left without this feature.

2. Description of the Prior Art

To place a call using the earliest long-distance telephone systems, a calling party initiated a request with the local switchboard operator. The calling party's local operator would connect to the inward operator, and specify the called party. The inward operator would identify the calling party to the called party, then coordinate the completed telephone circuit with the originating local operator.

Direct dial systems using automated protocols over the Public Switched Telephone Network eventually phased out the operator switchboard system by the 1960's. Unlike the system utilizing human operators, the direct dial networks did not readily identify the calling party to the called party. The relative anonymity of automated PSTN systems created both inconvenience and the potential for abuse. The invention of what became known as caller identification addressed these shortfalls. Between 1969 and 1975, Mr. Theodore Paraskevakos successfully claimed twenty separate patents related to automatic telephone line identification. By 1989, Bell Atlantic, BellSouth, and U.S. West Communications had implemented caller identification in their consumer service offerings.

Caller identification, or Caller ID, may colloquially refer to the presentation of either the calling party's telephone number, or name, to the called party. The initial caller identification systems transmitted only the calling party's phone number to the called party. By their rollout in the late 1980's, or shortly thereafter, the "Baby Bell" Caller ID service offerings typically included both CID and CNAM functionality. These services grew in popularity, with tens of millions of subscribers by the late 1990's. For this specification, caller identification, or CID, refers to the presentation of the calling party's phone number to the called party. Caller name identification, or CNAM Caller ID, shall refer to the presentation of the calling party's name to the called party.

The technical protocols for Caller ID evolved since Mr. Paraskevakos' invention, to what is now industry-standard implementation over the PSTN SS7 network. Despite the standardization of the protocol, telephone line portability deregulation significantly increased the complexity and cost of a CNAM Caller ID query. CNAM information previously held in a few databases of the Baby Bells increased to hundreds, if not thousands, of databases operated by the emerging telephone companies.

At the time of filing, a complete CID & CNAM Caller ID query typically involved the following steps: 1) the CID is transmitted from the calling party to the called party during SS7 call circuit provisioning (the network "page"), 2) a Global Title Translation (GTT) is initiated from the called party's SS7 signaling transfer point (STP) to determine which CNAM database and telephone carrier represents the calling party CID, 3) a GR-1188 CNAM query is relayed via SS7 to the service control point (SCP) for the respective CNAM database, and 4) the GR-1188 CNAM query result is presented to the called party. The exact sequence of events may vary depending upon the called and calling party's intercarrier agreements and SS7 implementation. Characteristic of the prior art implementations, the entire sequence of events takes place during the ringing or network page, and prior to the call completion.

As mobile phones and voice-over-IP telephony (VOIP) proliferated over the past decade, many providers never implemented full CNAM Caller ID to their mobile or VOIP end-users. Those that did implement CNAM Caller ID usually charge a monthly fee for CNAM Caller ID. For example, a major American wireless carrier recently began offering "Caller Name ID" as a premium monthly feature. Furthermore, individuals now may own several phone numbers, including a home land-line, a personal cellular mobile, and a VOIP line at work. Subscribing to a monthly CNAM service on multiple lines, if the feature is even available, is costly. As a result, CNAM Caller ID prevalence is trending backwards.

## SUMMARY OF THE INVENTION

In view of the foregoing limitations inherent in the known types of caller identification systems present in the prior art, the present invention provides a post-page caller name identification system. This standalone system may function for multiple telephone devices owned or operated by the end-user. The system is independent of the end-user's carrier implementation (or lack thereof) of CNAM Caller ID.

The utility of the present invention, which shall be described subsequently in greater detail, is to identify the calling party's name when only the CID is known. This is typically the case with most modern cellular mobile and VOIP systems. The present invention's post-page functionality complements the prior art. In an ideal telephony network, CNAM Caller ID would be transmitted during the page, or ring. As described above, CNAM implementation has been declining for a decade due to increasing complexity of carriers. This necessitates the present invention as the next-best solution for an end-user wishing to identify a calling party.

To attain this, the present invention comprises a system that interfaces the user directly with the calling party's SS7 SCP-connected CNAM database. After a call or page terminates, the user accesses the present invention via the user terminal, which may operate on a mobile phone application or via direct HTML web access. The user inputs the CID information relayed from the calling party to the end-user. The system then performs a Global Title Translation (GTT) query using its SS7 node. The GTT lookup returns the respective phone carrier and CNAM database applicable to the CID. The system then performs a GR-1188 CNAM query via SS7 to the service control point (SCP) for the

respective CNAM database. Finally, the CNAM query result is presented on the user-interface.

