Ayelet Faerman, Esq.
Faerman Law P.A.
3859 NW 124 Ave
Coral Springs, FL 33065
954-271-8484
ayelet@faerman.law

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| GREENFLIGHT VENTURE CORPORATION, JEFFREY D. ISAACS, MD<br>*on behalf of themselves*<br>*and all others similarly situated*<br><br>                    Plaintiffs,<br><br>vs.<br><br>GOOGLE LLC<br><br>                    Defendant. | Case No. **24-cv-80395-RLR**<br><br>**SHERMAN ACT ANTITRUST CLASS ACTION**<br><br>**FIRST AMENDED COMPLAINT**<br><br><br>DEMAND FOR JURY TRIAL |

<u>**PLAINTIFFS' FIRST AMENDED COMPLAINT**</u>

<u>**FOR DAMAGES AND INJUNCTIVE RELIEF**</u>

## I.        INTRODUCTION

1. This is a class action lawsuit representing web developers, including lead Plaintiff Greenflight Venture Corporation, concerning conduct alleged against Defendant Google LLC for violations of federal antitrust laws, including the Sherman Act, and state competition laws, including the Florida Deceptive and Unfair Trade Practices Act (FDUTPA). This action arises from Google's unlawful monopolization of the market for general search engines (GSE) and its anticompetitive behavior that has caused significant harm to downstream markets, including specialized search services created by web developers, such as the Plaintiffs. A Developer Compensation Fund is sought as redress for the proposed class members.

2. The Department of Justice (DOJ) recently prevailed in a landmark case against Google, establishing that Google has unlawfully maintained a monopoly in the United States GSE market. This case addresses the broader impact of Google's anticompetitive practices on related markets, where Google's monopolistic behavior has stifled innovation, suppressed competition, and inflicted substantial economic harm on specialized search providers and web developers.

3. Plaintiffs and other web developers operate in markets that depend on fair and competitive access to internet users through general search engines like Google. By leveraging its dominance in the GSE market, Google has distorted competition in these downstream markets, favoring its own products and those of its strategic partners while disadvantaging independent developers and specialized service providers.

4.  As a result of Google's conduct, Plaintiffs and members of the proposed class have suffered significant financial harm, including loss of revenue, diminished market share, and a decrease in consumer choice. This lawsuit seeks to redress these injuries and to restore competition in the affected markets through damages and injunctive relief. In some instances, web development projects were additionally protected under various intellectual property laws including trade dress, affecting rampant copycat sites on Google, and patent, constituting further related violation of state competition laws.

## **VENUE**

5.  Venue in the Florida Southern District is proper under 15 U.S.C. § 22, which states that any suit proceeding under antitrust laws against a corporation may be brought in any district where it transacts business. Venue is additionally proper in this District under 28 U.S.C. § 1391(b) and (c), as Google LLC resides in part, transacts business, and is found in this District, and a substantial part of the events giving rise to Plaintiffs' claims occurred in this District. Venue is further appropriate under 28 U.S.C. § 1400(b) for patent infringement cases. Defendant Google LLC ("Google") has committed acts of patent infringement within this district, including, but not limited to, offering for sale and selling infringing products and services to Florida citizens and maintaining a business presence. Google engaged directly with Plaintiffs, for years, hosting meetings and events in Miami, Florida. Such activities demonstrate that Google LLC has a substantial and continuous presence within this district, making it a proper venue for this litigation.

6.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), as this action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§

1 and 2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. The Court also has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

7. This Court has personal jurisdiction over Defendant Google LLC because Google conducts substantial business in this District, including related operation of its search engine services that are at the core of this litigation. Google has purposefully availed itself of the privilege of conducting business in Florida by maintaining continuous and systematic contacts with this state, thereby rendering the exercise of jurisdiction by this Court over Google consistent with traditional notions of fair play and substantial justice.

8. The combination of Google's anticompetitive business activities within the State of Florida, its direct interactions with Plaintiffs within this jurisdiction, and the impacts of its alleged patent infringement on a Florida resident, collectively establish that exercising personal jurisdiction over Google LLC in the Southern District of Florida is fair, reasonable, and consistent with the principles of due process. Alternatively, Delaware would be the next-best forum under 28 U.S.C. § 1400(b). The Southern District of Florida is the most convenient and appropriate venue for this matter, as it minimizes the logistical and health-related challenges Plaintiff Dr. Jeffrey Isaacs would face if forced to travel extensively – disability has rendered him unable to fly for the past six years.

## II.     PARTIES

9. Plaintiff Greenflight Venture Corporation is a Florida C corporation with its principal place of business in Wellington, Florida. Greenflight Venture Corporation invests in diverse technology products, develops and operates specialized online services, including reverse phone search and medical research websites. The majority of the company's investment funds stem from its initial success working with Google on OkCaller.com. The company's

success and growth are heavily reliant on fair access to users via general search engines. Google's monopolistic conduct has significantly impacted the corporation's ability to compete, resulting in financial losses and stunted growth.

10.  Plaintiff Jeffrey D. Isaacs, M.D. is a United States citizen and resident of Wellington, Florida. Dr. Isaacs is the founder and principal of Greenflight Venture Corporation, through which he developed and operated a specialized reverse phone search service and other web-based platforms. Dr. Isaacs has invested substantial time and resources into developing innovative online tools that depend on fair and competitive access to users through general search engines like Google. Dr. Isaacs is the sole inventor of the reissue patent. Dr Jeffrey D. Isaacs is a Dartmouth-trained medical doctor (M.D) and computer scientist (A.B., *hons)*. Dr. Isaacs additionally holds an MBA in international studies from Wharton and INSEAD. At University of Pennsylvania's School of Engineering, he was a Benjamin Franklin Scholar. Before medical school, he matriculated at the Vanderbilt Law JD program for almost two years, where he had been awarded a full scholarship. Dr. Isaacs aspires to complete medical residency, should his health improve and blacklisting cease, having attained a 99/99 score above the average neurosurgeon on the USMLE National Medical Boards.

11. Defendant Google LLC is a limited liability company organized and existing under the laws of the State of Delaware, and is headquartered in Mountain View, California. Google is owned by Alphabet Inc., a publicly traded company incorporated and existing under the laws of the State of Delaware. Google operates the world's most widely used general search engine and engages in a range of business activities that substantially affect interstate commerce. Google provides a range of products and services that are marketed, distributed,

and offered to consumers throughout the United States, across state lines, and internationally. Today, Google is a monopoly gatekeeper of the internet, controlling around 95% of every query for information. The Department of Justice last week secured a guilty verdict against Google for its conduct in monopolizing general search engines. This case invokes identical Sherman foremarket and causes of action as the DOJ case, which is hereby incorporated by reference. As a result of its market power, Google is able to fully control how the majority of US customers look up phone numbers, by directing them to sites like OKCaller or competitors.  Google profits from these queries through advertisements on websites, and/or a 30% share of phone directory app purchase commissions. The DOJ verdict indicated Google pays Apple $20 billion annually to maintain its search monopoly. Google's control of US search, combined with Apple's control over US smartphone apps, is alleged to constitute duopoly control over major United States internet content, access methods, and/or on-ramps generally.

### III.    FACTUAL HISTORY

12. Since its now famous inception as a "Do No Evil" fledgling startup, Google has taken a concerning, increasingly anticompetitive approach to internet search, leveraging vast economies of scale to further their own economic and even political interests.

13. There has been a growing international consensus that Google engages in anticompetitive conduct to monopolize internet search.  This is part of an emerging trend of global public interest in regulating "Big Tech." The world rapidly adopted smartphone internet connectivity over the past two decades, leading to vast economic and sociological implications. Recent government antitrust proceedings are of particular relevance to this

case, which combined form an international consensus that Defendant harms competition and innovation by monopolizing internet search.

14. These include a verdict last week in the Department of Justice antitrust lawsuit against Defendant for monopolizing the general search engine services and search advertising markets. Relevant background information in that lawsuit (*20-cv-3010, D.C.*) is directly applicable and thus incorporated and asserted herein:

> "Two decades ago, Google became [] an innovative way to search the emerging internet. That Google is long gone. The Google of today is a monopoly gatekeeper for the internet, and one of the wealthiest companies on the planet, with a market value of $1 trillion and annual revenue exceeding $160 billion. For many years, Google has used anticompetitive tactics to maintain and extend its monopolies in the markets for general search services, search advertising, and general search text advertising—the cornerstones of its empire.

> For years, Google has entered into exclusionary agreements, including tying arrangements, and engaged in anticompetitive conduct to lock up distribution channels and block rivals…Google's exclusionary agreements cover just under 60 percent of all general search queries. Nearly half the remaining queries are funneled through Google owned-and- operated properties (e.g., Google's browser, Chrome). Between its exclusionary contracts and owned-and-operated properties, Google effectively owns or controls search distribution channels accounting for roughly 80 percent of the general search queries in the United States. Largely as a result of Google's exclusionary agreements and anticompetitive conduct, Google in recent years has accounted for nearly 90 percent of all general-search-engine queries in the United States, and almost 95 percent of queries on mobile devices.

> Google has thus foreclosed competition for internet search. General search engine competitors are denied vital distribution, scale, and product recognition— ensuring they have no real chance to challenge Google. Google is so dominant that "Google" is not only a noun to identify the company and the Google search engine but also a verb that means to search the internet.

> Google monetizes this search monopoly in the markets for search advertising and general search text advertising, both of which Google has also monopolized for many years. Google uses consumer search queries and consumer information to sell advertising. In the United States, advertisers pay about $40 billion annually to place ads on Google's search engine results page (SERP).

Google's anticompetitive practices are especially pernicious because they deny rivals scale to compete effectively. General search services, search advertising, and general search text advertising require complex algorithms that are constantly learning which organic results and ads best respond to user queries; the volume, variety, and velocity of data accelerates the automated learning of search and search advertising algorithms…

Google's grip over distribution also thwarts potential innovation. For example, one company recently started a subscription-based general search engine that does not rely on advertising profits derived from monetizing user information. Another, DuckDuckGo, differentiates itself from Google through its privacy-protective policies. But Google's control of search access points means that these new search models are denied the tools to become true rivals: effective paths to market and access, at scale, to consumers, advertisers, or data.

