Ayelet Faerman, Esq.
Faerman Law P.A.
3859 NW 124 Ave
Coral Springs, FL 33065
954-271-8484
ayelet@faerman.law
Attorney for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| GREENFLIGHT VENTURE CORPORATION<br>*on behalf of themselves*<br>*and all others similarly situated*<br><br>Plaintiff,<br><br>vs.<br><br>GOOGLE LLC<br><br>Defendant. | Case No. **24-cv-80395-RLR**<br><br><br>**PLAINTIFF'S OBJECTION TO<br>GOOGLE'S MOTION TO DISMISS** |

TABLE OF AUTHORITIES------------------------------------------------------------------------------- 2

INTRODUCTION---------------------------------------------------------------------------------------- 3

LEGAL STANDARD ----------------------------------------------------------------------------------- 3

ARGUMENT -------------------------------------------------------------------------------------------- 3

    I.    Greenflight Venture Corporation Has Antitrust Standing ------------------------------------- 3

    II.   The FAC Adequately Alleges Relevant Sherman Markets and Agreements-------------------- 5

      A.   Vertical Search Provider(VSP) Market, Based on Congressional Findings, Is Plausible -- 6

      B.   Reverse Phone Search Market Identifies All Competitors and Reasonable Substitutes ---- 8

      C.   The Market Definition Cases Cited by Google Are Distinguishable ------------------------- 9

      D.   The Eleventh Circuit Disfavors Dismissal on Market Definition at the Pleading Stage ---- 9

      E.   Sherman Antitrust Agreements Exist as a Matter of Law------------------------------------- 10

      F.   Reference to *Dreamstime* Case --------------------------------------------------------------- 11

    III.   Greenflight States a Claim for Refusal to Deal Under The *Aspen* Exception -------------- 12

      A.   *Trinko* is Misplaced --------------------------------------------------------------------------- 13

      B.   Google's Attempt to Distinguish *Aspen Skiing* Is Erroneous----------------------------- 15

      C.   Greenflight Adequately Alleges That Google Is an Essential Facility ----------------------- 15

    IV.   Florida and California State Competition Law Claims Are Properly Pled ------------------ 16

    V.   Indirect Patent Infringement Claims Properly Identify Third-Party Direct Infringers -------- 18

      A.   Google's *Artrip v. Ball Corp*. Defense Is Distinguishable ------------------------------- 19

      B.   The FAC Properly Asserts Contributory and Induced Indirect Infringement Claims------ 20

      C.   USPTO Status of the '847 Reissue Patent--------------------------------------------------- 22

CONCLUSION ---------------------------------------------------------------------------------------- 22

CERTIFICATE OF SERVICE ------------------------------------------------------------------------ 24

# TABLE OF AUTHORITIES

## CASES

Artrip v. Ball Corp., 735 F. App'x 708 (Fed. Cir. 2018)------------------------------------------------------------------19

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)-------------------------------------------------------------------- 3, 15

Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585 (1985) ------------------------------------12

Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 553 (2007)------------------------------------------------- 3, 11

Blue Shield of Va. v. McCready, 457 U.S. 465, 484 (1982) ----------------------------------------------------- 3

Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co., 20 Cal. 4th 163 (1999) ------------------16

Conley v. Gibson, 355 U.S. 41, 45-46 (1957) ----------------------------------------------------------------------18

Datascape, Inc. v. Springleaf Fin. Servs, No. 18-0231, 2019 WL 1316415, at *3 (N.D. Ga. Mar. 21, 2019) -----------------22

Disc Disease Sols. Inc. v. VGH Sols., Inc., 888 F.3d 1256, 1257 (Fed. Cir. 2018) -----------------------------18

Dreamstime v. Google LLC, 54 F.4th 1130 (9th Cir. 2022) ------------------------------------------------------11

Duty Free Americas, Inc. v. Estee Lauder Cos., 797 F.3d 1248, 1262 (11th Cir. 2015) ------------------- 3, 10

Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 479-80 (1992)---------------------------------- 4

FTC v. Indiana Fed'n of Dentists, 476 U.S. 447, 465-66 (1986) ------------------------------------------------17

FTC v. Staples, Inc., 970 F. Supp. 1066, 1075-76 (D.D.C. 1997) ------------------------------------------------ 8

Halo Elecs., Inc. v. Pulse Elecs., Inc., 579 U.S. 93, 105 (2016) ------------------------------------------------21

Hecht v. Pro-Football, Inc., 570 F.2d 982, 992-93 (D.C. Cir. 1977)--------------------------------------------15

Hunt v. Florida Department of Corrections, 666 F.3d 1257, 1264 (11th Cir. 2012)----------------------------18

In re Bill of Lading Transmission & Processing Sys. Patent Litig., 681 F.3d 1323, 1333 (Fed. Cir. 2012) ----------------------20

In re High-Tech Employee Antitrust Litig., 856 F. Supp. 2d 1103, 1116 (N.D. Cal. 2012)----------------------10

Jacobs v. Tempur-Pedic Int'l, Inc., 626 F.3d 1327 (11th Cir. 2010),------------------------------------------ 6

JES Props., Inc. v. USA Equestrian, Inc., 253 F. Supp. 2d 1273 (M.D. Fla. 2003) ------------------------------ 6

K-Tech Telecomms., Inc. v. Time Warner Cable, Inc., 714 F.3d 1277, 1286 (Fed. Cir. 2013) ------------------20

Laurel Sand & Gravel, Inc. v. CSX Transp., Inc., 924 F.2d 539, 544 (4th Cir. 1991)-----------------------------15

Lifetime Indus., Inc. v. Trim-Lok, Inc., 869 F.3d 1372, 1379 (Fed. Cir. 2017) ---------------------------------18

Limelight Networks, Inc. v. Akamai Techs., Inc., 572 U.S. 915, 921 (2014) -----------------------------------20

MetroNet Servs. Corp. v. Qwest Corp., 383 F.3d 1124, 1131-32 (9th Cir. 2004) ------------------------------14

Morris Communications Corp. v. PGA Tour, Inc., 364 F.3d 1288, 1294-95 (11th Cir. 2004)-------------------14

Newcal Indus., Inc. v. Ikon Office Sol., 513 F.3d 1038, 1045 (9th Cir. 2008)----------------------------------- 9

Porsche Cars N. Am., Inc. v. Diamond, 140 So. 3d 1090, 1100 (Fla. Dist. Ct. App. 2014)------------------------16

Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430 (3d Cir. 1997)----------------------------------- 6

Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993)----------------------------------------------------- 4

Sunbeam Television Corp. v. Nielsen Media Research, Inc., 711 F.3d 1264, 1271 (11th Cir. 2013) --------------------------- 4

Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007) ----------------------------------------18

United States v. Continental Can Co., 378 U.S. 441, 455-56 (1964) ------------------------------------------- 8

United States v. Google LLC, No. 1:20-cv-03010-APM----------------------------------------------------------- 7

Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398 (2004) ---------------------------13

## STATUTES

18 USC § 1512 ----------------------------------------------------------------------------------------------------------14

35 U.S.C. § 271 --------------------------------------------------------------------------------------------------------18

Cal. Bus. & Prof. Code §§ 17200, et seq. ----------------------------------------------------------------------------16

Fla. Stat. § 501.204(1) -----------------------------------------------------------------------------------------------16

Sherman Act of 1890 (15 USC § 1-2) ---------------------------------------------------------------------------------14

## TREATISES

Philip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and deir Application ¶ 530c
    (4th ed. 2020 supp)-------------------------------------------------------------------------------------------------- 5

2

## GREENFLIGHT'S OBJECTION TO GOOGLE LLC'S MOTION TO DISMISS

### INTRODUCTION

Plaintiff Greenflight Venture Corporation ("Greenflight"[1]) respectfully submits this Opposition to Defendant Google LLC's Motion to Dismiss the First Amended Complaint ("FAC"). Greenflight alleges that Google has engaged in anticompetitive conduct in violation of Sections 1 and 2 of the Sherman Act, as well as state competition laws, and has infringed upon Greenflight's patent. No sooner than the ink is dry on the *US v. Google* verdict, the monopolist seeks backward steps on antitrust enforcement from this Honorable Court. To evade class action ramifications, Defendant advances misguided and scattershot assertions that last month's GSE verdict cannot have downstream leveraging effects. The MTD, which could create regressive case law, should be denied in its entirety.

