UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-CV-80395-ROSENBERG

GREENFLIGHT VENTURE
CORPORATION,

     Plaintiff,

v.

GOOGLE LLC,

     Defendant.
_____/

**ORDER GRANTING IN PART AND RESERVING IN PART ON
THE DEFENDANT'S MOTION TO DISMISS AND ORDER TO SHOW CAUSE**

**THIS CAUSE** is before the Court the Defendant's Motion to Dismiss at docket entry 36. The Motion has been fully briefed. For the reasons set forth below, the Motion is granted in part and the Court reserves in part.

This is a case about Google search results. Plaintiff Greenflight is a "web developer" company that offers reverse phone number lookups. DE 24 at 2. It has sued Defendant Google LLC, alleging two different sorts of claims. First, Plainitff claims that the Defendant has utilized a monopoly on general search services to harm the Plaintiff's reverse phone number lookups by reducing the amount of internet traffic that the Plaintiff receives from the Defendant's search engine. Second, Plaintiff claims that the Defendant should be held liable for infringing on a reverse phone number lookup patent.

In response, the Defendant previously filed a motion to dismiss. The Court granted that motion and dismissed a patent infringement claim brought by another Plaintiff in this case, *pro se* Jeff Isaacs, who owns Greenflight. DE 26. Mr. Isaacs joined his (closely held) company, Greenflight, as a Plaintiff in this case and retained counsel to represent Greenflight. Shortly thereafter, the Court stayed Mr. Isaacs' *pro se* claims and also stayed discovery on all claims. *Id.*

Due to the stay, the Court's references to "Plaintiff" in this Order are to Greenflight unless the Court specifies otherwise. This Order addresses the Defendant's motion to dismiss Greenflight's claims on a count-by-count basis.

### A. Count I – "Violation of Sherman Act § 2"

The Plaintiff's Count I is an antitrust claim under the Sherman Act. To bring such a claim, the Plaintiff must allege that the Defendant is monopolizing a particular market and that the Plaintiff is a participant in the market—the Plaintiff must allege that it is a market participant. *Fla. Seed Co., Inc. v. Monsanto Co.*, 105 F.3d 1372, 1374 (11th Cir. 1997) ("Basically, a plaintiff must show that it is a customer or competitor in the relevant antitrust market."). Here, the Plaintiff alleges that the relevant market is "general search services." DE 24 at 37. The Defendant argues that Count I should be dismissed because the Plaintiff has not alleged that it is a market participant in the general search services market.

In response, the Plaintiff effectively concedes that it is not a market participant in the general search services market because it argues that that it has standing through two different avenues—through two different theories. First, the Plaintiff argues that its operations are "inextricably linked to the general search services market," and that gives it standing. DE 46 at 4. For support, the Plaintiff relies upon *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982). Second, the Plaintiff argues that: "[l]everaging monopoly power in one market to harm competition in another market" confers standing, and because it has alleged the same Count I may proceed. DE 46 at 5. The Court addresses each argument in turn.

#### *Blue Shield of Virginia v. McCready* and the "Inextricably Intertwined" Standard

In *McCready*, the plaintiff was a recipient of health insurance benefits. *McCready*, 457 U.S. at 468. Her health insurance plan allowed for her to receive psychotherapy, but only if the therapy was provided by a psych*iatrist*. *Id.* The plaintiff received psychotherapy, but not from a psychiatrist. *Id.* Instead, the plaintiff utilized a psych*ologist*. *Id.* When the plaintiff sought

2

reimbursement from her health insurance provider for her therapy, the provider denied her request. *See id.*

The plaintiff filed suit, alleging that psychiatrists and her health insurance provider had engaged in anticompetitive, monopolistic practices that forced her to use a psychiatrist for mental health services, instead of a psychologist. *Id.* at 469-70. In response, the provider argued that the plaintiff lacked standing—that she was not a participant in the market, such as a psychologist, nor had she (as a consumer in the market) been denied the services of a psychologist—she had instead successfully obtained those services. *Id.*

