Jeffrey Isaacs
11482 Key Deer Circle
Wellington, FL 33449
(212) 257-0737
jeffreydi@gmail.com

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF FLORIDA

GREENFLIGHT VENTURE CORPORATION
   *on behalf of themselves*
   *and all others similarly situated,*
DR JEFF ISAACS

               Plaintiffs,

vs.

GOOGLE LLC

               Defendant.

Case No. **24-cv-80395-RLR**

**PLAINTIFF'S MEMORANDUM TO SHOW CAUSE RE DISMISSAL FOR FAILURE TO STATE A CLAIM**

## <u>MEMORANDUM TO SHOW CAUSE RE 12(b)(6) DISMISSAL</u>

## INTRODUCTION

Sherman antitrust case law recognizes that the finalized definition of a relevant market is not a prerequisite at the pleading stage. Market definitions are often complex, fact-intensive inquiries best suited for determination after discovery and, ultimately, by a jury. In the formative case of *Brown Shoe Co. v. United States*, the Supreme Court teaches that market delineation involves "pragmatic" considerations and "fact-finding" that go beyond mere legal formalism. Rigid analysis of preliminary market definition at the outset may impede the just resolution of antitrust claims. Under *Brown Shoe*, market contours are a matter for fact-finding by a jury, not a determination to be made at the motion to dismiss stage. Excessive scrutiny of market definitions at the pleading stage undermines the plaintiff's opportunity to develop a factual record that substantiates the alleged antitrust violations.

A recent and relevant illustration is found in the *Epic Games, Inc. v. Apple Inc*. In that case, during the bench trial, the court ultimately found an entirely different market from the market initially proposed by the plaintiff—the international gaming market. Preliminary market definitions, especially in rapidly evolving digital markets that demand nuanced analysis, are just that: preliminary. Google has been placed on notice that its self-preferencing conduct and lack of transparency in the GSE market results in antitrust injury and inefficiencies to the economy at large, including not just end-users, but developers.

This is a lawsuit about search transparency, fairness, and quality when a single entity holds monopolistic power. It is not contested that Google controls over approximately 90% of web search traffic which translates into a substantial grip on web content visibility and accessibility. Such dominance raises significant antitrust issues, not to mention sociological concerns, for anticompetitive practices that harm both consumers and developers.

In the present case, the First Amended Complaint (FAC) anchors its market definitions to the government-established General Search Engine (GSE) and Vertical Search Provider (VSP) markets, primarily to align with established frameworks for the Court's convenience. While the GSE market is traditionally defined from the perspective of consumers, it is a straightforward exercise to identify a parallel and symmetric market reflecting developers' interactions with search engines. This symmetry underscores the need for further discovery and expert analysis to refine the precise contours of the relevant market. It is neither realistic nor required for a *pro se* plaintiff and two independent legal practitioners to predict, at the pleading stage, the exact market definition that a jury may ultimately

adopt. Indeed, even in the highly publicized *Epic* litigation, seasoned counsel at Quinn Emanuel were unable to fully anticipate the markets that were ultimately recognized at trial.

The FAC's markets, particularly when read in conjunction with the adjacent and analogous markets outlined in Exhibit A, demonstrate plausible and legally cognizable claims rooted in economic reality. Antitrust law does not demand perfection at the pleading stage, nor does it require plaintiffs to resolve complex factual disputes upfront. To dismiss under Rule 12(b)(6), the Court must conclude that the alleged markets are implausible or so litigation-contrived as to defy economic reality. That is clearly not the case here. The markets described in the FAC and supporting documents are plausible, rational, and firmly tethered to established principles, leaving no basis for the Court to foreclose the fact-finding necessary to adjudicate them fully.

