# Exhibit A

# Similar, Symmetric, and Adjacent Relevant Markets

1) **The Market for Search Visibility and Webmaster Tools**

A fundamental developer-based market in the digital ecosystem is the market for search visibility and webmaster tools provided to website content owners and developers. This market is essentially the developer-facing counterpart to the general search services (GSE) market, mirroring its dynamics and monopolistic concerns but from the perspective of those who create and manage online content. It is how developers inform search engines of their content, and receive feedback accordingly.

The market for search visibility and webmaster tools encompasses services that enable website owners to monitor, analyze, and optimize their sites' presence in search engine results. These tools provide essential insights into:

**Search Performance Analytics**: Data on search queries that lead users to a site, click-through rates, and impressions.

**Indexing and Crawling Information**: Notifications about how and when a site is crawled by search engine bots.

**Site Health Monitoring**: Alerts on issues affecting visibility, such as crawl errors, security problems, or manual penalties.

**Optimization Guidance**: Recommendations for improving site structure, content, and usability to enhance search rankings.

*Quality Transparency Metrics*: How the site compares to others in its field, based on objective data and surveys. Often this is missing from offerings, such as Google's.

Google's Search Console is the predominant tool in this market, offering comprehensive features that are indispensable for maintaining a website's visibility on Google Search. Given that Google handles approximately 90% of global search queries, its webmaster tools have become the de facto standard for webmasters seeking to reach the majority of internet users.

**Symmetry with the General Search Services Market**

The market for search visibility and webmaster tools is essentially the symmetric counterpart of the GSE market, but oriented toward developers and content providers rather than end-users. While the GSE market focuses on delivering search results to users, the webmaster tools market focuses on providing website owners with the means to appear in those search results effectively.

Just as users rely on search engines to access information, website owners rely on search visibility tools to reach their audience. This creates a mutual dependency where both markets are interconnected. Google's dominance in the GSE market translates into control over the visibility of websites. Through its webmaster tools, Google can influence how sites appear in search results, effectively controlling the gateway between content providers and users. With Google's overwhelming market share, alternative webmaster tools lack the efficacy and reach needed to compete meaningfully. This mirrors the limited competition in the GSE market, where few alternatives can rival Google's capabilities.

**The Impact of Limited Competition on Transparency and Fairness**

The monopolistic control of Google over search visibility tools has significant implications for transparency, ranking metrics, and fairness. Google's search algorithms are proprietary and not fully disclosed, leaving website owners with limited understanding of how to optimize their sites effectively. Websites may be penalized or demoted in rankings without clear explanations, and the appeals process lacks transparency, affecting businesses' livelihoods. Google may prioritize its own services or those of preferred partners in search results, disadvantaging independent websites

and skewing competition. The absence of competing webmaster tools reduces incentives for innovation in providing better analytics, optimization techniques, or user-friendly interfaces.

### The Need for Competitive Alternatives

If multiple providers offered search visibility and webmaster tools, it would foster competition that could lead to **Enhanced Transparency**. Competing tools might offer more detailed insights into ranking factors, providing website owners with clearer guidance on improving visibility. **Improved Fairness** results from a competitive market which would reduce the potential for a single entity to impose arbitrary penalties or favor certain sites, promoting a level playing field. Different providers could introduce innovative features, cater to specific industry needs, and offer tailored solutions that address unique challenges faced by website owners. Google's monopolistic position in the market for search visibility and webmaster tools raises antitrust concerns similar to those in the GSE market:

- **Monopoly Leveraging**: Google leverages its dominance in search services to maintain control over webmaster tools, reinforcing its monopoly by making website owners dependent on its platform for visibility.
- **Exclusionary Conduct**: By integrating its own services and prioritizing them in search results, Google can exclude competitors not only from user visibility but also from the tools that could help them improve their search presence.
- **Barriers to Entry**: New entrants into the webmaster tools market face significant challenges, as they cannot offer the same level of integration with Google's search engine, limiting their effectiveness and appeal.

