Ayelet Faerman, Esq.
Faerman Law P.A.
3859 NW 124 Ave
Coral Springs, FL 33065
954-271-8484
ayelet@faerman.law
*Counsel for Greenflight Venture Corporation*

### IN THE UNITED STATES DISTRICT COURT

### FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| GREENFLIGHT VENTURE CORPORATION, JEFFREY D. ISAACS, MD<br>*on behalf of themselves*<br>*and all others similarly situated*<br><br>Plaintiffs,<br><br>vs.<br><br>GOOGLE LLC<br><br>Defendant. | Case No. **24-cv-80395-RLR**<br><br>**SHERMAN ACT ANTITRUST CLASS ACTION**<br><br>**SECOND AMENDED COMPLAINT**<br><br><br>DEMAND FOR JURY TRIAL |

## PLAINTIFFS' JOINT SECOND AMENDED COMPLAINT

## FOR DAMAGES AND INJUNCTIVE RELIEF

### I.        INTRODUCTION

1. Plaintiff Greenflight Venture Corporation (Greenflight) brings this class action lawsuit concerning Google's unlawful monopolization of the market for general search engines (GSE) and related anticompetitive conduct in violation of the Sherman Act and California UCL. A Developer Compensation Fund provides redress for developers harmed in downstream markets, including specialized search and directory services.

2. The Department of Justice (DOJ) recently prevailed in a landmark case against Google, establishing that Google has unlawfully maintained a monopoly in the United States GSE market (US v. Google 20-cv-3010 APM, US District Court for the District of Columbia). This case addresses the broader impact of Google's anticompetitive practices on related markets. Google's monopolistic behavior has stifled innovation, suppressed competition, and inflicted substantial economic harm on specialized search providers and web developers. A proposed remedy in the government action is to open Google search index data to developers like Plaintiffs, creating new incumbents in the GSE field. This proposal, similar to recent regulations in the European Union, unequivocally recognizes developers and class members as competitors of the Defendant. This case complements other enforcement actions by implementing transparency measures for GSE results that mitigate future antitrust injury and expedite reform. (Digital Markets Act (DMA)).

3. Plaintiffs and other web developers operate in markets that depend on fair and competitive access to internet users through general search engines like Google. By leveraging its dominance in the GSE market, Google has distorted competition in these downstream

markets, favoring its own products and those of its strategic partners while disadvantaging independent developers and specialized service providers.

## **VENUE & JURISDICTION**

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), as the claims arise under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. Additionally, the Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367. Lastly, this Court has jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), because the proposed class is sufficiently numerous, minimal diversity exists between the parties, and the amount in controversy exceeds $5,000,000, exclusive of interest and costs. Google LLC's nationwide and international business activities ensure that the challenged conduct affects a substantial class of web developers, content owners, and other market participants across multiple jurisdictions, thus satisfying CAFA's requirements for federal jurisdiction over interstate class actions.

2. Venue in the Southern District of Florida is proper under 15 U.S.C. § 22, which authorizes antitrust suits against corporations in any district where they transact business. It is proper under 28 U.S.C. § 1391(b) and (c) because Google LLC resides in part, transacts business, and is found in this District, and a substantial portion of the events giving rise to Plaintiffs' claims occurred here. Google engaged directly with Plaintiffs for years, hosting meetings and events in Miami, Florida. These ongoing activities demonstrate Google LLC's substantial and continuous presence within the District, making it an appropriate venue for this litigation.

3.  This Court also has personal jurisdiction over Google LLC. By conducting substantial business in this District, including the operation of search engine services central to the claims alleged, Google has purposefully availed itself of the privileges of doing business in Florida. Its continuous and systematic contacts, combined with the alleged anticompetitive conduct and related interactions with Plaintiffs in this jurisdiction, render the exercise of personal jurisdiction over Google consistent with traditional notions of fair play and substantial justice. The integrated presence of Google in Florida's economy, along with the alleged patent infringement impacts on a Florida resident, further solidifies the fairness and reasonableness of exercising personal jurisdiction in this District.

## II. __PARTIES__

4.  Plaintiff Greenflight is a Florida C corporation with its principal place of business in Wellington, Florida. Greenflight invests in diverse technology products, develops and operates specialized online services, including reverse phone search and medical research websites. The majority of the company's investment funds stem from its initial success working with Google on OkCaller.com. The company's success and growth are heavily reliant on fair access to users via general search engines. The company's previous success in large-data operations renders it a competitor to Google; with access to Googlebot's indexing raw data, Greenflight could, and would, develop competing GSE products. Google's monopolistic conduct has significantly impacted the corporation's ability to compete in all relevant markets described herein, resulting in representative antitrust injury.

5.  Plaintiff Jeffrey D. Isaacs, M.D. is a United States citizen and resident of Wellington, Florida. Dr. Isaacs is the founder and principal of Greenflight, through which he developed

and operated a specialized reverse phone search service and other web-based platforms. Dr. Isaacs has invested substantial time and resources into developing innovative online tools that depend on fair and competitive access to users through general search engines like Google. Dr Jeffrey D. Isaacs is a Dartmouth-trained medical doctor (M.D) and computer scientist (A.B., *hons)*. Dr. Isaacs additionally holds an MBA in international studies from Wharton and INSEAD. At University of Pennsylvania's School of Engineering, he was a Benjamin Franklin Scholar. He matriculated at the Vanderbilt Law JD program, where he had been awarded a full scholarship, and left in good standing to pursue medical studies. Dr. Isaacs aspires to complete medical residency, having attained a 99/99 score above the average neurosurgeon on the USMLE National Medical Boards.

6. Defendant Google LLC is a limited liability company organized and existing under the laws of the State of Delaware, and is headquartered in Mountain View, California. Google is owned by Alphabet Inc., a publicly traded company incorporated and existing under the laws of the State of Delaware. Google operates the world's most widely used general search engine and engages in a range of business activities that substantially affect interstate commerce. Google provides a range of products and services that are marketed, distributed, and offered to consumers throughout the United States, across state lines, and internationally. Today, Google is a monopoly gatekeeper of the internet, controlling around 95% of every query for information. The Department of Justice recently secured a guilty verdict against Google for its conduct in monopolizing general search engines. This case invokes identical Sherman foremarket and causes of action as the DOJ case, which is hereby incorporated by reference. As a result of its market power, Google is able to fully control how the majority of US customers look up phone numbers, by directing them to

sites like OKCaller or competitors. Google profits from these queries through advertisements on websites, and/or a 30% share of phone directory app purchase commissions. The DOJ verdict indicated Google pays Apple, through the "ISA Agreement," $20 billion annually to maintain its search monopoly. Google's control of US search, combined with Apple's control over US smartphone apps, is alleged to constitute duopoly control over major United States internet content, access methods, and/or on-ramps generally.

### III.    <u>FACTUAL HISTORY</u>

7. Since its now famous inception as a "Do No Evil" fledgling startup, Google has taken a concerning, increasingly anticompetitive approach to internet search, leveraging vast economies of scale to further their own economic and even political interests.

8. There has been a growing international consensus that Google engages in anticompetitive conduct to monopolize internet search.  This is part of an emerging trend of global public interest in regulating "Big Tech." The world rapidly adopted smartphone internet connectivity over the past two decades, leading to vast economic and sociological implications. Recent government antitrust proceedings are of particular relevance to this case, which combined form an international consensus that Defendant harms competition and innovation by monopolizing internet search.

9. These include the August 2024 verdict in the Department of Justice antitrust lawsuit against Defendant for monopolizing the general search engine services and search advertising markets. Relevant background information in that lawsuit (*20-cv-3010, D.C.*) is directly applicable and thus incorporated and asserted herein:

"Two decades ago, Google became [] an innovative way to search the emerging internet. That Google is long gone. The Google of today is a monopoly gatekeeper for the internet, and one of the wealthiest companies on the planet, with a market value of $1 trillion and annual revenue exceeding $160 billion. For many years, Google has used anticompetitive tactics to maintain and extend its monopolies in the markets for general search services, search advertising, and general search text advertising—the cornerstones of its empire.

For years, Google has entered into exclusionary agreements, including tying arrangements, and engaged in anticompetitive conduct to lock up distribution channels and block rivals…Google's exclusionary agreements cover just under 60 percent of all general search queries. Nearly half the remaining queries are funneled through Google owned-and- operated properties (e.g., Google's browser, Chrome). Between its exclusionary contracts and owned-and-operated properties, Google effectively owns or controls search distribution channels accounting for roughly 80 percent of the general search queries in the United States. Largely as a result of Google's exclusionary agreements and anticompetitive conduct, Google in recent years has accounted for nearly 90 percent of all general-search-engine queries in the United States, and almost 95 percent of queries on mobile devices.

Google has thus foreclosed competition for internet search. General search engine competitors are denied vital distribution, scale, and product recognition—ensuring they have no real chance to challenge Google. Google is so dominant that "Google" is not only a noun to identify the company and the Google search engine but also a verb that means to search the internet.

Google monetizes this search monopoly in the markets for search advertising and general search text advertising, both of which Google has also monopolized for many years. Google uses consumer search queries and consumer information to sell advertising. In the United States, advertisers pay about $40 billion annually to place ads on Google's search engine results page (SERP).

Google's anticompetitive practices are especially pernicious because they deny rivals scale to compete effectively. General search services, search advertising, and general search text advertising require complex algorithms that are constantly learning which organic results and ads best respond to user queries; the volume, variety, and velocity of data accelerates the automated learning of search and search advertising algorithms…

Google's grip over distribution also thwarts potential innovation. For example, one company recently started a subscription-based general search engine that does not rely on advertising profits derived from monetizing user information. Another, DuckDuckGo, differentiates itself from Google through its privacy-protective policies. But Google's control of search access points means that these new search models are denied the tools to become true rivals: effective paths to market and access, at scale, to consumers, advertisers, or data.

Google's practices are anticompetitive under long-established antitrust law. Almost 20 years ago, the D.C. Circuit in *United States v. Microsoft* recognized that anticompetitive agreements by a high-tech monopolist shutting off effective distribution channels for rivals … were exclusionary and unlawful under Section 2 of the Sherman Act.

Absent a court order, Google will continue executing its anticompetitive strategy, crippling the competitive process, reducing consumer choice, and stifling innovation. Google is now the unchallenged gateway to the internet for billions of users worldwide. As a consequence, countless advertisers must pay a toll to Google's search advertising and general search text advertising monopolies; American consumers are forced to accept Google's policies, privacy practices, and use of personal data; and new companies with innovative business models cannot emerge from Google's long shadow. For the sake of American consumers, advertisers, and all companies now reliant on the internet economy, the time has come to stop Google's anticompetitive conduct and restore competition."