By utilizing the present invention, the end-user consolidates CNAM services and enjoys significant cost savings. At time of filing, a commercial implementation of the present invention was offered free-of-charge to the user via either a smartphone applications or direct web access. As stated above, the CNAM functionality offered by the present invention is often unavailable, even as a premium service, on many VOIP and cellular carriers.

The calling party may opt-out from this process at three points. First, the calling party may opt-out from CID transmission on a per-call basis, which is typically known as "*67 Caller ID Block." Second, the calling party may inform his/her carrier to remove his information from their CNAM database. Third, the calling party may opt-out using a form implemented on the privacy policy page of the present invention.

## BRIEF DESCRIPTION OF THE DRAWINGS

Features of the exemplary implementations of the invention will become apparent from the description, the claims, and the drawings in which:

FIG. 1 identified as subparts 1A, 1B, & 1C, represents three typical variations of the caller identification prior art;

FIG. 2 is a graphical depiction of the core system components and their interactions;

FIG. 3 is a flow diagram enumerating each possible step the system performs to process a user query for caller name identification; and

FIG. 4 depicts two additional embodiments of the user interface.

## DETAILED DESCRIPTION

From FIG. 1, three scenarios are identified which represent the current prior art of caller identification systems. Scenario 1A represents the ideal provisioning of a call where the called party receives both the name and phone number of the calling. In this case, the CID and CNAM are 617-555-1212 and "Smith, Robert," respectively. Scenario 1B, the middle illustration, only provides the calling party phone number. This scenario is typical of most cellular mobile carriers. In lieu of the CNAM, the cellular carrier will approximate the location of the calling party, although this is frequently subject to error. Scenario 1C, illustrated at the bottom of FIG. 1, depicts a typical VOIP caller identification presentation, which only includes the calling party number (CID).

Having understood the possible combinations of CID and/or CNAM presentations possible on a caller identification system, FIG. 2 embodies the components of the present invention utilized in the context of the scenario depicted in FIG. 1B. The calling party has placed a call (1) over the PSTN, and the carrier has provisioned for the CID and estimated location to be presented on the end-user's telephone screen (2) during the network page.

The end-user initiates use of the system by accessing the user terminal. The user enters the CID from (2) into the CID entry field (3) of the user terminal. After entering a valid CID, the user (4) submits the query to the system. The system then initiates the "CNAM database query" (5) via the SS7 network.

There exist several methodologies to obtain a CNAM database result via SS7, and the exact implementation depends upon the calling party's carrier, the system's carrier, and any contractual relationships between the two carriers. Exemplified in FIG. 2, and most typical, the system performs a Global Title Translation (6) using various Line Information Databases (LIDBs) to determine the calling party's carrier. In some cases, the system will already know the calling party's carrier (e.g. if they are the same as the called party), and this step will be unnecessary. Once the carrier is known, the system is able to route a CNAM query using GR-1188 (7) to the appropriate SS7 signal control point (SCP). The SCP controls CNAM database access for a given phone carrier. For the purposes of this invention, the entire process is referred to as "CNAM Database Query" (5) and refers to any of the proper SS7 methods to retrieve CNAM information.

Upon successful CNAM database query, the CNAM Caller ID is relayed back to the user terminal. The caller name identification is displayed on the appropriate user interface element, thereby completing the process.

FIG. 3 serves as a flow diagram enumerating all possible steps for the system, as embodied, to carry out its function. The utilization of this system commences upon end-user receipt of a CID page (100). The user then activates the system by entering the page CID into the CID entry interface (101). Before the system proceeds, it first validates that the CID is not listed within the system's opt-out privacy database (102). At this stage, the system may also ask the user to confirm the CID had been transmitted to a telephone device they own or operate.

The system then instructs the SS7 interfacing node to initiate an SS7 session, if one is not already active (103). The exact state or instructions relayed to the SS7 switch/node varies depending upon carrier implementation. Once the SS7 session is active, a Global Title Translation (GTT) is performed using the CID from the CID entry interface. (104). The GTT returns the calling party carrier information necessary to locate the carrier's CNAM database on the SS7 network. A query is thereafter sent, usually via the GR-1188 protocol, to the signal control point (SCP) for the calling carrier CNAM database (105). Assuming the calling party didn't opt-out from its carrier CNAM database, the calling party's CNAM is returned to the system's SS7 node (106). Then, the CNAM database query result is displayed on the user interface (107).