Google's practices are anticompetitive under long-established antitrust law. Almost 20 years ago, the D.C. Circuit in *United States v. Microsoft* recognized that anticompetitive agreements by a high-tech monopolist shutting off effective distribution channels for rivals … were exclusionary and unlawful under Section 2 of the Sherman Act.

Absent a court order, Google will continue executing its anticompetitive strategy, crippling the competitive process, reducing consumer choice, and stifling innovation. Google is now the unchallenged gateway to the internet for billions of users worldwide. As a consequence, countless advertisers must pay a toll to Google's search advertising and general search text advertising monopolies; American consumers are forced to accept Google's policies, privacy practices, and use of personal data; and new companies with innovative business models cannot emerge from Google's long shadow. For the sake of American consumers, advertisers, and all companies now reliant on the internet economy, the time has come to stop Google's anticompetitive conduct and restore competition."

15. The DOJ action was filed subsequent to and based in part upon the "*Investigation of Competition in Digital Markets*" majority staff report and recommendation by the United States House of Representatives Subcommittee on Antitrust, herein referred to as the "House report." The facts uncovered by the House report applicable to Google are hereby wholly incorporated herein. That report is incorporated by reference herein, and for

convenience, relevant sections on specialized search, which describes Plaintiffs' service offerings, are directly restated:

> Google's claim that it ''operates in a highly competitive environment'' is also at odds with the lived reality of market participants. Numerous companies—spanning major public corporations, small businesses, and upstart entrepreneurs—told the Subcommittee that they overwhelmingly depend on Google for traffic and that no alternate search engine even remotely approaches serving as a substitute. For example, J&J Smith, a printer repair shop based in Rhode Island, stated, ''Google is our lifeblood. Foundem, a UK-based comparison shopping search provider, has noted that Google's ''overwhelming global dominance'' of horizontal search creates for most websites an ''uncomfortable but unavoidable reliance on Google.'' Many other companies described their dependence on Google in similar terms.

> Furthermore, some of the same specialized search providers that Google identifies as competitors stated that their own businesses heavily rely on Google, in some cases for up to 80 percent of traffic on both desktop and mobile devices. One specialized search provider wrote that Google's business practices ''have a very material effect on [our] business, but due to Google's monopoly power in search, there is nowhere else for [us] to turn for additional search traffic. The company is beholden to how Google decides to structure its search results page and algorithm. Another told the Subcommittee, ''From [our] perspective, there are no adequate substitutes for Google,''and, ''[T]hanks to its monopoly in general internet search, Google has become the gatekeeper for vertical search rivals.'' One specialized search provider said that 97.6 percent of its traffic comes from Google; another said that Google accounted for such an outsized share of traffic that ''we don't even track non-Google sources.''

> Google's apprehension about vertical search providers [is documented]. For example, a 2006 strategy memo identifying challenges asked, ''How do we deal with the problem of 'proliferating verticals?''' Another message noted, ''Vertical search is of tremendous strategic importance to Google. Otherwise, the risk is that Google is the go-to place for finding information only in the cases where there is sufficiently low monetization potential that no niche vertical search competitor has filled the space with a better alternative.'' In short, Google executives feared that vertical search providers would build direct relationships with users, thereby bypassing Google Search and diverting traffic, valuable data, and ad revenue. While vertical search providers were complements to Google in the short term, Google recognized their potential for disintermediating Google and therefore viewed them as a major competitive threat…

> Documents show that Google developed a multi-pronged strategy to thwart the threat. Two of these tactics included: (1) misappropriating third-party content; and (2) privileging Google's own services while demoting those of third parties.

Through these practices, Google exploited its dominance to weaken potential rivals and boost its search advertising revenue. Evidence shows that once Google built out its vertical offerings, it introduced various changes that had the effect of privileging Google's own inferior services while demoting competitors' offerings. This conduct has undermined the vertical search providers that Google viewed as a threat.

Additional market participants echoed the view that Google's self-preferencing comes at the expense of users. One search provider … noted that Google's limits on rival vertical search providers likely prevent consumers from seeing the cheapest or best-valued prices…

Google has actively demoted certain rivals through imposing algorithmic penalties. For example, in 2007 and in 2011, Google launched an algorithm that demoted sites that Google considered ''low quality.'' Among the websites especially hit were comparison shopping providers, which enable users to compare product offers from multiple merchant websites. In a submission to the Subcommittee, one publisher stated that Google's algorithmic penalty caused search leads and revenues to its website to fall by 85 percent.

In external messaging, Google justified the algorithmic penalties it imposed on third-party sites as a response to users' desire to see fewer ''low quality'' sites in their search results. However, Google did not subject its own vertical sites to the same algorithmic demotion, even though Google's vertical services aggregated and copied content from around the web—just like the third-party sites that Google had demoted. Indeed, Google's documents reveal that employees knew Google's own vertical sites would likely fit the demotion criteria that Google applied to other sites. When one employee suggested that Google index its comparison shopping site, Froogle, another responded that it was unlikely Froogle would get crawled ''without special treatment,'' noting, ''We'd probably have to provide a lot of special treatment to this content in order to have it be crawled, indexed, and rank well.''

Despite the fact that Google's own comparison shopping service was of such low quality that Google's product team couldn't even get it indexed, Google continued to give Froogle top placement on its search results page…

Through mis-appropriating third-party content and giving preferential treatment to its own vertical sites, Google abused its gatekeeper power over online search to coerce vertical websites to surrender valuable data and to leverage its search dominance into adjacent markets. Google's conduct both thwarted competition and diminished the incentive of vertical providers to invest in new and innovative offerings.

In an interview with the Subcommittee, one market participant observed that Google's conduct has sapped investment, as ''investors don't want to invest in companies that are producing content that relies on Google traffic,'' resulting in ''less capital invested in companies reliant on traffic from Google.'' The website

noted that Google's business practices have also skewed the website's own investment decisions, leading it to allocate the vast majority of its revenue to creating ''news-like temporary content'' rather than ''evergreen content.'' It added, ''If we could trust that Google was not engaging in unfair search practices, we would be producing different content.'' A vertical provider, meanwhile, said that Google's conduct had held the firm's growth ''at bay'' and risks reducing innovation over the long term, as providers whose growth is capped by Google may be more reluctant to invest and expand. It added:

> "Competitors are not the only ones who have a reduced incentive to innovate as a result of Google's conduct. The anticompetitive effects reduce Google's own incentives to improve the quality of its services, because it does not need to compete on the merits with rival services." Several market participants told the Subcommittee that Google's business practices in online search have already foreclosed opportunity: "It is my view that Google has removed essentially all of the oxygen from the open internet ecosystem. There is no longer any incentive or even basic opportunity to innovate as I did back in 2008. If someone came to me with an idea for a website or a web service today, I would tell them to run. Run as far away from the web as possible. Launch a lawn care business or a dog grooming business— something Google can't take away as soon as he or she is thriving."

> More broadly, market participants expressed concern that Google has evolved from a ''turnstile'' to the rest of the web to a ''walled garden'' that increasingly keeps users within its sites. Many observers have noted that when Google filed its initial public offering, Google cofounder Larry Page identified the company's mission as the following: ''We want you to come to Google and quickly find what you want. We want you to get you out of Google and to the right place as fast as possible. In recent years, however, studies have shown that more than half of all queries on Google either terminate on Google or result in a click to Google's own properties—a share that is growing over time.

16. The "Investigation of Competition in Digital Markets" majority staff report and recommendation by the United States House of Representatives Subcommittee on Antitrust provides compelling support and evidence supporting the Plaintiffs' claims.

17. Per the DOJ verdict, Google controls approximately 90% of the GSE market, which it has achieved and maintained through a series of exclusionary agreements and anticompetitive practices. These practices have effectively foreclosed competition in the GSE market, preventing rivals from gaining the necessary scale to compete meaningfully.

18.  Google's dominance in the GSE market has significant downstream effects on vertical and specialized search markets, which rely on fair access to users through general search engines. Web developers and specialized content providers, such as those offering reverse phone search, medical research tools, and other niche services, are directly harmed by Google's manipulation of search engine results. By favoring its own products and those of its strategic partners, Google has distorted competition, suppressing the visibility and accessibility of independent developers' services.

19.  Google has systematically undermined the ability of specialized content providers and developers to compete by: a. Manipulating Search Results: Google has intentionally ranked its own products and services, and those of its strategic partners, above those of independent developers, regardless of the quality or relevance of the content. This manipulation effectively forces independent developers to invest heavily in Google Ads or other Google services to maintain any visibility in search results. b. Exclusionary Agreements: Google has entered into agreements with major corporations and other partners that require the preinstallation of Google services on devices, further entrenching its monopoly and excluding competition from independent developers. c. Suppression of Innovation: By controlling the flow of traffic to specialized sites, Google has stifled innovation and limited consumer choice, forcing developers to either comply with Google's terms or risk being pushed out of the market entirely.

20. As a direct result of Google's anticompetitive conduct, Plaintiffs and other members of the proposed class, which includes web developers and operators of specialized content websites, have suffered substantial financial harm. This harm includes, but is not limited to: a. Loss of Revenue: Plaintiffs' websites have experienced a significant decrease in

traffic due to their demotion in Google search results, directly leading to a loss of revenue.

b. Diminished Market Share: Plaintiffs have lost market share as consumers are directed toward Google's own services or those of its preferred partners. c. Increased Costs: To maintain any visibility, Plaintiffs have been forced to spend considerable sums on Google Ads, effectively paying Google to compete in a market it already dominates. d. Suppressed Innovation: Plaintiffs have been unable to fully develop and deploy new features or services due to the financial constraints imposed by Google's anticompetitive practices.