### LEGAL STANDARD

When evaluating a motion to dismiss under Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint must contain sufficient factual matter to state a claim that is plausible on its face. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Antitrust claims are subject to the same pleading standards. *Duty Free Americas, Inc. v. Estee Lauder Cos.*, 797 F.3d 1248, 1262 (11th Cir. 2015).

### ARGUMENT

### I.   Greenflight Venture Corporation Has Antitrust Standing

Google contends that Greenflight lacks antitrust standing to bring Count I under Section 2 of the Sherman Act because it is not a participant in the alleged relevant market for general search services ("GSEs"). MTD at 2-3. This argument fails for several reasons.

Greenflight operates in markets that are inextricably linked to the general search services market. Specifically, Plaintiff offers vertical search providers ("VSPs") and operators of reverse phone search services, which are directly affected by Google's monopolistic practices in the general search market. (FAC ¶¶18-20,83-84). The FAC explicitly states: *"Google has leveraged this [GSE]monopoly to injure VSPs as a whole by reducing competition and consumer VSP choice."* FAC ¶102. Under antitrust law, a plaintiff need not be a direct competitor in the monopolized market to have antitrust standing. It is sufficient if the injuries are "inextricably intertwined" with the injury the antitrust laws were intended to prevent. *Blue Shield of Va. v. McCready*, 457 U.S. 465, 484 (1982).

---

[1] "Greenflight" is the preferred abbreviation for Greenflight Venture Corporation, which reflects its charter mission of launching green, triple bottom line ventures. The entity is also named after its founder's parrot.

In *McCready*, the Supreme Court held that a party who was not a competitor in the relevant market could still have antitrust standing because her injury was a direct result of the conduct.

Similarly, Plaintiff here alleged that Google's monopolistic practices in the GSE market have directly harmed by manipulating search results to favor its own services and by foreclosing competition in downstream markets. FAC ¶ 19, 82-84. The FAC alleges that Google's anticompetitive conduct in the GSE market has directly injured Greenflight and class members by reducing competition and consumer choice. Likewise, Google has foreclosed competition in downstream markets: "By manipulating search algorithms and controlling access to search traffic, Google has insulated itself from competition, ensuring that independent developers cannot effectively compete without being subjugated to Google's terms and conditions." FAC ¶ 21.

Plaintiff's injuries are thus inextricably intertwined with the harm to GSE competition. Antitrust laws protect potential competitors as well as actual competitors. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). The Eleventh Circuit has recognized that antitrust standing exists where the plaintiff is a participant in a market that is inextricably linked to the market in which the antitrust violation occurs. *Sunbeam Television Corp. v. Nielsen Media Research, Inc.,* 711 F.3d 1264, 1271 (11th Cir. 2013). Leveraging monopoly power in one market to harm competition in another market is actionable under Section 2. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 479-80 (1992) (holding that Kodak's leveraging of its monopoly power in the parts market to impede competition in the service market violated Section 2).

The FAC details how reverse phone search services do in fact compete with and could even evolve into GSEs. The Subcommittee Report is referenced concerning "proliferating verticals." FAC at 8. The report describes how Google fragmented specialized search providers to prevent any competitive threat to their GSE. Historically, a significant share of Google's early searches were phone and people searches. FAC ¶ 42-45, 77-79. OkCaller.com at its peak had approximately 250,000 users per day and ranked among the top 2,000 websites on Google. FAC ¶ 23-24, 46. Plaintiff alleged that, but for Google's anticompetitive conduct towards proliferating verticals, their service could have expanded significantly, easily covering an estimated ten million searches[2] daily that infringe its patent, potentially becoming a viable entrant into the GSE market. FAC ¶ 78. Nonetheless, whether reverse phone search services place OkCaller within a subset of GSEs (an alternate theory), or a distinct market, is a question of fact that should be resolved after discovery, not at the pleading stage.

---

[2] As depicted in the FAC chart, the site hovered around 150,000 daily users for most of a decade, but the patent method is executed at least 2-10 million daily instances. This traffic was remarkable and fueled record profits through 2022; Google's narrative of a slow decline is false.

The idea of VSPs competing with GSEs is neither far-fetched nor grandiose. In fact, it mirrors historical patterns when dominant monopolies opened their infrastructure to competitors, resulting in thriving markets. For example, when cellular tower infrastructure was opened to fledgling providers, it led to a surge of low-cost entrants. Similarly, contemplated remedies in cases like *U.S. v. Google* and the EU's DMA emphasize the potential for such mandates in the search industry. Widespread media coverage indeed highlights potential remedies including Google being required to share its Googlebot search data with competitors.

VSPs, such as OkCaller with its 300 million users, are no strangers to handling large datasets. The moment they gain open access to Google's bot data, they could quickly build and innovate novel search platforms. These providers have the technical infrastructure and data management experience to offer search solutions tailored to user needs, something a single dominant GSE can overlook.

Just as the news media outlets thrive with diverse voices and perspectives, allowing VSPs to compete in the search space would enhance the quality, diversity, and innovation of internet searches. Instead of one monolithic GSE dominating over 90% of the market, we could see vibrant competition of search engines, akin to choosing ones preferred newspaper or news channel. This vision is precisely why Congress investigated Google's perception of VSPs as threat to its GSE monopoly. It also supports the argument that Google's anticompetitive agreements—such as the one with Apple—are stifling the potential for innovation and growth in downstream VSP markets like reverse search.

## II. The FAC Adequately Alleges Relevant Sherman Markets and Agreements

A Sherman relevant *product* market "must encompass the product at issue as well as all economic substitutes for the product." *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008); *see also* 5C Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and deir Application* ¶ 530c (4th ed. 2020 supp) ("To define a market is to identify those producers providing customers of a defendant firm (or firms) with alternative sources for the defendant's product or service."). For products to be economic substitutes, they must be "reasonably interchangeable by consumers for the same purpose." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956).

The FAC properly alleges three relevant Sherman markets: The market for General Search Engines (GSEs), the market for Vertical Search Providers, and a Reverse Phone Search Services market. The GSE market itself was proven in the recent DOJ verdict. That court's opinion also issued finding of facts asserting the existence of an SVP market, analogous to both the Congressional Subcommittee's VSP findings and the FAC's VSP market. The reverse phone search services market

is defined as "phone search services which allow consumers to verify identity information about the owners of phone numbers they transact and/or communicate with," and includes Whitepages, Spokeo, OkCaller, "Googling a number" (Google GSE Search), and similar apps sold on App Store and Google Play. (FAC ¶ 80). All three Sherman markets reference reasonable interchangeability, and cross-elasticity[3] of demand, by plainly identifying a representative group of substitutes. Critically, each FAC market definition defines the boundaries of what is *not* a substitute. The GSE and VSP/SVP markets are recognized by two branches of the United States government. There is no allegation any of these markets are overly narrow, overly broad, or litigation contrived, which are the only exceptions to *Brown Shoe* mandated fact-finding that permit dismissal at the Rule 12 level. Google cannot credibly argue that Plaintiff's VSP market is implausible, when it aligns with the court recognized SVP market and the VSP findings discussed in the Congressional Subcommittee report.