In grappling with the plaintiff's standing to sue for the alleged monopolistic practice, the Supreme Court struggled with where the line should be drawn. On the one hand, Congress intended antitrust law to serve an "expansive remedial purpose" to deter monopolistic practices and to deprive monopolies of the fruits of their illegal actions. *Id.* at 472. On the other hand, the Supreme Court acknowledged that: "Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages of the injury to his business or property." *Id.* at 477. Lacking guidance or clarity from Congress, the Supreme Court "resort[ed] to an analysis no less elusive than that employed traditionally by courts at common law with respect to the matter of 'proximate cause.'" *Id.* Applying proximate cause principles to the plaintiff's case in *McCready*, the Supreme Court reasoned that the plaintiff's alleged injury was not too remote. *Id.* at 479. Instead, the Supreme Court reasoned that the express goal of the alleged conspiracy was to prevent persons like the plaintiff from obtaining services from a psychologist, and that was sufficient for standing. *Id.* In reaching this conclusion, the Supreme Court did indeed state, as the Plaintiff in the instant case emphasizes, that an injury that is "inextricably intertwined" with the injury the monopolistic competitors sought to inflict was sufficient for standing. *Id.*

3

Since *McCready*, circuit courts have authored guidance on how the inextricably intertwined exception should be applied. According to the First Circuit and the Second Circuit, the plaintiff in *McCready* had standing because she was a participant in "the very market directly distorted by the antitrust violation." *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 160 (2d Cir. 2016). According to the Eleventh Circuit, the plaintiff in *McCready* had standing because: "Denying reimbursement to patients who were treated by psychologists was necessary to accomplish the desired result—the exclusion of psychologists—because the beneficiaries of the Blue Shield Plan would be forced either to go to psychiatrists or to forego reimbursement." *Mr. Furniture Warehouse, Inc. v. Barclays American/Commercial Inc.*, 919 F.2d 1517, 1521 (11th Cir. 1990). Consistent with the Eleventh Circuit's reading of *McCready*, the Third Circuit and Sixth Circuit have focused on the fact that in *McCready*, the plaintiff was "used as a conduit" to "harm the defendants' actual competitors." *Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*, 806 F.3d 162, 173 (3d Cir. 2015); *see also Province v. Cleveland Press Pub'lg Co.*, 787 F.2d 1047, 1052 (6th Cir. 1986).[1] The Court applies these principles to the instant case.

Here, what was the "desired result" of the alleged monopolistic practices? Stated differently, how was the Plaintiff used as a conduit for the Defendant to harm its competitors? To answer these questions, the Plaintiff relies upon a recent antitrust decision in favor of the Department of Justice and against the Defendant. DE 24 at 2. The author of that decision, Judge Amit P. Mehta, concluded that the Defendant was liable in antitrust as follows:

> Google has not achieved market dominance by happenstance. It has hired thousands of highly skilled engineers, innovated consistently, and made shrewd business decisions. The result is the industry's highest quality search engine, which has earned Google the trust of hundreds of millions of daily users.

---

[1] There is support in subsequent Supreme Court decisions for the circuit courts' understanding of *McCready*. In *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 529 n.19 (1983), the Supreme Court clarified that a *McCready* plaintiff must be "directly harmed by the defendants' unlawful conduct" to establish injury.

4

> **But Google also has a major, largely unseen advantage over its rivals: default distribution**. Most users access a general search engine through a browser (like Apple's Safari) or a search widget that comes preloaded on a mobile device. Those search access points are preset with a "default" search engine. The default is extremely valuable real estate. Because many users simply stick to searching with the default, Google receives billions of queries every day through those access points. Google derives extraordinary volumes of user data from such searches. It then uses that information to improve search quality. Google so values such data that, absent a user-initiated change, it stores 18 months-worth of a user's search history and activity.
>
> . . .
>
> Thus, most devices in the United States come preloaded exclusively with Google. **These distribution deals** have forced Google's rivals to find other ways to reach users. Google's dominance eventually attracted the attention of antitrust enforcers—the U.S. Department of Justice and nearly every state's Attorney General. They homed in on Google's distribution agreements and in late 2020 filed two separate lawsuits alleging that the agreements and certain other conduct violate Section 2 of the Sherman Act.

*U.S. v. Google LLC*, No. 20-CV-03010, DE 1033 at 6-7 (D.C. Aug. 5, 2024) (emphasis added). The Court takes this decision to mean that the Defendant entered into agreements with web browser companies (such as Apple) and cell phone companies (such as Android) to ensure that its web browser was the default browser of choice.  Based upon those agreements, the district court concluded that the Defendant stifled competition in the market of general search engines. *Id.* Consistent with those findings, the Plaintiff in the instant case has alleged that the Defendant's anticompetitive market is the market of general search services.

Returning to the germane questions posed by *McCready*, how was the Plaintiff in the instant case used as a conduit for the Defendant to harm competing search engines, such as Bing? Pursuant to the Plaintiff's allegations, it wasn't.  No such allegations exist.  Relatedly, how was harming the Plaintiff necessary for the Defendant's search engine monopoly to be accomplished? Also pursuant to the Plaintiff's allegations, it wasn't.  No such allegations exist.