The Court expressed apprehension that granting standing to the Plaintiffs could potentially open the floodgates to litigation, effectively allowing "every company in the entire world" to sue Google when dissatisfied with search result rankings. Indeed, for many years challenging Google rankings has been considered beyond the reach of the Courts, in light of Section 230 and other law. But times have changed, any many experts – and press articles – are awaiting the outcome of cases like this to determine a shifting tide. While concerns about an influx of lawsuits are understandable, historical precedent demonstrates that fears of overwhelming litigation often prove unfounded. For instance, the tobacco industry long believed it was immune to legal challenges due to the perceived impossibility of individual smokers establishing causation. However, once the courts began to allow such cases, the legal system managed the subsequent litigation effectively, leading to significant public health advancements without collapsing under the weight of lawsuits. Resolving this issue of national importance would not inundate the courts with endless litigation. Historically, when significant antitrust or public health cases have been adjudicated, subsequent related cases are often consolidated through mechanisms like Multi-District Litigation (MDL). This approach ensures judicial efficiency and consistency in legal rulings. Moreover, a decisive legal precedent can deter future anticompetitive conduct, reducing the need for additional lawsuits. If Google implemented the transparency measures sought in this lawsuit, and settled a Developer Compensation Fund, it is unclear how further floodgates would open.

The issue at hand transcends individual grievances; it encompasses a national—and international—concern regarding the control of the internet by Big Tech. Google, along with a few other tech giants, wields unparalleled influence over information accessibility. This case seeks to implement transparency measures within Google's search operations. Transparency is a foundational

principle in antitrust law, promoting fairness and preventing hidden practices that could harm competition and consumers. As the Court is probably familiar, there exist various approaches to addressing Google's monopoly:

First, there is the notion of **Encouraging Competition Among Search Engines:** The Department of Justice focus on the ISA agreement suggests the penalty stage of that case may focus on promoting alternative search engines to challenge Google's dominance. While fostering competition is beneficial, establishing viable competitors to a company with Google's resources and entrenched market position could take years, if it materializes at all. In the interim, consumers and developers continue to suffer from the lack of competition.

Second, **Regulatory Interventions Like the EU's Digital Markets Act (DMA) seek to expedite the addition of search competitors.** The European Union has taken steps to require access to Google's crawl data, enabling emerging general search engine (GSE) entrants—including vertical search providers (VSPs)—to develop competitive ranking algorithms. While this approach addresses some barriers to entry, and does indeed make VSPs like OkCaller competitors to GSEs — it is uncertain whether similar legislation like AICOM will ever be adopted here or whether it fully remedies the anticompetitive conduct.

Third is **Advocating for Transparency in the Current Search System.** The approach advocated by the First Amended Complaint (FAC) seeks to enhance transparency within Google's existing search framework. By requiring Google to be more open about its ranking methodologies and policies, this strategy aims to improve search quality for users and reduce inefficiencies for developers whose products remain unseen due to opaque algorithms. Transparency would foster a fairer competitive environment, encourage innovation, and benefit consumers through improved services. It would have immediate impact, even if Google remains the *de facto* preferred search tool for years to come. Implementation could require mediation and arbitration frameworks, serving as a deterrent to litigation. Similar mechanisms exist with credit cards, air travel, and other modern day commercial realities.

No single solution has emerged as definitively superior in addressing the challenges posed by Google's market dominance. Dismissing this case at the pleading stage precludes the exploration of a potentially effective remedy that could bring about significant positive change.

The Court's application of *Blue Shield of Virginia v. McCready* questioned whether OkCaller served as a conduit for anticompetitive practices. The proposed adjacent markets demonstrate that

OkCaller is a direct participant adversely affected by Google's conduct. However, even under the conduit theory raised by the Court, OkCaller still meets the criteria for antitrust standing.

A decade ago, Google selected OkCaller as one of a select few national "phonebooks," effectively distributing OkCaller's content by prominently ranking millions of its pages in search results. This extensive distribution significantly contributed to Google's utility and trustworthiness among users, particularly by providing access to difficult-to-find cellular numbers—an estimated 300 million phone queries. Over time, Google's alteration of its algorithms and ranking practices reduced OkCaller's visibility from millions of pages to a single page. This drastic reduction is akin to ceasing the distribution of phonebooks, directly impacting OkCaller's business and exemplifying exclusionary conduct. The below Google Search "site:okcaller.com" query showed "About 12 million results" until November 2023. It now alternates between zero or one, which Plaintiff asserts is "techie" humor and bullying.