### Standing and Antitrust Injury

Under antitrust laws, particularly following the reasoning in *Apple Inc. v. Pepper*, these harms confer standing upon website owners to bring claims against monopolistic practices in this market. In *Apple Inc. v. Pepper*, the Supreme Court held that iPhone users purchasing apps from Apple's App Store had standing to sue Apple for monopolistic practices, despite Apple's argument that it was merely an intermediary, and that only developers have standing. Big Tech notoriously make inconsistent arguments when cases are analyzed collectively, that standing is conferred on the symmetrically opposite party. The Pepper decision established that direct consumers of a service have standing to sue for antitrust violations, just like the developer counterparts, in platform-based markets.

Applying this to the market for search visibility and webmaster tools, it is clear website owners directly use Google's webmaster tools to access and manage their presence on Google Search, making them consumers of Google's services. Just as app developers and users are both affected by Apple's control over the App Store, website owners and users are both impacted by Google's control over search visibility tools and search results. Google's dual role as a platform operator and a service provider mirrors the dynamics in *Pepper*, where control over access and distribution channels raises antitrust concerns.

Introducing competition into the market for search visibility and webmaster tools would have several benefits, such as **Empowering Website Owners**: Access to diverse tools would enable website owners to make more informed decisions, optimize their sites more effectively, and challenge unfair practices. It also would **Promote Fairness**: Competition would incentivize providers to adopt fairer policies, offer better support, and avoid discriminatory practices that could drive users to alternatives. Likewise, it could **Drive Innovation**: Competing tools would spur innovation, leading to new features, better integration with other platforms, and improved user experiences for both developers and end-users.

### 2) Single-Brand Market For Google Organic Traffic

There exists a single-brand market for Google-referred traffic. This market aligns with the principles established in *Eastman Kodak Co. v. Image Technical Services, Inc.*, where the Supreme Court recognized that a single brand can constitute a separate market under certain conditions. By framing the market in this way, the plaintiff can demonstrate how Google's dominance and control over its search platform create a distinct market with significant antitrust implications.

Consumers inherently trust Google's search results due to the company's reputation for delivering relevant and authoritative information. This trust bestows upon Google-referred websites a perceived quality and legitimacy that is not easily replicated through other channels. For many users, the act of "Googling" has become synonymous with searching the internet, further entrenching Google's brand as the primary gateway to online content. Consequently, websites are heavily dependent on Google's organic search traffic to reach their audience and remain competitive.

The lack of viable substitutes reinforces this single-brand market characterization. While alternative search engines like Bing or Yahoo exist, their combined market share is negligible compared to Google's overwhelming dominance, which accounts for approximately 90% of search queries. For most businesses, the traffic derived from these alternatives is insufficient to sustain operations or achieve meaningful market presence. This reality mirrors the circumstances in *Kodak*, where customers had limited options for servicing their equipment despite the theoretical availability of alternatives.

Google's control over access to its GSE ecosystem allows it to exert significant influence over downstream markets such as this. By adjusting algorithms, prioritizing its own services, or selectively enforcing policies, Google can effectively determine which websites receive visibility and which are relegated to obscurity. This conduct has profound anticompetitive effects, as it enables Google to favor its own offerings and stifle competition without regard to the merits of the content or services provided by independent websites.

Moreover, website owners face substantial barriers to switching away from reliance on Google. Investing in search engine optimization (SEO) tailored to Google's algorithms requires considerable resources, and the knowledge and practices involved are often not transferable to other platforms. Additionally, consumers' entrenched preference for Google means that efforts to redirect marketing strategies toward alternative search engines or platforms yield minimal returns. These high switching costs and dependencies further support the single-brand market definition.

Furthermore, this market perspective aligns with the antitrust injury requirement by demonstrating that the plaintiff's harm is directly linked to Google's anticompetitive actions within the single-brand market. The reduced visibility and traffic experienced by the plaintiff are not merely incidental effects but are the result of deliberate conduct designed to maintain and exploit Google's monopoly power in GSE and the all-important organic Google referral market.

Googles' control over this market is demonstrated by the SSNDQ market. Given a small but non significant change in quality, Google maintains its rankings of its preferred partners, demonstrating inefficiencies of the zero-priced digital content.