10. The DOJ action was filed subsequent to and based in part upon the "*Investigation of Competition in Digital Markets*" majority staff report and recommendation by the United States House of Representatives Subcommittee on Antitrust, herein referred to as the "House report." The facts uncovered by the House report applicable to Google are hereby wholly incorporated herein. That report is incorporated by reference herein, and for convenience, relevant sections on specialized search, which describes Plaintiffs' service offerings, are directly restated:

Google's claim that it ''operates in a highly competitive environment'' is also at odds with the lived reality of market participants. Numerous companies— spanning major public corporations, small businesses, and upstart entrepreneurs— told the Subcommittee that they overwhelmingly depend on Google for traffic and that no alternate search engine even remotely approaches serving as a substitute. For example, J&J Smith, a printer repair shop based in Rhode Island, stated, ''Google is our lifeblood. Foundem, a UK-based comparison shopping search provider, has noted that Google's ''overwhelming global dominance'' of horizontal search creates for most websites an ''uncomfortable but unavoidable reliance on Google.'' Many other companies described their dependence on Google in similar terms.

Furthermore, some of the same specialized search providers that Google identifies as competitors stated that their own businesses heavily rely on Google, in some cases for up to 80 percent of traffic on both desktop and mobile devices. One specialized search provider wrote that Google's business practices ''have a very material effect on [our] business, but due to Google's monopoly power in search, there is nowhere else for [us] to turn for additional search traffic. The company is beholden to how Google decides to structure its search results page and algorithm. Another told the Subcommittee, ''From [our] perspective, there are no adequate substitutes for Google,''and, ''[T]hanks to its monopoly in general internet search, Google has become the gatekeeper for vertical search rivals.'' One specialized search provider said that 97.6 percent of its traffic comes from Google; another said that Google accounted for such an outsized share of traffic that ''we don't even track non-Google sources.''

Google's apprehension about vertical search providers [is documented]. For example, a 2006 strategy memo identifying challenges asked, ''How do we deal with the problem of 'proliferating verticals?''' Another message noted, ''Vertical search is of tremendous strategic importance to Google. Otherwise, the risk is that Google is the go-to place for finding information only in the cases where there is sufficiently low monetization potential that no niche vertical search competitor has filled the space with a better alternative.'' In short, Google executives feared that vertical search providers would build direct relationships with users, thereby bypassing Google Search and diverting traffic, valuable data, and ad revenue. While vertical search providers were complements to Google in the short term, Google recognized their potential for disintermediating Google and therefore viewed them as a major competitive threat…

Documents show that Google developed a multi-pronged strategy to thwart the threat. Two of these tactics included: (1) misappropriating third-party content; and (2) privileging Google's own services while demoting those of third parties. Through these practices, Google exploited its dominance to weaken potential rivals and boost its search advertising revenue. Evidence shows that once Google built out its vertical offerings, it introduced various changes that had the effect of privileging Google's own inferior services while demoting competitors' offerings. This conduct has undermined the vertical search providers that Google viewed as a threat.

Additional market participants echoed the view that Google's self-preferencing comes at the expense of users. One search provider … noted that Google's limits on rival vertical search providers likely prevent consumers from seeing the cheapest or best-valued prices…

Google has actively demoted certain rivals through imposing algorithmic penalties. For example, in 2007 and in 2011, Google launched an algorithm that demoted sites that Google considered ''low quality.'' Among the websites especially hit were comparison shopping providers, which enable users to compare product offers from multiple merchant websites. In a submission to the

Subcommittee, one publisher stated that Google's algorithmic penalty caused search leads and revenues to its website to fall by 85 percent.

In external messaging, Google justified the algorithmic penalties it imposed on third-party sites as a response to users' desire to see fewer ''low quality'' sites in their search results. However, Google did not subject its own vertical sites to the same algorithmic demotion, even though Google's vertical services aggregated and copied content from around the web—just like the third-party sites that Google had demoted. Indeed, Google's documents reveal that employees knew Google's own vertical sites would likely fit the demotion criteria that Google applied to other sites. When one employee suggested that Google index its comparison shopping site, Froogle, another responded that it was unlikely Froogle would get crawled ''without special treatment,'' noting, ''We'd probably have to provide a lot of special treatment to this content in order to have it be crawled, indexed, and rank well.''

Despite the fact that Google's own comparison shopping service was of such low quality that Google's product team couldn't even get it indexed, Google continued to give Froogle top placement on its search results page…

Through mis-appropriating third-party content and giving preferential treatment to its own vertical sites, Google abused its gatekeeper power over online search to coerce vertical websites to surrender valuable data and to leverage its search dominance into adjacent markets. Google's conduct both thwarted competition and diminished the incentive of vertical providers to invest in new and innovative offerings.

In an interview with the Subcommittee, one market participant observed that Google's conduct has sapped investment, as ''investors don't want to invest in companies that are producing content that relies on Google traffic,'' resulting in ''less capital invested in companies reliant on traffic from Google.'' The website noted that Google's business practices have also skewed the website's own investment decisions, leading it to allocate the vast majority of its revenue to creating ''news-like temporary content'' rather than ''evergreen content.'' It added, ''If we could trust that Google was not engaging in unfair search practices, we would be producing different content.'' A vertical provider, meanwhile, said that Google's conduct had held the firm's growth ''at bay'' and risks reducing innovation over the long term, as providers whose growth is capped by Google may be more reluctant to invest and expand. It added:

"Competitors are not the only ones who have a reduced incentive to innovate as a result of Google's conduct. The anticompetitive effects reduce Google's own incentives to improve the quality of its services, because it does not need to compete on the merits with rival services." Several market participants told the Subcommittee that Google's business practices in online search have already foreclosed opportunity: "It is my view that Google has removed essentially all of the oxygen from the open internet ecosystem. There is no longer any incentive or even basic

opportunity to innovate as I did back in 2008. If someone came to me with an idea for a website or a web service today, I would tell them to run. Run as far away from the web as possible. Launch a lawn care business or a dog grooming business—something Google can't take away as soon as he or she is thriving."

More broadly, market participants expressed concern that Google has evolved from a ''turnstile'' to the rest of the web to a ''walled garden'' that increasingly keeps users within its sites. Many observers have noted that when Google filed its initial public offering, Google cofounder Larry Page identified the company's mission as the following: ''We want you to come to Google and quickly find what you want. We want you to get you out of Google and to the right place as fast as possible. In recent years, however, studies have shown that more than half of all queries on Google either terminate on Google or result in a click to Google's own properties—a share that is growing over time.

11. The "Investigation of Competition in Digital Markets" majority staff report and recommendation by the United States House of Representatives Subcommittee on Antitrust provides compelling support and evidence supporting the Plaintiffs' claims.

12. Google has been found to control approximately 90% of the GSE market, which it has achieved and maintained through a series of exclusionary agreements and anticompetitive practices, such as the ISA Agreement with Apple. These practices have effectively foreclosed competition in the GSE market, preventing rivals from gaining the necessary scale to compete meaningfully.

13. Google's dominance in the GSE market has significant downstream effects on vertical and specialized search markets, which rely on fair access to users through general search engines. Web developers and specialized content providers, such as those offering reverse phone search, medical research tools, and other niche services, are directly harmed by Google's manipulation of search engine results. By favoring its own products and those of its strategic partners, Google has distorted competition, suppressing the visibility and accessibility of independent developers' services.

14.  Google has systematically undermined the ability of specialized content providers and developers to compete by: a. Manipulating Search Results: Google has intentionally ranked its own products and services, and those of its strategic partners, above those of independent developers, regardless of the quality or relevance of the content. This manipulation effectively forces independent developers to invest heavily in Google Ads or other Google services to maintain any visibility in search results. b. Exclusionary Agreements: Google has entered into agreements with major corporations and other partners that require the preinstallation of Google services on devices, further entrenching its monopoly and excluding competition from independent developers. c. Suppression of Innovation: By controlling the flow of traffic to specialized sites, Google has stifled innovation and limited consumer choice, forcing developers to either comply with Google's terms or risk being pushed out of the market entirely.

15. As a direct result of Google's anticompetitive conduct, Plaintiffs and other members of the proposed class, which includes web developers and operators of specialized content websites, have suffered substantial financial harm. This harm includes, but is not limited to: a. Loss of Revenue: Plaintiffs' websites have experienced a significant decrease in traffic due to their demotion in Google search results, directly leading to a loss of revenue. b. Diminished Market Share: Plaintiffs have lost market share as consumers are directed toward Google's own services or those of its preferred partners. c. Increased Costs: To maintain any visibility, Plaintiffs have been forced to spend considerable sums on Google Ads, effectively paying Google to compete in a market it already dominates. d. Suppressed Innovation: Plaintiffs have been unable to fully develop and deploy new features or services due to the financial constraints imposed by Google's anticompetitive practices.

16.  Google has leveraged its monopoly power in the GSE market to control the downstream markets in which Plaintiffs operate. By manipulating search algorithms and controlling access to search traffic, Google has insulated itself from competition, ensuring that independent developers cannot effectively compete without being subjugated to Google's terms and conditions.

17. For many years challenging Google rankings has been considered beyond the reach of the courts, in light of Section 230 and other law. But as the novelty of digital markets faded, and in light of the recent Google DOJ verdict, many antitrust scholars – and a population in overwhelming support of Big Tech reform – await a different outcome from cases like this, including a similar case brought by Yelp, now pending in Northern California District.

18. Indeed, the Ninth Circuit opined (in *dicta*) to the possibility of such litigation several years ago in the *Dreamstime* case (<u>Dreamstime.com, LLC v. Google LLC (</u>2022), 54 F.4th 1130., US Court of Appeals, 9th Circuit). The redress sought by this lawsuit is not invented by undersigned counsel, but rather, marks an informed and cutting-edge measure to reflect a changing tide in the applicability of Sherman Act to digital markets. Big Tech matches these efforts with its own aggressive steps to prevent the inevitable, including significant pressure tactics and retaliation against antitrust advocates.