FIG. 4 depicts additional embodiments of the system relating to its user interface. In this illustration, the system's SS7 interface (200) is physically separated from its user interface. The user interface is implemented on either another computer linked via the TCP/IP (204), or the end-user's telephone that received the initial call page (203). The SS7 interface communicates (201 or 202) with the user interface via an industry standard API protocol such as JSON.

I claim:

[1. A system, functioning independently of a called party's telephone carrier and device, provides a calling party's CNAM after entry of the calling party's telephone number CID, comprising:

a) an entry field, within a HTML web or mobile phone application, permitting the called party to input a query, post-page, specifying the CID;

b) an SS7 interfacing node permitting real-time access to the SS7 network;

c) a function serving as a direct interface between the called party's query and the calling party carrier's respective CNAM database;

d) within the HTML web or mobile phone application, a display of the successfully queried calling party CNAM.]

[2. The system of claim 1, wherein the web or mobile phone application provides free-of-charge CNAM resolution for any of the end-user's multiple telephony devices, thereby permitting cost-savings.]

[3. The system of claim 1, wherein the called party enjoys significant cost savings and free-of-charge CNAM querying through an advertising display within the user interface.]

[4. The system of claim 1, wherein component function (c) additionally:

confirms that the CID is not subject to system opt-out privacy controls; and

confirms that the CID paged a telephonic device owned or operated by the called party.]

[5. A method for providing a called party with the calling party's CNAM after a network page, independent of interaction with the carrier or device receiving the page, comprising the following steps:

a) entering of the calling party's telephone number CID into a web HTML or mobile phone application query field;

b) connecting to the PSTN via an SS7 interfacing node;

c) directly querying the calling party carrier CNAM database with the CID query entry;

d) displaying the successfully queried calling party CNAM on the HTML web or mobile phone application user interface.]

[6. The method of claim 5, further comprising a step to display advertising sponsorship on the web or mobile phone application interface, thereby achieving significant user cost savings and free-of-charge CNAM querying.]

*7. An SS7 interfacing node connected to both a TCP/IP network and an SS7 communication network, comprising:*

*a TCP/IP network interface configured to provide a connection to a user terminal, the connection being configurable over an application program interface (API) using an industry standard protocol; and*

*an SS7 communication network interface configured to communicate with signal control points (SCPs) on the SS7 communication network;*

*wherein the SS7 interfacing node is configured (a) to receive from the user terminal over the TCP/IP network interface a query of a caller name identification (CNAM) database for a CNAM based on a telephone number obtained from a paging signal of an SS7 call, (b) to transmit the telephone number in a carrier identity request over the SS7 communication network interface to one or more line information databases (LIDBs); (c) to receive a carrier identity from the LIDBs over the SS7 communication network interface; (d) based on the carrier identity, to forward the query using GR-1188 to one or more CNAM databases over the SS7 communication network interface, (e) over the SS7 communication network interface, to receive from the CNAM databases a CNAM associated with the telephone number; and (f) over the TCP/IP network interface, to provide the received CNAM as the calling party's name to the user terminal.*

*8. The SS7 interfacing node of claim 7, wherein the industry standard protocol comprises JSON.*

*9. A method in an SS7 interfacing node connected to both a TCP/IP network and an SS7 telecommunication network, comprising:*

*configuring a TCP/IP network interface with a user terminal using an application program interface (API) that conforms to an industry standard protocol; and*

*configuring an SS7 communication network interface that communicates with one or more line information databases (LIDBs) and one or more SS7 signal control points (SCPs) over the SS7 communication network;*

*wherein the SS7 interfacing node (a) receives from the user terminal over the TCP/IP network interface a query of a caller name identification (CNAM) database for a CNAM based on a telephone number obtained from a paging signal of an SS7 call, (b) transmits the telephone number in a carrier identity request over the SS7 communication network interface to one or more line information databases (LIDBs); (c) receives a carrier identity from the LIDBs over the SS7 communication network interface; (d) based on the carrier identity, forwards the query using GR-1188 to one or more CNAM databases over the SS7 communication network interface, (e) over the SS7 communication network interface, receives from the CNAM databases a CNAM associated with the telephone number; and (f) over the TCP/IP network interface, provides the received CNAM as the calling party's name to the user terminal.*

*10. The method of claim 9, wherein the industry standard protocol comprises JSON.*

* * * * *

**EXHIBIT B**



OkCaller.com

User Login

Reverse Lookup

MY NUMBERS

ADDRESS BOOK

MY COMMENTS

AUDIT LOG

RECENT SAFECALLER

RECENT NOT SAFE

SEND MESSAGE

WEBSITE & BLOG OWNERS

Ad served by Google

Ad options

Send feedback

Why this ad?