21. Google has leveraged its monopoly power in the GSE market to control the downstream markets in which Plaintiffs operate. By manipulating search algorithms and controlling access to search traffic, Google has insulated itself from competition, ensuring that independent developers cannot effectively compete without being subjugated to Google's terms and conditions.

**Lead Plaintiffs Background – OkCaller.com & Greenflight Venture Corporation**

22. Plaintiffs Greenflight Venture Corporation are developers of web apps, smartphone apps, and related technologies. A substantial majority of the software applications developed by Plaintiffs could be considered specialized search websites and apps, and VSPs (vertical search providers). Two examples of such products are FactMed.com and OkCaller.com, which provide informatics portals for end-users in the pharmaceutical side effect and phone directory search services sectors, respectfully. As discovery will evidence, Plaintiffs spent much of the past decade developing around a dozen such software products. Plaintiffs are especially suited to represent the class of developers given the diversity of their projects, their extensive interactions with Google on both highly successful – and highly unsuccessful – endeavors. GFVC will demonstrate the inefficiencies and antitrust costs

incurred when its investment products weren't subject to fair ranking or transparent evaluation by Google. For example, even on their most successful investment, OkCaller.com, GFVC encountered systematic and routine difficulties with Google in its ability to improve their product or create competing, alternate versions for other markets. This resulted in significant lost investments of person-hours, monetary costs, goodwill, and other tangible and intangible losses. In most cases, both GFVC and Dr. Isaacs had shared ownership interests in a particular SVP, and thereby suffered losses collectively. Furthermore, GFVC and/or Plaintiff Isaacs would often partner with co-investors, friends, and/or family on new startups.

23. In 2012, during his medical residency at Dartmouth-Hitchcock Hospital in New Hampshire, Dr. Jeff Isaacs faced a life-altering challenge when he became disabled. Undeterred by this setback on his goal to be a neurosurgeon, and determined not to rely indefinitely on Dartmouth's own-occupation long-term disability benefit, Dr. Isaacs founded OkCaller.com in 2013. This initiative led to the awarding of U.S. Patent (Exhibit A – USPTO RE48847) for the groundbreaking reverse phone search technology the website utilized. Google, recognizing the significance of Dr. Isaacs' contribution, quickly elevated OkCaller to a premier position among reverse phone search sites:



24. By Google's own Analytics records, OkCaller garnered 293 million new users since launch and 605 million pageviews, positioning it among the top 2000 websites on Google, comparable to established brand sites like Jeep.com.  Dr. Isaacs' site was operated by Greenflight Venture Corporation, a Florida C Corporation which he serves as CEO. Regular communications between Google, Greenflight, and Dr. Isaacs underscored a partnership marked as highlighted in a 2015 email from Google:

> "You are one of the few partners who we have invited for Enhanced Support and Optimization. Thank you for working with us! We are grateful to count you as a trusted partner, and we hope to continue improving our relationship to suit your business needs."

25. This "trusted partnership" transcended mere algorithmic website ranking, making OkCaller a Google success story and facilitated Dr. Isaacs' participation in workshops with senior Google personnel in their Miami office, significantly contributing to Google's AdSense revenue. Working with independent sites like OkCaller fundamentally allowed Google to reach the success it enjoys today.

26. Because Dr. Isaacs ran the site efficiently, he gave away his patent for free, which allowed customers to save 90% on phone searches. Dr. Isaacs' invention saved US consumers over $100 million by estimate. Phone searches are a lucrative and substantial part of search engine revenues. Historically they were an early, even perhaps the first major profit center for Google.

27. Unlike nearly every competitor, Greenflight never sold information about its users to third-parties. Moreover, OkCaller was a decade early to implement privacy controls that the US Marshal service now asks all phone directories to do, to protect Federal Court personnel's residence data. That is a result of Dr. Isaacs' vision in 2013 to prevent forward lookups of confidential information, like phone numbers and addresses. OkCaller only permits "called parties" who received a text or phone call from an unknown "calling party" to look up the name of the person. The functionality of traditional Caller-ID over the web was novel and worthy of a patent, as it helped hundreds of millions safely find out, under "natural law," who communicated with them See OKCaller.com Terms, generally.

28. To wit, OkCaller was a successful Florida-based internet startup that offered the ideal phone directory: it worked, it didn't sell user data to anyone, it was free, and it prevented safety risks associated with forward-lookup caching , exemplifying Daniel's Law concerns.

It was also a successful outcome of the disability system, allowing Dr. Isaacs to promptly get back on his feet and serve others.

*A Convergence of Complex Litigation Emerges*

29. OkCaller faced considerable legal obstacles in the effort to bring free caller ID to the general public. As OkCaller gained market share, competitors took note and began to infringe upon Dr. Isaacs' patent. Within six months of Apple Inc. learning that Isaacs' desired to give away his patent for free and prevent high-grossing apps like Whitepages from charging for the same information, Apple dropped OkCaller from their Top 10 ranked phone apps to an unranked position. Whitepages simultaneously commenced a lawsuit to invalidate the patent under the controversial Alice IP case law. The patent went back to the drawing board, and the USPTO spent several years reviewing Federal Circuit findings while corresponding with Greenflight's MIT-trained intellectual property attorney to reissue the patent. Hence today, the reissue patent again enjoys presumption of validity, having survived double scrutiny by the USPTO and Federal Circuit Appeals Court.

30. Despite these obstacles, Google notably continued to support Dr. Isaacs' work, significantly aiding him in his endeavor to bring free caller ID services to the general public. Dr. Isaacs has faced nineteen years of federal litigation surrounding his medical credentials, and he believed he was improperly blacklisted from the federally-funded residency system. Google allowed Dr. Isaacs to work from home, as he dealt with the worsening health issues and complex federal litigation to enforce the clearing of his name.

31. Between 2014-2022, a former Assistant United States Attorney[1] who specialized in complex health care matters worked tirelessly to help Dr. Isaacs return to active medical practice.

32. Recognizing that his clinical medical career was indefinitely delayed, in February 2020 Plaintiff partnered with the inventor of the gold-standard test for heart attacks to develop a Coronavirus tracking app. Apple rejected the app "Coronavirus Reporter," the first of its kind, in March 2020. Plaintiff subsequently became a lead witness in Apple antitrust matters concerning App censorship which are ongoing and have received considerable media attention.

33. On the day Dr. Isaacs tendered a Closing Brief to the Ninth Circuit in the Apple antitrust lawsuit, Google abruptly terminated the OkCaller partnership without any prior notice. Other competitors in Reverse Phone Search were unaffected, including blatant copycat sites which infringe upon the reissue patent. His previous contacts, who for a decade were happy to provide Dr. Isaacs with consultation, suddenly went silent. Similarly, no meaningful response was to be found on the Webmaster Forum, which had previously garnered a response from Google Executive Mr. Mueller worthy of news coverage by a major SEO blog.

---

1.   [1] Former AUSA Mark Josephs, who spent almost a decade on a *pro bono* effort to reinstate what he called Dr. Isaacs' promising neurosurgery career, tragically passed away last year. In reviewing years of federal discovery files, AUSA Mark Josephs identified evidence that a California university was publishing false disciplinary records on national academic clearinghouses about Dr. Isaacs. The university had previously agreed, via two court-ordered federal settlement agreements, to acquit Isaacs of any controversies and seal the acquitted records. Two competent authorities, the American Academy of Medical Colleges, and a New Hampshire Employment Tribunal, both determined that the records had been expunged. Nonetheless, "leaked" records prevent Dr. Isaacs from practicing neurosurgery. Mr. Josephs sought declaratory action with the Department of Education and the California university. Both were blocked, due to statute of limitations and jurisdictional defenses raised by law firm Gibson Dunn. In 2020, The Ninth Circuit had a divided ruling with a stark dissent on the matter. This lawsuit will also seek the same declaratory judgment.

34. Plaintiff Isaacs, through his legal counsel, has spent the past year asking Google to investigate any link the aforementioned litigation, only to be stonewalled.

35. Plaintiff's legal counsel has determined that substantiated concerns exist that Google violated witness retaliation laws, such as Section 1512. A subpoena was issued to Google in a related lawsuit to seek information and evidence about the reasons for OkCaller's termination by Google.

36. Therefore, as best as Plaintiffs' can ascertain prior to discovery, Google dropped OkCaller's rankings after learning about his litigation history, including litigation against Big Tech. Notably, Google and Apple have jointly lobbied together to thwart antitrust enforcement.

37. Google has directly accused Plaintiff of "failed litigation" against Apple. That litigation is ongoing and Google's efforts to render perception of it as failed represents evidence of underlying retaliatory intent. But the reality is, Dr. Isaacs' longstanding anti-trust litigation threatened Apple as well as Google's duopoly business models.

38. Dr. Isaacs justifiably fears that in December 2022 his second career as a computer developer, was again blacklisted in violation of Section 1512, the same way his neurosurgery career had been wrongfully halted. Dr. Isaacs, with stellar medical credentials and absolutely no criminal record, has been prevented from practicing medicine, largely due to aforementioned legal pleadings being weaponized against him. That weaponization, Dr. Isaacs fears, spread to Google LLC around Thanksgiving 2022.

39. Dr. Isaacs practiced his invention through intricate collaboration with Google. The compensation he received from them, in part, reflected payment of patent royalties. Upon

their termination of OKCaller, Dr. Isaacs requested Google reimburse him directly for infringing conduct. Google refused to pay patent royalties owed to Isaacs. Hence this is not a patent case brought by a non-practicing entity; it is a case brought by a previously compensated inventor, who was potentially subjected to witness retaliation that resulted in total cessation of patent royalty payments by Google.

40. Plaintiffs' reverse search phone websites constitute a vertical search competitor as described in the Subcommittee report. Plaintiffs allege their experiences as a vertical search competitor are consistent with, and corroborate, the concerns and evidence presented in the Subcommittee report. Alternatively, over the past decade Plaintiff operated reverse phone search services and other websites that were subjected to similar anticompetitive conduct as documented in the Subcommittee report.