**A. Vertical Search Provider(VSP) Market, Based on Congressional Findings, Is Plausible**

Google contends that allegations regarding the Vertical Search Provider ("VSP") market and the reverse phone search market are "threadbare and inadequate," failing to provide factual allegations of cross-elasticity of demand or reasonable interchangeability. MTD at 5-6. Google's reliance on cases such as *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327 (11th Cir. 2010), *JES Props., Inc. v. USA Equestrian, Inc.*, 253 F. Supp. 2d 1273 (M.D. Fla. 2003), and *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997) is misplaced. These cases are distinguishable because Plaintiff has adequately defined the recognized, rather than contrived, relevant markets.

The FAC defines the VSP market by drawing on authoritative sources, including the Congressional Subcommittee on Antitrust "Investigation of Competition in Digital Markets" report, which discusses specialized vertical search providers and their significant role in the digital marketplace. FAC ¶ 15-17. Additionally, the recent Department of Justice verdict against Google in the general search engine (antitrust case recognizes the existence and importance of Specialized Vertical Providers, which are analogous to the VSPs described in the FAC and Subcommittee Report. Per the *US v. Google* findings:

> "Specialized vertical providers, or SVPs, are platforms that respond to queries centered on a particular subject matter. Examples of SVPs include Amazon,

---

[3] Many VSPs, Reverse Search, and GSEs are free digital products. The notion of cross-elasticity does not apply in a traditional sense to free products, as elasticity from zero is undefined. The FTC and DOJ have filed numerous *amicus* briefs indicating that Courts should not hesitate to apply Sherman Act to free digital products. Despite the inapplicability of historic price elasticity measures, today's digital products still compete for user's time and attention, which, as in this case, are then monetized through ads or other digital equivalents to revenue. Significant academic discussion exists on metrics like SSNDQ (where quality serves as price for substitutability), and a *Brown Shoe* jury can adequately assess such practical indices. Identifying all reasonable, interchangeable substitutes suffices at this stage.

Expedia, and Yelp." (*United States v. Google LLC*, No. 1:20-cv-03010-APM, Findings of Fact ¶ 141).

That holding further elaborates that while SVPs are not GSEs, they are distinct entities that provide specialized search functionalities within specific verticals. This recognition by both Congress and the *United States v. Google* court underscores the legitimacy and plausibility of the VSP market.

At the pleading stage, plaintiff meets the requirement to define the relevant market with reference to reasonable interchangeability and cross-elasticity of demand by identifying substitutes or competitors within that market. In *Brown Shoe Co. v. United States*, the Supreme Court emphasized that practical indicia, such as industry or public recognition – which plainly exist here – of the market as economic entity, are relevant to market definition. *370 U.S. 294, 325 (1962)*.

Plaintiff met this standard by naming at least eight VSPs and providing specific examples: **Medical Research Databases**: PubMed, FactMed (FAC ¶ 67) **Legal Research Services**: Westlaw, LexisNexis (FAC ¶ 69). **Reverse Phone Search Services**: OkCaller, Whitepages (FAC ¶ 67, 80). **Travel Search Services**: Expedia, Booking.com (FAC ¶ 71). **Shopping Search Services**: Google Shopping, Amazon (FAC ¶ 71). By identifying these competitors and explaining their specialized functions within the VSP market, Plaintiff adequately referenced reasonable interchangeability and cross-elasticity of demand. A market definition enumerating every potential substitute might number tens or hundreds of thousands in this case, which is not reasonable.

Google nonetheless contends that the VSP market is inadequately defined because it does not include specific entities, such as Amazon and Expedia. MTD at 5. However, market definition under antitrust law does not require the inclusion of every conceivable substitute, especially at the pleading stage. The VSP focuses on informatics functionality, but clarifies it "invokes the broadest definition of VSPs to form an inclusive putative class." FAC ¶ 76. Google points out that Amazon and Expedia were listed in the DOJ SVP Market, but not in the FAC. The exact contours of this market – and whether Amazon and Expedia belong in it – are matters for a jury, not a Rule 12 motion.  This is the guidance provided by the Supreme Court in *Brown Shoe*.

Google further asserts that the idea of OkCaller being interchangeable with Google Flights or Google Shopping is implausible. This misconstrues what a competition market defines. Greenflight does not allege that OkCaller is identical to every other VSP, but rather, that these services all fall within the broader category of VSPs, each providing specialized search functions within their respective niches. FAC ¶ 66-69. This is common practice in antitrust markets. A market for crayons doesn't mean that blue crayons are identical to green crayons; each serves their unique purpose, but are *reasonably* interchangeable under economic product market theories.

Interchangeability can exist from different angles or perspectives within the supply chain. For example, an autobiography, cookbook and a dictionary are all books, yet serve different purposes for consumers—a person needing a dictionary would not open up an autobiography—they are nonetheless books and are interchangeable from the perspective of publishers or bookstores that categorize, market, and sell them within the broader book market. Similarly, VSPs like OkCaller (reverse phone search), Google Flights & Expedia (travel search), and Google Shopping (product search)  are interchangeable from the perspective of advertisers, data providers, and search platforms that view them as specialized search services within the broader VSP market. VSPs like OkCaller, Google Flights, and Google Shopping provide specialized search services within different verticals but compete for user attention, data resources, advertising revenue, and market presence.

Antitrust cases have recognized that products may be considered part of the same market even if they are not direct substitutes from the consumer's perspective but are functionally similar from the supplier's perspective. In *United States v. Continental Can Co.,* 378 U.S. 441, 455-56 (1964), the Supreme Court held that glass and metal containers were in the same market because, despite differences in consumer perception, they were interchangeable for suppliers and manufacturers. Similarly, in *FTC v. Staples, Inc.,* 970 F. Supp. 1066, 1075-76 (D.D.C. 1997), the court found that different types of office supplies could constitute a single market due to similarities in distribution and marketing channels.

**B.  Reverse Phone Search Market Identifies All Competitors and Reasonable Substitutes**

To round-out their motion, Google purports that there is not even a market for reverse phone search in the United States. This is akin to arguing there was no market for yellow page books in the pre-Google era. In this aspect, the MTD borders on the frivolous. The reverse phone search market is a distinct relevant market characterized by a particular service that general search engines, social media platforms, and online directories do not necessarily provide. FAC ¶ 77-83. While Plaintiff acknowledges the existence of other competitors, Google's dominance effectively forecloses competition, controlling over 90% of the market. FAC ¶ 80-83.

Google contends that it does not offer the same reverse phone lookup functionality as OkCaller. MTD at 6. However, Greenflight alleges that Google does provide reverse phone search capabilities and captures a significant share of such queries due to its dominance in general search. FAC ¶ 80-82. Including Google in the reverse phone search market is not only appropriate, because it competes with reverse phone services by offering similar functionalities. Millions of Americans

"Google a number" every day, and at this stage, it must be assumed that this behavior constitutes reverse search.