Instead of alleging that the Plaintiff has suffered harm because it was a conduit for the Defendant to accomplish a monopoly in the market of general search engines, what the Plaintiff

5

has alleged is, at best, that it has felt the effects of the alleged monopoly.[2] Pursuant to Eleventh Circuit cases such as *Feldman v. American Dawn, Inc.*, 849 F.3d 1333 (2017), that is not sufficient.

In *Feldman*, the plaintiff alleged that two businesses engaged in an anticompetitive agreement to monopolize the sale of restaurant linens. *Id.* at 1341. As part of the fallout from that alleged monopoly, the plaintiff alleged that he had lost his job selling linens. *Id.* The Eleventh Circuit held that the plaintiff's injury was insufficient for standing because the monopoly concerned the *sale* of linens, not the *labor* market for linen-based employees. *Id.* ("[T]he conspiracy [pertained to] the market for restaurant linens, not to harm competition in the market for restaurant linens salesmen."). In reaching this conclusion, the Eleventh Circuit expressly rejected the idea that the linen salesman could rely upon *McCready* to establish standing; his termination did not mean that his injury was inextricably intertwined with the alleged monopoly. *Id.*

Just so here. The Plaintiff has not sufficiently alleged that it is a market participant in the general search services market, nor has the Plaintiff alleged any other basis for standing.[3] The Plaintiff's Count I is dismissed for lack of standing.

*Leveraged Monopoly Power*

The Plaintiff argues that the Defendant leveraged its monopoly power in general search services to harm competition in two other markets: the market for "vertical search providers" and the market for "reverse phone number lookup," and the Plaintiff alleges that it is a market participant in both such markets. For such an allegation to be a cognizable antitrust claim, the Plaintiff must allege that the Defendant had specific intent to monopolize another market, and that

---

[2] Given that Google's search engine arguably impacts the entire globe, the Court thinks it would be fair to say that just about every company on the internet could argue that it has felt the effects of the alleged monopoly. But the Court is not persuaded that every company on the internet would have, as a result of those effects, sufficient standing to sue the Defendant in antitrust.

[3] The Plaintiff also tangentially makes the argument that it could have "evolved" into a company capable of competing with the Defendant in the general search services market. DE 46 at 5. Such a claim is both implausibly pled and contradicted by the text of the Complaint itself for all of the reasons set forth in the Defendant's Motion and Reply.

a "dangerous probability of achieving monopoly power" existed. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 447-48 (1993). To show a "dangerous probability," a plaintiff must allege a definition of the relevant market and must examine market power—can the defendant "destroy competition?" *Id.* at 455, 456. The Plaintiff's (very broad) definitions of the "vertical search provider" and "reverse phone lookup" markets defeats its reliance upon the same, and the Plaintiff's arguments on this point fail for the reasons set forth below.

### The Vertical Search Provider Market

The Plaintiff defines the vertical search provider market so broadly that it encompasses all websites that allow specialized searching including medical research, scholarly research, and internet shopping services that utilize search bars. DE 24 at 11-13. As a concrete example, the Plaintiff cites to Google Shopping as the Defendant's intrusion on the vertical search provider market, but the size of the alleged market—including shopping services that have a search bar—is staggering. *Id.* at 28. Using common knowledge,[4] Plaintiff's concrete example (internet shopping) would include Amazon and Walmart. How does the Plaintiff allege a "dangerous probability" that the Defendant will **monopolize** the internet shopping market, Amazon and Walmart notwithstanding? It doesn't. Similarly, the Plaintiff defines vertical search providers so broadly that its definition also includes Google Flights, but that market is very large as well. *Id.* What of booking.com or Expedia? How does the Plaintiff allege a "dangerous probability" that the Defendant will monopolize air travel? It doesn't.

### The Reverse Phone Number Lookup Market

The Plaintiff's allegations on the reverse phone lookup market are much the same. The Plaintiff alleges that market is so broad that it includes "many" competitors besides the Defendant, numbering in the "dozens." *Id.* at 24. How does the Plaintiff explain this market is monopolized

---

[4] When evaluating plausibility, a court may draw upon its common sense. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