The public generally assumes that Google's search results are reasonably and transparently ranked. When users Google specific phone numbers like "561-555-1212," they expect to find relevant listings, including those from OkCaller. For a decade, consumers were used to finding accurate, real-time reverse search information in Google SERPs, through OkCaller's patented process. That has ceased, but consumer expectation likely remains the same. From that perspective, the Court should be able to see that OkCaller was indeed used as a conduit to build Google's search business. The FAC clearly describes that before OkCaller, cellular phone results on Google were abysmal. That fact must be accepted as true at this stage, hence, OkCaller helped in some meaningful way build Google's

present success, making it a conduit.[1] Moreover, the recent absence of OkCallers results indicates a fundamental alteration of a prior profitable business relationship, aligning with the criteria for anticompetitive refusal to deal under *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.* The loss of this relationship not only harms OkCaller but also deprives consumers of valuable information, illustrating broader market implications.

This case deserves its day in court. It presents a viable approach to addressing the Google monopoly by advocating for transparency measures within the current search system. Such measures could yield immediate benefits, improving search quality for users and reducing wasted efforts by developers whose innovative products remain unseen due to opaque ranking practices.

### A Hypothetical AI Tool: An Analogy for Understanding Search

Imagine an artificial intelligence (AI) tool that has assimilated a vast corpus of human knowledge, becoming the primary resource for answering over 90% of general questions posed by the public. Over a decade, this tool becomes indispensable, with individuals relying on it for information ranging from health advice to political insights. However, the AI begins to exhibit biases: it provides politically skewed answers, injects its own views contrary to traditional wisdom, and preferentially links to websites from which it derives greater profits.

While this scenario remains hypothetical for AI, it mirrors the concerns that bipartisan Senate committees, authoritative entities, and reasonable observers have about Google's current operations. Google's search algorithms and result rankings significantly shape public discourse and access to information. When such a dominant entity starts self-preferencing its services, manipulating search results, or exhibiting bias, it raises substantial antitrust issues that merit judicial intervention.

### The Necessity of Broad Antitrust Interpretation

The Sherman Act's plain text prohibits "every contract, combination… or conspiracy, in restraint of trade or commerce." Historically, there has been debate amongst experts about whether companies like Google fall within the ambit of antitrust laws, with some believing that new legislation like the American Innovation and Choice Online Act (AICOA) or the European Union's Digital Markets Act (DMA) are necessary to regulate them. However, many advocates, including this Plaintiff, maintain that the fundamental principles of the Sherman Act are sufficiently broad to encompass and prohibit Google's anticompetitive conduct. It is well within the Court's discretion to set *Brown Shoe* aside, in light of the new challenges posed by digital marketplaces, and chart its own course based on

---

[1] There is also the non-trivial argument that Google made OkCaller a conduit to warn people not to sue the Apple-Google duopoly. When *Epic* sued Apple, it lost its entire iOS userbase for the wildly popular Fortnight game. This is not the first time Big Tech has retaliated against who they consider 'rogue' developers who simply question the status quo.

the plain text of Sherman (where clearly a claim for relief has been stated). Nonetheless, keeping in line with *Brown Shoe*, the remainder of this document elucidates that there are indeed multiple relevant Sherman marketplaces that permit this case's progression to discovery.

The Court should not let Google evade scrutiny by fixating on esoteric or overly narrow market definitions at the pleading stage. Public policy no longer supports such an approach, especially given the profound implications of Google's dominance on market fairness and consumer welfare. The recent verdict in *United States v. Google LLC,* public opinion, and the intent of Sherman and State Competition laws all demand recognition of the need to address these concerns.

**Advancing Adjacent Markets as Evidence of Anticompetitive Conduct**

This memorandum introduces three adjacent markets to those in the First Amended Complaint (FAC), demonstrating that the originally proposed markets are sufficiently plausible to warrant proceeding to discovery. All of these markets are 'reasonably close' to the FAC's markets, and therefore show that flexibility is warranted until discovery and expert analysis are available for further perfection and refinement of the market definitions. By recognizing this, the Court can defer months of briefing on an SAC, and instead, be informed by actual expert opinion at the summary judgment stage.

First, Exhibit A defines the **Market for Search Visibility and Webmaster Tools:** This developer-facing market is essentially symmetrical to the General Search Engine (GSE) market but caters to content creators and website owners. Google's dominance here restricts competition, transparency, and fairness, as there are limited alternatives for developers to optimize their visibility. While the Court referred to its general knowledge of search in the dismissal order, it very likely may have never accessed Google search from a developer or publisher perspective. From this angle, a content owner seeks to be found by end-users on the internet, so it engages with Webmaster Tools and other services from GSEs to gain indexing in their product. It is at this portal where the FAC alleges there is a lack of transparency, hence this market was referenced by the FAC in actuality. OkCaller is a customer in this case, rendering the court's *McCready* analysis moot as it is easily resolved in favor of Okcaller's standing.  With this understood, it is also clear how restrictive agreements like ISA harm OkCaller; if there existed better competition in search, there would be better, and more transparent Webmaster and Visibility Tools.