### 3) **The Market for Person Directory Services, Including Reverse Search Capabilities**

The digital economy has seen the rapid evolution of directory services, expanding from traditional static listings to highly dynamic and integrated platforms. The market for person directory services—including reverse search capabilities—comprises platforms and services that enable users to locate individuals or businesses by name, phone number, or other identifying data. This market includes standalone directory services like OkCaller and Yelp, as well as functionalities embedded within larger ecosystems such as Google Maps, Google Search, and other Google products. Notably, Google's growing dominance in this space highlights the monopolistic dynamics of these services, particularly through mechanisms like OneBox results and "clickless searches," where Google provides users with the sought-after information directly on its platform without requiring them to visit external websites.

Google's participation in the person directory services market is undeniable. When users search for a phone number or business, they are often presented with information sourced directly from Google Maps or other Google-controlled products. For example, a user searching for a business phone number may encounter a Google OneBox result or a prominently placed link to Google's proprietary directory listings. These results often satisfy the query entirely, removing the need to click through to independent services like OkCaller or Yelp. By controlling this process, Google effectively competes in the directory services market, even if its primary focus is on search engine operations. This dual role as a general search engine (GSE) operator and a directory service provider mirrors other cases where a dominant player in one market leverages its position to control adjacent markets, as seen in monopolistic behaviors scrutinized under antitrust laws.

The Small but Significant and Non-Transitory Decrease in Quality (SSNDQ) test provides a useful framework for evaluating Google's market power in person directory services. By leveraging its near-total dominance in the GSE market, Google can reduce the visibility of competing directory services in its search rankings without losing users to alternative search engines. This dynamic demonstrates a lack of viable substitutes for Google-referred directory results, underscoring its market power. A decrease in the quality of directory listings, such as prioritizing Google's own services or reducing transparency in how directory rankings are determined, further cements its monopolistic position.

OkCaller and Yelp are clear participants in the market for person directory services, competing to provide users with accurate and accessible directory information. These platforms depend on visibility within search engines to attract users and remain competitive. Google's practices, such as prioritizing its own directory results and pushing competing services lower in rankings, directly harm these participants. Users frequently rely on Google's directory-related products—such as Maps and Business Listings—for the same functionalities provided by independent services like OkCaller. This makes Google both a competitor and a gatekeeper in the person directory services market.

Google's participation in both GSE and directory services markets is analogous to a smartphone manufacturer dominating related industries, such as digital cameras. While smartphones are not exclusively marketed as cameras, they have effectively captured the consumer camera market, making them direct competitors to traditional camera manufacturers. Similarly, Google may not market itself as a directory service or reverse search provider, but its products and functionalities place it squarely within this market. This dual market presence highlights the anticompetitive risks of leveraging dominance in one market to control adjacent markets.

Google's practices in the person directory services market create significant antitrust injury. By embedding directory functionalities within its search engine and promoting its own products over competitors, Google has created barriers to entry for new participants and hindered the competitiveness of existing ones. This conduct also harms users by reducing the diversity and quality of directory services available to them. As Google continues to expand its directory-related offerings, its market share grows, particularly in business phone number searches, where it already holds a monopolistic position.

### 4) **Relevant Market for Web Content User Attention**

The "market for web content user attention," encompasses the total supply of user attention allocated among all websites. This attention is measured in user minutes, clicks, and monetization opportunities. In this market, user engagement functions as a commodity, with websites competing to attract and retain users' attention. Google is alleged to leverage its monopoly power in the General Search Engine (GSE) market to control this downstream market of web user attention.

Defining the relevant market as the market for web content user attention is plausible under antitrust principles for several reasons. Firstly, the product in question—user attention—is a finite resource that websites compete for. Everyone knows today Google and content providers compete for "clicks" "views" "likes" and so forth. This market is distinct from the GSE market, as it focuses on the consumption side, where users allocate their attention, rather than on the provision of search services. Secondly, websites and online platforms are substitutable to the extent that users can choose where to spend their time and attention. The level of substitutability varies based on content type, user preferences, and accessibility. Thirdly, both Google and OkCaller operate websites that attract user attention. Google, through its various platforms such as Google Search, YouTube, and Google Maps, competes directly with other content providers for user engagement. Lastly, the allegation is that Google leverages its monopoly power in the GSE market to control the allocation of user attention in the downstream market, thereby disadvantaging competitors like OkCaller.