19. For example, in this case, the Plaintiffs politely sought from Google an explanation for the sudden termination of OkCaller, a website serving 300 million individuals. The termination was unusual, to say the least, and historically, abruptly ending such a lucrative partnership typically carried an explanation with it. However, Google has embarked on a blame-the-victim defense, alleging straightforward discovery requests to be "harassment." Put differently, Google is on record as declaring Plaintiffs' legitimate antitrust inquiry – backed

by multiple authorities for similar situations – constitute harassment. This is actionable under UCL and other law (see causes of action), and particularly egregious, considering antitrust violations constitute a felony, as does witness retaliation. Google is requested to provide prompt, specific responsive answers as to this improper conduct.

**Lead Plaintiffs Background – OkCaller.com & Greenflight Venture Corporation**

20. Plaintiffs Greenflight are developers of web apps, smartphone apps, and related technologies. A substantial majority of the software applications developed by Plaintiffs could be considered specialized search websites and apps, and VSPs (vertical search providers). Two examples of such products are FactMed.com and OkCaller.com, which provide informatics portals for end-users in the pharmaceutical side effect and phone directory search services sectors, respectfully. As discovery will evidence, Plaintiffs spent much of the past decade developing around a dozen such software products. Plaintiffs are especially suited to represent the class of developers given the diversity of their projects, their extensive interactions with Google on both highly successful – and others less so – endeavors. Greenflight will demonstrate the inefficiencies and antitrust costs incurred when its investment products weren't subject to fair ranking or transparent evaluation by Google. For example, even on their most successful investment, OkCaller.com, Greenflight encountered systematic and routine difficulties with Google in its ability to improve their product or create competing, alternate versions for other markets. This resulted in significant lost investments of person-hours, monetary costs, goodwill, and other tangible and intangible losses. In most cases, both Greenflight and Dr. Isaacs had shared ownership interests in a particular VSP, and thereby suffered losses collectively.

Furthermore, Greenflight and/or Plaintiff Isaacs would often partner with co-investors, friends, and/or family on new startups.

21. In 2012, during his medical residency at Dartmouth-Hitchcock Hospital in New Hampshire, Dr. Jeff Isaacs faced a life-altering challenge when he became disabled. Undeterred by this setback on his goal to be a neurosurgeon, and determined not to rely indefinitely on Dartmouth's own-occupation long-term disability benefit, Dr. Isaacs founded OkCaller.com in 2013. This initiative led to the awarding of U.S. Patent RE48847 for the groundbreaking reverse phone search technology the website utilized. Google, recognizing the significance of Dr. Isaacs' contribution, quickly elevated OkCaller to a premier position among reverse phone search sites:



22. By Google's own Analytics records, OkCaller garnered 293 million new users since launch and 605 million pageviews, positioning it among the top 2000 websites on Google, comparable to established brand sites like Jeep.com.  The above chart shows organic referral volume. Google is on record as having made misleading claims that this chart suggests longstanding decline of OkCaller. In fact, OkCaller's profitability grew steadily over the years, and its final year achieved record profits nearly double the average.

23.  Compared to some normal fluctuation in user volume, profitability was unusually constant, which was largely influenced by Google's price per hundred as impressions (CPM). Greenflight always assumed Google "pegged" profitability and adjusted volume and CPM for their own internal purposes. Hence Greenflight specifically rejects Google's narrative that OkCaller was in decline, and alleges Google has attempted to mislead the Court, along with the aforementioned claims that prompt inquiry into the termination constituted harassment.  Okcaller consistently generated around $2m each year in profits for Google, and the final year, before termination, was a record profit year. Termination of a $20m partnership without explanation formed a reasonable basis for inquiry. Google's attempts otherwise create a chilling effect on the free and open commerce this nation pioneered.

24. Combined with the other top 2000 websites, these revenues amounted to at least $ 4 billion annually for Google. Hence, by extrapolation, Okcaller and peers represent a pivotal business relationship for Google, especially in 2014 when the relationship commenced, and could be considered a joint-venture of internet content providers (or VSPs) that helped the company attain its current success.

25.  Dr. Isaacs' site was operated by Greenflight, a Florida C Corporation which he serves as CEO. Regular communications between Google, Greenflight, and Dr. Isaacs underscored a partnership marked as highlighted in a 2015 email from Google:

> "You are one of the few partners who we have invited for Enhanced Support and Optimization. Thank you for working with us! We are grateful to count you as a trusted partner, and we hope to continue improving our relationship to suit your business needs."

26. This "trusted partnership" transcended mere algorithmic website ranking, making OkCaller a Google success story and facilitated Dr. Isaacs' participation in workshops with senior Google personnel in their Miami office, significantly contributing to Google's AdSense revenue. Working with independent sites like OkCaller fundamentally allowed Google to reach the success it enjoys today.

27. That trusted partnership ended on Thanksgiving 2022. As of today, Google search returns zero pages for Okcaller.com, down from indexing millions of pages, consistently, for a decade. The below screenshot indicates Google completely terminated a longstanding, profitable business relationship (digital content advertising joint venture) by removing millions of directory pages completely from its index. From time to time, it appears Google may index one page, but transient indexing of one page is not meaningful, compared to the prior twelve million, and prevents OkCaller from serving in capacity as a VSP and/or information directory service.



28.     Because Dr. Isaacs ran the site efficiently, he gave away his patent for free, which allowed customers to save 90% on phone searches. Dr. Isaacs' invention saved US consumers over $100 million by estimate.  Phone searches are a lucrative and substantial part of search engine revenues. Historically they were an early, even perhaps the first major profit center for Google.

29.     Unlike nearly every competitor, Greenflight never sold information about its users to third-parties. Moreover, OkCaller was a decade early to implement privacy controls that the US Marshal service now asks all phone directories to do, to protect Federal Court personnel's residence data. That is a result of Dr. Isaacs' vision in 2013 to prevent forward lookups of confidential information, like phone numbers and addresses. OkCaller only permits "called parties" who received a text or phone call from an unknown "calling party" to look up the name of the person. The functionality of traditional Caller-ID over the web was novel and worthy of a patent, as it helped hundreds of millions safely find out, under "natural law," who communicated with them See OKCaller.com Terms, generally.

30.  To wit, OkCaller was a successful Florida-based internet startup that offered the ideal phone directory: it worked, it didn't sell user data to anyone, it was free, and it prevented safety risks associated with forward-lookup caching , exemplifying Daniel's Law concerns. It was also a successful outcome of the disability system, allowing Dr. Isaacs to promptly get back on his feet and serve others.

*A Convergence of Complex Litigation Emerges*

31. OkCaller faced considerable legal obstacles in the effort to bring free caller ID to the general public. As OkCaller gained market share, competitors took note and began to infringe upon Dr. Isaacs' patent. Within six months of Apple Inc. learning that Isaacs' desired to give away his patent for free and prevent high-grossing apps like Whitepages from charging for the same information, Apple dropped OkCaller from their Top 10 ranked phone apps to an unranked position. Whitepages simultaneously commenced a lawsuit to invalidate the patent under the controversial Alice IP case law.  The patent went back to the drawing board, and the USPTO spent several years reviewing Federal Circuit findings while corresponding with Greenflight's MIT-trained intellectual property attorney to reissue the patent. Hence today, the reissue patent again enjoys presumption of validity, having survived double scrutiny by the USPTO and Federal Circuit Appeals Court.

32. Despite these obstacles, Google notably continued to support Dr. Isaacs' work, significantly aiding him in his endeavor to bring free caller ID services to the general public. Dr. Isaacs has faced nineteen years of federal litigation surrounding his medical credentials, and he believed he was improperly blacklisted from the federally-funded residency system.  Google allowed Dr. Isaacs to work from home, as he dealt with the worsening health issues and complex federal litigation to enforce the clearing of his name.

33. Between 2014-2022, a former Assistant United States Attorney[1] who specialized in complex healthcare matters worked tirelessly to help Dr. Isaacs return to active medical practice.

34. Recognizing that his clinical medical career was indefinitely delayed, in February 2020 Plaintiff partnered with the inventor of the gold-standard test for heart attacks to develop a Coronavirus tracking app. Apple rejected the app "Coronavirus Reporter," the first of its kind, in March 2020. The plaintiff, Dr. Isaacs, subsequently became a lead witness in Apple antitrust matters concerning App censorship, which are ongoing and have received considerable media attention.

35. On the day Dr. Isaacs tendered a Closing Brief to the Ninth Circuit in the Apple antitrust lawsuit, Google abruptly terminated the OkCaller partnership without any prior notice. Other competitors in Reverse Phone Search were unaffected, including blatant copycat sites which infringe upon the reissue patent. His previous contacts, who for a decade were happy to provide Dr. Isaacs with consultation, suddenly went silent. Similarly, no meaningful response was to be found on the Webmaster Forum, which had previously garnered a response from Google Executive Mr. Mueller worthy of news coverage by a major SEO blog.

---

1. [1] Former AUSA Mark Josephs, who spent almost a decade on a *pro bono* effort to reinstate what he called Dr. Isaacs' promising neurosurgery career, tragically passed away last year. In reviewing years of federal discovery files, AUSA Mark Josephs identified evidence that a California university was publishing false disciplinary records on national academic clearinghouses about Dr. Isaacs. The university had previously agreed, via two court-ordered federal settlement agreements, to acquit Isaacs of any controversies and seal the acquitted records. Two competent authorities, the American Academy of Medical Colleges, and a New Hampshire Employment Tribunal, both determined that the records had been expunged. Nonetheless, "leaked" records prevent Dr. Isaacs from practicing neurosurgery. Mr. Josephs sought declaratory action with the Department of Education and the California university. Both were blocked, due to statute of limitations and jurisdictional defenses raised by law firm Gibson Dunn. In 2020, The Ninth Circuit had a divided ruling with a stark dissent on the matter. This lawsuit will also seek the same declaratory judgment.

36. Isaacs, through his legal counsel, has spent the past year asking Google to investigate any link the aforementioned litigation, only to be stonewalled.

37. Plaintiff's legal counsel has determined that substantiated concerns exist that Google violated witness retaliation laws, such as Section 1512. A subpoena was issued to Google in a related lawsuit to seek information and evidence about the reasons for OkCaller's termination by Google.

38. Therefore, as best as Plaintiffs' can ascertain prior to discovery, Google dropped OkCaller's rankings after learning about his litigation history, including litigation against Big Tech. Notably, Google and Apple have jointly lobbied together to thwart antitrust enforcement.

39. Google has directly accused Plaintiff of "failed litigation" against Apple. That litigation is ongoing and Google's efforts to render perception of it as failed represents evidence of underlying retaliatory intent. But the reality is, Dr. Isaacs' longstanding anti-trust litigation threatened Apple as well as Google's duopoly business models.