Home > Terms of Service

# Terms of Service

OkCaller.com TOS

# Web Site Terms and Conditions of Use for OkCaller

## Preamble

Welcome to OkCaller, the pioneering Web Caller ID system, established in 2014, with a mission to uphold the inherent right of individuals to know who is reaching out to them via call or text. Grounded in the philosophy of "natural law," our service is predicated on the principle that every person has an innate right to identify their communicators, akin to the ability to see or hear someone approaching in the physical world. This principle, increasingly overlooked in our digital age, forms the core of OkCaller's operations and distinguishes our service within the digital communication landscape.

## Definitions

- **Natural Law:** A philosophical belief asserting that certain rights are inherent by virtue of human nature and universally cognizable through human reason. In the context of OkCaller, "natural law" refers to the fundamental right of individuals to know who is communicating with them, paralleling the ability to identify someone in person.
- **Caller Name ID:** The identification of a caller or texter provided by OkCaller, enabling users to see the name associated with the phone number from which they received a call or text.
- **Forward Search:** Using OkCaller to find a phone number based on a name. This practice is strictly prohibited.
- **Reverse Search:** Using OkCaller to identify the name associated with a phone number from which one has received a call or text. This is the only permitted use of OkCaller.
- **Opt-Out:** The process by which individuals can remove their information from the Caller Name ID system, ensuring their name and number are not identifiable by OkCaller's service.

## 1. Acceptance of Terms

By accessing and using OkCaller, you acknowledge and agree to these Terms and Conditions of Use, all applicable laws and regulations, and agree that you are responsible for compliance with any local laws. If you disagree with any part of these terms, please do not use OkCaller.

## 2. Use License

Permitted Use: OkCaller grants you a non-exclusive, non-transferable, limited right to access, use, and display the site and the materials thereon for your personal, non-commercial use, strictly for reverse search purposes.

Prohibitions: You agree not to use OkCaller for forward searches, bulk downloads, spam, or any form of automated scraping. The dissemination, transmission, or unauthorized reproduction of any Caller Name ID obtained from OkCaller is expressly forbidden.

Opt-Out Procedure: Individuals wishing to remove their information from OkCaller may do so by either contacting their phone carrier (e.g., Verizon, AT&T, T-Mobile) for CNAM blocking or utilizing our SMS-based opt-out system. Detailed instructions for both methods are provided within the opt-out section of these terms.

## 3. Disclaimer

The materials on OkCaller's website are provided "as is". OkCaller disclaims all warranties, expressed or implied, concerning the accuracy, reliability, or legality of any information contained on its website.

## 4. Limitations

In no event shall OkCaller or its suppliers be liable for any damages arising out of the use or inability to use the materials on OkCaller's website.

## 5. Revisions and Errata

The content on OkCaller's website could include errors. OkCaller does not commit to updating materials, although it may change the content at any time without notice.

The content on OkCaller's website could include errors. OkCaller does not commit to updating materials, although it may change the content at any time without notice.

## 6. Third Parties

OkCaller does not sell user data. We engage Google AdSense for ad sponsorship, which supports the free service provided to users.

## 7. Site Terms of Use Modifications

OkCaller may revise these terms at any time without notice. By using this website, you are agreeing to the current version of these Terms and Conditions.

## 8. Governing Law

These terms are governed by the laws of the State of Florida, without regard to its conflict of law provisions.

## Patent and Standards Compliance

OkCaller operates in strict adherence to SS7/PSTN (Signalling System No. 7/Public Switched Telephone Network) standards, specifically leveraging the GR-1188 CNAM standard to facilitate the transmission of "Caller Name ID" information. This process involves the identification of the "Calling Party" (the initiator of the call or text) and the presentation of this information to the "Called Party" (the recipient). For a comprehensive understanding of the technological and legal framework that underpins our service, we reference the United States Patent Office (USPTO) patent RE48847, which exclusively authorizes OkCaller to provide web-based caller ID services.