### Reverse Phone Search Industry Background

41. The emergence of the reverse phone search industry largely coincided with the initial growth of Defendant Google's search engine monopoly in the early 2000s. Prior to internet search engine availability, it was simply impractical to look up a phone number to see the corresponding name of the owner. Phone companies offered rudimentary services such physical reverse phone books and operator assisted phone queries, but these were highly specialized and localized, and for the most part, not used by the general population. They also typically only referenced landline numbers. The first dedicated online internet-based reverse phone search engines also suffered such limitations, derived from landline data and limited public records.

42. As mobile phones overtook landlines, the consumer demand for reverse phone search grew exponentially. Most consumers did not subscribe to Caller Name ID, which presented the

name of an individual who called them from a wireless or landline phone. Text messages, even for those who could afford Caller Name ID, often didn't implement the service, and still don't, to this day. As our culture shifted to online transactions on services like AirBnB, eBay, etc with strangers across the country – or the globe – knowing the identity of an incoming call or text message evolved from being a luxury convenience to a matter of safety.

43. Despite the need for such Caller Name ID, a complete void existed until 2013 whenever consumers would "Google someone" or "Google a number" to perform a reverse phone search. But until 2013, a typical reverse search query on Google's engine was plagued with inaccuracy and subscription-service scams.[2] The results presented to an end-user searching for a phone number would be lists of "keyword stuffed" mathematics lists, such as prime numbers, random numbers, and Fibonacci number lists, masquerading as phone numbers, directing them to an affiliate subscription, or presenting them with a Google advertisement.

44. While Google doesn't publish the number of phone and people searches conducted on its general search engine, the numbers are significant. Upon information and belief, in Google's early days over 25% of internet searches were simply phone or people searches. Today these numbers may be similar. Google knowingly ranked phone search spam in its results, such as prime number lists, as a way to monetize a large part of its search queries. Hence Google's early profitability as they grew their monopoly was built, at least in large part, on exploiting phone and people searches.

45. In 2013, recognizing this problem, Dr. Isaacs developed a method and technique to bridge the telecommunications Caller Name ID system with the internet IP web protocols. In

---

[2] In fact, this industry pioneered internet subscriptions, which are now, of course, ubiquitous.

simple terms, Dr. Isaacs invented and patented "Web Caller Name ID," and has spent the last decade on a mission to make the invention free to users.

46. OkCaller.com had been consistently ranked as a top provider in its field by web analysis firms such as SimilarWeb and Alexa. Plaintiffs' reverse phone search services platform ranked in the top few thousand websites in the United States. The platform ranked first among small-medium publishers; only Whitepages, Spokeo, and several other large corporations ranked higher.

47. Plaintiff's search platform was efficient to consumers. Plaintiffs spent a decade trying to ensure their Caller Name ID technology was offered free to end-users. Google recognized the novel value and directed a significant share of their search traffic to Plaintiffs' platform.

48. When Dr. Isaacs first submitted Web Caller Name ID to Google in 2014, the company flagged it as spam. Trying several different improvements, the Defendant repeatedly accused Dr. Isaacs of "keyword stuffing," when in fact, he had a website that was a *solution* to keyword stuffing. He submitted a question to Google's "Webmaster Forum," which eventually attracted the attention of Senior Executive Mueller. Mueller advised Isaacs to keep working on the interface, and that eventually, he would gain a userbase of organic Google traffic.

49. In fact, the reason the site was flagged as SPAM was because Plaintiffs took measures to ensure the safe use of Caller ID data. That meant they didn't allow Google bots to cache the "Caller Name ID," but only the phone number. However, Google saw large lists of phone numbers, without associated data, and incorrectly assumed it was SPAM.

50. Google eventually realized that OkCaller was not spamming them, but in fact, was trying to ethically and safely implement web caller ID.

51. Copycats weren't so careful, and allowed name search of Caller Name ID to phone numbers. These sites violate the intent and spirit and literal statute of "Daniel's Law" and other phone safety regulations. Were Google to block infringing websites, the web would be safer and there would be fewer "Daniel's Law" violations. That is because Plaintiffs would only license Web Caller ID to sites that shared opt-out information, and that didn't publish Caller Name ID's on SERPs for forward-lookup.

52. In other words, enforcement of the '847 patent is a matter of public safety and in the interest of public policy. It would ensure that a large source of phone data (Caller ID PSTN databases) is used responsibly, with no forward-lookup, and coordinated opt-out. Google's decision to subvert the patent holder is flagrantly in violation of Daniel's Law and other public policy.

53. The other major source of phone ownership data is credit bureau records. Those are regulated by the credit bureaus for responsible use. Google (and Apple's) failure to recognize the '847 patent, for retaliatory reasons, ultimately harms the public and must be enjoined by this lawsuit.

54. As Google recognized after Mr. Mueller's involvement, pairing Web Caller Name ID with user-vetted Spam reports provided a powerful combination. In one single screen, an end-user could see the name associated with a phone number, and submit or view crowdsourced reports pertaining to that number. Google recognized the potential of this novel combination as well, and the critical mass necessary to make its implementation successful. Almost overnight, Plaintiffs' reverse search service went from zero to approximately a half million user sessions a day.

55. The success of the site was immediately noted and emulated literally around the web. Within a year, dozens of phone websites all utilized the simple "Safe" and "Not Safe" user interface Plaintiffs' pioneered as "SafeCaller" adjacent to the Web Caller Name ID. Effectively, Plaintiffs set a user interface standard for phone search that instantly replaced the prime number and Fibonacci number sites, which largely disappeared within a year. The "look and feel" of the SafeCaller interface remains, to this day, a common interface standard for reverse phone search.

56. Nonetheless, Google has increasingly desired to fragment reverse search, and there are antitrust concerns that may be ascertained during discovery. Around 2017, a near-identical copycat of Plaintiffs' platform was awarded almost half of Plaintiffs' pre-2017 traffic. Plaintiffs notified Google of the matter in 2017 but never regained the pre-2017 traffic level. Nonetheless, Google kept OkCaller in a competitive position that was valuable and reflected ongoing recognition of the patent validity and royalties owed.

57. Plaintiffs tried to improve the platform over the years, but were never awarded increased traffic despite significant investments in platform improvement. For example, Plaintiffs developed a global reverse phone search platform with significant international telecommunication standards capability. Google awarded the international version effectively zero traffic. This was the beginning of Plaintiffs' realization, in conjunction with their FactMed experience, that Google's methodologies lacked in transparency, resulting in antitrust losses to consumers and developers alike.

58. Similarly, OkCaller was limited in improvement capability by Defendant Google. Google requested he transition his website to AMP technology, which Google had strategic interests in as a developer of AMP. Plaintiff did so, which meant foregoing other tools like

Javascript to add functionality he had invested for the international version. In short, Plaintiff sought to innovate phone search, but his new platforms were ignored by Google and over the years, Google's conduct in advancing their own interests clearly increased.

59. Ongoing fragmentation from domestic and international copycats often presented fake Caller-Name data and had generally low quality control and risked public safety. Plaintiff's reverse search services platform nonetheless maintained significant market share on Google until Thanksgiving Eve 2022, as described in the aforementioned section. Google removed millions and millions of the platform's pages of Caller Name IDs and Spam reports from their rankings. In other words, they were not merely lowered in rankings; they were removed from the index and censored for undisclosed reasons.

## Sherman Antitrust Relevant Market Theory

### General Search Services in the United States Is a Relevant Antitrust Market

60. General search services in the United States is a relevant antitrust market. General search services allow consumers to find responsive information on the internet by entering keyword queries in a general search engine such as Google, Bing, or DuckDuckGo. General search services are unique because they offer consumers the convenience of a "one-stop shop" to access an extremely large and diverse volume of information across the internet. Consumers use general search services to perform several types of searches, including navigational queries, informational queries, and commercial queries.  Other search tools, platforms, and sources of information are not reasonable substitutes for general search services. Offline and online resources, such as books, publisher websites, social media platforms, and specialized search providers such as Whitepages, Expedia, or Tripadvisor, do not offer consumers the same breadth of information or convenience. These

resources cannot respond to all types of consumer queries, particularly navigational queries. Few consumers would find alternative sources a suitable substitute for general search services. Thus, there are no reasonable substitutes for general search services, and a general search service monopolist would be able to maintain quality below the level that would prevail in a competitive market. Alternatively, consumers would have learned to use specialized search services directly, but were prevented from doing so by Google's anticompetitive conduct. This General search services relevant market has been recognized and defined by the Department of Justice and ultimately prevailed in last week's litigation verdict.

61. The United States is a relevant geographic market for general search services. Google offers users in the United States a local domain website with search results optimized based on the user's location in the United States. General search services available in other countries are not reasonable substitutes for general search services offered in the United States. Google analyzes search market shares by country, including the United States. Therefore, the United States is a relevant geographic market.

***Google Has Monopoly Power in the General Search Services Market in the United States***

62. Google has monopoly power in the United States general search services market. There are currently only four meaningful general search providers in this market: Google, Bing, Yahoo!, and DuckDuckGo. According to public data sources, Google today dominates the market with approximately 88 percent market share, followed far behind by Bing with about seven percent, Yahoo! with less than four percent, and DuckDuckGo with less than two percent.

63. There are significant barriers to entry in general search services. The creation, maintenance, and growth of a general search engine requires a significant capital investment, highly complex technology, access to effective distribution, and adequate scale. For that reason, only two U.S. firms—Google and Microsoft—maintain a comprehensive search index, which is just a single, albeit fundamental, component of a general search engine.

64.  Scale is also a significant barrier to entry. Scale affects a general search engine's ability to deliver a quality search experience. The scale needed to successfully compete today is greater than ever. Google's anticompetitive conduct effectively eliminates rivals' ability to build the scale necessary to compete.

65. Google's large and durable market share and the significant barriers to entry in general search services demonstrate Google's monopoly power in the United States.