Google critiques the FAC for mentioning only two competitors in the reverse phone search market. MTD at 6. Again, at the pleading stage, parties are not required to list every market participant. By naming key competitors and explaining the market dynamics, Plaintiff has provided sufficient detail to define the market plausibly. *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008) ("There is no requirement that these elements of the antitrust claim be pled with specificity."). Moreover, the FAC alleges far more than two competitors – it alleges a large group of infringing apps on the Android Play Store, OkCaller, and Google's flagship Search product. These, collectively, reasonably define a market for reverse search services.

**C. The Market Definition Cases Cited by Google Are Distinguishable**

In *Jacobs*, the plaintiff defined the relevant market as "the market for visco-elastic foam mattresses and visco-elastic foam pillows," effectively including only one manufacturer's products without justification and excluding obvious substitutes. *626 F.3d at 1339*. The Eleventh Circuit found this market definition implausible because it was artificially narrow and limited to a single brand.

In *JES Props.*, the plaintiff failed to define the relevant market with any reference to reasonable interchangeability, resulting in a legally insufficient market definition. *253 F. Supp. 2d at 1282*. Similarly, in *Queen City Pizza*, the Third Circuit dismissed an antitrust claim where the plaintiff defined the market as "ingredients, supplies, and materials used in the operation of Domino's Pizza stores," effectively limiting the market to a single brand's franchisees. *124 F.3d at 438*. The court found this single-brand market definition implausible and litigation contrived. That is simply not the case here, nor has Google even asserted that in their threadbare Rule 12 motion. Put simply, alleging the existence of a market for reverse phone services is not analogous to a litigation contrived, single brand for pizza franchise supplies.

Plaintiff here has defined the VSP and reverse search markets to include multiple competitors offering specialized search services across various verticals, and one specific phone information market, respectively. The markets are not confined to a single brand, and are not alleged to be artificially contrived, too narrow, or too broad. In short, the MTD fails to identify any good cause why these markets shouldn't be left for *Brown Shoe* jury fact-finding.

**D. The Eleventh Circuit Disfavors Dismissal on Market Definition at the Pleading Stage**

Plaintiff's definition of the VSP market is consistent with antitrust principles, considering interchangeability and competition from different levels of the market structure. The Eleventh Circuit

has cautioned against dismissing antitrust claims based on market definition at the pleading stage unless the alleged market "clearly does not encompass all interchangeable substitute products or if it is defined in terms of a single brand, franchise, institution, or comparable entity." *Duty Free Americas, Inc. v. Estee Lauder Cos.,* 797 F.3d 1248, 1263 (11th Cir. 2015).

Similarly, in *Spanish Broadcasting System of Florida, Inc. v. Clear Channel Communications, Inc.*, the Eleventh Circuit recognized the determination of the relevant market is a question of fact for the jury, and dismissal on the pleadings is appropriate only if the alleged market makes no economic sense under any set of facts. *376 F.3d 1065, 1075 (11th Cir. 2004)* (quoting *St. Joseph's Hosp., Inc. v. Hosp. Corp. of Am., 795 F.2d 948, 953 (11th Cir. 1986)*).

The pleaded market definitions are plausible, grounded in authoritative sources, and make economic sense. Therefore, dismissal at this stage is inappropriate.

**E.  Sherman Antitrust Agreements Exist as a Matter of Law**

Not only is Google's assertion that its conduct is purely unilateral and lacks any agreements inaccurate, it is knowingly false and arguably in contempt of the legal findings of *United States v. Google*. In a breathtaking falsity, the MTD states "There Are No Well Pleaded Facts Supporting an Agreement Between the Defendant and a Third Party." MTD at 11. The FAC plainly states "The DOJ verdict indicated Google pays Apple $20 billion annually to maintain its search monopoly." FAC ¶ 11. This MTD omission is not an oversight, it is a false representation to the Court.

The FAC alleges that Google's dominance in search has been maintained and expanded through various agreements and concerted actions that restrain trade and harm competition. Over the past two decades, Google has dominated the search market, and its search engine results pages (SERPs) have rarely been legally challenged with any success. The notion that Google's conduct is unilateral is a fiction. Beyond explicit contracts, Google's control over search results effectively forces every end user and content provider to accept its SERP listings. The entire internet information economy relies on this structure, creating an ecosystem where millions of end users, knowingly or unknowingly, are participants in furthering Google's monopolistic agenda.

Antitrust claims involving allegations of agreements are fact-intensive and generally unsuitable for dismissal at the pleading stage. *In re High-Tech Employee Antitrust Litig.,* 856 F. Supp. 2d 1103, 1116 (N.D. Cal. 2012) ("Whether an antitrust conspiracy exists is generally a factual question for the jury."). Nonetheless, the FAC plainly alleges that Google has entered into agreements with strategic partners that result in the manipulation of search rankings to favor its own products and those of its partners, thereby restraining trade. (FAC ¶ 19, 108-109, 112). Specifically, the FAC

10

references agreements with Strategic Partners: "Google engages in anticompetitive agreements with strategic partners to restrict trade in the general search services market and downstream relevant markets." (FAC ¶ 109). It alleges preferential treatment based on advertising expenditure: "Google typically favors heavy advertising spenders such as Spokeo and Whitepages... and gives preference to them in their result SERPs." FAC ¶ 110-111. And most incriminating is the Apple-Google Agreement – the FAC references the Department of Justice's bombshell findings regarding the $20 billion annual hidden payment between Apple and Google to maintain Google as the default search engine on iOS devices, which has significant anticompetitive effects. FAC ¶ 11, 19. These agreements are not only alleged but have been publicly scrutinized and, in the case of the Apple-Google agreement, formed a significant part of the government's antitrust case against Google.

The FAC also suggests the existence of implied agreements between Google and entities like OkCaller. Plaintiff alleges that there was an implied understanding that Google would continue to send traffic to OkCaller, given their longstanding partnership and interactions, including quarterly meetings at Google's Miami office. FAC ¶ 25, 54, 161. To be sure, OkCaller was, for most of the past decade, a preferred partner of Google's. Discovery seeks information on the frequency of termination of such partners invited to regional headquarters, and whether other reverse search services meet with Google on a routine basis. It seems reasonably certain that Google doesn't typically invite companies to their office, only to de-list them shortly thereafter.

Courts recognize that implied agreements or courses of dealing can satisfy the agreement requirement under Section 1. *United States v. Gen. Motors Corp.,* 384 U.S. 127, 142-43 (1966) (finding that a "common understanding" among parties can constitute an agreement under Section 1). An explicit agreement is not necessary to establish a Section 1 violation; a tacit understanding or concerted action can suffice. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 553 (2007) ("The crucial question is whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express.'").

### F.  Reference to *Dreamstime* Case

Google claims that Plaintiff erroneously relies upon competition theory discussed in *Dreamstime v. Google LLC*, 54 F.4th 1130 (9th Cir. 2022), to support their claim. MTD at 4-5. However, Plaintiff cited *Dreamstime* to illustrate that recent courts have recognized the possibility that Google's self-preferencing and manipulation of search results could constitute anticompetitive conduct under Section 1. FAC ¶ 107. While the Ninth Circuit ultimately affirmed the dismissal in *Dreamstime*, it acknowledged that a claim based on self-preferencing and manipulation of search

results could potentially survive a motion to dismiss if adequately pleaded. *Dreamstime*, 54 F.4th at 1142. Notably, the Ninth Circuit decision issued after years of Section 230 dismissals of litigation about Google Search, but also, after the filing of government antitrust charges. In short, *Dreamstime* represented the beginning of a changing jurisprudence tide, with regard to digital market monopolies.