7

by the Defendant? It doesn't, because when the Plaintiff's Complaint defines the market for reverse phone lookups it discusses only two, Whitepages and Spokeo. *Id.* at 31. But for the Plaintiff to define the reverse phone number lookup market to be so broad as to include the Defendant's *general* search services (including someone typing a phone number into Google Search), the Plaintiff has defined a market so broad that it includes *any* general method to research a phone number with a search, such as other general search engines, social media platforms, online directories, etc. Taken to its logical conclusion, what the Plaintiff argues is that the Defendant competes in any market that can be reached via the general Google search engine. If the Defendant, therefore, competes in the reverse phone number lookup market because a Google search query can return information on the same, the Defendant would also compete in every market displayed in the search engine (such as the insurance market) despite not selling insurance, as well as any other number of absurdities. In short, the Plaintiff has failed to plausibly allege that the Defendant both intends to monopolize the reverse phone number lookup market and that there is a dangerous probability that it will do so.[5]

### *Conclusions on Count I*

Instead of alleging standing based upon the Supreme Court's holding in *McCready*, as the Plaintiff argues, what the Plaintiff is really arguing is that because it appears lower in the Defendant's search engine results, it has standing to sue. That is not the holding in *McCready*, and the Court fails to see how that could realistically be the law. Were that sufficient, effectively every company in the entire world would have standing to sue the Defendant in antitrust when Google search results were not satisfactory to the company. To analogize to *McCready*, it would

---

[5] Instead of plausibly alleging that the Defendant competes in the reverse phone search market, the Plaintiff argues just the opposite; in the Plaintiff's own words: "The reverse phone search market is a distinct relevant market characterized by a particular service that general search engines . . . do not necessarily provide." DE 46 at 9. The Court also adopts and accepts as persuasive the Defendant's arguments on the Plaintiff's failure to plausibly plead general elasticity as set forth in the Motion and Reply.

8

be as if the psychologists' suppliers, such as office supply companies or utility companies, would have standing to sue for the loss of some of the psychologists' business. After all, if the psychologists had increased business due to additional psychotherapy sessions, there would have been a greater demand for office supplies.

As contrasted with the narrow exception for standing set forth in *McCready*, in the Plaintiff's own words:

> The Department of Justice (DOJ) recently prevailed in a landmark case against Google, establishing that Google has unlawfully maintained a monopoly in the United States GSE market. **This case addresses the broader impact of Google's anticompetitive practices <u>on related markets</u>**, where Google's monopolistic behavior has stifled innovation, suppressed competition, and inflicted substantial economic harm on specialized search providers and web developers.

DE 24 at 2 (emphasis added). The Court's interpretation of the Plaintiff's broad definition of standing is confirmed in a subsequent paragraph in the Complaint:

> Plaintiffs and other web developers operate in markets that depend on fair and competitive access to internet users through general search engines like Google. By leveraging its dominance in the GSE market, **Google has distorted competition in these downstream markets**, favoring its own products and those of its strategic partners while disadvantaging independent developers and specialized service providers.

*Id.* (emphasis added). The Court is not persuaded that the Plaintiff's broad theory of standing can be squared with *McCready*, and the Plaintiff has failed to plausibly plead a claim premised upon the concept of "leveraged power" as well. As a result, Count I is dismissed.

### B. Count II – "Sherman Act § 1 Unreasonable Restraints of Trade"

The Plaintiff's Count II is also a Sherman Act antitrust claim, and it also alleges that the Defendant engaged in monopolistic practices. For each of the three[6] reasons outlined in **bold** below, Count II is dismissed.

---

[6] In addition to the three grounds outlined below, Count II is ripe for dismissal for all of the reasons Count I was dismissed.

**First**, Count II is improperly premised upon an unrelated party's pleading. In the Plaintiff's own words: "A United States Courts of Appeals recently held that Google's self-preference and manipulation [of search results] could constitute a [Sherman Act claim.] This cause of action is intended to invoke the claim theory discussed in that circuit opinion." DE 24 at 38. This attempt to plead a claim through a citation to *dicta* in an appellate decision is so patently improper, the Court devotes no additional discussion to the topic. *See generally* Local Rule 15.1 (prohibiting a pleading from incorporating a prior pleading by reference). The Court does note, however, that the appellate case cited by the Plaintiff resulted in the affirmance of the dismissal of all antitrust claims brought against the Defendant. *See Dreamstine.com, LLC v. Google LLC*, 54 F.4th 1130, 1134 (9th Cir. 2022).

**Second**, for Count II to be legally sufficient, the Plaintiff must allege "an agreement between two or more persons to restrain trade, because unilateral conduct is not illegal." *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1545 (11th Cir. 1996). Consistent with that requirement, the Plaintiff has alleged: "Google has entered into agreements and engaged in unilateral and bilateral practices that unfairly demote the search rankings of [Plaintiff]." DE 24 at 38. That allegation is conclusory. It contains no plausibly alleged, supporting facts. With whom did the Defendant enter in an agreement to demote the Plaintiff's search results? Ultimately, how did the alleged agreement harm the Plaintiff?