Next, Exhibit A defines the **Market for Online Website Attention, or web content generally:** This market recognizes user attention as a finite resource that websites compete for. Google's control over search results directly impacts how this attention is distributed, disadvantaging competitors and

influencing market dynamics. This market would be downstream from GSE and Webmaster markets, where Google sends traffic. And Google is a competitor in that market, clearly, with popular tools like Youtube and Google Maps, and even a product (AdSense) that monetizes *a monopoly* or majority of web attention. Preempting any argument that this market is overly broad, is the fact that Google's monopoly over the visibility of web content and its monetization necessitates such a broad view. An additional, narrower downstream market is also listed in Exhibit A, for Person Directories. Here, Google competes with OkCaller in easy to recognize terms: phone queries. When someone searches for a phone number on Google, increasingly they are referred to 'zero-click' results like Google Maps and other Google products which have phone numbers. A similar market is heavily discussed in the pending *Yelp v. Google* litigation. Is the Court truly saying there is no possibility Google made a strategic decision to diminish OkCaller and Yelp, in favor of its own directories? There can be little doubt Google has profited from shifting traffic to its own directory services, and its monetized partners, and away from others, like Yelp and OkCaller, thereby monopolizing this market. Recent press articles discussing cases such as Yelp's lawsuit against Google acknowledge that some cases are gaining traction, reflecting a broader shift toward holding dominant tech companies accountable which previously seemed outside the realm of the cours. This case, much like Yelp's, is at the forefront of necessary reforms targeting monopolistic practices in the technology sector.

Finally, the **Market for Google-Referred Traffic (Single-Brand Market)** exists. Drawing from the *Eastman Kodak Co. v. Image Technical Services, Inc.* precedent, Google's search ecosystem can be viewed as a single-brand market. Websites heavily rely upon Google-referred traffic, and the lack of viable substitutes due to Google's overwhelming market share solidifies this market definition. Consumers have been lured into associating the credibility and quality of a website with its presence and/or ranking on Google. Hence, this has become a market in and of its own right: Google endorsed/Google referred traffic. Sites like OkCaller compete to participate in this market.

### The Duopoly Warrants Scrutiny

Google and Apple, as a duopoly, control and monetize a vast majority of internet content. Their unparalleled influence makes them particularly dangerous in terms of potential anticompetitive conduct. Allowing them to escape judicial scrutiny due to narrow market definitions undermines the purpose of antitrust laws and neglects the public interest. The Court's order made no mention of the duopoly allegations. While they are succinct, that is because they are simple: Apple and Google are gatekeepers, together, for nearly all web content. Apple has 80% control on apps, which are increasingly preferred by end-users to plain web content. Google has 90% control on web content.

Given the extraordinary nature of this duopoly, Plaintiff submits the plain text of Sherman again indicates a valid claim for adjudication. Even under *Brown Shoe*, the aforementioned web visibility and web attention markets could easily be expanded to "web and app" content, collectively. This is an obvious duopoly and it is hard to imagine that history will permit such a duopoly. Plaintiff urges this Court to consider these forward-thinking ideas, rather than being influenced by Google's portraying them as 'harassment', and permit litigation regarding the duopoly.

The time for leniency based on technicalities is long past.

### Reconsideration of the Court's Application of *Blue Shield of Virginia v. McCready*

The Court held that the Plaintiff could not establish standing under *Blue Shield of Virginia v. McCready*, as it was neither a competitor nor a consumer in the general search services market. However, this interpretation misreads *McCready* and its progeny, which recognize that plaintiffs whose injuries are "inextricably intertwined" with the defendant's anticompetitive conduct have standing under antitrust laws.

In *McCready*, the Supreme Court acknowledged that antitrust standing extends to parties who are not direct competitors but are nonetheless directly harmed by anticompetitive practices. The plaintiff, a health insurance beneficiary, was denied reimbursement for services provided by a psychologist due to a conspiracy between psychiatrists and an insurer to exclude psychologists from the market. The Court held that her injury was "inextricably intertwined" with the scheme's anticompetitive effects, granting her standing.