While the proposed market is broad, it is grounded in the economic realities of the digital ecosystem. To pre-empt concerns that the market definition is artificial or manufactured, it is essential to note this is how Google made it's fortune, through its acquisition of AdSense long after PageRank was invented. Establishing that both the plaintiff and Google are participants in this market, competing for the same finite resource—user attention—is crucial. Additionally, illustrating how Google's conduct in leveraging its GSE monopoly harms competition in the market for web content user attention directly impacts the plaintiff and demonstrates antitrust injury.

The relevant product market is the market for web content user attention in the United States. This market comprises all online platforms and websites that compete for the finite resource of user attention, measured by user engagement metrics such as time spent, page views, clicks, and interactions. Participants in this market include content providers—websites and platforms offering various types of content such as news, entertainment, information services, social media, and specialized services like reverse phone lookup—and aggregators and platforms like Google that aggregate content and direct user attention through search results, recommendations, or curated feeds.

Several characteristics define this market. Users typically access web content without direct monetary payment, creating zero-price dynamics. Instead, user attention is monetized through advertising revenues and data collection. Users can and do switch between different websites and platforms based on content quality, relevance, and accessibility, making websites substitutable to the extent that they fulfill similar user needs or interests. The demand for user attention is highly elastic; small changes in content availability, accessibility, or visibility can lead to significant shifts in user attention allocation.

Given the zero-price nature of the market, the standard Small but Significant and Non-transitory Increase in Price (SSNIP) test is not directly applicable for assessing market boundaries. Instead, the Small but Significant and Non-transitory Decrease in Quality (SSNDQ) test is more appropriate. If a hypothetical monopolist controlling all websites in the defined market were to degrade the quality of content or user experience—for example, by increasing ad load, reducing content diversity, or imposing access restrictions—users would have limited alternatives outside the market to which they could turn. Alternatives such as offline media like television and print media are not reasonable substitutes due to differences in accessibility, interactivity, and immediacy.

The relevant geographic market is the United States. This is justified by the regulatory environment, as content providers and platforms operate under U.S. laws and regulations that affect content availability and monetization strategies. Additionally, user preferences in the United States, shaped by common language and cultural contexts, influence their choice of web content.

Google possesses significant market power in the GSE market, controlling approximately 90% of search queries in the United States. This dominance allows Google to influence the allocation of user attention by prioritizing certain websites or content in search results, thereby directing user attention toward preferred sites. Google also promotes its own content platforms, such as YouTube and Google Maps, within search results and other services. Furthermore, by controlling major advertising networks like Google Ads and AdSense that monetize user attention, Google affects the revenue potential of competing websites.

By leveraging its monopoly in search services, Google can manipulate the downstream market for web content user attention, disadvantaging competitors like OkCaller. The substitutability between different websites depends on user intent and content type. For specific needs, such as reverse phone lookup, substitutability is limited to websites offering similar services. Barriers to entry for new content providers include challenges in achieving visibility due to search engine algorithms and the dominance of established platforms. Users cannot readily substitute web content consumption with other media without losing the interactive and on-demand features unique to the internet.

Google's conduct potentially results in several anticompetitive effects. By directing user attention toward its own services or preferred partners, Google limits the visibility and competitiveness of independent websites, leading to the foreclosure of competition. Users may be unaware of alternative content providers due to manipulated search rankings, diminishing diversity in available content and reducing consumer choice. Additionally, new or smaller websites face difficulties in attracting user attention, discouraging innovation and investment in new content or services.

In conclusion, the market for web content user attention is a plausible and meritorious relevant market under antitrust principles. Both Google and OkCaller are participants in this market, directly competing for user attention. Google's alleged leveraging of its monopoly power in the GSE market to control the downstream market of web content user attention raises significant antitrust concerns.