40. Dr. Isaacs justifiably fears that in December 2022 his second career as a computer developer, was again blacklisted in violation of Section 1512, the same way his neurosurgery career had been wrongfully halted. Dr. Isaacs, with stellar medical credentials and absolutely no criminal record, has been prevented from practicing medicine, largely due to aforementioned legal pleadings being weaponized against him. That weaponization, Dr. Isaacs fears, spread to Google LLC around Thanksgiving 2022.

41. Dr. Isaacs practiced his invention through intricate collaboration with Google. The compensation he received from them, in part, reflected payment of patent royalties. Upon their termination of OKCaller, Dr. Isaacs requested Google reimburse him directly for

infringing conduct. Google refused to pay patent royalties owed to Isaacs. Hence this is not a patent case brought by a non-practicing entity; it is a case brought by a previously compensated inventor, who was potentially subjected to witness retaliation that resulted in total cessation of patent royalty payments by Google.

42. Plaintiffs' reverse search phone websites constitute a vertical search competitor as described in the Subcommittee report. Plaintiffs allege their experiences as a vertical search competitor are consistent with and corroborate the concerns and evidence presented in the Subcommittee report. Alternatively, over the past decade, Plaintiff operated reverse phone search services and other websites that were subjected to similar anticompetitive conduct as documented in the Subcommittee report.

### Reverse Phone Search Industry Background

43. The emergence of the reverse phone search industry, a subset of the directory services market, largely coincided with the initial growth of Defendant Google's search engine monopoly in the early 2000s. Prior to internet search engine availability, it was simply impractical to look up a phone number to see the corresponding name of the owner. Phone companies offered rudimentary services such physical reverse phone books and operator assisted phone queries, but these were highly specialized and localized, and for the most part, not used by the general population. They also typically only referenced landline numbers. The first dedicated online internet-based reverse phone search engines also suffered such limitations, derived from landline data and limited public records.

44. As mobile phones overtook landlines, the consumer demand for reverse phone search grew exponentially. Most consumers did not subscribe to Caller Name ID, which presented the name of an individual who called them from a wireless or landline phone. Text messages,

even for those who could afford Caller Name ID, often didn't implement the service, and still don't, to this day. As our culture shifted to online transactions on services like AirBnB, eBay, etc with strangers across the country – or the globe – knowing the identity of an incoming call or text message evolved from being a luxury convenience to a matter of safety.

45. Despite the need for such Caller Name ID, a complete void existed until 2013 whenever consumers would "Google someone" or "Google a number" to perform a reverse phone search. But until 2013, a typical reverse search query on Google's engine was plagued with inaccuracy and subscription-service scams.[2] The results presented to an end-user searching for a phone number would be lists of "keyword stuffed" mathematics lists, such as prime numbers, random numbers, and Fibonacci number lists, masquerading as phone numbers, directing them to an affiliate subscription, or presenting them with a Google advertisement.

46. While Google doesn't publish the number of phone and people searches conducted on its general search engine, the numbers are significant. Upon information and belief, in Google's early days over 25% of internet searches were simply phone or people searches. Today these numbers may be similar. Google knowingly ranked phone search spam in its results, such as prime number lists, as a way to monetize a large part of its search queries. Hence Google's early profitability as they grew their monopoly was built, at least in large part, on exploiting phone and people searches.

47. In 2013, recognizing this problem, Dr. Isaacs developed a method and technique to bridge the telecommunications Caller Name ID system with the internet IP web protocols. In

---

[2] In fact, this industry pioneered internet subscriptions, which are now, of course, ubiquitous.

simple terms, Dr. Isaacs invented and patented "Web Caller Name ID," and has spent the last decade on a mission to make the invention free to users.

48. OkCaller.com had been consistently ranked as a top provider in its field by web analysis firms such as SimilarWeb and Alexa. Plaintiffs' reverse phone search services platform ranked in the top few thousand websites in the United States. The platform ranked first among small-medium publishers; only Whitepages, Spokeo, and several other large corporations ranked higher, which typically offered additional directory information services functions.

49. Plaintiff's search platform was efficient to consumers. Plaintiffs spent a decade trying to ensure their Caller Name ID technology was offered free to end-users. Google recognized the novel value and directed a significant share of their search traffic to Plaintiffs' platform.

50. When Dr. Isaacs first submitted Web Caller Name ID to Google in 2014, the company flagged it as spam. Trying several different improvements, the Defendant repeatedly accused Dr. Isaacs of "keyword stuffing," when in fact, he had a website that was a *solution* to keyword stuffing. He submitted a question to Google's "Webmaster Forum," which eventually attracted the attention of Senior Executive Mueller. Mueller advised Isaacs to keep working on the interface, and that eventually, he would gain a userbase of organic Google traffic.

51. In fact, the reason the site was flagged as SPAM was because Plaintiffs took measures to ensure the safe use of Caller ID data. That meant they didn't allow Google bots to cache the "Caller Name ID," but only the phone number. However, Google saw large lists of phone numbers, without associated data, and incorrectly assumed it was SPAM.

52. Google eventually realized that OkCaller was not spamming them, but in fact, was trying to ethically and safely implement web caller ID.

53. Copycats weren't so careful, and allowed name search of Caller Name ID to phone numbers. These sites violate the intent and spirit and literal statute of "Daniel's Law" and other phone safety regulations. If Google blocks copycat websites, the web would be safer and fewer "Daniel's Law" violations. That is because Plaintiffs would only license Web Caller ID to sites that shared opt-out information, and that didn't publish Caller Name ID's on SERPs for forward-lookup.

54. As Google recognized after Mr. Mueller's involvement, pairing Web Caller Name ID with user-vetted Spam reports provided a powerful combination. In one single screen, an end-user could see the name associated with a phone number, and submit or view crowdsourced reports pertaining to that number. Google recognized the potential of this novel combination as well, and the critical mass necessary to make its implementation successful. Almost overnight, Plaintiffs' reverse search service went from zero to approximately a half million user sessions a day.

55. The success of the site was immediately noted and emulated by many websites around the web. Within a year, dozens of phone websites all utilized the simple "Safe" and "Not Safe" user interface Plaintiffs' pioneered as "SafeCaller" adjacent to the Web Caller Name ID. Effectively, Plaintiffs set a user interface standard for phone search that instantly replaced the prime number and Fibonacci number sites, which largely disappeared within a year. The "look and feel" of the SafeCaller interface remains, to this day, a common interface standard for reverse phone search.

56. Nonetheless, Google has increasingly desired to fragment reverse search, and there are antitrust concerns that may be ascertained during discovery. Around 2017, a near-identical copycat of Plaintiffs' platform was awarded almost half of Plaintiffs' pre-2017 traffic, although OkCaller's profitability doubled from Google ads. Plaintiffs notified Google of the matter in 2017 but never regained the pre-2017 traffic level, but in light of the doubled CPMs, assumed Google "pegged" the site's income at a level they determined as fair. In other words, Google kept OkCaller in a competitive position that was valuable and reflected ongoing recognition of the patent validity and benefits of OkCaller, generally.

57. Plaintiffs tried to improve the platform over the years, but were never awarded increased traffic despite significant investments in platform improvement. For example, Plaintiffs developed a global reverse phone search platform with significant international telecommunication standards capability. Google awarded the international version effectively zero traffic. This was the beginning of Plaintiffs' realization, in conjunction with their FactMed experience, that Google's methodologies lacked in transparency, resulting in antitrust losses to consumers and developers alike.

58. Similarly, OkCaller was limited in improvement capability by Defendant Google. Google requested he transition his website to AMP technology, which Google had strategic interests in as a developer of AMP. Plaintiff did so, which meant foregoing other tools like Javascript to add functionality he had invested for the international version. In short, Plaintiff sought to innovate phone search, but his new platforms were ignored by Google and over the years, Google's conduct in advancing their own interests clearly increased.

59. Ongoing fragmentation from domestic and international copycats often presented fake Caller-Name data and had generally low quality control and risked public safety. Plaintiff's

reverse search services platform nonetheless maintained significant market share (and a record year of profits for OkCaller and Google) until Thanksgiving Eve 2022. Google removed millions and millions of the platform's pages of Caller Name IDs and Spam reports from their rankings. In other words, they were not merely lowered in rankings; they were removed from the index and censored for undisclosed reasons.

## Sherman Antitrust Relevant Market Theory

### *General Search Engines in the United States Is a Relevant Antitrust Market*

60. General search services (GSEs) in the United States constitute a relevant antitrust market. "General search engines" refers to platforms such as Google, Bing, and DuckDuckGo, which enable users to retrieve responsive information from the internet by entering keyword queries. These services are unique in that they provide a highly convenient, centralized "one-stop shop" for an extraordinarily broad range of content. Users rely on general search services for numerous types of queries—navigational, informational, and commercial—and other sources, whether offline media or niche online platforms, lack the universal scope, immediacy, and relevance that GSEs offer. Consequently, there are no reasonable substitutes for general search services, and a GSE monopolist could maintain service quality below competitive levels without losing the majority of its user base.

61. General search engines act as digital platforms serving two symbiotic customer groups: end-users seeking information and the developers and publishers who supply content to be discovered. While the end-user facing aspect of GSEs is straightforward, the developer-facing dimension—encompassing search visibility, indexing feedback, and webmaster tools—is equally critical. Through these tools and analytics, website owners effectively "purchase" distribution services from GSEs, ensuring their content can be found by the

end-user population. This arrangement mirrors a bookstore's role in distributing books from publishers to readers: the publisher (developer) relies on the bookstore (GSE) to reach readers (end-users), and the bookstore, in turn, provides valuable data, insights, and optimization guidance to ensure that the publisher's products are discoverable.

62. This interdependence establishes a developer-oriented component within the GSE market. While GSEs provide users with broad access to internet content, they also supply developers with the essential means to present, monitor, and improve their sites' visibility. Given Google's dominant share of global search queries, its webmaster tools have become the industry standard. Developers cannot realistically forego Google's platform or find alternatives with comparable reach, mirroring the concentrated conditions found in the consumer-facing side of the GSE market. Google's entrenched dominance thus allows it to control not only how users access content but also the terms by which developers can achieve online visibility.

63. This dominance raises serious concerns regarding transparency, fairness, and innovation. Because Google's search algorithms and penalties are opaque, developers struggle to understand or respond to changes in ranking and visibility. Without competitive pressure, Google can prioritize its own properties or favored partners, disadvantaging independent sites and distorting competition. In a market with few or no substitutes, developers lack meaningful recourse to alternative visibility tools, reducing incentives for rivals to innovate or enhance their services. In effect, both user-facing and developer-facing aspects of the GSE market are intertwined, giving a single dominant firm disproportionate influence over the entire chain of content discovery.