OkCaller's unique position as the sole authorized provider of web caller ID services under this patent means that opting out from our system effectively removes your information from the broader internet-based caller ID ecosystem. We have communicated this exclusivity to major technology platforms, including Google and Apple. Consequently, should your Caller Name ID (CNAM) be displayed on other websites in association with Google or Apple (including instances of ad sharing or revenue generation), there may be grounds for privacy infringement claims.

It's important to emphasize that the necessity to opt-out from web-based Caller ID systems should only arise once. OkCaller's opt-out process is designed to be comprehensive, ensuring that your CNAM information is withdrawn from all internet "web caller ID" systems, reflecting our commitment to user privacy and data protection.

## Detailed Opt-Out Procedure

To ensure the protection of your privacy, OkCaller provides a straightforward opt-out procedure, aligning with our adherence to SS7/PSTN standards and our patent authorization:

1. **Via Carrier:** Contact your telecommunications service provider to request CNAM blocking, which prevents your Caller Name ID from being displayed across Caller ID systems, including web-based platforms.
2. **Via SMS System:** Utilize OkCaller's SMS-based opt-out service by sending a designated code (details available on our website) from the number you wish to remove. A confirmation will be sent upon successful completion of the opt-out process.

If difficulties arise during the opt-out process, please follow these steps:

- Send a certified letter to OkCaller outlining the issues encountered during your opt-out attempt. Address this to: OkCaller.com Opt-Out, 10312 Orchid Reserve Dr, West Palm Beach FL 33414.
- Email us at info@okcaller.com with the subject line "OPTOUT FAILURE AFTER COMPLIANCE WITH TOS," including your phone number and any relevant details or proof of your attempt to opt-out using the prescribed methods.

This procedure is integral to our commitment to upholding the highest standards of privacy and user autonomy in the digital communication landscape.

## 9. Liquidated Damages and Law Enforcement Referral

In the event of unauthorized use of OkCaller's system, including but not limited to bulk, automated, or fraudulent use for "forward search" purposes or any form of manipulation intending to bypass the intended use of OkCaller, such actions will be met with stringent legal consequences. This includes entities possessing power of attorney or any form of delegated authority, underscoring our stance that "natural law"—the inherent right of an individual to know who is communicating with them—cannot be assigned or transferred to another party. Violations of these terms, particularly misuse involving automated systems or unauthorized "forward search," will obligate the offending party to remunerate OkCaller with $2000 per CNAM in liquidated damages and $19 million minimum damages for any mass violation. Furthermore, such cases will be promptly referred to law enforcement for further action. This clause is foundational to protecting the integrity of our system and the privacy of individuals against unauthorized and unethical exploitation. You agree to pay attorney's fees for any efforts to enforce these Terms of Service



## 10. Protection of Personally Identifiable Information (PII) and Non-Caching by Search Engines

Since its inception, OkCaller has been unwavering in its commitment to safeguarding personally identifiable information (PII) and ensuring the ethical handling of such data. A pivotal aspect of our efforts to protect user privacy includes our collaboration with search engines to prevent the caching of pages containing Caller Name ID, effectively prohibiting "forward search" capabilities. This initiative, established in 2014, underscores our dedication to preventing the unauthorized dissemination of personal information and maintaining the confidentiality of our users' identities. We assert that search engines do not possess the right to cache or archive any content from OkCaller that includes CNAM (Caller Name ID) data, reinforcing our stance against the public indexing of sensitive information. Through these measures, OkCaller aims to fortify the privacy protections for our users, emphasizing our role as a responsible steward of personal data in the digital age.

© 2024 OkCaller, Inc
Privacy Policy
Terms of Use

Case 9:24-cv-80395-RLR Document 1-2 Entered on FLSD Docket 04/01/2024 Page 15 of 18

**To: Alphabet Inc. Legal Team**
**Date: January 2, 2024**
**Re: Deposition Subpoena –**
***Thanksgiving 2022 Adverse Event & December 2022 Anti-Semitic Event***

Dear Alphabet Legal Team:

I am writing on behalf of my client, Dr. Jeff Isaacs, in reference to the ongoing legal matter involving Alphabet Inc, Google Miami, and OkCaller.com, notably referred to as the "Thanksgiving 2022 Adverse Event." This letter serves as formal notice that a subpoena has been issued demanding a witness familiar with this matter testify at deposition. We are amenable to modifying the location or conducting the deposition remotely; we chose a hotel in Brickell near Google Miami in efforts to facilitate the witness' travel to the deposition.