### *Vertical Search Providers (VSPs) Is a Relevant Product Market*

66. Vertical Search Providers (VSPs)  is a relevant antitrust market. Vertical search providers allow consumers to perform highly specialized searches within a specific category or niche, such as medical research, reverse phone search, travel, legal information, clip-art, or product reviews. These services offer targeted, in-depth information that general search engines do not typically provide with the same level of specificity or expertise.

67.  VSPs are distinct from general search engines in that they cater to specialized needs by offering more refined and context-specific results. For example, a consumer searching for clinical studies on a particular medication might turn to a specialized medical research database rather than a general search engine. Similarly, users seeking legal precedents might prefer a legal database over a general search engine.

68.  General search engines like Google, while powerful, do not adequately substitute for the focused results that VSPs provide. Consumers and professionals rely on VSPs for precise and authoritative information that is curated and filtered according to specific criteria relevant to their needs. As such, there are no reasonable substitutes for VSPs, making this a distinct and relevant market.

69.  The VSP market includes specialized search providers across various industries, including but not limited to medical research (e.g., FactMed, PubMed), legal research (e.g., Westlaw, LexisNexis), travel (e.g., Expedia, Kayak), reverse phone search (OkCaller, Whitepages) and product reviews (e.g., Yelp, TripAdvisor). Each of these verticals operates independently, catering to users who require specialized search results that general search engines cannot provide as effectively.

70. The United States is the relevant geographic market for VSPs. Users in the United States rely on VSPs that are tailored to local regulations, standards, and consumer preferences. Additionally, the market dynamics, including competition and user behavior, are distinct in the U.S. compared to other regions, making it a separate and relevant geographic market.

**Google Has Monopoly Power in the Vertical Search Provider Market in the United States**

71. Google has substantial power in the Vertical Search Provider market by leveraging its dominance in the General Search Engine market. Google systematically directs traffic away from independent VSPs and towards its own specialized services, such as Google Scholar (for academic research), Google Flights (for travel searches), and Google Shopping (for product searches).

72.  The barriers to entry in the VSP market are significant, particularly due to Google's ability to manipulate search rankings and direct traffic to its own vertical offerings. Google's practices make it difficult for independent VSPs to compete, as they rely on traffic generated through general search engines to reach users.

73.  Google's conduct has effectively foreclosed competition in the VSP market. By prioritizing its own services in search results and entering into exclusionary agreements with partners, Google has stifled competition, making it nearly impossible for independent VSPs to gain significant market share without Google's endorsement and approval.

74.  Plaintiffs, as operators of specialized search services, have been directly harmed by Google's monopolistic practices. Their ability to compete in the market has been severely impaired, leading to reduced visibility, lower traffic, and lost revenue. Google's monopolization of the VSP market has caused significant antitrust injury to Plaintiffs and other similar businesses.

75.  Google's large and durable market share, combined with its control over both the General Search Engine and Vertical Search Provider markets, demonstrates its monopoly power in the United States. Google's conduct in leveraging this power to disadvantage independent VSPs constitutes a clear violation of antitrust laws.

76. For clarity, this complaint refers to VSPs as web developer products, information portals, informatics sites, and other synonyms. A jury *Brown Shoe* determination shall ultimately define the precise contours of this market. This Amended Complaint invokes the broadest definition of VSPs to form an inclusive putative class. Nonetheless, in most cases VSPs do not include blogs, news sites, message forums, and many other popular formats of web sites. A VSP by definition has a centralized, intentional organization of a specialized field

of data, typically requiring database programming and fine-tuned user interface development appropriate for the specialized field.

***Reverse Phone Search Services in the United States Is a Relevant Antitrust Market***

77. Reverse phone search services in the United States is a relevant antitrust market. Reverse phone search services allow consumers to verify identity information about the owners of phone numbers they transact and/or communicate with. Reverse phone search services are unique because they offer consumers a method to differentiate from nearly one billion phone numbers in the North American Numbering Plan (NANPA). Consumers use reverse phone search services to perform several types of searches, including researching missed telephone calls, incoming text messages, or individuals conducting online transactions over platforms such as eBay, Craigslist, and AirBNB.

78. Other search tools, platforms, and sources of information are not reasonable substitutes for reverse phone search services. Offline resources, such as phone books, are impractical and outdated for this task. Few consumers would find alternative sources a suitable substitute for reverse phone search services. Thus, there are no reasonable substitutes for reverse phone search services, and a reverse phone search service monopolist would be able to maintain quality below, and prices higher than the level that would prevail in a competitive market. A significant percentage of Google's general search queries are simply reverse search phone queries, and historically, phone and person queries may have even represented the majority of Google's early queries.. In this sense, Google and Plaintiffs directly compete in the same market, and Google is the nation's largest reverse search service. When users trying to perform a reverse search query the number on Google.com,

they are often not utilizing Google for its general search capability; they have directly queried Google as a reverse search service.

79. The United States is a relevant geographic market for reverse phone search services. Reverse phone search services available in other countries are not reasonable substitutes for reverse phone search services offered in the United States. Phone numbering schemes vary by country, as do caller-ID protocols. Consumers are sensitive to different languages and cultures for usage of telephone communication networks. As such, reverse phone search services, as implemented today, typically target one particular country.

***Google Has Monopoly Power in the Reverse Phone Search Services Market in the United States***

80.  Google has monopoly power in the United States reverse phone search services market. There are currently a reasonably small group of reverse search providers handling the significant volumes in this market. In other words, when a consumer in the United States wishes to reverse search a phone number, they would go to one of a small group of competitors. By far and large, the verb "Google a number" is precisely what most US consumers do, and Google is estimated to own over 90% of the reverse phone search market in the USA. Whitepages and Spokeo offer websites and apps specializing in reverse search, in addition to Plaintiffs. Apps sold on the App Store and Google Play Store may constitute another 5% of the entire market. As Google is the merchant of record for Google Play Apps (such as Whitepages for Android), Google's share of reverse search likely exceeds ninety percent.

81. For many years, Plaintiffs' reverse search Apple App Store app was ranked in the Top Ten telecommunications apps, higher than Whitepages's iOS app. By over 90% margins,

Plaintiffs' collective reverse search traffic came from Google, even inclusive of iOS searches and Bing results, where Okcaller also ranks highly. Hence, Plaintiffs possess years of data that substantiate that Google is the dominant player in the reverse search market in the United States. It directs nearly every such search in the United States, users have assigned a eponymous verb to the action, and many browser launches of Google.com are solely to perform a reverse phone search.

82. Indeed, from the earliest days, phone and people search constituted a significant share of Google's general search queries. Google learned early on that a phone/people search directory could become a competitor in the general search services market. Google took proactive, calculated measures to fragment competitors and avoid referring all phone search to one single service. This meant diverting traffic away from better, free services, in all likelihood. Had Google sent all of its reverse phone service to Plaintiffs, for example, they would risk losing their dominant position in "Googling a number," because consumers would learn that Google was a middle-man.

83.  Google's large and durable market share and the significant barriers to entry in reverse phone search services demonstrate Google's monopoly power in the United States.

## ANTICOMPETITIVE INJURY

84. Google has maintained unlawful monopolies in the general search services, VSPs, and reverse phone search services through its many exclusionary practices & agreements, and other conduct that have separately and collectively harmed competition by:

   a.  Substantially foreclosing competition in general search services and reverse phone search services and protecting a large majority of search queries in the United States against any meaningful competition;

    b.  Excluding reverse phone search services and general search services rivals from effective distribution channels, thereby denying rivals the necessary scale to compete effectively in the and reverse phone search services and general search services markets;

    c.  fragmenting other potential distribution paths for reverse phone search services rivals; and

    d.  Increasing barriers to entry and excluding competition at emerging search access points from nascent competitors on both computers and mobile devices; Stunting innovation in reverse phone search services that could serve as alternative search access points or disruptors to the traditional Google search model;

85. Absent Google's exclusionary practices & agreements and other conduct, dynamic competition for reverse phone search services would lead to higher quality search, increased consumer choice, lower consumer prices and a more beneficial user experience.

86. The House Report documents similar antitrust injury to specialized search providers, included in this Amended Complaint's broad definition of VSPs. That report's discussion of such antitrust injury is hereby invoked.

87. To the extent Google itself is serves as a reverse search service, it has clearly fragmented this market to maintain its monopoly, at the cost of innovation and competitive pricing for consumers. It is evident Google wishes to maintain the verb "Googling someone" or "Google a number", which evidences its participation in the reverse search market. Historically, reverse search and person lookup constituted a significant portion of Google queries, and Google recognized from an early stage that a success person / phone search system could erode its monopolies in all three relevant markets. Therefore Google offered

limited assistance and opportunity for services like OkCaller to grow, and in fact, took anticompetitive measures to fragment and shut them down periodically, all harming both developers and consumers.

## **Putative Class Definitions**

88. Plaintiff Greenflight Venture Corporation brings this proposed class action pursuant to Fed. R. Civ. P. 23(b)(1), (2), and (3).

89. Plaintiff brings this action on behalf of itself and the following nationwide classes, for monetary and injunctive relief based on violations of Sherman Act or State Competition Laws:

> *- All web developers whose VSPs for United States internet consumers were not indexed, or not effectively indexed, on Google Search, from four years prior to filing of this Complaint through the present. (VSP non-indexed class)*

> *- All web developers whose VSPs for United States consumers were suppressed in Google SERPs, and not ranked according to objective quality metrics, causing developer investment losses, from four years prior to filing of this Complaint through the present. (VSP SERP metric transparency class)*

90. Excluded from these proposed classes are the Google defendants (i.e. Alphabet); Google defendants' affiliates and subsidiaries; Google defendants' current or former employees, officers, directors, agents, and representatives; and the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members.

91. **Numerosity:** The exact number of the members of the proposed classes is unknown and is not available to the plaintiffs at this time, but a reasonable estimate is that approximately

250,000 small developers submitted VSPs to Google Webmaster Tools / Search Console over the past five years.