The *Dreamstime* decision acknowledged in *dicta* that Google's self-preferencing and manipulation of search results could potentially constitute anticompetitive conduct under the Sherman Act if adequately pleaded. 54 F.4th 1130, 1142. Since the *Dreamstime* decision, significant legal developments have occurred. The Department of Justice secured a verdict against Google for monopolization in the general search services market. FAC ¶ 2, 14, 60. This verdict establishes that Google's GSE practices do violate Sherman 2 and supports the likely success related Clayton-Sherman claims. Following the verdict, and one week after the FAC was lodged, Yelp filed a similar lawsuit against Google, alleging unfair manipulation of search rankings and anticompetitive conduct that harms specialized search providers (reviews sites). These cases highlight a growing recognition of the anticompetitive practices involved in Search and the duopoly. These developments also indicate that courts are increasingly willing to scrutinize Google's conduct under antitrust laws.

**III.     Greenflight States a Claim for Refusal to Deal Under The *Aspen* Exception**

Google contends the FAC does not allege recognized exclusionary conduct by a monopolist, and further, purportedly lacks a relevant market. MTD at 6-9. These arguments are without merit.

While antitrust claims generally require the definition of a relevant market and demonstration of monopoly power, courts have recognized exceptions, particularly in refusal to deal cases akin to *Aspen Skiing Co. v. Aspen Highlands Skiing Corp*.[4], 472 U.S. 585 (1985). In such cases, the focus is on the unilateral termination of a preexisting, profitable course of dealing that harms competition. In *Aspen Skiing*, the Supreme Court affirmed a jury verdict finding that the defendant's termination of a joint ticketing arrangement, without a legitimate business justification, constituted anticompetitive conduct under Section 2. The Aspen Court emphasized the defendant's intent to harm competition rather than to advance legitimate business interests. *Id.* at 608-11. Even if a relevant market were required, as discussed in previous sections, the FAC defines the general search services market, the vertical search provider market, and the reverse phone search services market, alleging that Google holds significant market power in each. FAC ¶ 62, 71, 80.

---

[4] In 2020, Greenflight's founder alleged Apple violated *Aspen* when it blocked its first-mover COVID-19 app, in favor of the botched Apple-Google contact tracing app. There, it was argued *Aspen* applied, but with a considerably more nuanced longstanding profitable course of dealing. In all probability, Google learned of the *Aspen* allegation which concerned them; shortly thereafter, Greenflight's pre-existing, voluntary relationship with Google terminated.

In Count III, Greenflight alleges that Google abruptly terminated a longstanding, profitable relationship with OkCaller without legitimate business justification, resulting in significant harm to the Plaintiff and competition. FAC ¶ 23-25, 33, 116-120. This termination effectively removed OkCaller's products—millions of digital information pages about specific phone numbers—from Google's search results, causing a drastic 99% reduction in traffic. FAC ¶ 33, 54, 83. The partnership between the parties was sufficient as to bring free caller ID to three hundred million people, and result in substantial earnings. Providing free caller ID at such scale fosters competition, by definition. Google's MTD tries to weave a false narrative (see MTD at 2) that no termination occurred, but rather, a multi-year trend reached its course. That is false. Per FAC ¶ 46, "OkCaller.com had been consistently ranked as a top provider in its field." Therefore, metrics like market share, earnings, and organic search volume, *collectively* form overall commercial success, which was "top" for nearly a decade. If the Court deems necessary, revenues could be amended into the complaint, and Greenflight can demonstrate that record revenues from Google occurred in 2022, just prior to termination. Even if Google's assertion were true, which it is not, it would evidence the Subcommittee finding that Google intentionally fragments VSPs to limit GSE competition. Greenflight's enviable organic traffic certainly was not cause for alarm prior to 2022.

### A. *Trinko* is Misplaced

Google contends that its unilateral refusal to deal with Plaintiffs is lawful under *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004), and that the *Aspen Skiing* exception does not apply. MTD at 8-9. This argument mischaracterizes the law and the facts. In *Trinko*, the Supreme Court acknowledged that while unilateral refusals to deal are generally lawful, *Aspen Skiing* represents a narrow exception where anticompetitive conduct can be established. *Trinko*, 540 U.S. at 408-09. The key factors in *Aspen* are typically enumerated: 1) The defendant terminated a voluntary and profitable business relationship with the plaintiff, 2) The defendant was willing to forsake short-term profits to achieve an anticompetitive end. 3) There was no valid business reason for the termination other than to harm competition. *Aspen Skiing*, 472 U.S. at 608-11.

Unlike in *Trinko*, where the defendant was compelled by regulatory obligations to deal with competitors, Greenflight alleges that Google voluntarily engaged in a profitable relationship with OkCaller and then terminated it without legitimate justification. FAC ¶ 23-25, 33, 54, 116-120. This places the case squarely within the *Aspen* exception. The *Trinko* decision does not provide blanket immunity for unilateral refusals to deal. Courts have continued to apply the *Aspen* exception post-*Trinko* when appropriate. See, e.g., *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1131-32

13

(9th Cir. 2004). While the Supreme Court in *Trinko* expressed limits surrounding the essential facilities doctrine, it did not overrule it. *Trinko*, 540 U.S. at 411. Lower courts, including the Eleventh Circuit, have recognized and applied the doctrine. See *Morris Communications Corp. v. PGA Tour, Inc*., 364 F.3d 1288, 1294-95 (11th Cir. 2004).

Greenflight alleges facts that perfectly align with the *Aspen Skiing* exception. OkCaller and Google had a longstanding, profitable relationship. Google indexed OkCaller's pages and provided substantial traffic, while Plaintiff contributed valuable content that enhanced Google's search results, and most importantly, generated significant earnings for Google. FAC ¶ 23-25, 54, 116-120. Google monetized the free digital[5] product through Google AdSense. Google abruptly removed millions of OkCaller's digital products from its search index, resulting in a 99% reduction in overall traffic, without providing any legitimate business justification. FAC ¶ 33, 54, 83, 120. By removing OkCaller's digital products and patent-protected information content, Google potentially sacrificed the quality and comprehensiveness of its search results, indicating a willingness to forsake short-term benefits to harm competition. The FAC alleges that Google's actions were motivated by a desire to eliminate competition in the reverse phone search market, to favor its own services and those of competitors with large advertising budgets. FAC ¶ 19, 82-84, 121.

Moreover, Greenflight alleges that Google retaliated against them due to their participation in Sherman Act of 1890 (15 USC § 1-2) litigation against their joint COVID project with Apple, Inc. FAC ¶ 35-36, 131. By terminating the profitable relationship with Plaintiff and removing their content from search results, Google intended to suppress competition and discourage other developers from advocating for antitrust enforcement. Under *Aspen Skiing*, the defendant's intent to harm competition can be inferred from actions that lack legitimate business justification and are aimed at excluding rivals. *Aspen,* 472 U.S. 585, 608-11 (1985). Plaintiff's allegations suggest that Google's conduct was motivated by an anticompetitive intent to stifle opposition and maintain its monopoly.[6] If discovery reveals that Google's retaliation was indeed linked to Plaintiff's antitrust advocacy, it would strengthen the application of the *Aspen Skiing* exception. Such conduct not only harms the individual plaintiff but also undermines the broader competitive process by deterring others from challenging monopolistic practices.