**Third**, to the extent the Plaintiff does allege a concrete agreement between two or more persons to restrain trade, it does so based upon facts with no alleged connection to this case. The Plaintiff relies upon antitrust agreements entered into between the Defendant and Apple.[7] DE 46

---

[7] The Court is unclear whether the Plaintiff relies upon the (brief) allegation that the Defendant favors "heavy advertising spenders" to support Count II. DE 24 at 38. If it does, that allegation is insufficient for the reasons set forth in the Defendant's Motion and Reply. *See Kendall v. Visa U.S.C., Inc.*, 518 F.3d 1042, 1049 (9th Cir. 2008) ("Allegations of facts that could just as easily suggest rational, legal business behavior of the defendants as . . . an illegal conspiracy are insufficient to plead a violation of the antitrust laws.").

10

at 11.  But the Plaintiff must show how it can bring a cause of action against the Defendant based upon that agreement: "plaintiff must be the target against which anticompetitive activity is directed . . . . [i]ncidental or consequential injury . . . does not give a plaintiff standing . . . ." *Nat'l Indep. Theatre Exhibitors, Inc. v. Buena Vista Distribution Co.*, 748 F.2d 602, 608 (11th Cir. 1984).  The Plaintiff has not alleged, and it certainly has not plausibly alleged, how it has suffered some direct effect from this agreement.

For the foregoing reasons, Count II is dismissed.

**C. Count III – "Refusal to Deal in Violation of § 2 of the Sherman Act"**

The Plaintiff's Count III seeks to hold the Defendant liable under the Sherman Act for "refusing to deal."  Among other things, such a claim requires well-pled allegations of an antitrust market and a defendant's monopoly power in that market, as well as a plaintiff with antitrust standing.  *E.g., Duty Free Americas v. Estee Lauder Cos., Inc.*, 797 F.3d 1248, 1263 (11th Cir. 2015).  Accordingly, for all of the reasons Count I and Count II were previously dismissed, Count III is also ripe for dismissal.

Count III additionally requires a refusal to deal.  The seminal case on this sort of claim, *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), is cited and relied upon by the Plaintiff in its description of Count III.

In *Aspen Skiing*, the defendant skiing company owned most of the resorts in a particular area. *Id.* at 585.  The plaintiff was a competing resort. *Id.*  The parties had historically, in a sort of joint venture, sold tickets that allowed customers to access all of the parties' resorts. *Id.*  The defendant altered its course of dealing, however, and refused to continue to sell tickets that could be used to access the plaintiff-competitor's resort. *Id.*  That refusal—a refusal to deal—was held to be an actionable basis for antitrust by the Supreme Court. *Id.*

The refusal to deal present in *Aspen Skiing* is not analogous to the instant case for several reasons.  First, the facts in *Aspen Skiing* were "at or near the outer boundary" of antitrust liability,

11

and the instant case is far removed from the facts in *Aspen Skiing*. *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 399 (2004). Second, the parties in this case are not alleged to have previously engaged in a joint venture, unlike *Aspen Skiing*; the Plaintiff is not even alleged to be a rival or competitor in the market of general search services.[8] Third, the Plaintiff does not even adequately allege that the Defendant has refused to deal—the Plaintiff still appears on the Defendant's search results.[9]

The Plaintiff does not receive as much traffic from Google as it would like, but there is a "long recognized right of [a] trader or manufacturer engaged in an entirely private business, [to] freely exercise his own independent discretion as to parties with whom he will deal." *Id*. Moreover, the Supreme Court "has been very cautious in recognizing . . . exceptions" to the general rule that one need not deal with another company, "because of the uncertain virtue of forced sharing and difficulty of identifying and remedying anticompetitive conduct by a single firm." *Id*. at 408. Simply stated, *Aspen Skiing* stands for the proposition that there *can* be liability when a defendant refuses to sell to a competitor-plaintiff at the defendant's own retail market price after the two parties previously engaged in a long-term profitable course of dealing. *Duty Free American*, 797 F.3d at 1266. That does not even remotely resemble the allegations in the Plaintiff's Complaint. For all of the reasons set forth above, the Plaintiff has failed to state a claim for failure to deal under *Aspen Skiing*, and Count III is dismissed.