Applying this reasoning, the Plaintiffs in the present case operate a website that relies heavily on visibility in Google's search results—a dependency that is a direct consequence of Google's dominance in the search engine market. Google's alleged manipulation of search algorithms and prioritization of its own services directly harm them by reducing visibility and traffic, thus causing economic injury. This harm is not incidental but is a foreseeable and intentional result of Google's conduct, designed to suppress competition and maintain its control over web content generally. Google controls who reads what content, and this is an anticompetitive and monopolistic goal.

Furthermore, the plaintiff's injury facilitates the anticompetitive scheme by allowing Google to reinforce its dominance and limit consumer access to alternative services. The Court's order questioned whether OkCaller was a conduit for Google's anticompetitive practices. As demonstrated by the proposed markets (Exhibit A), OkCaller is a direct participant in markets adversely affected by Google's conduct. However, even under the conduit theory raised by the Court, OkCaller meets the criteria for antitrust standing.

10

A decade ago, Google selected OkCaller as one of a select few national "phonebooks," effectively distributing OkCaller's content by prominently ranking millions of its pages in search results. This extensive distribution significantly contributed to Google's utility and trustworthiness among users, particularly by providing access to difficult-to-find cellular numbers—an estimated 300 million phone queries.

Over time, Google's alteration of its algorithms and ranking practices reduced OkCaller's visibility from millions of pages to a single page, or sometimes, zero. This drastic reduction is tantamount to ceasing distribution of the "phonebooks," directly impacting OkCaller's business and exemplifying exclusionary conduct. Again, Plaintiff implores the Court not to take Google at its word here, when it suggests OkCaller remains in the listings. This disregards many developer angles, and the plain fact that 15 million pages disappeared.

The public generally assumes that Google's search results are reasonably and transparently ranked. When users search for specific phone numbers like "561-555-1212," they expect to find relevant listings, including those from OkCaller. The absence of such results indicates a fundamental alteration of the prior profitable business relationship, aligning with the criteria for anticompetitive refusal to deal under *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.* The language from the Supreme Court in *Aspen* does not require "Joint Venture," but rather, a termination of a profitable course of dealing. Google made around $20milion from OkCaller, invited its owner to Miami (perhaps 1000 content providers across the country had such access to their facilities), and distributed its phonebook to 300 million people. This is a profitable, pre-existing relationship. Whether Google has kept one, or zero, of the 15 million pages is immaterial, and would be like *Aspen* letting one or two people buy lift tickets from the old partnership. The Court should reconsider and defer on factual determination of this partnership until discovery takes place. Plaintiff has repeatedly informed Google that if they provide him with a reasonable explanation for OkCaller's termination, he will walk away. The Court, should that exist, would have every opportunity to summarily dismiss this case, should Google provide such evidence. Plaintiff doubt it exists, believes something improper likely occurred, and is willing to immediately testify under oath to the Court in this regard.

**Stifling of competition is actionable under *Kodak***

The Court's characterization of the Plaintiff's vertical search provider (VSP) market definition as overly broad misconstrues the nature of the market and its relationship to Google's conduct. From the lens of a developer lawsuit, this market serves as essentially wholesale content providers to Google Search. One could extend this market to all of Google's information suppliers, as exemplified in

Exhibit A. The Plaintiff's allegations do not posit that Google monopolizes every submarket encompassed by vertical search providers, such as internet shopping or air travel; rather, the claim is that Google's leveraging of its dominance in the general search engine (GSE) market stifles competition within these downstream verticals by distorting the competitive playing field. This does not require proof that Google has a "dangerous probability" of monopolizing every segment of the VSP market. Instead, the claim centers on the exclusionary and anticompetitive practices that harm competitors in these markets, regardless of whether Google controls all facets of them.

The court's reliance on the size and diversity of the VSP market misses the crux of the antitrust harm. Google's dominance in the GSE market allows it to steer traffic disproportionately toward its own vertical search(e.g. wholesale content) offerings (e.g., Google Shopping, Google Flights) or to those of preferred partners, undermining fair competition. The harm alleged is not that Google has monopolized every VSP submarket but that it uses its gatekeeping power in general search to systematically disadvantage independent competitors like Booking.com or Yelp or Okcaller. This is a quintessential leveraging claim, akin to the dynamics identified in *Eastman Kodak Co. v. Image Technical Services, Inc*., where Kodak's restrictions in one market harmed competition in adjacent markets.