64. Since these services—both the general search results and the developer tools—are typically provided at no direct monetary cost, conventional price-based methodologies are less informative for market definition. Instead, the Small but Significant and Non-Transitory Decrease in Quality (SSNDQ) test is the appropriate analytical lens. Under the SSNDQ framework, if a hypothetical monopolist controlling GSE services and their associated webmaster tools were to degrade service quality—such as providing less transparent ranking criteria, slower indexing, or weakened analytics—users and developers would have no readily available substitutes offering comparable breadth, convenience, and audience reach. This inelasticity of demand with respect to quality confirms that GSEs form a distinct antitrust market, as stakeholders cannot simply shift to alternative platforms in response to quality declines. The SSNDQ test thus solidifies the conclusion that general search services in the United States constitute a relevant antitrust market.

65. Google has monopoly power in the United States general search services market, with 90% market share. There are currently only four meaningful general search providers in this market: Google, Bing, Yahoo!, and DuckDuckGo.

66. There are significant barriers to entry in general search services. The creation, maintenance, and growth of a general search engine requires a significant capital investment, highly complex technology, access to effective distribution, and adequate scale. For that reason, only two U.S. firms—Google and Microsoft—maintain a comprehensive search index, which is just a single, albeit fundamental, component of a general search engine. Google's large and durable market share and the significant barriers to entry in general search services demonstrate Google's monopoly power in the United States.

67. The Department of Justice and European competition authorities have recognized that significant barriers to entry, including the enormous cost of comprehensive indexing and the sophisticated webmaster tool infrastructures, prevent meaningful competition against an incumbent like Google. Were these barriers mitigated, by requiring Google to share indexing data, choosing a search engine would be more like selecting from a variety of podcasts or other easily accessed digital content, fostering new entrants and promoting a healthier competitive environment.

### *Vertical Search Providers (VSPs) Is a Relevant Product Market*

68. Vertical search providers (VSPs) constitute a relevant antitrust market under the Sherman Act. A "vertical search provider" is a specialized online platform that indexes, curates, and retrieves information from a narrowly defined category of data or services, such as medical studies, legal precedents, reverse phone lookups, travel listings, or product reviews. Unlike general search engines, which offer users a broad, one-stop interface for queries spanning countless subject areas, VSPs deliver deeply contextualized results calibrated to the specific informational needs of their users. For example, a traveler seeking flight options on Expedia, a researcher investigating clinical drug trials on Pubmed, or a consumer searching for authoritative phone directory data on Yelp may turn to the corresponding vertical search platform whose depth and domain specificity general search services cannot reliably replicate.

69. The distinctiveness of VSPs arises from their curated focus on a particular field of information. This specialization renders VSPs uniquely valuable to users who require more targeted, authoritative, and domain-specific information than what general search engines can provide. Substitutes from alternative platforms—such as social media sites, traditional

directories, niche apps, or generalized web portals—fail to offer the same level of precision, integration, and relevance. As a result, users find themselves dependent on VSPs for solutions that general search engines or conventional directories cannot match, establishing VSPs as a separate, non-interchangeable product market.

70. From an antitrust perspective, the application of the Small but Significant and Non-Transitory Decrease in Quality (SSNDQ) test to the VSP market highlights its distinctiveness and the limited elasticity of both user and developer demand. Although no single vertical search provider is dominant, VSPs as a whole occupy a specialized, downstream position relative to general search engines (GSEs) and must compete on quality to earn placement and prominence in GSE search results. If VSPs' quality were systematically reduced—whether through diminished content curation, transparency, or indexing efficiency—there would be no readily available substitutes offering a similar depth of niche expertise. Users and developers, in turn, cannot simply shift their reliance to general search engines or unrelated platforms, as these do not deliver comparable vertical specificity. This dynamic means that even a modest, non-transitory deterioration in VSP quality fails to induce a meaningful competitive response or user migration, thereby underscoring that VSPs form a distinct antitrust market segment dependent on GSE gatekeeping practices and highlighting the vulnerability of this market to anticompetitive conditions. In sum, VSPs form a discrete and relevant antitrust market in the United States.

### Directory Information Services in the United States Is a Relevant Antitrust Market

71. Directory information services form a distinct and meaningful antitrust market within the digital economy. Historically dominated by printed white and yellow pages, these services have long served as a vital reference for finding individuals, businesses, and contact details.

As technology progressed, traditional directories gave way to online platforms such as Whitepages and Yellowpages, which transferred the familiar "lookup" function into a more accessible digital environment. Subsequently, newer entrants like Yelp and OkCaller emerged, bringing specialized capabilities, user reviews, and efficient reverse lookup functions to the fore. This array of providers—ranging from well-established directory brands to specialized newcomers—collectively offers comprehensive repositories of names, addresses, phone numbers, and related information that cannot be replicated by mere casual browsing or general web navigation.

72. Google's integration of directory functionalities within its General Search Engine (GSE) platform has fundamentally reshaped the competitive landscape. Leveraging its dominance in search, Google now incorporates business listings, contact information, and local results directly into its general search results pages. Through features like Google Maps business listings and "clickless" search results—where the user's query is fully answered on the search results page—Google effectively competes with and often displaces independent directory services. No longer must users click through to standalone directory websites; instead, Google centralizes and controls the flow of directory information, building on its established credibility, user trust, and broad user base to command a critical portion of the directory inquiries market.

73. From an antitrust perspective, the Small but Significant and Non-Transitory Decrease in Quality (SSNDQ) test underscores the vulnerability of this market to anticompetitive harm. Directory information services—provided largely at zero monetary cost—compete primarily on quality, reliability, and comprehensiveness. If a hypothetical monopolist directory provider, like Google acting through its integrated GSE ecosystem, were to

degrade the accuracy of its listings, reduce transparency about how businesses are ranked, or introduce friction into how users find contact information, consumers and businesses would have limited incentives or opportunities to migrate to competing platforms. The broad market share, brand recognition, and user familiarity with Google's offerings mean that even a sustained and noticeable decline in quality would not drive users or businesses to lesser-known, narrower directories. The unique trust and extensive reach that Google's integrated directory services command result in an inelastic demand with respect to quality, ensuring that users and content providers remain locked into its ecosystem.

74. In practical terms, this means that Google's integrated directory information services—spanning from Google Maps-based listings to featured snippets that obviate the need to visit third-party sites—constitute a non-substitutable resource for many users and businesses. The absence of equally influential competitors and the entrenched trust users place in Google's results provide Google with leverage that allows it to regulate visibility, control referral pathways, and shape market outcomes. Thus, directory information services, including those delivered through Google's GSE platform, can be identified as a relevant antitrust market. The SSNDQ analysis confirms that the combination of high user dependence, few practical substitutes, and Google's dual role as both information gateway and competitor creates precisely the conditions in which anticompetitive conduct can thrive, warranting careful scrutiny under antitrust law.

75. The United States constitutes a relevant geographic market for the directory information and related search services at issue. Cultural norms, regulatory frameworks, and consumer preferences differ significantly from those in other regions, affecting the way users interact with directories and the expectations placed on data accuracy, reliability, and transparency.

Local regulations, language use, and the nature of domestic advertising markets further distinguish U.S. conditions. Within this unique environment, Google's dominance is particularly pronounced. Google possesses and exercises market power in the U.S. directory information market, imposing nontransparent and discriminatory conditions that harm consumers and businesses alike. Upon information and belief, nearly half of information directory searches begin and complete on Google, and Google may possess monopoly power, pending discovery.

76. Reverse search services comprise a significant portion of the directory information services market. Pursuant to *Brown Shoe Co., Inc. v. United States* (370 U.S. 294 (1962)), and because market contours are a matter for fact-finding by a jury, the directory search services market may be narrowed to the reverse search services market alleged in the prior operative complaint.

### *There Exists a Single-Brand Relevant Market for Google Organic Traffic*

77. There exists a single-brand market for Google-referred traffic. This market aligns with the principles established in *Eastman Kodak Co. v. Image Technical Services, Inc.* 504 U.S. 451 (1992)), where the Supreme Court recognized that a single brand can constitute a separate market under certain conditions. Google's dominance and control over its search platform creates a distinct market with significant antitrust implications. Consumers inherently trust Google's search results due to the company's reputation for delivering relevant and authoritative information. This trust bestows upon Google-referred websites a perceived quality and legitimacy that is not easily replicated through other channels. For many users, the act of "Googling" has become synonymous with searching the internet, further entrenching Google's brand as the primary gateway to online content.

Consequently, websites heavily depend on Google's organic search traffic to reach their audience and remain competitive.

78. The lack of viable substitutes reinforces this single-brand market characterization. While alternative search engines like Bing or Yahoo exist, their combined market share is negligible compared to Google's overwhelming dominance, which accounts for approximately 90% of search queries. For most businesses, the traffic derived from these alternatives is insufficient to sustain operations or achieve meaningful market presence. This reality mirrors the circumstances in *Kodak*, where customers had limited options for servicing their equipment despite the theoretical availability of alternatives.

79. Google's control over access to its GSE ecosystem allows it to exert significant influence over downstream markets such as this. By adjusting algorithms, prioritizing its own services, or selectively enforcing policies, Google can effectively determine which websites receive visibility and which are relegated to obscurity. This conduct has profound anticompetitive effects, as it enables Google to favor its own offerings and stifle competition without regard to the merits of the content or services provided by independent websites.

80. Moreover, website owners face substantial barriers to switching away from reliance on Google. Investing in search engine optimization (SEO) tailored to Google's algorithms requires considerable resources, and the knowledge and practices involved are often not transferable to other platforms. Additionally, consumers' entrenched preference for Google means that efforts to redirect marketing strategies toward alternative search engines or platforms yield minimal returns. These high switching costs and dependencies further support the single-brand market definition.