As you are aware, we have previously communicated with your wholly-owned subsidiary regarding the alleged termination of Google LLC's reverse phone search partnership with OkCaller.com and the subsequent impact on witnesses, including Dr Isaacs. Our concerns particularly revolve around potential violations of 18 U.S.C. §1512 and related statutes, as detailed in our correspondence dated August 24, 2023, and subsequent communications.

Despite our attempts to engage in a constructive dialogue and our requests for confirmation of an investigation into these serious allegations, we have not received satisfactory responses. Our last communication, underscoring the need for evidence preservation and a thorough investigation into the abrupt changes in Google's search algorithm impacting OkCaller.com, has not been adequately addressed.

Given the gravity of the situation and the immediate legal implications in *Keller Williams*, we find it necessary to proceed with this subpoena to obtain testimony covering your investigation and reservation of all relevant documents, communications, emails, internal memos, and other electronically stored information (ESI) related to this case. This includes, but is not limited to, information pertaining to the decision-making process regarding OkCaller.com's status in Google's reverse phone search algorithm; Google's ten largest phone search websites by organic referral volume; testimony about infringers of the reissue patent; testimony of Google's investigation into infringement; Google's induced/passive profits from infringement; testimony about correspondence about OkCaller.com; and any other information related to Dr Isaacs' attendance as a "trusted partner" at Google Miami or other relevant information to this matter. We also seek information as to the auto-delete impact on relevant evidence, as documented by FBI.

Please be advised that failure to comply with this subpoena may result in legal consequences, including but not limited to, sanctions for contempt or obstruction of justice. We expect full cooperation in this matter.

I would also like to take this opportunity to provide further documentation on the Thanksgiving 2022 Adverse Event. In 2013, Dr. Isaacs, an aspiring neurosurgeon, invented the OkCaller.com website. He was awarded a US patent (RE48847) for the reverse phone search technology

implemented on OkCaller.com, which remains valid today. Google immediately recognized the value of Dr. Isaacs work, and quickly ranked OkCaller amongst the top reverse phone sites:




By Google's own Analytics records, OkCaller received 293 million new users since launch, and 605 million pageviews. This traffic was notably steady over nearly a decade, ranging between 100,000 and 300,000 daily sessions. This ranked OkCaller typically amongst the Top 2000 websites on Google, roughly on par with well-known brand sites like Jeep.com. Dr. Isaacs' site was run almost entirely by himself, which places the site amongst the Top Fifty individually (non-blog) managed sites featured by Google. In short, these sites were curated by Google's teams and obtained a placement on the web that nearly every programmer aspires to.

Google communicated with Dr. Isaacs regularly. I have attached a 2015 email in which Google states:

> *"You are one of the few partners who we have invited for Enhanced Support and Optimization. Thank you for working with us! We are grateful to count you as a trusted partner, and we hope to continue improving our relationship to suit your business needs."*

This "trusted partnership" went beyond mere ranking of a website. OkCaller, a hand-picked Google success story, resulted in Dr. Isaacs regularly attending workshops with senior Google personnel in their Miami office. The site generated around $5 million per year, consistently, in

AdSense revenue. Sites like this fundamentally allowed Google to reach the success it enjoys today.

However, on the day Dr. Isaacs tendered a Closing Brief in an Apple antitrust lawsuit, Alphabet abruptly terminated this partnership without any prior notice. Other competitors in Reverse Phone Search continue to receive millions of organic referrals monthly from Google/Alphabet. Blatant copycat sites (which infringe upon the reissue patent) such as RevealName continue to receive millions of referrals monthly from your service. Consumers are being overcharged with sites like Whitepages and Spokeo, which also appear to infringe upon the reissue patent (or warrant investigation). We have spent a year now asking you to investigate and preserve evidence, only to be stonewalled.