92. **Commonality:** Numerous questions of law and fact are common to the claims of the plaintiffs and members of the proposed classes. These include, but are not limited to: a. Google Defendants willful violations of State Competition Laws directed at each class member; b. Google Defendants willful violations of Sherman Act; c. Whether plaintiff and members of the proposed classes are otherwise entitled to any damages, including treble damages, or restitution, and to their attorney fees, costs, and expenses related to any recovery of such monetary relief; and h. Whether plaintiff and members of the proposed classes are entitled to any damages, including treble damages, or restitution incidental to the declaratory or injunctive relief they seek, and to their attorney fees, costs, and expenses related to any recovery of such monetary relief.

93. **Typicality:** Plaintiff's claims are typical of the claims of the members of the proposed classes. The factual and legal bases of Google Defendants' liability are the same and resulted in injury to plaintiff and all of the other members of the proposed classes. The typicalness of these claims is evidenced by the fact they warranted entire sections in the House Report regarding specialized search services. To support apportionment of class compensation fund, web developers of VSPs may submit evidence of hours spent, resources dedicated, or monetary investments in non-indexed or ranking suppressed sites.

94. **Adequate representation:** Plaintiff will represent and protect the interests of the proposed classes both fairly and adequately. Plaintiff retained counsel able to engage, and experienced with, complex litigation and class actions. Plaintiff has no interests that are

antagonistic to those of the proposed classes, and do not conflict with the interests of the proposed class members.

95. **Prevention of inconsistent or varying adjudications:** If prosecution of a myriad of individual actions for the conduct complained of were undertaken, there likely would be inconsistent or varying results. This would have the effect of establishing incompatible standards of conduct for the defendant. Certification of Plaintiff's proposed classes would prevent these undesirable outcomes.

96. **Injunctive and declaratory relief:** By way of its conduct described in this complaint, Google Defendants have acted on grounds that apply generally to the proposed classes. Accordingly, final injunctive relief or corresponding declaratory relief is appropriate respecting the classes as a whole.

97. **Predominance and superiority:** This proposed class action is appropriate for certification. Class proceedings on these facts and this law are superior to all other available methods for the fair and efficient adjudication of this controversy, given that joinder of all members is impracticable. Even if members of the proposed classes could sustain individual litigation, that course would not be preferable to a class action because individual litigation would increase the delay and expense to the parties due to the complex factual and legal controversies present in this matter. Here, the class action device will present far fewer management difficulties, and it will provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by this Court. Further, uniformity of decisions will be ensured.

## IV.   <u>VIOLATIONS ALLEGED</u>

*First Claim for Relief: Maintaining Monopoly of General Search Services in Violation of Sherman Act § 2 (DOJ Verbatim Cause of Action)*

98. Plaintiffs incorporate the allegations of paragraphs 1 through 97 above.

99. General search services in the United States is a relevant antitrust market and Google has monopoly power in that market.

100.      Google has willfully maintained and abused its monopoly power in general search services through anticompetitive and exclusionary distribution agreements that lock up the preset default positions for search access points on browsers, mobile devices, computers, and other devices; require preinstallation and prominent placement of Google's apps; tie Google's search access points to Google Play and Google APIs; and other restrictions that drive queries to Google at the expense of search rivals.

101.      Google's exclusionary conduct has foreclosed a substantial share of the general search services market.

102.      Google's anticompetitive acts have had harmful effects on competition and consumers. Google has leveraged this monopoly to injure VSPs as a whole by reducing competition and consumer VSP choice. (*added*)

103.      The anticompetitive effects of Google's exclusionary agreements outweigh any procompetitive benefits in this market, or can be achieved through less restrictive means.

104.      Google's anticompetitive and exclusionary practices violate Section 2 of the Sherman Act, 15 U.S.C. § 2.

*Second Claim for Relief: Maintaining Sherman Act § 1 Unreasonable Restraints of Trade in the General Search Services, SVP, and Reverse Phone Search Services Markets*

105.      Plaintiffs incorporate the allegations of paragraphs 1 through 97 above.

106.     This cause of action is brought under Section 1 of the Sherman Act, 15 U.S.C. § 1, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations."

107.     A United States Court of Appeals recently held that Google's self-preferencing and manipulation of SERPs could constitute a claim under Sherman Act § 1. (see *Dreamstime v. Google LLC, Ninth Circuit*). This cause of action is intended to invoke the claim theory discussed in that circuit opinion.

108.     Google has entered into agreements and engaged in unilateral and bilateral practices that unfairly demote the search rankings of competitors, including Plaintiffs, thereby restraining trade in the markets for specialized search services. These actions have forced independent developers to pay for advertising on Google's platform or face exclusion from search results altogether, reducing consumer choice and stifling innovation.

109.     Google engages in anticompetitive agreements with strategic partners to restrict trade in the general search services market and downstream relevant markets. In *Dreamstime*, it was alleged Google favored rankings from Getty Images as a result of such agreements, over *Dreamstime's* own stock images and clip art. *Dreamstime* is a VSP, and it has previously alleged analogous conduct to that described in this complaint. As a class member, it would be entitled to renumeration from the Developer Compensation Fund for ranking suppression.

110.     Google typically favors heavy advertising spenders such as Spokeo and Whitepages, in the case of OkCaller, or Getty images, in Dreamstimes' case, and gives preference to them in their result SERPs.

111.     In this case, Google removed all twenty million of OkCaller's content pages and 800 million phone Caller Name ID pages from its SERPs; in *Dreamstime*, the pages were alleged to have been moved to page 20 of SERPs. In other words, OkCaller suffered (de)indexing, whereas Dreamstime apparently suffered ranking suppression.

112.     Google's conduct, including the agreements with strategic partners that result in the manipulation of search rankings, constitutes a *per se* violation of Section 1 of the Sherman Act. Alternatively, even under a rule of reason analysis, Google's conduct unreasonably restrains trade and has no legitimate procompetitive justification.

113.     These agreements serve no legitimate or procompetitive purpose that could justify their anticompetitive effects, and thus unreasonably restrain competition in the general search services and/or reverse phone search markets. Alternatively, to the extent that these agreements provide any procompetitive benefits, those benefits are outweighed by the anticompetitive effects of the agreements and could have been achieved through less anticompetitive and less harmful means.

114.     As a direct and proximate result of Google's unreasonable restraints of trade, Plaintiffs and the members of the proposed class have suffered substantial harm, including loss of revenue, diminished market share, increased operational costs, and reduced opportunities for innovation.

115.     Plaintiffs and the class members are entitled to damages, including treble damages, as well as injunctive relief to prevent further harm from Google's anticompetitive agreements and practices.

*Third Claim for Relief:* Refusal to Deal in Violation of Section 2 of the Sherman Act (*Aspen Skiing Co. v. Aspen Highlands* Precedent)

116.     Plaintiffs incorporate the allegations of paragraphs 1 through 97 above.

117.     Defendant Google LLC, by leveraging its dominant position in the general search engine market, has engaged in a unilateral refusal to deal with independent web developers and specialized content providers, such as Plaintiffs, in violation of Section 2 of the Sherman Act.

118.     Google has terminated longstanding and profitable business relationships with developers like Plaintiffs, who were previously able to rely on Google's search engine for traffic and revenue generation. This conduct is analogous to the behavior condemned by the Supreme Court in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), where the Court held that a monopolist's refusal to deal with a competitor could give rise to a claim under Section 2 of the Sherman Act.

119.     *Aspen Skiing Co. V. Aspen Highlands Skiing Corp.* (472 U.S. 585, 1985) unequivocally broadens the examination of monopolistic behavior beyond the boundaries of market definition into the realm of exclusionary conduct. The Supreme Court has provided vital precedent, recognizing that a monopolist's refusal to deal with competitors, absent a credible efficiency rationale, can constitute a standalone concern under the purview of antitrust enforcement. The operative conduct under scrutiny is exclusion of rivals, not the defendant's power within a strictly defined market.

120.     Google's refusal to provide fair and equitable access to its search engine results constitutes exclusionary conduct intended to suppress competition and maintain its monopoly power. This refusal has resulted in significant harm to Plaintiffs and other class members, who have been denied access to a critical facility essential for competing in the

market. Google sacrificed short-term profits, which they had received from OkCaller for a decade, to obtain long-term monopolistic gains, consistent with *Aspen* case law.

121.     To the extent Google operates in the reverse search services market, it is a direct competitor with OkCaller and simultaneously controls OkCaller's access to consumers. This is precisely the conduct that occurred in the underlying *Aspen* case. In the alternative only, Google operates in general search services, and excluded a competitor in a sub-sector (VSPs and/or reverse phone search) of general search and or a competitor who could achieve GSE status if their VSP or reverse search business succeeded.

122.     As a direct and proximate result of Google's refusal to deal, Plaintiffs and the members of the proposed class have suffered economic injury, including loss of revenue, diminished market share, and increased costs. Google's conduct is a clear violation of Section 2 of the Sherman Act, and Plaintiffs are entitled to damages, including treble damages, and injunctive relief to prevent further harm.

123.     Plaintiffs similarly invoke all four elements of related MCI exclusionary conduct caselaw. *MCI Communications Corp. v. American Tel. & Tel. Co.,* 708 F.2d 1081 (7th Cir.), cert. denied, 464 U.S. 891 (1983), a case challenging AT&T's use of local telephone networks to thwart competition in the long distance telephone service market. There, the court held that "to establish liability under the essential facilities doctrine [a plaintiff must show]: (1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility." Id. at 1132-33."

124.     Here, Google controlled access to general and reverse search customers, OkCaller and Greenflight could not reasonably duplicate the facility, Google denied use of the

facility by deindexing OkCaller, and Google could have, and did for a decade, feasibly provided the facility.

*Fourth Claim for Relief:  Violation of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA) (Fla. Stat. §§ 501.201, et seq.)*

125.    Plaintiffs incorporate the allegations of paragraphs 1 through 97 above.

126.    Defendant Google LLC has engaged in deceptive and unfair trade practices in violation of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), Fla. Stat. §§ 501.201, et seq. These practices include, but are not limited to, monopolistic and anticompetitive conduct that has harmed Plaintiffs and the proposed class.