---

[5] Even if Google's actions do not rise to the level of an 18 USC § 1512 violation, they still reflect an intent to harm competition under *Aspen Skiing*. This provides additional support for the FAC refusal to deal claim. Google's challenge to the applicability of *Aspen* may be counterproductive, as maintaining the focus on *Aspen* allows for the consideration of anticompetitive intent without discovery delving into potential criminal allegations under § 1512.

### B. Google's Attempt to Distinguish *Aspen Skiing* Is Erroneous

Google attempts to distinguish *Aspen Skiing* by asserting that there was no prior course of dealing or joint venture between Google and Plaintiffs. MTD at 8. This mischaracterizes the facts and ignores the standard of viewing allegations in the light most favorable to the plaintiff at the motion to dismiss stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The longstanding relationship between Google and OkCaller can be characterized as a form of joint venture. Google benefited from including OkCaller's content in its search results, enhancing the value of its search engine, while OkCaller relied on Google for user access. FAC ¶ 23-25, 54, 116-120. This symbiotic relationship aligns with the collaborative arrangement in *Aspen Skiing*. Furthermore, Google's assertion that OkCaller remains indexed but merely receives less traffic ignores FAC allegations that 99% of Greenflight's pages were removed from Google's index. FAC ¶ 33, 54, 83. The removal of millions of products constitutes a *de facto* termination of a prior course of dealing, not a mere downgrading. This would be analogous to Google distributing phone books that changed to ten-page pamphlets, rather than the prior dictionary-sized telephone books.[7] This analogy applies to Aspen's original facts, where the majority of mountain ski access was revoked.

### C. Greenflight Adequately Alleges That Google Is an Essential Facility

Greenflight alleges that Google's search engine is an essential facility for reaching users, particularly in the reverse phone search market. FAC ¶ 80-83, 121. The FAC cites congressional reports to support the assertion that access to Google's search engine is essential for developers to compete effectively. FAC ¶ 15-17.

Google suggests that *MCI* and the essential facilities doctrine have been nullified. MTD at 9. However, *MCI* remains good law, and the essential facilities doctrine continues to be recognized and applied by courts. See *Hecht v. Pro-Football, Inc.,* 570 F.2d 982, 992-93 (D.C. Cir. 1977); *Laurel Sand & Gravel, Inc. v. CSX Transp., Inc.,* 924 F.2d 539, 544 (4th Cir. 1991).

Moreover, the FAC alleges that not only is Google Search an essential facility for a reverse search service, but Google and Apple collectively form a duopoly controlling, *generally*, all internet content in the United States through their dominance of search/websites (Google) and apps/platform distribution (Apple). FAC ¶ 11, 28. This duopoly effectively serves as an essential facility for developers and content providers seeking to reach users. Under the essential facilities doctrine, a facility is considered essential if control of it carries with it the power to eliminate competition in a

---

[7] A jury would recognize replacing McDonald's iconic "Over 300 Million Served" with "One thousand Served" might indicate an unusual change of business dealing.

downstream market. *Hecht* at 982, 992. The doctrine applies when 1) A monopolist controls access to the facility, 2) Competitors cannot reasonably duplicate the facility, 3) The monopolist has denied access to the facility, and 4) Providing access is feasible. *MCI* at 1081, 1132-33.

With respect to the duopoly, Greenflight alleges: 1) Google and Apple, through their duopoly, control the primary channels for internet content distribution—search engines and app platforms. FAC ¶ 11, 28, 80-83. 2) It is not feasible for competitors to replicate the scale and reach of Google's search engine or Apple's app ecosystem. FAC ¶ 63-65, 72. 3) Google has denied Plaintiff access by removing OkCaller content from search results and app stores. FAC ¶ 33, 54, 83, 120. And, 4) Google could provide fair access without undue burden, as they previously did. FAC ¶ 25, 54, 124.

**IV.    Florida and California State Competition Law Claims Are Properly Pled**

Google's argument that Plaintiff fails to allege a valid FDUTPA claim is incorrect. FDUTPA broadly prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). FDUTPA claims are evaluated based on the totality of the circumstances. Courts have found that anticompetitive behavior, such as exclusionary conduct and retaliatory actions, can constitute unfair trade practices under FDUTPA. See *Porsche Cars N. Am., Inc. v. Diamond*, 140 So. 3d 1090, 1100 (Fla. Dist. Ct. App. 2014). Allegations that Google manipulated search results, suppressed OkCaller, and retaliated against Plaintiffs for asserting their patent rights are sufficient to state a claim under FDUTPA. Similarly, Google's actions violate California's UCL, which prohibits any unlawful, unfair, or fraudulent business act or practice. Cal. Bus. & Prof. Code §§ 17200, et seq. The UCL is intentionally broad, covering a wide range of business practices that offend established public policy or are immoral, unethical, oppressive, unscrupulous, or substantially injurious. In *Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.,* 20 Cal. 4th 163 (1999), the California Supreme Court held that the UCL applies to anticompetitive conduct, including actions that harm competitors or stifle innovation. Allegations that Google used its monopoly power to suppress OkCaller and other VSPs, thus harming competition and innovation, clearly fall within the scope of UCL.

Under FDUTPA and UCL, the FAC alleges that Google's conduct is unfair, deceptive, and unlawful, including anticompetitive practices. FAC ¶ 125-134, 136-143. These allegations, taken as true, state a claim under these statutes. Furthermore, the FAC details how Google's lack of transparency in its ranking methodologies conceals potential anticompetitive conduct, which supports Greenflight's claims and the need for proper adjudication. FAC ¶ 129, 139. The courts have

recognized that anticompetitive practices disguised through opaque processes can be actionable. *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 465-66 (1986).

The FAC alleges at least five unfair practices by Google, enumerated herein, that violate California's Unfair Competition Law and the Florida Deceptive and Unfair Trade Practices Act. These unfair practices, as described in the FAC, go beyond the scope of the Sherman Act claims but are not adequately addressed in Google's Motion to Dismiss. Even if Google's MTD were correct regarding the Sherman Act claims (which is disputed), these unfair practices alleged constitute independent grounds for relief under the UCL and FDUTPA:

1 – The FAC alleges that Google and Apple collectively form a duopoly controlling major aspects of internet content and access methods. FAC ¶ 11, 28. This duopoly stifles competition and innovation by controlling the primary distribution channels for *all* software applications, thereby disadvantaging independent developers like Greenflight. Such concentrated control is inherently unfair and detrimental to a competitive market, and a Sherman antitrust claim against the entire duopoly and all of its collective digital markets is not prerequisite to raise a UCL claim.

2 – Google is alleged to favor reverse search services that spend heavily on advertising, such as Spokeo and Whitepages, by giving them preferential treatment in search rankings. FAC ¶ 110-111. This practice unfairly disadvantages competitors like Greenflight who may not have comparable advertising budgets, undermining fair competition based on the quality of services offered.

3 – The FAC describes how Google fails to enforce intellectual property laws by allowing rampant copycat sites that infringe on Plaintiff's patent and trade dress rights to flourish in search results. FAC ¶ 55-56, 130. This not only harms Plaintiff but also misleads consumers, constituting unfair business practices under the UCL and FDUTPA.

4 – Google's lack of transparency in its search ranking algorithms prevents developers from understanding how to improve their products to gain visibility. FAC ¶ 57-58, 129) This opacity leads to wasted resources and hinders fair competition, which is unfair to developers relying on Google for user access. Google's failure to implement transparent quality metrics leads to wasted resources by developers who cannot effectively improve their products without understanding Google's criteria. FAC ¶ 57-58, 129.