### D. Count VI – "Patent Infringement"

In its Motion, the Defendant argues that the Plaintiff's claim for direct patent infringement should be dismissed, relying upon the fact that the Complaint did not identify any product made

---

[8] The Court is unpersuaded that the Plaintiff's greater Google traffic in the past may be plausibly equated to the joint venture present in *Aspen Skiing*.

[9] For the reasons set forth in the Defendant's Motion, footnote 4, the Court is persuaded that it can consider DE 34-4, a letter from the Plaintiff's counsel, indicating that the Plaintiff's domain has not been removed from Google search. Anecdotally, the Court was easily able to locate the Plaintiff's domain using Google search. Finally, for the reasons set forth in the Motion and Reply the Court can see no basis for the Plaintiff to plead that, as a competitor, it cannot be denied access to "an essential facility."

12

by the Defendant that infringed upon the Plaintiff's patent. In its Response, the Plaintiff concedes that its patent infringement claim is not a direct infringement claim. DE 46 at 20 n.9 ("Counsel clarifies that Google is not alleged to directly infringe the '847 reissue patent."); *contra* DE 24 at 52 ("Google LLC has directly infringed . . ."). Instead, the Plaintiff clarifies that it has brought an indirect patent infringement claim against the Defendant. DE 46 at 20 n.9 ("This is essentially an indirect infringement case.").

An indirect patent infringement claim requires the Plaintiff to plead (1) direct infringement by a third party and (2) a basis for the Defendant to be held liable for inducing or contributing to that infringement. *See Intellectual Ventures I LLC v. Motorola Mobility LLC*, 879 F.3d 1320, 1322 (Fed. Cir. 2017). However, just as the Plaintiff has not identified any specific product of the Defendant that infringes upon the Plaintiff's patent, the Plaintiff has also not identified any specific third-party product that infringes upon the Plaintiff's patent. This is no small matter, as the identification of an infringing product is the most basic pleading requirement for a patent infringement claim. *E.g., Artrip v. Ball Corp.*, 735 F. App'x 708, 714-15 (Fed. Cir. 2018) (affirming dismissal of direct infringement claim because the complaint failed to identify an infringing product); *Cross v. Dick's Sporting Goods, Inc.*, No. 21-198, 2022 WL 138038, at *2 (N.D. Ind. Jan. 14, 2022) ("[A]n infringement claim must specifically identify the products accused of infringing[.]"); *Upstream Holdings, LLC v. Brekunitch*, No. 22-3513, 2022 WL 17371052, at *1 (C.D. Cal. Aug. 3, 2022) ("Plaintiff does not come close to alleging the necessary facts to plead a claim for patent infringement [because] Plaintiff does not identify an accused product.").

In lieu of a clear and plausible identification of an infringing product, the Plaintiff's Complaint intermixes technical jargon with vague statements:

> Based on these distinct GR-1188 formats, and process of elimination of data sets from credit bureaus, **numerous apps on the Google Play Store appear reasonably certain to infringe the patent**. In particular, these apps are a mobile

13

> phone application and system that functions independently of the called party's carrier and device. A user inputs a phone number into an entry field, which could come from any device, to determine who called from that number. When a result is found in a carrier's CNAM database, **the infringing apps** return a Caller Name result, identifying the name associated with the queried number. Upon information and belief, the Caller Name result in the infringing Google Play Apps may use extra steps like caching but ultimately return CNAM database rows accessed by SS7, including an SS7 interfacing node. In some cases, a more detailed CNAM result is obtained using LIDB, which is still an infringing behavior.

DE 24 at 50-51 (emphasis added). The Complaint therefore vaguely refers to potentially "infringing apps" and websites, but it does not identify any specific product. The Complaint is equally vague in identifying who these third-party "infringing apps" belong to, making repeated references to "app developers."

The only named third party "app developers" that the Court could locate in Count VI, Spokeo and Whitepages, are unconnected in any cogent way to the Plaintiff's allegations of infringement; how do Spokeo and Whitepages—parties the Plaintiff has elected not to sue for patent infringement in this case—infringe upon the Plaintiff's patent? Instead of clearly and plausibly alleging the answer to this question, the Plaintiff appears to concede that it lacks the intent to do so, alleging that: "Due to the large volume of apps on Play Store, and Google Ad monetized web sites, **discovery is necessary to identify the infringing products**." DE 24 at 50 (emphasis added). The Plaintiff's reference to its need for discovery is not isolated to the quotation above. *Id.* ("Source code serves as the final evidentiary link to GR-1188 operations, and is unavailable to Plaintiffs prior to discovery.").