Furthermore, the court overlooks the fact that the relevant inquiry under antitrust law is not whether Google will monopolize a downstream vertical market but whether its conduct diminishes competition in a manner that harms market participants and consumers. Google's ability to self-preference its vertical search products or demote competitors in its search rankings restricts consumer choice and inhibits innovation. For example, by prioritizing Google Flights or Google Shopping in search results, Google makes it significantly harder for competitors in these markets to succeed, even if they offer superior products or services. The Court's ruling that Google must monopolize the vertical search provider (VSP) market to face antitrust liability fundamentally misinterprets the standards set forth in *Kodak*, where monopolization is not required to establish antitrust liability; it is sufficient to show that a defendant's conduct stifled competition in a relevant market. Specifically, the Supreme Court in *Kodak* held that antitrust claims could proceed when a company used its dominance in one market to harm competition in a related, downstream market, even if it did not entirely monopolize that downstream market.

In this case, the plaintiff plausibly alleged that Google leveraged its dominance in the general search engine (GSE) market to distort competition in downstream markets such as VSPs. By self-preferencing its own products, excluding competitors from visibility, and manipulating search

algorithms, Google has effectively harmed competition in the VSP space, creating significant barriers for rivals and limiting consumer choice. This type of exclusionary conduct aligns precisely with the competitive harms addressed in *Kodak*, where harm stemmed from *Kodak's* ability to restrict competition through its control over a key input—in that case, parts; here, Google's control over search traffic.

The Court's insistence on proving monopolization of the VSP market places an unjustified burden on the plaintiff. Antitrust law recognizes that harm to competition can occur without complete monopolization of a secondary market, particularly when the dominant firm's conduct forecloses meaningful competition or entrenches its power in the primary market. As *Kodak* demonstrated, the focus should be on whether the defendant's conduct restricts competitive opportunities and harms market participants, not whether the defendant has a monopoly in the secondary market.

### Addressing Concerns of Discovery Conduct

The Court referenced its concerns about discovery tactics by the plaintiffs. Any improper intention is adamantly denied. Plaintiff has legitimate concerns that Google retaliated against his prior antitrust litigation. Most people told this story find it likely, obvious, or at least possible, that Google terminated OkCaller on this basis, making it potentially in violation of 18 USC 1512. Plaintiff sought explanation from Google for nearly two years, only to now be improperly alleged by the company to be harassing them for an explanation. This alone warrants antitrust investigation.

Understanding this Court manages its docket with strict efficiency, Plaintiff had no idea an early Rule 30 deposition was not fair game, and indeed still believes it could resolve this case most efficiently, as Google knows why OkCaller was terminated and could explain it in a brief deposition. Moreover, the RFA discovery requests were understood to be routine and fair first round requests. Had Google raised any reasonable objections, Plaintiff would have considered them and amended the requests.

### Notice of Dismissal of Florida State Law Claims

Under Rule 41, Plaintiff hereby dismisses without prejudice his claim for Florida Deceptive and Unfair Trade Practices. As principal for Greenflight, he anticipates the same action will be undertaken by the company soon. The duty to disclose, as Defendants pointed out, has a higher threshold than UCL.  Moreover, Plaintiff recognizes the added complexity Exhibit A's new relevant market considerations brings to this Court. Out of an abundance of caution, and in the interest of judicial economy, this claim is dismissed under Rule 41.

### Conclusion

In light of the arguments presented, it is requested that the Court reconsider its approach to market definitions and antitrust scrutiny at the pleading stage. The plaintiffs have advanced plausible and informed market definitions that reflect the realities of the digital economy and have demonstrated how Google's conduct adversely affects competition and violates antitrust laws. By allowing the case to proceed, the court would align itself with the evolving judicial recognition of the need to address monopolistic practices in the technology sector. This approach honors the intent of the Sherman Act and supports public policy objectives aimed at protecting competition, consumers, and innovation.

.

Jeffrey Isaacs (*pro se*)
11482 Key Deer Circle
Wellington, FL 33449
(212) 257-0737
jeffreydi@gmail.com

## CERTIFICATE OF SERVICE

This document was served upon all parties via CM/ECF.

Jeffrey Isaacs