81. This market maintains and exploits Google's monopoly power in GSE. Google's dominance in this single-brand market is further confirmed by the application of the Small but Significant and Non-Transitory Decrease in Quality (SSNDQ) test. Because these services are provided at zero monetary cost, quality becomes the key metric of competition. If Google were to reduce its transparency, alter its algorithm to favor certain partners more overtly, or otherwise degrade the quality of the referral process, neither users nor developers could effectively turn to alternative platforms. Rival search engines, holding negligible market shares, could not provide a comparable audience or deliver sufficient traffic to sustain most websites. This inelasticity with respect to quality illustrates that even a seemingly modest decline in service quality would not prompt users or developers to abandon Google. Instead, Google would retain control and continue to reap the benefits of its self-preferencing conduct, thereby entrenching its market power and compounding the anticompetitive harm. In such an environment, a small but significant and non-transitory deterioration in the services offered still fails to induce market entry or user migration, confirming the tightly defined, single-brand character of this market and its susceptibility to anticompetitive abuses.

### *United States Internet Content Access Market*

82. General search engines and smartphone application distribution platforms, taken together, constitute a relevant antitrust market in which American consumers access the vast majority of internet content. In this "United States Internet Content Access Market," two dominant entities—Google and Apple—collectively control the primary channels or "on-ramps" by which users discover and engage with online information. Apple, through its near-total control over U.S. smartphone application distribution (i.e. the App Store),

captures roughly 80% of user time and attention. Concurrently, Google, with its dominance in general web search, covers approximately 20%. While these shares reflect different methods of accessing content (apps versus websites), their combined result is that nearly 100% of meaningful content discovery and referral in the United States flows through this duopolistic structure.

83. This market is unique because it combines two historically distinct access points—web search and smartphone apps—into a single, functionally integrated ecosystem. Users now rely heavily on dedicated apps for the bulk of their media consumption while still turning to websites for particular content and services. Developers and content providers, in turn, must engage with and adapt to the policies and technical frameworks set by Apple and Google. Attempts to bypass one channel push content providers into the other's domain, yet Apple's restrictive policies (including limitations on API access for website-to-app functionalities) and Google's entrenched dominance in web indexing and referrals create a lockstep environment. This environment forecloses meaningful competition by ensuring no viable alternate routes exist for large-scale consumer reach. The lack of substitutes is stark: no independent suite of tools outside Apple's App Store or Google's search ecosystem can deliver comparable breadth and audience access. Even the creation of new platforms or distribution methods faces insurmountable barriers due to the duopolists' preexisting scale, incumbency advantages, and user habits.

84. OkCaller faced exclusion from both duopolists. After asserting its patent infringement claims against Apple in 2016, its App dropped off the Top Ten App Store list, where it had enjoyed years of leading position. And in 2022, Google dropped OkCaller. Hence Plaintiffs had no reasonable access to internet content access markets for their product.

85. The Small but Significant and Non-Transitory Decrease in Quality (SSNDQ) test illustrates the inelasticity of demand in this market. Were Apple and Google, acting individually or in tacit coordination, to degrade the quality of their services—whether by injecting biased results, restricting developer access, or erecting additional barriers to entry—consumers and content providers would find no adequate substitutes capable of achieving similar nationwide reach and immediacy. Users who wish to access internet content would have nowhere else to turn for comprehensive coverage and seamless convenience. Developers dependent on these platforms to reach audiences would lack practical alternatives to bypass Apple's App Store restrictions or Google's indexing algorithms. This lack of elasticity in response to a reduction in quality or fairness confirms that the United States Internet Content Access Market is distinct and subject to antitrust scrutiny. Absent competitive pressure, Apple and Google can maintain or impose conditions detrimental to both consumer welfare and content innovation without facing the usual market-based checks.

86. In short, the United States Internet Content Access Market—encompassing both app-driven content access dominated by Apple and web-based search dominated by Google—forms a relevant antitrust market. The severe concentration, the absence of reasonable substitutes, and the inelasticity demonstrated by the SSNDQ framework substantiate that these combined on-ramps to the internet represent a definable and critical market for antitrust analysis. The US is an appropriate geographic market, given the aforementioned language and cultural issues for content preferences.  Google and Apple collectively monopolize this market as a duopoly.

**ANTICOMPETITIVE INJURY**

87. Google's unlawful maintenance of monopoly power and exclusionary conduct within and across the relevant markets identified—general search services, vertical search providers, directory information services, and the single-brand market for Google-referred traffic— have inflicted substantial anticompetitive harm on consumers, developers, and the broader internet ecosystem. Google's dominance, combined with its use of exclusionary agreements, self-preferencing, and non-transparent algorithmic practices, has produced a marketplace where competitors struggle to gain visibility, scale, or meaningful access to users, thereby stifling innovation and diminishing the overall quality of services available.

88. By leveraging its position at the core of online content discovery, Google has substantially foreclosed competition in general search and directory-related services, effectively protecting the majority of U.S. search queries and directory lookups from any meaningful rival. This foreclosure takes multiple forms. First, Google's actions exclude would-be competitors, including reverse phone search and general search alternatives, from effective distribution channels. Such conduct denies rivals the necessary scale to compete effectively, reinforcing Google's entrenched dominance.

89. Second, Google fragments and restricts other potential distribution paths for vertical search providers and directory services, ensuring that even if a competing service emerges, it cannot achieve sufficient audience reach. As a result, barriers to entry rise steeply, excluding competition at critical emerging access points on both desktop and mobile devices. Reduced competition in these markets not only limits choices for consumers but also discourages the development of new or improved search technologies that might otherwise arise in a more open marketplace.

90. The absence of vigorous competition and the resulting imbalances in bargaining power have real-world consequences. The House of Representatives Subcommittee Report on Antitrust in Digital Markets, which has been referenced in and is incorporated into this Amended Complaint, documents analogous injuries befalling specialized search providers. These documented harms resonate directly with the conditions faced by Plaintiffs and similar businesses in these defined relevant markets, confirming that the restraints imposed by Google's market conduct are neither hypothetical nor distant—they are pressing, tangible, and well-documented.

91. Moreover, Google's internal vertical search and directory functionalities serve as reverse search (as a component of directory services) services that reinforce its dominance. By controlling the gateway to internet content and directing user queries to its own or preferred partners' offerings, Google ensures that would-be rivals in reverse search and related directory fields cannot rise to challenge its hegemony. Historical reliance on reverse phone lookups and person directory searches illustrates how a successful challenger could have diminished Google's monopolistic power, had it not been systematically excluded and undermined. Google's calculated fragmentation and marginalization of promising services like OkCaller, combined with the inability of general search rivals to gain a foothold, has undercut both consumer choice and developer opportunity, resulting in higher barriers to innovation and depressed quality of service.

92. In sum, the anticompetitive injuries inflicted by Google's conduct include, but are not limited to, suppressed innovation, reduced transparency, diminished consumer welfare, and the foreclosing of pathways for potential competitors to reach users at scale. These harms align squarely with the antitrust injury the Sherman Act seeks to prevent, and they

warrant the Court's careful scrutiny and the corresponding relief appropriate to restore competition and fairness to these vital markets.

**Putative Class Definitions**

93. Plaintiff Greenflight (and only this Plaintiff) brings this proposed class action pursuant to Fed. R. Civ. P. 23(b)(1), (2), and (3).

94. Greenflight brings this action on behalf of itself and the following nationwide classes, for monetary and injunctive relief based on violations of Sherman Act or State Competition Laws:

> *- All web developers whose VSPs or Directory Information Services for United States internet consumers were not indexed, or not effectively indexed, on Google Search, from four years prior to filing of this Complaint through the present. (Google GSE non-indexed class)*

> *- All web developers whose VSPs or Directory Information Services for United States consumers were suppressed in Google SERPs, and not ranked according to objective quality metrics, causing developer investment losses, from four years prior to filing of this Complaint through the present. (SERP metric transparency class)*

> *- All publishers who consumed Google Webmaster Tools/Search Console services and whose content was not indexed, or not fairly indexed, on Google Search, from four years prior to filing of this Complaint through the present. (GWT Content non-indexed class)*

95. Excluded from these proposed classes are the Google defendants (i.e. Alphabet); Google defendants' affiliates and subsidiaries; Google defendants' current or former employees,

officers, directors, agents, and representatives; and the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members.

96. **Numerosity:** The exact number of the members of the proposed classes is unknown and is not available to the plaintiffs at this time, but a reasonable estimate is that approximately 250,000 small developers submitted VSPs to Google Webmaster Tools / Search Console over the past five years.

97. **Commonality:** Numerous questions of law and fact are common to the claims of the plaintiffs and members of the proposed classes. These include, but are not limited to: a. Google Defendants willful violations of State Competition Laws directed at each class member; b. Google Defendants willful violations of Sherman Act; c. Whether plaintiff and members of the proposed classes are otherwise entitled to any damages, including treble damages, or restitution, and to their attorney fees, costs, and expenses related to any recovery of such monetary relief; and h. Whether plaintiff and members of the proposed classes are entitled to any damages, including treble damages, or restitution incidental to the declaratory or injunctive relief they seek, and to their attorney fees, costs, and expenses related to any recovery of such monetary relief.

98. **Typicality:** Plaintiff's claims are typical of the claims of the members of the proposed classes. The factual and legal bases of Google Defendants' liability are the same and resulted in injury to plaintiff and all of the other members of the proposed classes. The typicalness of these claims is evidenced by the fact they warranted entire sections in the House Report regarding specialized search services. To support apportionment of class compensation fund, web developers of VSPs may submit evidence of hours spent, resources dedicated, or monetary investments in non-indexed or ranking suppressed sites.

99. **Adequate representation:** Plaintiff will represent and protect the interests of the proposed classes both fairly and adequately. Plaintiff retained counsel able to engage, and experienced with, complex litigation and class actions. Plaintiff has no interests that are antagonistic to those of the proposed classes, and do not conflict with the interests of the proposed class members.

100. **Prevention of inconsistent or varying adjudications:** If prosecution of a myriad of individual actions for the conduct complained of were undertaken, there likely would be inconsistent or varying results. This would have the effect of establishing incompatible standards of conduct for the defendant. Certification of Plaintiff's proposed classes would prevent these undesirable outcomes.

101. **Injunctive and declaratory relief:** By way of its conduct described in this complaint, Google Defendants have acted on grounds that apply generally to the proposed classes. Accordingly, final injunctive relief or corresponding declaratory relief is appropriate respecting the classes as a whole.

102. **Predominance and superiority:** This proposed class action is appropriate for certification. Class proceedings on these facts and this law are superior to all other available methods for the fair and efficient adjudication of this controversy, given that joinder of all members is impracticable. Even if members of the proposed classes could sustain individual litigation, that course would not be preferable to a class action because individual litigation would increase the delay and expense to the parties due to the complex factual and legal controversies present in this matter. Here, the class action device will present far fewer management difficulties, and it will provide the benefit of a single

adjudication, economies of scale, and comprehensive supervision by this Court. Further, uniformity of decisions will be ensured.