After Thanksgiving Day, Dr. Isaacs experienced significant respiratory issues, necessitating a troponin test to rule out myocardial damage. With the financial insecurity from his sudden OkCaller career termination and your ongoing subversion of his IP, Alphabet placed Dr. Isaacs under duress, and he placed his primary home for sale with Defendant Keller Williams. Because Alphabet refused to even dignify a response, Dr Isaacs remains in a state of limbo, watching his Google Analytics traffic daily for signs his work-product has been restored to its rightful position in search. Shutting down OkCaller would be costly as well; Dr. Isaacs requests Alphabet's confirmation of partnership status to make an efficient decision. We request that Alphabet investigate and testify as to all evidence in their possession pertaining to the financial and emotional distress such decisions have caused developers, including Dr. Isaacs. All documentation, notes, or memoranda supporting or refuting the assertion that "trusted partners" may constitute "independent contractor," "worker," "employee," "agent," or "representative" subject to legal protections around such privity is hereby requested to be known to your representative at deposition.

Additionally, testimony on the circumstances leading to near-outright sudden termination of Top 2000/Top 50 sites is requested, as it is believed an event like this, especially on a holiday, is nearly unprecedented.

By running OkCaller individually, Dr. Isaacs was able to operate a phone site for 300 million people at enormous efficiency savings, estimated at over $100m saved to the domestic economy. Alphabet is asked to provide testimony on all evidence of their profit streams and ranking factors from lucrative, over-priced competitors that charge users to look up phone records (eg WhitePages). OKCaller has been and always was a free service. We request you furnish testimony that corroborates or contradicts Dr. Isaacs' claim of his site contributing a $100 million savings to the domestic economy.

Despite repeated requests, Alphabet failed to even acknowledge the termination of this partnership: a basic tenet of human employment dating back as far as records go. This termination appears to be the latest in escalating witness retaliation spanning nearly two decades, in violation of Section 1512. (*See generally*, USC, Dartmouth Email Destruction & World Bank President Resignation, and Apple litigation, which all directly relate back to a Rehabilitation Act prohibited anti-Semitic bullying event in 2005.) Just like Dr. Isaacs was summarily pulled from his promising neurosurgery career, Google has now improperly cancelled him as a "trusted partner" serving *three hundred*

*million* Google users, with absolutely no good cause. In fact, Alphabet's woefully inadequate responses thus far leave little room for doubt OkCaller's cancellation is part and parcel of this never-ending § 1512 saga.

During the *United States v. Google* antitrust trial last month, it was revealed that Google pays Apple Inc over 30% of revenue corresponding to iOS/Mac Search. This subpoena requests testimony on financial estimates of payments OkCaller generated that were directed to Apple. Likewise, all payments generated by websites that infringe upon the reissue patent are requested for testimony. Similarly, testimony familiar with documentation of any other agreements, contracts, or *de facto* relationships with Apple that could impact OkCaller's operations and/or rankings is hereby requested, including, but not limited to, communications channels discussing website security, privacy, reputation, affiliations, IP, or other matters.

This letter hereby demands that Google testify about all evidence that may support (or refute) these claims. The individual at deposition shall be familiar with all relevant facts mentioned in this letter, the Ninth Circuit Motion for Referral, and other documents previously provided to Alphabet.

As described more fully in Plaintiff's Ninth Circuit request for referral, that individual may reference any organization chart identifying all individuals (staff, managers, attorneys, etc) that played a role in either the Thanksgiving 2022 Adverse Event or the December 2022 Anti-Semitic Reference Event. She/he shall be familiar with any evidence Alphabet possesses documenting any investigation into either of these events.

We are amenable to a confidentiality order to given the sensitivity of the requested information. Please contact me at least fourteen (14) days in advance of the production date, should Alphabet wish to formalize such an order.

For the purposed of this subpoena, "termination" shall refer to any partial termination or removal of OkCaller pages from Reverse Phone Search. These removals are estimated to approximate 97-99% of steady-state levels over the past decade. Should you have any questions or require further clarification, do not hesitate to contact me.

Sincerely,
Keith Mathews

Case 9:24-cv-80395-RLR Document 4 Entered on FLSD Docket 04/01/2024 Page 1 of 1

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

Dr. Jeff Isaacs

*Plaintiff(s)*

v.

Google LLC

*Defendant(s)*

Civil Action No. 24 CV 80395

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* Google LLC
1600 Amphitheatre Parkway
Mountain View, CA 94043

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are: Dr. Jeff Isaacs
11482 Key Deer Circle
Wellington, FL 33449

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

CLERK OF COURT

*Signature of Clerk or Deputy Clerk*

Date: 04/01/2024