127.    Google's conduct, as described in the preceding counts, constitutes unfair methods of competition and unfair or deceptive acts or practices under FDUTPA. This conduct has had the effect of deceiving consumers, suppressing competition, and stifling innovation, thereby causing significant harm to Plaintiffs and other class members who operate in Florida.

128.    Google's actions have misled and deceived consumers and developer competitors regarding the nature and operation of its search engine, including the manipulation of search rankings to favor its own products and those of its strategic partners while disadvantaging independent developers and specialized content providers, such as Plaintiffs.

129.    Google's actions are unfair to the extent the developers invest substantial time, money, and resources to bring competitive services to consumers, but are squelched and (de)indexed or suppressed in Google Search. Similarly, Google's failure to implement

transparent quality metrics, where developers could fairly compete and improve their work products, is unfair, especially given Google's two decade timeframe to implement such metrics that are customary in other high volume disbursement allocations. Developer transparency would avoid wasted resources, and benefit consumers greatly, and therefore a monopolist like Google with 90% of the search market should provide such an offering.

130.     Google's actions are unfair and illegal to the extent intellectual property trade dress laws are unenforced, and copycat sites are rampant on SERPs, even amongst Google's business partner offerings.

131.     Google's actions are unfair and illegal to the extent the company retaliates against antitrust advocates, such as Plaintiffs. Beyond being unfair and un-American, the conduct violates federal witness protection statutes, including 18 USC 1512, and therefore is protected conduct under FDUTPA.

132.     Google's undue influence and conduct towards VSPs and reverse search services violates the spirit of State Competition Laws like FDUTPA, even if Defendant is not found guilty of directly monopolizing the VSP Sherman markets.  FDUTPA considers incipient monopolies and leverage of realistic market conditions beyond traditional Sherman relevant market theory.

133.     As a direct and proximate result of Google's deceptive and unfair trade practices, Plaintiffs and the members of the proposed class have suffered economic injury, including loss of revenue, diminished market presence, and increased operational costs.

134.     Plaintiffs, on behalf of themselves and the proposed class, seek actual damages, declaratory and injunctive relief, and attorneys' fees as provided for under FDUTPA, as well as any other relief deemed just and proper by the Court.

*Fifth Claim for Relief:  Violation of California's Unfair Competition Law (Cal. Bus. &
Prof. Code §§ 17200, et seq.)*

135.     Plaintiffs incorporate the allegations of paragraphs 1 through 97 above.

136.     Defendant Google LLC has engaged in unlawful, unfair, and fraudulent business
practices in violation of California's Unfair Competition Law (UCL), Cal. Bus. & Prof.
Code §§ 17200, et seq. These practices include, but are not limited to, monopolistic and
anticompetitive conduct that has harmed Plaintiffs and the proposed class.

137.     Google's conduct, as detailed in the preceding counts, constitutes unlawful business
practices in violation of the UCL because it violates the Sherman Act, FDUTPA, as well
as other federal and state laws.

138.     Google's practices are also unfair within the meaning of the UCL because they
offend established public policy, are immoral, unethical, oppressive, unscrupulous, and
substantially injurious to consumers, web developers, and specialized content providers.
Google's conduct has had the effect of stifling competition, reducing innovation, and
causing significant financial harm to Plaintiffs and the class.

139.     Furthermore, Google's conduct is fraudulent within the meaning of the UCL
because it has misled and deceived consumers and competitors about the nature of its
search rankings and the reasons for the demotion or exclusion of certain websites, including
those operated by Plaintiffs and other class members. In short, consumers and developers
believe their Google queries result in a reasonably fair and competitive SERP result, but
this is often untrue.

140.     Google's systematic failure to screen for trade dress and patent violations similarly
violates the unfair and illegal clauses of this act.

141.     This California State Competition Law is invoked extra-jurisdictionally. Google's headquarters is situated in Mountain View, California. Many of the decisions to violate Sherman Act, and engage in anticompetitive conduct, are executed in California. Therefore UCL should apply to redress such conduct, to complement the jurisdiction and intent of FDUTPA .

142.     As a direct and proximate result of Google's unlawful, unfair, and fraudulent business practices, Plaintiffs and the members of the proposed class have suffered economic injury, including loss of revenue, diminished market presence, and increased operational costs.

143.     Plaintiffs, on behalf of themselves and the proposed class, seek restitution, disgorgement of profits, and injunctive relief to prevent Google from continuing its unlawful, unfair, and fraudulent practices, as well as any other relief deemed just and proper by the Court.

*Sixth Claim for Relief:  35 U.S.C. § 271 PATENT INFRINGEMENT*

144.     On October 14, 2014, the United States Patent and Trademark Office ("USPTO") duly and legally issued U.S. Patent No. 8,861,698 ("'698 Patent"), entitled "Post-Page Caller Name Identification System."  That patent overcame substantial litigation in the Federal Circuit and years of scrutiny by the USPTO, to resolve a common obstacle for software patents – *Alice* non-abstraction. The patent reissued on December 7, 2021 as Reissue Patent #48,847.

145.     Plaintiff Dr Jeffrey Isaacs is the inventor and Plaintiffs collectively possess majority ownership of the US Reissue Patent #48,847.  The patented technology allows a mobile

phone user to identify the name associated with a particular phone number through a reverse lookup.  But unlike reverse phone lookup internet technology available prior to the invention, the '847 technology connects an internet search to phone carrier databases on the Public Switched Telephone Network (PSTN), to identify caller name information.

146.    The '847 Reissue Patent is currently in full force and effect and is entitled to a presumption of validity under the law.

147.    As owners, Plaintiffs collectively own all rights, title, and interest in the '847 Patent, including the right to sue for past, present, and future infringement of that patent.

148.    The '847 Patent describes and claims a novel convergence of two telephone network related technologies, namely SS7 Caller Name ID ("CNAM"), and internet based reverse telephone number search.

149.    Originally, the Baby Bells disbursed paper phone books to each landline customer, which served as the primary mode of looking up a phone number by the customer's name. In the 1980s, telephone companies began offering caller ID as an add-on feature for a landline telephone subscription.  Caller ID was supported by CNAM, which at that time was reaching widespread use by the carries.  CNAM allowed a carrier to determine the name of the calling party and display that to the called party for calls between landline phones.  Prior to that time, a called party generally had no way to trace the name of a caller; calls were anonymous.  CNAMs were stored in a relatively small number of databases managed by the Baby Bell companies.

150.    Upon information and belief, in 1997, the largest competing reverse phone services copied the Baby Bell phonebooks onto their internet searchable database.  This had the effect of allowing reverse telephone number lookups via the internet by entering a phone

number to search for its owner, without adding a "Caller ID" feature to a telephone subscription. The limitation of this method, of course, was that it only included listed numbers for landlines contained in public telephone books, and did not include cell phone numbers. It also relied on data from a single snapshot of time, and could not account for new telephone numbers or changed numbers as those additions or changes occurred. The reverse search competitors charged for the service. Over time, they added other data sources to its database of information, to expand its reverse phone lookup service, but what it lacked was access to a large swath of cell phone numbers and associated names.

151.    Although mobile phones, and particularly smart phone technology, have proliferated in the last two decades, cell phone Caller ID technology did not, presumably because CNAM was based on the Public Switched Telephone Network (PSTN). As a result, many mobile phones today will display "UNKNOWN CALLER", or a city name e.g., "W PALM BEACH" instead of the name of the person who owns the account for the calling number. In short, despite great advances in the past decade or so related to mobile phone technology, Caller Name ID was often left behind. Text messages almost never, to this day, contain CNAM information.

152.    The lack of CNAM information on mobile phones created a less than ideal situation for the average consumer. Mobile phone owners often do not know who is calling them, and as noted, reverse search technology of copying phone books onto the internet suffered from the drawback of lacking mobile phone numbers.

153.    As part of its mission and terms, OkCaller.com asserts that people have a right to know who is communicating with them. OkCaller calls this "Natural Identity Law" or just "Natural Law," and is akin to natural identifiers such as voice, facial/physical features, and

so forth. OkCaller hence operates under stringent ethical, moral and legal foundations for safety. Natural law is particularly relevant in this early era of Artificial Intelligence, where it will become increasingly difficult to ascertain the identity of incoming communications.

154.     For nearly a decade after Google's search engine launched, a large volume of search queries went to mathematical number lists, which were affiliate links to Whitepages, Spokeo, and others. In short, the '847 technique was non-obvious as a great demand for billions and billions of mobile phone number queries went unmet for a decade, until Plaintiff launched his reverse phone search services. This left reverse phone search users with little recourse for mobile telephone numbers.   They responded by introducing expensive "upcharge" subscriptions to access credit report files, which include most phone numbers. The customer of such service typically agrees (whether they intent to or not) to a recurring monthly subscription of approximately $19/month.

155.     In 2013, Dr Isaacs conceived of and invented a free technology that bridged the gap between CNAM and internet reverse search.  He filed for and obtained a patent on his invention which is known as the Post Page Caller Name Identification System.   It is described and claimed in the '847 Patent.  In particular, the '847 Patent describes a system and method in which a user can input a telephone number into a webpage or mobile phone app, separate and apart from its phone carrier, and return name information associated with the queried phone number.  To accomplish this in practice, the patent licensee uses an SS7 query to a CNAM database in real time to obtain the caller name information.  Hence two discrete and independent systems were linked in a novel way (the SS7 infrastructure and the TCP/IP internet) producing novel value to users. Plaintiff was the first to implement

this technology, and OkCaller remains the leading example of a safe and responsible Web Caller ID directory.

156.     In addition to obtaining patent protection the inventor set about to create the computer code required to make his invention work. He worked with third parties to gain access to SS7 CNAM, and with Apple, Google, and other App providers to ensure that his App was not only successful, but was implemented to protect the privacy of users and enhance their experience.