5 – Google is alleged to have fragmented the reverse phone search market and other VSP verticals to maintain its monopoly, diverting traffic away from better, free services like OkCaller and harming innovation and competitive pricing. FAC ¶ 41, 82-83.

Beyond these fundamentally unfair practices, the FAC alleges a concern that Google retaliated[8] against them by terminating their partnership and suppressing their site after learning about their litigation history against Big Tech companies. FAC ¶ 33-36, 131. Such potentially unlawful conduct undermines the principles of open competition and free speech. Courts have held that dismissing a case when there are underlying allegations of wrongful conduct that require discovery is disfavored. In *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), the Supreme Court emphasized that a complaint should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of their claim. Google's attempt to dismiss potential 18 U.S.C. § 1512 witness retaliation concerns at the pleading stage has no basis in law. While the FAC only asserts heightened 'more likely than not' suspicion that Google dropped OkCaller for illegal reasons, including potential retaliation against litigating their joint venture with Apple, they have alleged sufficient facts to state a plausible claim. FAC ¶ 35-36, 131. Dismissing the case at this stage would be inappropriate, as discovery is necessary to uncover evidence related to Google's motives.

## V.    Indirect Patent Infringement Claims Properly Identify Third-Party Direct Infringers

To state a claim for direct patent infringement under 35 U.S.C. § 271(a), a plaintiff must allege facts that plausibly suggest that the infringer, without authority, makes, uses, offers to sell, or sells any patented invention within the United States during the term of the patent. *Disc Disease Sols. Inc. v. VGH Sols., Inc.*, 888 F.3d 1256, 1257 (Fed. Cir. 2018). The complaint must place the alleged infringer on notice of what activity is being accused of infringement. *Lifetime Indus., Inc. v. Trim-Lok, Inc.,* 869 F.3d 1372, 1379 (Fed. Cir. 2017).

---

[8] In evaluating retaliation claims, courts consistently apply a three-pronged analysis:  (1) the plaintiff engaged in protected conduct; (2) the defendant took an adverse action against the plaintiff; and (3) there was a causal connection between the protected conduct and the adverse action. The courts have consistently recognized that participation in litigation is protected activity under various statutory frameworks, including the ADA and Title VII. In *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273 (2001), the Supreme Court confirmed that filing complaints and lawsuits are quintessential forms of protected conduct. Here, the removal of OkCaller's pages was a direct economic injury to Greenflight, one that halted its ability to generate revenue from its core business (FAC ¶ 39-42). In retaliation cases, causation can often be inferred from temporal proximity between the protected conduct and the adverse action. As the Eleventh Circuit noted in *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007), "[t]he burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse action." Google's repeated refusals to address Plaintiff's concerns and its abrupt termination of OkCaller after nine years of cooperation strongly suggest retaliatory intent. Courts have recognized that such circumstantial evidence is often critical in retaliation claims. In *Hunt v. Florida Department of Corrections*, 666 F.3d 1257, 1264 (11th Cir. 2012), the court found that unexplained adverse actions shortly after protected conduct can create an inference of retaliation.

The FAC identifies specific products and services that allegedly infringe the '847 Reissue Patent, including "paid services like Spokeo and Whitepages and many copycat infringers" which perform reverse phone CNAM functions that infringe the '847 Patent. As alleged, "Google LLC allowed multiple competing apps on the Play Store to infringe the patent. Similarly, Google LLC allows infringing websites to run Google Ads, thereby knowingly profiting from active[direct] infringement." FAC ¶ 159-163.

These allegations provide sufficient identification of the accused instrumentalities to put Google on notice of the alleged third-party direct infringement. [9] The FAC includes factual allegations that explain how Google's products and services infringe the '847 Patent. In particular, FAC ¶162 states numerous apps on the Google Play Store appear reasonably certain to infringe, then enumerates each element of the specified system and method.

These allegations go beyond mere recitations of the legal elements and provide factual content that allows the Court to draw the reasonable inference that direct infringement occurs by third parties. In *Disc Disease*, the Federal Circuit reversed a dismissal of a patent infringement complaint, holding that allegations identifying the accused products by name and alleging that they met "each and every element of at least one claim" were sufficient under *Twombly* and *Iqbal*. 888 F.3d at 1260. Similarly, in Lifetime Industries, the Federal Circuit held that allegations identifying the accused product and providing a general description of how it infringed the patent were sufficient to state a claim. 869 F.3d at 1380.The FAC here provides at least as much detail as in *Disc Disease* and *Lifetime Industries*, identifying the accused products and explaining how they infringe the patent claims.

### A. Google's *Artrip v. Ball Corp*. Defense Is Distinguishable

Defendant cites *Artrip v. Ball Corp.,* 735 F. App'x 708 (Fed. Cir. 2018), to support its argument that the FAC fails to identify any accused products. MTD. at 14-15. However, *Artrip* is distinguishable from the present case. In *Artrip*, the plaintiff alleged that the defendant infringed his patent by using certain machines incorporating his patented technology but failed to identify any specific machines or provide details about the alleged infringement. In contrast to *Artrip*, Greenflight

---

[9] This is essentially an indirect infringement case. Counsel clarifies that Google is not alleged to directly infringe the '847 reissue patent. FAC ¶162 states that "Defendant directly infringes the '847 patent by directly selling infringing apps to consumers, as they are merchant of record for nearly all Android apps." This statement, and a similar phrase in FAC ¶166, refer to *prima facie* evidence of contributory infringement. This reference to direct evidence in public SERPs, rather than direct infringement, emphasizes infringement takes place overtly, in the public realm. Additionally, it should be clarified that no users are alleged to infringe – Google induces third-party app developers, and ultimately the infringement occurs upon a user CID query being transmitted to developer's servers. There exists the possibility Google implements internal security applications which directly infringe the '847 patent. Even if so, these are believed to be relatively insubstantial quantities. Pursuant to *Artrip*, these internal products are not identified in the FAC and therefore not alleged.

has identified specific accused products and services: Spokeo and Whitepages' apps and websites sold on Google Play and Search, and a plethora of similar copycats. FAC ¶ 160, 164.

Greenflight acknowledges that certain details about specific infringing apps and functionalities are within Google and/or third-party control and may require discovery. Courts have recognized that plaintiffs are not required to plead facts that are uniquely within the defendant's possession. See *K-Tech Telecomms., Inc. v. Time Warner Cable, Inc.*, 714 F.3d 1277, 1286 (Fed. Cir. 2013) ("[I]t is unreasonable to expect [the plaintiff] to have detailed knowledge of the accused instrumentalities at this stage."). The need for discovery to uncover specific details does not render the complaint insufficient. *Id*.

**B.   The FAC Properly Asserts Contributory and Induced Indirect Infringement Claims**

Google argues that Greenflight's claims for indirect infringement – both induced and contributory – should be dismissed because the FAC fails to allege direct infringement and lacks sufficient factual allegations. MTD at 16-18. This argument is unavailing.

To state a claim for indirect infringement, whether for induced infringement per 35 U.S.C. § 271(b) or contributory infringement per § 271(c), a plaintiff must allege that a third party has directly infringed the patent. *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 572 U.S. 915, 921 (2014). Indirect infringement is predicated on an underlying act of direct infringement by another party. *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1333 (Fed. Cir. 2012). A plaintiff must allege facts showing that the defendant knowingly induced a third party to infringe the patent and had specific intent to encourage it. *Commil USA, LLC v. Cisco Sys., Inc.,* 575 U.S. 632, 639 (2015). This scienter requirement mandates that a defendant knows the component it provides is "especially made or especially adapted for use in an infringement."