A barrier to a plaintiff using discovery in a case to plead a legally sufficient claim is plausibility. Has the Plaintiff plausibly pled that a third party has infringed upon its patent? The Court is persuaded that the answer to this question is "no" because the Plaintiff has failed to identify any specific infringing product, but that is not the truly germane question before the Court because the Plaintiff has not sued any party for direct patent infringement. In other words, what is not before the Court is the question of whether the Plaintiff may proceed against Spokeo or

14

Whitepages for patent infringement, and take party discovery from those companies, because the Plaintiff has elected not to sue them. Instead, the real question before this Court is whether the Plaintiff can proceed against the Defendant, and take party discovery from the Defendant, based upon its vague allegations against third-party infringers because, in the Plaintiff's own words, the Defendant is the "merchant of record." DE 46 at n.9.

For the Defendant to be liable for indirect infringement as "the merchant of record," there must be a basis for the Defendant to be liable for inducing or contributing to infringement. But in order to evaluate the plausibility of the Defendant's alleged inducement or contributions to infringement, the Court must know what the infringement is. *See Intellectual Ventures*, 870 F.3d 1320, 1322 ("[A] finding of direct infringement is predicate to any finding of indirect infringement."). And to know what the infringement is, the Court must know what the infringing product is. That the Plaintiff has not alleged, and while a plaintiff may not be required, as a general matter, to plead information that is uniquely within the knowledge of a defendant, the products at issue (whatever they may be) are not alleged to belong to the Defendant. The products are alleged to belong to parties the Plaintiff has elected not to sue.

For authority for the proposition that its allegations are sufficient, the Plaintiff cites to two patent cases that survived motions to dismiss after appellate review. Far from showing the Plaintiff is correct, however, the cases demonstrate why the Plaintiff is wrong. The Plaintiff relies upon *Disc Disease Solutions Inc. v. VGH Solutions, Inc.*, 888 F.3d 1256 (Fed. Cir. 2018), but in that case the plaintiff specifically identified the infringing product as a belt called the "DBB 3500." *Disc Disease Solutions Inc. v. VGH Solutions, Inc.*, No. 15-CV-00188, DE 1 (M.D. Ga. Nov. 30, 2015). Lest there be any doubt, the complaint contained a picture of the DBB 3500:



*Id.* The Plaintiff also relies upon *Lifetime Industries, Inc. v. Trim-Lok, Inc.*, 869 F.3d 1372 (Fed. Cir. 2017), but in that case the plaintiff also provided specific allegations about the infringing product, again utilizing a picture:



*Lifetime Industries, Inc. v. Trim-Lok, Inc.*, No., DE 32 (N.D. Ind. Oct. 13, 2014). Contrasted with the clear identification of infringing products in the Plaintiff's cited cases, the Plaintiff's identification of an infringing product in the instant case could be fairly summarized as "some apps in an app store." That is insufficient under federal pleading standards. *See Artrip*, 735 F. App'x at 714 (Fed. Cir. 2018) (affirming dismissal on plausibility grounds of an allegation that the infringing product was "one or more of the machines at least as [sic] the Bristol Plant"). Count VI is dismissed.[10]

### E. Count IV – "Violation of the Florida Deceptive and Unfair Trade Practices Act" and Count V – "Violation of California's Unfair Competition Law"

Because the Court, in this Order, dismisses all of the Plaintiff's federal claims, only the Plaintiff's state law claims remain. The Court declines to exercise supplemental jurisdiction over the state-law claims. *E.g., Parker v. Scrap Metal Processors, Inc.*, 468 F.3d 733, 743 (11th Cir.

---

[10] The Court is also persuaded by the Defendant's argument in its Motion and Reply that the Plaintiff has not plausibly alleged that the Defendant had knowledge of third-party infringement.

2006). As a result, the Court is uncertain whether it has federal jurisdiction over the state law claims because those claims have been styled as class actions. As potential class actions, the Court believes that if it has jurisdiction, it would be under the Class Action Fairness Act, or CAFA. *E.g., Lowery v. Ala. Power Co.*, 483 F.3d 1184, 1205 (11th Cir. 2007). CAFA jurisdiction applies, *inter alia*, when there are a sufficient number of potential claimants and when at least $5,000,000 is at issue. *Id.* The parties have not briefed whether the jurisdictional requirements of CAFA are met here, just as they have not briefed whether the parties would jointly prefer the state-law claims to be litigated in state court or whether, alternatively, either party believes that these matters should be decided by a federal court in another venue, such as California (given one of the counts is brought under California law). The Court will order subsequent briefing on this topic, and the Court does not address the legal sufficiency of Count IV and Count V at this time.