## IV.   <u>VIOLATIONS ALLEGED</u>

**First Claim for Relief: Maintaining Monopoly of General Search Engines in Violation of Sherman Act § 2 (DOJ Verbatim Cause of Action)**

103.      Plaintiffs incorporate the allegations of paragraphs 1 through 102 above.

104.      General search engine services (GSE) in the United States is a relevant antitrust market and Google has monopoly power in that market.

105.      Google has willfully maintained and abused its monopoly power in GSEs through anticompetitive and exclusionary distribution agreements that lock up the preset default positions for search access points on browsers, mobile devices, computers, and other devices; require preinstallation and prominent placement of Google's apps; tie Google's search access points to Google Play and Google APIs; and other restrictions that drive queries to Google at the expense of search rivals.

106.      Google's exclusionary conduct has foreclosed a substantial share of the general search services market.

107.      Google's anticompetitive acts have had harmful effects on competition and consumers. Google has leveraged this monopoly to injure downstream VSPs and Directory Services as a whole by reducing competition and consumer choice. Plaintiffs are consumers of Google GSE platform through their provision of content via tools like GWT. Plaintiffs are competitors under [proposed] DOJ and [active] EU regulations to permit competing developers access to Googlebot data. (*added*)

108.      The anticompetitive effects of Google's exclusionary agreements outweigh any procompetitive benefits in this market, or can be achieved through less restrictive means.

109.     Google's anticompetitive and exclusionary practices violate Section 2 of the

Sherman Act, 15 U.S.C. § 2.

**Second Claim for Relief: Maintaining Sherman Act § 1 Unreasonable Restraints of Trade in the GSE, VSP, and Directory Services, Internet Access, and Google Single-Brand Content Markets**

110.     Plaintiffs incorporate the allegations of paragraphs 1 through 102 above.

111.     This cause of action is brought under Section 1 of the Sherman Act, 15 U.S.C. § 1,

which prohibits "[e]very contract, combination in the form of trust or otherwise, or

conspiracy, in restraint of trade or commerce among the several States, or with foreign

nations."

112.     Google has entered into and enforced agreements, as well as engaged in unilateral

and bilateral practices, that have unreasonably restrained trade in multiple markets,

including the general search services market, vertical search provider (VSP) market,

directory information services market, internet content access, and single-brand Google-

referred traffic market. Through these arrangements and practices, Google systematically

suppresses competitors, including Plaintiffs, who depend on fair and non-discriminatory

access to search referrals and indexing.

113.     Google's anticompetitive agreements with strategic partners and its exercise of raw

gatekeeper power have forced independent developers and specialized search providers to

operate under conditions that drastically limit their ability to obtain visibility and scale.

This coercion takes many forms, from prioritizing websites that spend heavily on Google

Ads to entering into exclusionary agreements—such as the so-called ISA Agreement with

Apple—which collectively lock up crucial distribution channels and preserve Google's

entrenched position.

114.    As illustrated by industry examples, Google commonly prefers entities that amplify its advertising revenues or strategic interests. For instance, in *Dreamstime*, a vertical image search service alleged that Google manipulated SERP rankings to favor certain partners, such as Getty Images, over independent rivals. Similarly, Plaintiffs here witnessed Google removing or demoting millions of OkCaller pages and other independent content providers' listings, effectively diverting user traffic to Google's own properties or those of favored partners. This discrimination distorts competition and impairs the very competitive process that the Sherman Act is designed to protect.

115.    This conduct amounts to more than mere unilateral self-preferencing; it arises from explicit and implicit understandings, arrangements, and contractual obligations that preserve Google's supremacy. By structuring relationships and technical policies that require dependency on Google's platform, Google's actions have reduced consumer choice, limited innovation, and forced independent developers to shoulder increased costs or risk invisibility. Ultimately, competitors cannot effectively challenge Google or maintain their presence without acceding to its restrictive conditions.

116.     These agreements and concerted actions serve no legitimate procompetitive purpose and do not improve consumer welfare or enhance market efficiency. Even under a rule-of-reason analysis, any claimed benefits are decisively outweighed by the anticompetitive harms. The restraints at issue harm both consumers—who lose access to diverse and innovative content—and developers—who face artificially inflated costs and suppressed opportunities. Under a per se or rule-of-reason framework, Google's practices constitute unreasonable restraints of trade.

117.     As a direct and proximate result of Google's unreasonable restraints of trade, Plaintiffs and members of the proposed class have suffered tangible antitrust injury, including lost revenue streams, reduced market shares, increased operational costs stemming from the need to placate Google's ranking algorithms or purchase supplementary advertising to be seen at all, and diminished opportunities to introduce new or improved services. Such injuries are precisely the type of harm that the Sherman Act is intended to prevent.

118.     Plaintiffs and the class members are entitled to damages, including treble damages under the Clayton Act, and to injunctive relief preventing Google from continuing and renewing these anticompetitive agreements and practices. A judicial remedy is necessary to restore competition, fairness, and innovation within these critical segments of the digital economy.

**Third Claim for Relief:** Refusal to Deal in Violation of Section 2 of the Sherman Act (Aspen Skiing Co. v. Aspen Highlands Precedent)

119.     Plaintiffs incorporate the allegations of paragraphs 1 through 102 above.

120.     Defendant Google LLC, by leveraging its dominant position in the general search engine market, has engaged in a unilateral refusal to deal with independent web developers and specialized content providers, such as Plaintiffs, in violation of Section 2 of the Sherman Act.

121.     Google has terminated longstanding and profitable business relationships with developers like Plaintiffs, who were previously able to rely on Google's search engine for traffic and revenue generation. This conduct is analogous to the behavior condemned by the Supreme Court in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585

(1985), where the Court held that a monopolist's refusal to deal with a competitor could give rise to a claim under Section 2 of the Sherman Act.

122.    *Aspen Skiing Co. V. Aspen Highlands Skiing Corp.* (472 U.S. 585, 1985) unequivocally broadens the examination of monopolistic behavior beyond the boundaries of market definition into the realm of exclusionary conduct. The Supreme Court has provided vital precedent, recognizing that a monopolist's refusal to deal with competitors, absent a credible efficiency rationale, can constitute a standalone concern under the purview of antitrust enforcement. The operative conduct under scrutiny is exclusion of rivals, not the defendant's power within a strictly defined market.

123.    Google's refusal to provide fair and equitable access to its search engine results constitutes exclusionary conduct intended to suppress competition and maintain its monopoly power. This refusal has resulted in significant harm to Plaintiffs and other class members, who have been denied access to a critical facility essential for competing in the market. Google sacrificed short-term profits, which they had received from OkCaller for a decade, to obtain long-term monopolistic gains (growth of their own directory and advertising ambitions), consistent with *Aspen* case law.

124.    As described in the preceding sections, OkCaller had a formidable and significant preexisting, profitable relationship with Google. OkCaller generated profits that represented around .1%, or 1/1000[th] of 2010 level profits. In the directory services niche, OkCaller vitally improved Google's abysmal SERPs from that timeframe, giving the search firm credibility and user satisfaction. In multiple regards, OkCaller was a profitable course of business amongst competitors, which terminated.  Google now shows -zero-

pages for OkCaller (or perhaps one page) which represents an effective termination of the critical volume necessary for a directory services site to function and operate.

125.     In addition, similar allegations by Yelp corroborate the conclusion that Google's refusal to deal is neither accidental nor justified by procompetitive aims. Yelp, a vertical search and directory provider, has publicly complained and initiated legal actions alleging that Google systematically favors its own products, steering users to "clickless" search results and Google Business Listings instead of directing them outward to independent providers like Yelp or Plaintiffs. Its complaint provides compelling evidence and market research incorporated herein. This broader pattern reinforces the absence of a legitimate business justification for Google's sudden withdrawal of cooperation. Rather than improving efficiency or enhancing user experience, Google's conduct aligns with a calculated strategy to diminish the visibility of competitors, reduce external innovation, and foreclose opportunities for rival services. Taken together, these facts further confirm that Google's refusal to deal, as alleged here, is precisely the sort of exclusionary, competition-harming conduct that *Aspen Skiing* proscribes. It also cannot be ruled out that Google sought to eliminate competition by retaliating against antitrust advocates, which is the case for both OkCaller and Yelp.

126.     As a direct and proximate result of Google's refusal to deal, Plaintiffs and the members of the proposed class have suffered economic injury, including loss of revenue, diminished market share, and increased costs. Google's conduct is a clear violation of Section 2 of the Sherman Act, and Plaintiffs are entitled to damages, including treble damages, and injunctive relief to prevent further harm.

127.     Plaintiffs similarly invoke all four elements of related MCI exclusionary conduct caselaw. *MCI Communications Corp. v. American Tel. & Tel. Co.,* 708 F.2d 1081 (7th Cir.), cert. denied, 464 U.S. 891 (1983), a case challenging AT&T's use of local telephone networks to thwart competition in the long distance telephone service market. There, the court held that "to establish liability under the essential facilities doctrine [a plaintiff must show]: (1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility." Id. at 1132-33."

128.     Here, Google controlled access to general and reverse search customers, OkCaller and Greenflight could not reasonably duplicate the facility, Google denied use of the facility by deindexing OkCaller, and Google could have, and did for a decade, feasibly provided the facility.

**Fourth Claim for Relief:  Violation of California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, et seq.)**

129.     Plaintiffs incorporate the allegations of paragraphs 1 through 97 above.

130.     Defendant Google LLC has engaged in unlawful, unfair, and fraudulent business practices in violation of California's Unfair Competition Law (UCL), Cal. Bus. & Prof. Code §§ 17200, et seq. These practices include, but are not limited to, monopolistic and anticompetitive conduct that has harmed Plaintiffs and the proposed class.

131.     Google's conduct, as detailed in the preceding counts, constitutes unlawful business practices in violation of the UCL because it violates the Sherman Act, as well as other federal and state laws.

132.     Google's actions have misled and deceived consumers, publishers, and developer competitors regarding the nature and operation of its search engine, including the manipulation of search rankings to favor its own products and those of its strategic partners while disadvantaging independent developers and specialized content providers, such as Plaintiffs. In short, consumers and developers believe their Google queries result in a reasonably fair and competitive SERP result, but this is often untrue. Google does not disclose when it provides unfair or self-preferencing SERP results, which violates UCL. Transparency metrics are needed to comply with UCL.