157.     Hence in 2014, when it debuted, OkCaller received around a quarter million users each day. No other Web Caller ID system had anywhere close to this usage level for years to follow.

158.     The inventor released his "Caller-ID" app onto the Apple iTunes App Store in the summer of 2013. The app had over ten thousand positive user reviews; representative reviews include "finally, a phone search that didn't ask for my credit card number," "the only one that works," "why wasn't this invented ten years ago" and so forth.  The app was free, instead generating revenue through advertising rather than direct user payments. As a result, hundreds of millions of users avoided $19 subscriptions and obtained free caller name ID. The invention created by Dr Isaacs and specified in the '847 patent resulted in approximately $100 million in savings to the national economy. It was years ahead of its time in seeking to reduce costly subscriptions and protect public safety.

159.     Over the last decade since the original patent was issued, paid services like Spokeo and Whitepages and many copycat infringers gradually implemented CNAM as part of their service offering, which had historically used credit bureau information and other public records. Google is the merchant of record for many of these apps on Google Play

store. Google LLC allowed multiple competing apps on the Play Store to infringe the patent. Similarly Google LLC allows infringing websites to run Google Ads, thereby knowingly profiting from active infringement.

160.    Plaintiff has informed Google LLC that such infringement takes place. The email address he informed this to notified Plaintiff they "were sorry for any inconvenience" and has since stopped responding to Plaintiff. Due to the large volume of apps on Play Store, and Google Ad monetized web sites, discovery is necessary to identify the infringing products. As stated earlier, typically reverse phone software provideds information from either credit bureaus or CNAM data, i.e. GR-1188 derived caller name identification. GR-1188 often has distinct formatting, which serves as evidence a reverse search app uses this data, as opposed to credit bureau information. Google Play Store and Google sponsored reverse phone websites contain reverse phone data with distinct GR-1188 formatting, and therefore form the basis for informed discovery to determine the full extent of infringement. Source code serves as the final evidentiary link to GR-1188 operations, and is unavailable to Plaintiffs prior to discovery.

161.    Upon information and belief, Google, de-ranked the inventor's website– the only licensee of the '847 patent to this date to self-preference their own infringing apps and related search and display advertising.

162.    Based on these distinct GR-1188 formats, and process of elimination of data sets from credit bureaus, numerous apps on the Google Play Store appear reasonably certain to infringe the patent. In particular, these apps are a mobile phone application and system that functions independently of the called party's carrier and device. A user inputs a phone number into an entry field, which could come from any device, to determine who called

from that number.  When a result is found in a carrier's CNAM database, the infringing

apps return a Caller Name result, identifying the name associated with the queried number.

Upon information and belief, the Caller Name result in the infringing Google Play Apps

may use extra steps like caching but ultimately return CNAM database rows accessed by

SS7, including an SS7 interfacing node.  In some cases, a more detailed CNAM result is

obtained using LIDB, which is still an infringing behavior.

163.    Upon information and belief, Defendant directly infringes the '847 patent by

directly selling infringing apps to consumers, as they are merchant of record for nearly all

Android apps.  Likewise, Google passively infringes when it partners with and monetizes

infringing websites using GR-1188 protocols. Upon information and belief, Google's (or

passive partners) system includes a third-party CNAM query to return the calling party

name requested by the user, which is implemented, used, and operated at and under

Defendant's direction and control.

164.    Upon information and belief, Google also induces its users to infringe at least

Claims 7 & 8 of the '847 patent.  In particular, Google provides the complete system for

reverse phone lookup via an SS7 CNAM query to users, as described above, who place

that system into use when they enter a phone number to query.  Google induces

infringement through a variety of anticompetitive behaviors, including pay-for-play

ranking and encouraging Adwords/Ads expenditure in exchange for organic search

referrals.

165.    Google has alternatively infringed contributorily by providing to users a system for

reverse phone lookups, described above, that has no non-infringing uses.

166.     Google LLC has directly infringed Claims 1-10 of the '847 patent, and contributorily infringed and induced others to infringe at Claims 1-10 of the '847 Patent by making, having made, importing, using, offering for sale, and/or selling apps on the Google Play Store that are performing, implementing, and carrying out, processes and methods specified in the patent, in violation of 35 U.S.C. § 271(a), (b) and (c).

167.     Indirectly, Google accepts payments for search texts ads of infringing apps and websites, and then preferences those infringing products above Plaintiff's own apps and websites. Such profiting from known infringement constitutes infringement under this statute.

168.     On information and belief, Google's infringement is willful.   Defendant has been made aware of the reissue patent issuance, and the underlying infringement claims, but still publishes infringing apps. In fact, Google appears to have further retaliated against the inventor for asserting patent rights, which will be elucidated in discovery and may necessitate amendment of this Complaint.

169.     Plaintiff has been irreparably harmed by Defendant's acts of infringement of Claims 1-10 of the '847 Patent, and will continue to be harmed unless and until these acts of infringement are enjoined and restrained by order of this Court. Plaintiff has no other adequate remedy at law to redress Google's continuing acts of infringement. Upon information and belief, the hardships that would be imposed upon Google by an injunction are less than those faced by Plaintiff should an injunction not issue.  Furthermore, the public interest would be served by issuance of an injunction. Accordingly, Plaintiff is entitled to permanent injunctive relief against such infringement pursuant to 35 U.S.C. § 283.

170.    As a result of Google's acts of infringement, Plaintiff has suffered and will continue to suffer damages. Plaintiff is entitled to compensation for such damages pursuant to 35 U.S.C. § 284 in an amount to be determined at trial, estimated to exceed $50 million USD before treble damages.

## V.    <u>REQUEST FOR RELIEF</u>

WHEREFORE, to remedy these illegal acts The Plaintiffs and class members respectfully request that this Honorable Court:

A. Certify this case as a web developer class action lawsuit and that it certify the proposed federal law classes on a nationwide basis for all web developers of specialized search websites that were improperly (de)indexed, or subject to SERP ranking suppression, between today's filing date and four years prior.

B. Adjudge and decree that Google has acted unlawfully to monopolize the general search engine market in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; and leveraged this monopoly to injure the VSP and reverse phone search markets where it directly competes.

C. Enjoin Google from continuing to engage in the anticompetitive practices described herein and from engaging in any other practices with same purpose or effect as the challenged practices, including but not limited to:

   a. Failing to offer transparent evaluation metrics of VSPs and web developer work products; or failing to rank and index these work products on objective and transparent evaluation standards.

      b.  preventing Google from leveraging its GSE monopoly to exploit web developers, business partners, consumers, or others to obtain, maintain, extend, or entrench a monopoly.

D.  Order treble damages compensating the Class Members through a "Developer Compensation Fund" based on developer submission of damages computed by project expenditures, dedicated person-hours, and other metrics, estimated in the billions[3] USD; and to Lead Plaintiffs:

      a.  Plaintiff Greenflight Venture Corporation and its owners, which suffered actual losses of no less than $80 million in goodwill, revenue, and loss of investment opportunity for its software app portfolio including OkCaller, FactMed, and other VSPs.

E.  Permit trial by jury for all claims herein.

F.  Issue a finding that Google LLC has infringed literally and/or under the doctrine of equivalents, Claims 1-10 of the '847 Patent; Issue a finding that Google's infringement has been willful; Issue a permanent injunction that Google be permanently enjoined from making, using, offering for sale, selling, profiting from advertising on infringing websites, causing to sell, importing, exporting, supplying and/or distributing within, to and/or from the United States, or over the internet or on any app, any software infringing upon the '847 patent; Award pre-judgment interest and post-judgment interest at the maximum rate

---

[3] By creating an inefficient bottleneck on the entire US VSP market, Google put itself in a precarious liability position for lost value creation. Take for example a competitive VSP, never ranked in Google SERPs due to Defendants' preferencing of its own or strategic partners' VSP. If Google blocked just one single web SVP app from succeeding at the $1 billion valuation, it would be liable for $3 billion (3x) under Sherman act. Our estimate assumes at least three hundred SVP apps were suppressed or improperly (de)indexed, which would have been competitive in a transparent GSE service, each with an average valuation of $10million. Given these conservative estimates, it is evident Google's conduct causes a sizeable antitrust injury to the US economy and warrants a considerable Developer Compensation Fund.

allowed by law, including an award of pre-judgment interest, pursuant to 35 U.S.C. § 284, from the date of each act of infringement of Claims 1-10 of the '847 Patent to the day a damages judgment is entered, and a further award of post-judgment interest, pursuant to 28 U.S.C. § 1961, continuing until such judgment is paid, at the maximum rate allowed by law; Order an accounting for damages through judgment and post-judgment until Google is permanently enjoined from further infringing activities; That the Court award enhanced damages pursuant to 35 U.S.C. § 284; the Court award supplemental damages for any continuing post-verdict infringement up until Google is permanently enjoined from further infringing activities; That the Court award a compulsory future royalty in the event an injunction is not awarded.

G. Award each Plaintiff, as applicable, an amount equal to its costs, including reasonable attorneys' fees, incurred in bringing this action.

H. Grant any further relief as may be fair and just, including applicable State Competition Law redress and permanent injunctive orders.

Respectfully submitted, this 13th day of August 2024.

/s/ Ayelet Faerman
Ayelet Faerman, Esq.
Faerman Law P.A.
3859 NW 124 Ave
Coral Springs, FL 33065
954-271-8484
ayelet@faerman.law
Counsel for Greenflight Venture Corporation

/s/ Jeffrey Isaacs
Jeffrey D. Isaacs, M.D.
11482 Key Deer Circle
Wellington, FL 33449
212-257-0737
jeffreydi@gmail.com

## DEMAND FOR JURY TRIAL

In accordance with FRCP 38, Plaintiff and Class Members hereby request a trial by jury.

Executed on this 13th day of August 2024.
/s/ Ayelet Faerman
Ayelet Faerman, Esq.

/s/ Jeffrey Isaacs
Jeffrey D. Isaacs, M.D.