The FAC alleges third-party app developers directly infringe the '847 Patent by performing reverse phone lookup methods covered by the patent claims. The FAC alleges that Google was aware of the '847 Patent and the infringement by third parties. FAC ¶ 168. Despite this knowledge, Google induces infringement by promoting and distributing infringing apps on Google Play and encouraging the use of Google's search engine for reverse phone searches. FAC ¶ 164-166.  Google profits from numerous types of indirect infringement, rendering allegations sufficient to state a claim. *See In re Bill of Lading*, 681 F.3d at 1340 (holding that allegations that the defendant knowingly induced infringement by providing materials and instructions to infringe were sufficient to state a claim).

Under 35 U.S.C. § 271(c), contributory infringement occurs when defendant sells or offers to sell a component of a patented invention knowing it to be especially made or adapted for use in

infringement and not having substantial non-infringing use. The FAC alleges that provision occurs when Google sells apps and monetized sites specifically designed for reverse phone lookup functions covered by the patent claims. FAC ¶ 159-163. Google knows that these components are used to infringe the '847 Patent, and indeed, Greenflight notified Defendant about the infringement via email, with specific reference to the patent. FAC ¶ 160-168. Given that Google received a copy of the reissue patent nearly two years ago, it is unclear how in good faith[10] the MTD can assert the scienter requirement has not been satisfied. The FAC even reproduces Google's response: "we're sorry for any inconvenience." Google's scienter objection should be stricken for Rule 11 non-compliance.

The components provided by Google have no substantial non-infringing uses because their primary function is to lookup phone numbers, using methods covered by the patent specification. FAC ¶ 165. The MTD casts this plain truth as "threadbare assertion" – but the fact is, these apps are not 'staple articles' or 'commodities of commerce' by any stretch of the imagination. There exist no other reasonable uses of a reverse phone search app, other than to lookup phone numbers. These allegations meet the pleading requirements for contributory infringement. In any case, the question of whether substantial non-infringing uses exist is a factual issue that cannot be resolved on a motion to dismiss. Courts routinely deny motions to dismiss contributory infringement claims where non-infringing uses are in dispute. See *In re Bill of Lading*, at 1337.

Particularly concerning is that Google SERPs often cache an infringing website's GR-1188 result, which is prohibited under telecommunication standards, and poses a substantial and significant security threat. Daniel's Law was enacted subsequent to the tragic use of internet search portals to harm a victim. OkCaller, since its inception, has taken proactive efforts to implement safe, responsible caller ID. Every time Google caches (and infringes) a web CNAM result, from an induced infringing website, Google risks public safety. In the case of cached results, Google infringes the final elements of the reissue patent, rather than relaying the user to an infringing site. Defendant is fully aware of this fact; it is part of the pleadings and underlying documentation, and the MTD is silent on this serious security flaw. Rather than work with Greenflight to resolve the matter, Google puts its monopoly first, seeking to evade litigation into these meritorious issues.

To state a claim for willful infringement, a plaintiff must allege that the defendant knew of the patent and acted despite an objectively high likelihood that its actions constituted infringement. *Halo Elecs., Inc. v. Pulse Elecs., Inc.,* 579 U.S. 93, 105 (2016). The FAC alleges that Google was

---

[10] What's more, Google met with Greenflight for a decade and sent them three hundred million customers. It's reasonably evident Google did their due diligence and was aware of the patent for a decade.

made aware of the '847 Patent and the infringement claims. FAC ¶ 168. Despite this knowledge, Google continued to engage in the activities. FAC ¶ 154-156, 159-163, 168. Google's actions demonstrate intentional disregard for Greenflight's patent rights, if not public safety. FAC ¶ 168. These allegations are sufficient to state a claim for willful infringement. *Valinge Innovation AB v. Halstead New England Corp.,* No. 16-1082, 2018 WL 2411218, at *7 (D. Del. May 29, 2018).

### C.  USPTO Status of the '847 Reissue Patent

Google argues that Greenflight improperly asserts infringement of canceled patent claims #1–6, which are of no legal force. MTD at 18. The '847 Patent is presently undergoing Request for Continued Examination ("RCE"), and the status of these claims is in flux due to ongoing USPTO proceedings. Counsel acknowledges that Claims 1–6 are currently not allowed; derivative claims have been allowed which are numbered through #33. The inclusion of Claims 1–6 in the FAC was intended to preserve all rights and to inform the Court and Defendant of the potential scope of the patent claims upon conclusion of the RCE, which includes amendments based on Claims #1-6.

 Greenflight reserves the right to assert infringement of any additional claims that may be allowed upon conclusion of the RCE process. Counsel concurs that the current focus is on Claims 7–10. It is well-established that patent claims may change during prosecution, especially when an RCE is pending. Courts have recognized the challenges in identifying the exact scope of patent claims while USPTO proceedings are ongoing. See *Datascape, Inc. v. Springleaf Fin. Servs*, No. 18-0231, 2019 WL 1316415, at *3 (N.D. Ga. Mar. 21, 2019) (noting that patent claims may evolve during reexamination and that plaintiffs may need to adjust their infringement allegations accordingly).

## CONCLUSION

In this antitrust litigation concerning GSE transparency, Google's Rule 12 motion incredulously seeks determination that government recognized VSP/SVP markets are not plausible. The MTD disavows binding verdicts which proved anti-competitive agreements.  It asks the Court to conclude as a matter of law that Google does not sell any infringing reverse phone lookup apps, without discovery. It incorrectly posits that OkCaller's ten-year success with Google cannot be considered a prior, profitable course of dealing under *Aspen*. Moreover, the MTD seeks an order which could serve as dangerous precedent, subverting legitimate inquiry into downstream, leveraged effects of GSE conduct. Granting this proven monopolist's wishes would result in substantial setbacks within the current antitrust landscape, which has taken two decades to redress Google's conduct. The Court should deny the motion in its entirety. In the alternative, Greenflight respectfully requests leave to amend the operative complaint in light of further Court guidance.

Respectfully submitted on this 24th day of September 2024.


/s/Ayelet Faerman                    /s/ Keith Mathews
AYELET FAERMAN, ESQ.                 Keith Mathews
FBN: 102605                          Attorney for Plaintiff
Faerman Law, P.A.                    *Pro Hac Vice*
3859 NW 124th Ave                    NH Bar No. 20997
Coral Springs, FL 33065              American Wealth Protection
Tel: (954) 271-8484                  Manchester, NH 03105
F ax: (954) 271-8474                 Ph. 603-622-8100
ayelet@faerman.law                   keith@awplegal.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served on this 24th day of September 2024, to all parties of record via the CM/ECF filing system as per the Federal Rules of Civil Procedure and Local Court Rules.

| | |
|---|---|
| /s/Ayelet Faerman | /s/ Keith Mathews |
| AYELET FAERMAN, ESQ. | Keith Mathews |
| FBN: 102605 | Attorney for Plaintiff |
| Faerman Law, P.A. | *Pro Hac Vice* |
| 3859 NW 124th Ave | NH Bar No. 20997 |
| Coral Springs, FL 33065 | American Wealth Protection |
| Tel: (954) 271-8484 | Manchester, NH 03105 |
| F ax: (954) 271-8474 | Ph. 603-622-8100 |
| ayelet@faerman.law | keith@awplegal.com |