### F. Order to Show Cause

The Court construes the operative complaint as bringing claims not only on behalf of Plaintiff Greenflight, but also on behalf of *pro se* Plaintiff Jeff Isaacs. DE 24 at 55 (containing a *pro se* signature). The Court previously stayed all claims brought *pro se*. DE 26 at 2. Before dismissing any *pro se* claims, however, the Court will utilize an order to show cause process. *Pro se* Plaintiff Jeff Isaacs is **ORDERED** to **SHOW CAUSE** by **November 15, 2024**, why his *pro se* antitrust claim(s) should not be dismissed for the same reasons Greenflight's antitrust claims were dismissed. In the event no response to this order to show cause is filed, the Court will deem the *pro se* count(s) dismissed for the same reasons Greenflight's counts were dismissed.

### G. Leave to Amend

As a threshold, general matter, *pro se* pleadings are held to a less stringent standard than counseled pleadings, but the Court does not believe that the less stringent standard applies in this case for three reasons. *E.g., Erickson v. Pardus*, 551, U.S. 89, 94 (2007). First, while the original pleading in this case contained no signature of counsel, the operative pleading does—the *pro se*

Plaintiff in this case retained two attorneys to represent his (closely held) corporation and one of the attorneys signed the operative pleading. DE 24 at 55.  Second, the *pro se* Plaintiff in this case has substantial legal training,[11] and courts do not liberally construe the pleadings of those trained to draft such pleadings. *E.g., Barnes v. Madison*, 79 F. App'x 691, 696 n.4 (5th Cir. 2003); *see also Stuart v. Ryan*, No. 18-14244, 2019 WL 1235024, at *1 (S.D. Fla. Mar. 11, 2019) (declining to liberally construe the pleadings of a suspended attorney, acting *pro se*).  Third, pursuant to his own allegations, the *pro se* Plaintiff has decades of experience litigating in federal court, across various judicial districts and various circuit courts of appeals, including litigation pertaining to the revocation of his medical credentials and litigation pertaining to Apple and antitrust. DE 24 at 17.  In light of these considerations, the Court analyzes whether its dismissal in this matter should be with leave to amend.

    Normally, leave to amend is liberally granted. Fed. R. Civ. P. 15(a).  When further amendment would cause undue delay, when amendment is sought as part of a dilatory motive, when further amendment would be futile, or when further amendment would cause undue prejudice on the respondent, a court may deny leave to amend. *E.g., Burger King Corp. v. Weaver*, 169 F.3d 1310, 1319 (11th Cir. 1999).  Here, whether the Plaintiffs should be granted leave to amend is a close question.  Weighing in favor of denial of leave to amend is the fact that the Court has previously dismissed claims in this case,[12] the Defendant's motion to dismiss is the second such motion in this case, the Plaintiffs have previously amended their complaint, this is not the first litigation between the parties in this Court,[13] and there are facts to suggest that the Plaintiffs have leveraged discovery in this case to harass the Defendant. *See* DE 42-4 (noticing a Rule

---

[11] The *pro se* Plaintiff alleges that he "matriculated at Vanderbilt Law JD Program for almost two years, where he had been awarded a full scholarship." DE 24 at 5.
[12] DE 26.
[13] *See Isaacs v. Keller Williams Realty, Inc.*, No. 24-MC-80009 (S.D. Fla. Jan. 17, 2024) (containing a motion to quash subpoena by Google LLC issued by the Plaintiff in prior litigation).

30(b)(6) deposition almost immediately after the filing of the operative complaint); DE 42 (attaching requests for voluminous document discovery). On the other hand, the Court has yet to set a deadline for amended pleadings in this case and the case is less than one year old. The Court balances these competing considerations by allowing the Plaintiffs leave to amend once more, but the Plaintiffs shall do so by filing a motion for leave to amend that contains the proffered pleading attached as an exhibit. The deadline for the Plaintiffs to file a motion for leave to amend shall be **December 8, 2024**.

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that the Defendant's Motion to Dismiss [DE 41] is **GRANTED IN PART** and the Court **RESERVES IN PART** as more fully set forth in this Order. The parties shall confer and file simultaneous briefing on the Court's jurisdiction over the state law claims by **November 15, 2024**. After review of the parties' filings the Court will, if necessary, set a schedule for further briefing on the motion to dismiss and the state-law claims.

**DONE AND ORDERED** in Chambers, West Palm Beach, Florida, this 8th day of November, 2024.

Copies furnished to:  
Counsel of record

ROBIN L. ROSENBERG  
UNITED STATES DISTRICT JUDGE