133.     Google's practices are also unfair within the meaning of the UCL because they offend established public policy, are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers, web developers, and specialized content providers. Google's conduct has had the effect of stifling competition, reducing innovation, and causing significant financial harm to Plaintiffs and the class. Google breached its duty to disclose by the aforementioned conduct, leading to significant losses of developer time and resources.

134.     Google's actions are unfair to the extent the developers invest substantial time, money, and resources to bring competitive services to consumers, but are squelched and (de)indexed or suppressed in Google Search. Similarly, Google's failure to implement transparent quality metrics, where developers could fairly compete and improve their work products, is unfair, especially given Google's two-decade timeframe to implement such metrics that are customary in other high volume disbursement allocations. Developer transparency would avoid wasted resources, and benefit consumers greatly, and therefore a monopolist like Google with 90% of the search market should provide such an offering.

135.    In fact, many users widely report to news media, reddit, and other industry forums that Google SERPs have gone steadily downhill, since the PageRank days of transparency, and are now near-unusable for many queries. Therefore, there exists evidence that higher transparency in previous days benefited users and publishers, because they were findable in SERPs. Google has substantial internal research concerning this subject and is requested to provide it on expedited basis should it file any dispositive motion on the UCL claim, which would be frivolous without providing such data.

136.    Google's actions are unfair and illegal to the extent the company retaliates against antitrust advocates, such as Plaintiffs. Beyond being unfair and un-American, the conduct violates federal witness protection statutes, including 18 USC 1512, and therefore is protected conduct under UCL. Plaintiff asserts elements of retaliation occurred, including a protected act – their previous federal antitrust advocacy, the aforementioned adverse events, and temporal proximity between these events. Plaintiffs seeks expedited production by Google of evidence surrounding the termination of OkCaller. Plaintiffs, as alleged, submit that Google has stonewalled reasonable requests for over one year, effecting a DARVO campaign to blame Plaintiffs for simple inquiry into antitrust matters.

137.    Google's undue influence and conduct towards VSPs, directory services, and internet content access methods violates the spirit of State Competition Laws like UCL, even if Defendant is not found guilty of directly monopolizing the relevant Sherman markets.  UCL considers incipient monopolies, including the duopoly claims, and leverage of realistic market conditions beyond traditional Sherman relevant market theory.

138.     As a direct and proximate result of Google's deceptive and unfair trade practices, Plaintiffs and the members of the proposed class have suffered economic injury, including loss of revenue, diminished market presence, and increased operational costs.

139.     This California State Competition Law is invoked extra-jurisdictionally. Google's headquarters is situated in Mountain View, California. Many of the decisions to violate Sherman Act, and engage in anticompetitive conduct, are executed in California. Therefore UCL should apply to redress such conduct.

140.     As a direct and proximate result of Google's unlawful, unfair, and fraudulent business practices, Plaintiffs and the members of the proposed class have suffered economic injury, including loss of revenue, diminished market presence, and increased operational costs.

141.     Plaintiffs, on behalf of themselves and the proposed class, seek restitution, disgorgement of profits, and injunctive relief, and implementation of reasonable transparency measures and/or arbitration rights to challenge SERPs, to prevent Google from continuing its unlawful, unfair, and fraudulent practices, as well as any other relief deemed just and proper by the Court.

**Fifth Claim for Relief: Illegal Duopoly Control of the U.S. Internet Content Access in Violation of Section 2 of the Sherman Act.**

142.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

143.     In addition to holding monopoly power in the general search engine (GSE) market, Google exercises control over U.S. internet content access in concert with Apple, forming a duopoly that effectively dominates all meaningful channels by which consumers access

online information. Apple controls the lion's share—approximately 80%—of user attention and engagement through its near-total control over smartphone app distribution, while Google, with its dominance in general web search, commands the remaining 20%. Although this division might initially appear to reduce Google's relative share, the reality is that the two firms together foreclose nearly 100% of practical avenues for content discovery, leaving content developers, publishers, and specialized service providers with no viable alternatives.

144.     Despite holding the smaller share of this duopoly, Google cannot escape liability under Section 2 of the Sherman Act. Its 20% slice of the entire U.S. internet content access market is no modest piece—it represents the entirety of web-based content referral for the vast majority of consumers. This 20% sector, controlled by Google, remains subject to Google's established 90% share of the GSE market. Google's entrenched monopoly power in GSE thus informs and reinforces its critical role within the duopoly. In other words, Google's arguments that Apple's dominance in app distribution somehow absolves Google of accountability would be misplaced. The existence of a duopoly does not immunize a participant from scrutiny; rather, it underscores the joint stranglehold the two firms have on the essential pathways for content distribution and audience reach.

145.     The harm to Plaintiffs and the class members is substantial. With Google and Apple controlling all major "on-ramps" to online content, independent developers and specialized service providers cannot reach consumers at scale without bending to the terms set by these two giants. Google, as gatekeeper to web-based discovery, decides which sites merit visibility and which remain obscure, effectively determining winners and losers. Without competitive pressure from new entrants or meaningful substitutes, Plaintiffs and similarly

situated developers face suppressed innovation, limited revenue opportunities, and diminished consumer choice. The SSNDQ analysis applies here as well: even if Google and Apple were to degrade quality—by introducing more restrictive conditions, reducing transparency, or further self-preferencing their own offerings—users, developers, and publishers would remain effectively "locked in" due to the absence of alternate large-scale distribution platforms.

146.     Google's integral role in this duopoly, combined with its acknowledged monopoly power in GSE, means Google cannot disclaim responsibility by pointing to Apple's complementary control over app-based content. Both firms' actions—and Google's in particular—serve to exclude competition at critical nodes of discovery, maintain artificially high barriers to entry, and enforce conditions that stifle innovation and consumer welfare. This stable two-firm environment, in which Google is an essential partner, replicates the economic harms characteristic of single-firm monopolies. By jointly foreclosing competitive channels and reinforcing each other's entrenched market positions, the duopoly has created a scenario where anticompetitive conduct thrives, preventing Plaintiffs and the class from participating fairly in the digital marketplace.

147.     The presence of two coordinated or interdependent firms controlling the entire content access ecosystem does not excuse or attenuate Google's antitrust liability. Rather, it highlights how Google's longstanding exclusionary conduct and competitive abuses fit neatly into a broader environment designed to deny rivals any meaningful route to consumers. As a direct and proximate result of these conditions, Plaintiffs and class members have suffered economic harm, restricted opportunities, and diminished returns on investment and innovation, all of which the Sherman Act exists to prevent.

148.     Therefore, Google's active participation and central role within this duopolistic structure, combined with its already recognized monopoly power in GSE, constitute an illegal maintenance of market power and a violation of Section 2 of the Sherman Act. Plaintiffs and the class members are entitled to all available remedies under law, including injunctive relief and treble damages, to restore competition, encourage innovation, and safeguard the fundamental principles of a competitive digital economy.

## V.     <u>REQUEST FOR RELIEF</u>

WHEREFORE, to remedy these illegal acts, The Plaintiffs and class members respectfully request that this Honorable Court:

A.  Certify this case as a web developer and publisher class action lawsuit and that it certify the proposed federal law classes on a nationwide basis for all content products that were improperly (de)indexed, or subject to SERP ranking suppression, between today's filing date and four years prior.

B.  Adjudge and decree that Google has acted unlawfully to monopolize the general search engine market in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; and leveraged this monopoly to injure competition in the VSP, directory services, and single-brand organic traffic markets.

C.  Enjoin Google from continuing to engage in the anticompetitive practices described herein, including duopoly conduct in the internet content access markets, and from engaging in any other practices with same purpose or effect as the challenged practices, including but not limited to:

    a.  Failing to offer transparent evaluation metrics of VSPs and web developer work products; or failing to rank and index these work products on objective and transparent evaluation standards.

    b.  preventing Google from leveraging its GSE monopoly to exploit web developers, business partners, consumers, or others to obtain, maintain, extend, or entrench a monopoly.

D.  Order treble damages compensating the Class Members through a "Developer Compensation Fund" based on developer submission of damages computed by project expenditures, dedicated person-hours, and other metrics, estimated in the billions[3] USD; and to Lead Plaintiffs:

    a.  Plaintiff Greenflight and its owners, which suffered actual losses of no less than $80 million in goodwill, revenue, and loss of investment opportunity for its software app portfolio including OkCaller, FactMed, and other VSPs, directory services, or internet content.

E.  Permit trial by jury for all claims herein.

F.  Award each Plaintiff, as applicable, an amount equal to its costs, including reasonable attorneys' fees, incurred in bringing this action.

G.  Grant any further relief as may be fair and just, including applicable California UCL redress and permanent injunctive orders.

---

[3] By creating an inefficient bottleneck on the entire US VSP market, Google put itself in a precarious liability position for lost value creation. Take for example a competitive VSP, never ranked in Google SERPs due to Defendants' preferencing of its own or strategic partners' VSP. If Google blocked just one single web SVP app from succeeding at the $1 billion valuation, it would be liable for $3 billion (3x) under Sherman act. Our estimate assumes at least three hundred SVP apps were suppressed or improperly (de)indexed, which would have been competitive in a transparent GSE service, each with an average valuation of $10million. Given these conservative estimates, it is evident Google's conduct causes a sizeable antitrust injury to the US economy and warrants a considerable Developer Compensation Fund.

Respectfully submitted, this 9th day of December 2024.

/s/ Ayelet Faerman _____                         /s/ Jeffrey Isaacs _____
Ayelet Faerman, Esq.                               Jeffrey D. Isaacs, M.D.
Faerman Law P.A.                                   11482 Key Deer Circle
3859 NW 124 Ave                                    Wellington, FL 33449
Coral Springs, FL 33065                            212-257-0737
954-271-8484                                        jeffreydi@gmail.com
ayelet@faerman.law
*Counsel for Greenflight Venture Corporation*

/s/ Keith Mathews
Keith Mathews
Attorney for Plaintiff
*Pro Hac Vice*
NH Bar No. 20997
American Wealth Protection
Manchester, NH 03105
Ph. 603-622-8100
keith@awplegal.com

## DEMAND FOR JURY TRIAL

In accordance with FRCP 38, Plaintiff and Class Members hereby request a trial by jury.

Executed on this 9th day of December 2024.
/s/ Ayelet Faerman _____                         /s/ Jeffrey Isaacs _____
Ayelet Faerman, Esq.                               Jeffrey D. Isaacs, M.D.

/s/ Keith Mathews
Keith Mathews
*Pro Hac Vice*