Ayelet Faerman, Esq.
Faerman Law P.A.
3859 NW 124 Ave
Coral Springs, FL 33065
954-271-8484
ayelet@faerman.law
Attorney for Plaintiff


## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF FLORIDA


| | |
|---|---|
| GREENFLIGHT VENTURE CORPORATION<br>*on behalf of themselves*<br>*and all others similarly situated*<br><br>     Plaintiff,<br><br>vs.<br><br>GOOGLE LLC<br><br>     Defendant. | Case No. **24-cv-80395-RLR**<br><br><br>**PLAINTIFF'S OBJECTION TO<br>GOOGLE'S MOTION TO DISMISS** |

TABLE OF AUTHORITIES------------------------------------------------------------------------------------ii

INTRODUCTION---------------------------------------------------------------------------------------------1

LEGAL STANDARD------------------------------------------------------------------------------------------2

ARGUMENT --------------------------------------------------------------------------------------------------2

    I.    Greenflight Venture Corporation Has Antitrust Standing--------------------------------------2

    II.    Count II Adequately Alleges Relevant Sherman Markets and Agreements --------------------6

    III.    Count III States a Claim for Refusal to Deal Under The *Aspen* Exception --------------- 12

    IV.    Count IV States a Claim Under California Unfair Competition Law --------------------- 14

      A.    "Unlawful" Prong ------------------------------------------------------------------------ 15

      B.    "Unfair" Prong --------------------------------------------------------------------------- 16

      C.    "Fraudulent" Prong---------------------------------------------------------------------- 17

    V.    Duopoly Control of U.S. Internet Content Access Violates Sherman Act § 2 -------------- 18

CONCLUSION ---------------------------------------------------------------------------------------------- 20

CERTIFICATE OF SERVICE -------------------------------------------------------------------------------- 22

# TABLE OF AUTHORITIES

## CASES

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir. 1999) ................................................ 9

*American Tobacco Co. v. United States*, 328 U.S. 781 (1946) ....................................................... 19

*Apple Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008) ............................................ 9

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ........................................................................................ 2

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985) ................................................. 12

*Associated Press v. United States*, 326 U.S. 1, 12 (1945) ......................................................... 8

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 553 (2007).................................................................. 2

*Blue Shield of Va. v. McCready*, 457 U.S. 465 (1982) ..............................................................3, 5, 7

*Brown Shoe Co. v. United States*, 370 U.S. 294, 322 (1962) ............................................................... 3

*Camacho v. Auto. Club of S. Cal.*, 142 Cal. App. 4th 1394, 1403 (2006).......................................... 16

*Comm. on Children's Television, Inc. v. Gen. Foods Corp.*, 35 Cal. 3d 197, 214 (1983) .................... 18

*Dreamstime.com, LLC v. Google LLC*, 470 F.Supp.3d 1082 (2020) .................................................. 17

*Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 257 (2010) ..............................16, 17

*Duty Free Americas, Inc. v. Estee Lauder Cos*., 797 F.3d 1248, 1262 (11th Cir. 2015) ......................... 2

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992) ........................................ 9

*FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986) ........................................................ 6

*In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 361 (3d Cir. 2004) ..................................................... 11

*In re High-Tech Employee Antitrust Litig.*, 856 F. Supp. 2d 1103, 1117 (N.D. Cal. 2012) .................. 16

*In re Tobacco II Cases*, 46 Cal. 4th 298, 312–13 (2009) ...................................................................... 18

*Interstate Circuit*, 306 U.S. 208, 226–27 (1939) .............................................................................. 20

*Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1545 (11th Cir. 1996)................................. 10

*Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007) ....................................... 15

*Mayor & City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) .................. 16

*Midwest Gas Servs., Inc. v. Indiana Gas Co.*, 317 F.3d 703 (7th Cir. 2003) ..................................... 19

*Nat'l Indep. Theatre Exhibitors, Inc. v. Buena Vista Distrib. Co.*, 748 F.2d 602, 608 (11th Cir. 1984).................. 11

*Newcal Indus., Inc. v. IKON Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008) ........................... 10

*Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1073 (10th Cir. 2013) ............................................ 13

*Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018) ..................................................................... 3

*Pacific Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 448 (2009) ...................................... 12

*Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1299 (11th Cir. 2010)...................... 4, 9

*Realcomp II, Ltd. v. FTC*, 635 F.3d 815, 827–28 (6th Cir. 2011) ..................................................... 8

*South Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861, 886 (1999) ................. 17

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989) .......................... 8

*Todd v. Exxon Corp.*, 275 F.3d 191, 199–200 (2d Cir. 2001)............................................................ 6, 10

*United States v. Kottwitz*, 614 F.3d 1241, 1261 (11th Cir. 2010) ...................................................... 15

*United States v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001) ................................................. 11

*US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 63–64 (2d Cir. 2019)..................................... 19

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408–09 (2004) ............................. 12

*Westchester Day School v. Vill. of Mamaroneck*, 504 F.3d 338, 356 (2d Cir. 2007) ......................... 7, 14

## STATUTES

18 U.S.C. § 1512................................................................................................................................ 15

Cal. Bus. & Prof. Code § 17200 ...................................................................................................... 15

## OTHER AUTHORITIES

C. Scott Hemphill & Tim Wu, "Parallel Exclusion," 122 Yale L.J. 1182 (2013) ............................... 20

TREATISES

Richard Posner, *Antitrust Law* 33 (2001). ............................................................................................................. 1

REGULATIONS

Fed. Trade Comm'n, "Enforcement Policy Statement on Deceptively Formatted Advertisements" (2015).................. 15

**GREENFLIGHT'S OBJECTION TO GOOGLE LLC'S MOTION TO DISMISS**

**INTRODUCTION**

In opposing Google LLC's Motion to Dismiss, it is important to summarize the current Big Tech antitrust backdrop to the Court. The Sherman Antitrust Act was enacted in 1890 "against a background of perceived cartelization and monopolization of the American economy." Richard Posner, *Antitrust Law* 33 (2001). Though often referred to colloquially as "Big Tech," the cartelization presently facing Americans surpasses even the worst nightmares of the 19th-century drafters of the Sherman Act. Not only are the modern monopolies larger by orders of magnitude (even when adjusted for inflation) than the classic textbook antitrust example of the British East India Company, but they have embedded themselves deeply into cultural control and possess surveillance capabilities previously confined to the realm of science fiction or Orwell's *1984*.

The near-unanimous consensus that these powerful technology monopolies require imminent action illustrates the severity of the crisis. Yet massive lobbying and censorship efforts by Big Tech itself have complicated reform. Congress, for instance, issued a comprehensive subcommittee report several years ago urging district courts not to underenforce the Sherman Act. Bipartisan Senate efforts to regulate Big Tech enjoyed over 70% public approval—yet they were blocked from a floor vote under the weight of intense joint lobbying by Google and Apple. Both major political parties' executive branches have, for much of the past five years, openly acknowledged the dangers of Big Tech's grip. Last week, President Joe Biden warned "an oligarchy is taking shape in America, of extreme wealth, power, and influence that literally threatens our entire democracy, our basic rights and freedoms and a fair shot for everyone to get ahead."[1]

Despite these high-level acknowledgments, Big Tech systemically squelches legitimate antitrust inquiries at an early stage. Their success at doing so is facilitated by general assumption that because of these companies' large market valuations, they represent "American success stories" that must be safeguarded. That logic is misguided and inherently false. As undersigned counsel has contended for nearly five years, Big Tech stifles new value creation by smaller competitors— innovators who collectively could yield American success and broader equity creation dwarfing the present oligopoly market cap. Even Facebook's Mark Zuckerberg recently concurred, disclosing that Meta would "easily double" in value if not for duopolistic control by two major tech companies. He also made an allegation that resonates powerfully with the Second Amended Complaint: Apple, he

---

[1] In addition to domestic concerns, some forty other countries have determined that the Google-Apple duopoly engages in anticompetitive conduct that harms their citizens.

claimed, has not substantially innovated in twenty years and instead simply wields unilateral control for profit. The SAC makes a similar argument: Google has, in effect, *worsened* its core GSE product to gain even more control, while reaping larger profits within the growing duopoly. These entities are not the GE and Boeing of yesteryear, commanding profits from world-class innovation[2] and leadership. Instead, they increasingly demand profits.

From a forest and trees perspective, the present MTD aims to thwart legitimate Sherman Act scrutiny by appealing primarily to technical distinctions regarding the definition of relevant markets. Google cannot dispute President Biden's statement that the tech oligopoly threatens democracy—if it cannot do so in its reply, the Court should deny this MTD at the outset. Indeed, *none* of the MTD's technical reasons for dismissal appear in the plain text of the Sherman Act, which spans only a paragraph and plainly covers egregious monopolization such as modern tech monopolies. The *Brown Shoe* line of cases and other derivative precedents were developed in the context of century-old industrial pricing formulas, whereas today's "free" digital products require scrutiny under the Act's *original* broad mandate to prohibit anti-competitive restraints on trade. The rising threats of cartelization have evolved, but the statute's text remains sufficient to address them.

Nonetheless, in the following sections, Plaintiffs demonstrate that even under the *Brown Shoe* standards—misapplied here by Google—the SAC adequately alleges antitrust violations. The MTD's technical contentions fail, both legally and factually, when tested against Supreme Court and Eleventh Circuit case law. Google's arguments regarding market definitions, standing, and multi-sided platforms amount to disingenuous knit-picking to shield itself from scrutiny, disregarding the fundamental policy imperative underlying the Sherman Act.

## LEGAL STANDARD

When evaluating a motion to dismiss under Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint must contain sufficient factual matter to state a claim that is plausible on its face. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Antitrust claims are subject to the same pleading standards. *Duty Free Americas, Inc. v. Estee Lauder Cos*., 797 F.3d 1248, 1262 (11th Cir. 2015).

## ARGUMENT

### I.    Greenflight Venture Corporation Has Antitrust Standing

---

[2] Apple's competitive advantage, which ushered in the smartphone era, stemmed from Mac OS, the result of three decades of R&D with Xerox Palo Alto Research Center. Mr. Zuckerberg's comments apparently reference the contrast with recent failed R&D in Apple Car & Vision.

Antitrust cases involving complex market definitions are frequently ill-suited for resolution at the pleading stage, given the Supreme Court's admonitions to allow discovery in complicated factual disputes. *Brown Shoe Co. v. United States*, 370 U.S. 294, 322 (1962) (noting that market definition is a factual inquiry turning on "commercial realities" and "practical indicia"). Google's argument that Plaintiffs do not participate in the "general search services" market misconstrues both the *Amex* multi-sided platform framework and precedent on determining market contours by trial.

Plaintiffs, as direct users of Google's Webmaster Tools (GWT) and overall GSE services, plead that they have no meaningful alternative for distribution, making them effectively consumers of Google's platform. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018). Even if they are not themselves offering general search querying, they suffer inextricably intertwined injury from Google's alleged manipulation and self-preferencing. *Blue Shield of Va. v. McCready*, 457 U.S. 465 (1982). Because market power in GSE allows Google to withhold or degrade distribution, the alleged harm—OkCaller's dramatic traffic decline—flows directly from conduct in that market.

The Supreme Court in *Brown Shoe* recognized that market definition and the effects of alleged monopolistic behavior often involve intricate factual inquiries (e.g., cross-elasticities of demand, distribution channels, barriers to entry). 370 U.S. at 325–26. Here, Plaintiffs' theory rests on facts— such as behind-the-scenes ranking changes, data indexing decisions, exclusive default agreements, and new to the SAC – whether GWT is part of the GSE platform. Early dismissal would deny Plaintiffs any opportunity to substantiate these allegations. As recognized by *Twombly*, 550 U.S. at 556, plausible factual allegations – e.g. specialized markets – should be tested in discovery.

Nor can Google dismiss Plaintiffs' standing argument by insisting that GSE services and Google's Webmaster Tools (GWT) are categorically separate product markets. The GWT component is integral for content providers seeking visibility in that same platform. This is not simply "another market" for GWT. Rather, GWT is part of the multi-sided GSE ecosystem: *end-users* rely on Google to retrieve information, while *web developers* rely on Google for indexing and distribution. As such, Plaintiffs participate on the developer-facing side of the same GSE platform. The *Amex* decision unambiguously recognizes that certain platform markets involve two or more distinct user groups, and participants who provide content or specialized results can be deemed direct participants in that platform market. Plaintiffs use Google's platform to procure indexing and visibility (in exchange for content, search breadth, and ad revenue). In so doing, Plaintiffs effectively purchase distribution services in the GSE market; that is part and parcel of the "search ecosystem." Thus, they partake in the platform at the developer/content-provider side, even if end-user search queries are "free." The

3

Supreme Court in *Amex* held that platforms connecting multiple groups often comprise a single relevant market when each side depends on the other. 138 S. Ct. at 2285. Plaintiffs suffer immediate, direct harm when they are systematically excluded from the GSE's distribution side or forced to accept inferior ranking. Hence, they are "participants" in the GSE market in the sense recognized by multi-sided market jurisprudence.

 Google disputes that GWT and Google Search are "submarkets" or "separate products," but this is a factual question under *Brown Shoe*, and cannot be resolved at the Rule 12(b)(6) stage by Google's mere assertion. GWT represents the core interface through which content providers interact with, submit content, and optimize their presence in the Google Search results. For a multi-sided market, each side's participation is integral to the overall market's functioning. See *Amex*, 138 S. Ct. at 2286 (recognizing that each side of a multi-sided platform may rely on the other for the entire product to function effectively).

Google also fundamentally misrepresents and improperly dismisses Plaintiffs' allegations and standing arguments under the Sherman Act. Specifically, it misconstrues Plaintiffs' references to proposed Department of Justice (DOJ) and European Union (EU) regulations that seek to open Google's index data to potential entrants, including Plaintiffs—thus lowering the barriers to becoming a GSE competitor. Contrary to the MTD's assertion, there is no contradiction in Plaintiffs' stance. Merely because the SAC recognizes that creating a GSE historically required massive capital and scale (SAC ¶ 66) does not negate the possibility that new regulatory or remedial measures (SAC ¶ 107) could alter these economics. Reforms or forced data-sharing remedies would *reduce* entry barriers and enable developers to evolve their specialized search sites into more robust or broader GSE capabilities. That is entirely consistent with the notion that *absent* such measures, Google's monopoly power in indexing and distribution is insurmountable, leaving Plaintiffs and others foreclosed from the GSE market. Nothing in the law or logic prohibits Plaintiffs from alleging that Google's raw indexing data, if made available, would meaningfully reduce these hurdles and make OkCaller a plausible competitor to Defendant. Indeed, that is the point of the enforcement action.

The SAC alleges that OkCaller is not merely a passive recipient of traffic, but a prospective or nascent competitor in general search if provided fair access to indexing data. (SAC ¶ 107). Courts have recognized that a "nascent competitor" can have standing if the defendant's exclusionary conduct blocks that firm from entering or expanding in the relevant market. See *Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1299 (11th Cir. 2010) (acknowledging antitrust standing for potential entrants foreclosed from a market). The Eleventh Circuit in *U.S. Anchor Mfg.,*

*Inc. v. Rule Indus., Inc.* also applied the principle that potential competitors have standing to challenge a monopolist's exclusionary tactics. 7 F.3d 986, 995 (11th Cir. 1993). Because Plaintiffs allege that "[w]ith access to Googlebot's indexing raw data, [they] could, and would, develop competing GSE products" (SAC ¶ 7), the requisite "intent and preparedness" standard for potential competition is at least plausibly alleged at the pleading stage. *U.S. Anchor Mfg.*, 7 F.3d at 995. It is thus premature to dismiss for supposed lack of standing; discovery could reveal evidence supporting these nascent-competitor allegations. Google's conclusory remarks of "implausibility" fly in the face of the proposed DOJ remedy's intent.

Finally, Google's MTD incorrectly claims that Plaintiffs cannot rely on *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982), because OkCaller's de-indexing allegedly was not a "conduit" for harming rival GSEs:

> "There is no allegation (nor could there be) that Google's actions as to OkCaller.com were 'a conduit for the Defendant to harm competing search engines, such as Bing.'" (DE 53 at 5, analyzing *Blue Shield of Va. v. McCready*, 457 U.S. 465 (1982)).

But the Supreme Court in *Blue Shield of Va. v. McCready*, 457 U.S. 465 (1982), did not impose a rigid requirement that a plaintiff must act as a literal "conduit" for harm to a competitor in order to establish antitrust standing. Rather, the *McCready* Court's key holding is that a plaintiff may have standing if her injury is "inextricably intertwined" with the injury the defendant seeks to inflict on the broader market or on a particular competitor. Id. at 479–80. By fixating on "conduit," Google misreads the crux of *McCready*, which is about whether the plaintiff's harm flows directly from the anticompetitive conduct that sustains the defendant's monopoly. The Supreme Court explicitly stated that a plaintiff can recover if her injury is a "necessary step" in effecting the defendant's illegal scheme. Id. at 479. Even if one assumed McCready requires a "conduit" showing, Plaintiffs' allegations satisfy that test. The SAC pleads that by foreclosing OkCaller and similarly situated vertical or specialized sites, Google deprives potential or nascent rival GSEs—and the broader online ecosystem—of the scale, data, and user base needed to challenge Google's market dominance. (SAC ¶¶ 60–70, 107.) In effect, Plaintiffs are part of the critical pipeline of content that Google must either index or exclude. Suppressing independent content (i.e. slowly replacing OkCaller and Yelp) and funneling traffic to Google's own services is a "necessary step" in harming potential GSE entrants. This is precisely the "inextricable intertwinement" recognized in *McCready*. The SAC expands discussion of how sites like OkCaller indeed helped to build out Google's success.

Because Plaintiffs redefined the GSE market to include developer-facing tools, they no longer rely on being a mere "conduit." They are now direct participants (or "consumers") in that market, so

McCready's "inextricable intertwinement" flows naturally: blocking or downgrading OkCaller injures Plaintiffs as participants in GSE distribution. Moreover, the House Subcommittee's findings on "proliferating verticals" confirm Google's fear that specialized services could bypass or undermine general search. By foreclosing Plaintiff's vertical site, Google not only eliminates a potential GSE threat but also hinders rival GSEs that rely on robust third-party competition. *McCready*, 457 U.S. at 479–80. Thus, OkCaller's injury is still "inextricably intertwined" with Google's maintenance of monopoly power—even absent an explicit "conduit" characterization.

In sum, Google seeks a narrow reading under *McCready's* conduit requirement, but the addition of GWT to the GSE market, combined with recent developments (Googlebot access) substantiating the 'proliferating vertical' as actual GSE competitors, squarely places OkCaller's harm in the 'inextricably intertwined' category.

## II.   Count II Adequately Alleges Relevant Sherman Markets and Agreements

The SAC contains five alleged markets: (1) general search services, (2) vertical search provider (VSP) services, (3) directory information services, (4) internet content access, and (5) single-brand Google traffic. Google asserts that the Court has already dismissed or discredited these definitions, and thus any Section 1 claim based thereon must fail. However, this argument is misplaced for two principal reasons: Google's critiques often conflate the analysis required for monopolization/attempted monopolization under Section 2 with that required for an agreement in restraint of trade under Section 1. While market definition is relevant in both contexts, the inquiry under Section 1 focuses on whether multiple parties conspired to impose an unlawful restraint that injured Plaintiffs. *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1551 (11th Cir. 1996) (distinguishing between the requirements for § 1 collusion and § 2 monopolization). Even if a market definition is not sufficiently precise for establishing monopoly power, Plaintiffs may still show that Google and partners conspired in a way that harms competition in a broader sense. *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986).

Plaintiffs have alleged specific reasons for defining markets such as "internet content access" (where Apple's App Store and Google's search engine operate as complementary on-ramps) and "vertical search services" (specialized engines and directories). The MTD's contention that these definitions are duplicative or contradictory is better resolved after discovery clarifies the economic realities. *Todd v. Exxon Corp.*, 275 F.3d 191, 199–200 (2d Cir. 2001) (reversing Rule 12 dismissal of an antitrust complaint because market definition issues typically require factual development, citing *Brown Shoe*). Below is a concise rejoinder to each market-specific argument.

### General Search Services

Google repeats its standing and market arguments from Count I, asserting that Plaintiffs "lack antitrust standing" and have not shown direct harm in the GSE market. Yet for Section 1, a plaintiff can maintain a claim if they plausibly allege that an agreement among two or more parties (such as Google and Apple or Google and advertisers) restrains trade in a way that injures Plaintiffs—even if Plaintiffs are not themselves direct rivals to Google in the strict sense. This again turns on Google's erroneous interpretation of *Blue Shield of Va. v. McCready*, 457 U.S. 465 (1982).

### Vertical Search Provider (VSP) Services

In its original motion to dismiss, Google argued that the VSP definition (and others) were flawed because they did not address core antitrust concepts such as cross-elasticity of demand and product interchangeability. Plaintiffs have since remedied these issues by alleging the *SSNDQ* test. Despite these substantive amendments, Google's *new* MTD largely recycles the same arguments from its *old* MTD, insisting that "Count 2 fails for the same reason as the FAC did." This approach is problematic for several reasons. The new MTD does not meaningfully acknowledge the SAC's revisions addressing cross-elasticity and the SSNDQ test. For instance, while Expedia and OkCaller serve radically different user needs from a *consumer* perspective, the SAC now clarifies they nonetheless compete for visibility *from the angle of the GSE's search results.* In other words, VSPs are interchangeable to Google's GSE, which makes it a relevant market in this case, as Google pits VSPs against each other on indexing quality, curation, and technical engagement metrics.

The MTD again contends that OkCaller cannot plausibly compete with Expedia or Amazon simply because "phone lookups" and "travel bookings" or "online retail" serve different consumer end goals. But that misrepresents the SAC's market definition. Plaintiffs do *not* allege that phone lookups and travel searches are identical from a consumer-facing standpoint. Rather, they allege that from the *GSE vantage* (the gatekeeper controlling SERP visibility), all these vertical services must vie for ranking within the same specialized "downstream" category—namely, "vertical search." A bookstore analogy is apt: from a *consumer's* perspective, a mystery novel is not an interchangeable substitute for a math textbook, yet from the *bookstore's* perspective, both are "inventory" that must be bought, stocked, and sold. Similarly, from Google's vantage, OkCaller and Expedia are "downstream specialized services" that each rely on indexing, ranking, and distribution controlled by the GSE. The Court should therefore not credit the MTD's blanket assertion that these revised claims are duplicative. *Westchester Day School v. Vill. of Mamaroneck*, 504 F.3d 338, 356 (2d Cir. 2007) (rejecting motions that ignore or fail to address key amendments). Plaintiffs have expanded upon how

cross-elasticity is minimal and how the SAC's newly spelled-out SSNDQ approach directly addresses concerns the prior Rule 12 briefings raised about interchangeability amongst VSP genres.

The MTD states that this Court "previously observed" that VSP is overly broad, citing DE 53 at 7. The fact that VSPs exist spanning a large number of specialties does not defeat the notion that an agreement or arrangement (e.g., with Apple or advertisers) restrains these specialized providers' ability to compete on fair terms. *Realcomp II, Ltd. v. FTC*, 635 F.3d 815, 827–28 (6th Cir. 2011) (condemning an MLS board's collective agreement restricting certain real-estate brokers, even though no single entity "monopolized" the broker market).

### *Directory Information Services*

Similarly, Google contends that directory services, which now includes "reverse phone lookup," remains too broad or too competitive to be monopolized, despite Yelp alleging an identical claim. (DE 53 at 7–8.) Yet the question for Section 1 is not whether Google could "monopolize" directories, but whether Google has entered into agreements or collusive practices that unreasonably restrain competition for directory services or foreclose new directory providers from scaling. If Google systematically excludes or deprioritizes directory sites to favor its own directory products, bolstered by the Apple-ISA arrangement, that plausibly states a § 1 claim. *Associated Press v. United States*, 326 U.S. 1, 12 (1945) (under Section 1, the focus is on whether multiple parties conspired to exclude or disadvantage rivals or entrants).

Whether the directory-services market is too broad or sufficiently cohesive to constitute a single relevant market "is a question of fact." *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989). A jury (or the Court at summary judgment) might conclude that Whitepages, Yelp, and OkCaller do indeed compete in a directory market that is distinct from purely general search or from narrower vertical searches. Plaintiffs should have the opportunity to present evidence—e.g., consumer usage data, cross-elasticity analyses—to validate this. Google errs when it claims the VSP market must include GSEs. Google's products (Google Maps, clickless searches) can be VSPs, regardless of the fact Google also operates a GSE.

The MTD posits that because there exist "dozens of phone lookup" sites (SAC ¶ 55), directory services cannot be monopolized. This is plainly incorrect. There could be hundreds of small sites, yet Google's own services (Google Maps business listings, clickless searches) certainly have market power at this point. The existence of multiple players does not necessarily preclude a relevant market or a Section 1 restraint; an agreement among a dominant GSE or a subset of directory providers (or distributors) can unreasonably restrain the overall directory market. *Palmyra Park Hosp. Inc. v.*

*Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1299 (11th Cir. 2010) ("[T]he presence of some competition is not incompatible with the possibility of foreclosure.").

### Internet Content Access

The SAC's new "internet content access" market—which includes both smartphone app distribution and general search engines—reflects Plaintiffs' factual theory that Apple and Google together dominate how consumers find online content. Google repeats the argument that "OkCaller.com is not a market participant," but that is neither dispositive nor entirely correct for a Section 1 claim: so long as Plaintiffs show that an agreement among Apple, Google, or other co-conspirators restrains distribution in a way that injures them. *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir. 1999) ("[A] plaintiff who is forced to pay artificially high prices or receive artificially low compensation as a result of a defendant's anticompetitive conduct in the relevant market still has standing to bring a Section 1 claim.").

### Single-Brand Google Traffic

Lastly, Google points out that single-brand markets are "extremely rare," citing *Apple Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008). While that is typically relevant to Section 2 claims, a single-brand scenario can, under certain circumstances, be recognized for a Section 1 analysis if a defendant and its strategic partners collusively foreclose or lock in users. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992). The SAC alleges that Google effectively exerts gatekeeper control over its own brand ecosystem, forcing developers to accept its rules or be excluded. Whether that is legally cognizable under Section 1 is a factual question left to discovery, and the "rarity" of single-brand markets is not an automatic basis for dismissal. While courts do treat single-brand markets skeptically, it is not accurate to suggest they are *per se* barred at the motion-to-dismiss stage. Instead, the Supreme Court and lower courts have recognized certain fact patterns in which a single-brand (or quasi-single-brand) product can function as a relevant market when no adequate economic substitutes exist. Google might analogize *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992), to the camera or copier repair market, but it overlooks the point that, even though Kodak faced competition in general camera equipment, the Supreme Court still allowed a "Kodak-specific repair and parts" market to proceed because of high switching costs, locked-in consumers, and unique service needs. Id. at 483–84. Similarly, in the SAC's single-brand Google scenario, users and developers may be "locked in" to Google traffic because 90+% of all general-search-based referrals flow through Google, leaving no practical alternatives.

Courts require a fact-intensive exploration of whether brand loyalty, technical lock-in, or de facto exclusivity deprives consumers (or in this case, content providers) of feasible substitutes. *Newcal Indus., Inc. v. IKON Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008). Even if single-brand claims are ultimately difficult to prove, Plaintiffs need only allege enough facts at this stage to make the theory plausible. *Todd v. Exxon Corp.*, 275 F.3d 191, 199–200 (2d Cir. 2001). Here, the SAC explains that reliance on "Google traffic" is so entrenched, and other search engines so relatively small, that developers effectively have no substitute. (SAC ¶¶ 75–85.) Whether these allegations suffice is a question of economic reality—exactly the kind of issue the Court should leave to discovery under *Brown Shoe*. Thus, while single-brand markets are *less common*, they are not categorically off-limits to Section 1 or Section 2 claims. *Kodak* itself stands as a reminder that "rarity" does not equate to "impossibility." *See* 504 U.S. at 482–83 ("The relevant market for antitrust purposes is determined by the choices available to [the consumer]."). Consequently, dismissing the single-brand market allegations outright would prematurely foreclose legitimate factual inquiries.

Under Section 1 of the Sherman Act, a plaintiff must allege "an agreement or concerted action between two or more entities that unreasonably restrains trade." *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1545 (11th Cir. 1996). Although unilateral conduct is generally not actionable under Section 1, the courts recognize that even tacit or implicit understandings may suffice if pleaded with factual support suggesting "a meeting of the minds" to restrain trade. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007). A complaint need not produce the "smoking gun" at the pleading stage, so long as the factual allegations "raise a reasonable expectation that discovery will reveal evidence of an illegal agreement." Id. at 556–57.

Google cites this Court's prior ruling (DE 53 at 10–11) that Apple's Safari default arrangement did not plausibly cause Plaintiffs' direct injury. Yet the operative complaint takes the additional step of explaining how the Apple–Google agreement not only excludes competing general search engines, but also channels search traffic in ways that diminish or penalize independent websites reliant on open distribution. (SAC ¶ 113.) If the ISA blocked a competing search engine (like Bing, where site:www.okcaller.com is 149,000) from obtaining market share, it reasonably contributed to OkCaller's injury. The SAC clarifies that by paying Apple billions of dollars to keep Google as the default search engine, Google ensures that even potential *vertical search* or *directory* services must funnel traffic through Google's ecosystem on Apple devices. (SAC ¶¶ 115, 116.) Plaintiffs or other specialized providers, who might otherwise benefit from alternative default search engines, are forced to remain within Google's "controlled environment," thereby increasing their

dependence on Google and any penalizing ranking policies. That dependence can (and does) directly injure Plaintiffs when Google manipulates or excludes their content for self-serving reasons. *Nat'l Indep. Theatre Exhibitors, Inc. v. Buena Vista Distrib. Co.*, 748 F.2d 602, 608 (11th Cir. 1984) (recognizing standing if plaintiff is a "target" against which anticompetitive behavior is directed).

This Apple–Google agreement also secures a near-complete lock on GSE mobile distribution, enabling Google to glean massive user data while denying scale to any emergent competitor or alternative aggregator. That, in turn, cements Google's gatekeeping power over specialized search sites like Plaintiffs, which must rely on Google's ranking and indexing. *United States v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001) (exclusionary deals that preserve monopoly leverage and harm related markets can be cognizable under antitrust laws). Hence, contrary to Google's argument, the SAC does more than simply name the Apple–Google agreement; it spells out the direct, *logical chain* of injury from that arrangement to Plaintiffs' loss of visibility and user traffic. Whether these new allegations suffice is a *fact-bound* inquiry not suited for resolution under Rule 12(b)(6), given Plaintiffs' plausible assertion of direct, not merely incidental, harm.

The MTD dismisses the SAC's assertion that Google enters into "explicit and implicit understandings" to favor high-spend advertisers (SAC ¶¶ 114–15) as mere unilateral "business judgment." However, the Eleventh Circuit allows plaintiffs to plead "plus factors" from which one can infer a conspiracy or agreement. The SAC points to "explicit and implicit understandings" that Google systematically ranks or demotes organic results based on the advertiser's arrangement with Google, surpassing normal preference. (SAC ¶ 115.) Although the MTD suggests *Twombly* demands more detail, Plaintiffs are not required to produce internal communications at this stage. Antitrust jurisprudence recognizes that key evidence of collusion is often within the defendant's control.

The SAC contends that by artificially boosting big advertisers' organic placements—even where user relevance is lacking—Google sacrifices short-term user satisfaction (and thus its own stated brand proposition) to maintain a network of large spenders (or its own inferior products, which is the subject of the Yelp lawsuit) who might otherwise shift to potential rival platforms. This is at least one plausible "plus factor." While "preferences for big advertisers" might be plausible unilateral strategy, Plaintiffs allege more: Google compromised its own hallmark—high-quality, relevant organic search—in favor of lucrative partnerships, thereby acting against its *short-term* interest in consumer satisfaction. *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 361 (3d Cir. 2004) (plus factors include conduct against independent self-interest). By steering prime organic positions to advertisers or inferior verticals, Google effectively enters a tacit or explicit agreement that diminishes SERP

11

quality, alienates end-users, and artificially forecloses smaller publishers. This willingness to degrade core search results (a potential self-inflicted wound) and the elaborate financial ties with advertisers suffice to allege a "plus factor" indicating more than mere unilateral "self-preferencing."

Taken as a whole, these allegations are not mere "conclusory" statements but a coherent factual scenario in which Google and key advertisers have arrived at implicit or explicit deals to manipulate search results. While the MTD asserts that "businesses are free to choose their dealing partners" (*Pacific Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 448 (2009)), that principle does not immunize concerted action in restraint of trade.

### III.     Count III States an *Aspen Exception* Refusal to Deal Claim

Google's motion contends that the SAC has not cured any of the deficiencies the Court previously identified regarding Plaintiffs' refusal-to-deal claim under *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985). In reality, the SAC both (1) adds evidence of a *profitable, preexisting relationship* between OkCaller and Google that generated substantial revenues for both parties, and (2) clarifies that the near-complete delisting ("site count" effectively going to zero) demonstrates far more than a mere ranking fluctuation—indeed, it is an *effective termination* of a critical revenue-sharing venture. By disregarding these new allegations and largely relying on arguments from its previous MTD, Google fails to address the SAC on its own terms.

The Supreme Court in *Aspen Skiing* set forth a narrow but significant precedent under which a monopolist's abrupt refusal to deal with a prior partner can constitute exclusionary conduct in violation of Section 2 of the Sherman Act—especially where the refusal does not serve a legitimate business purpose and sacrifices short-term profits to maintain or extend monopoly power. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 608 (1985); *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408–09 (2004).

Google's MTD dismisses Plaintiffs' newly added facts detailing (1) OkCaller's substantial earnings generation and (2) the substantial share of profits that Google also enjoyed from this relationship. According to Google, these revelations do not change the outcome, alleging that "the central premise has not changed: Google simply ranked OkCaller for search results." But the SAC— particularly SAC ¶¶ 23–24—tells a more compelling story. OkCaller's "ad revenue from visits" consistently yielded millions of dollars for Google, signifying that their arrangement was more akin to a joint venture than a passive index listing. (SAC ¶¶ 23–24.) Over a relationship spanning a decade, Google invited Plaintiffs to their Miami headquarters to coach them how to increase the profitability of the partnership. If this was mere "listing a website," millions of publishers would have been invited

to these one-on-one meetings. They were not. At most, hundreds were invited, in a joint venture quantified by the SAC as "around 1/1000 of profits". Google does not dispute this, or even address this allegation, which alone is fatal to their MTD.

More importantly, the SAC's discussion of revenues rebuts Google's false narrative of a "gradual decline" by showing that the joint venture's earnings actually grew through 2022 (SAC ¶¶ 22–23). Thus, ending the relationship (i.e., refusing to list millions of OkCaller pages) meant Google was willingly sacrificing short-term profitability. Google improperly dismisses this information as irrelevant financial data. Because Google's prior emphasis on a "slow decline" has been refuted by explicit data in the SAC, the MTD cannot credibly maintain that "no profitable course of dealing existed." To the contrary, the abrupt and near-complete removal of OkCaller content from Google's index is starkly analogous to *Aspen Skiing*'s refusal to continue a successful joint ticketing program— an arrangement that had also been profitable for both parties. *Aspen Skiing*, 472 U.S. at 593.

The SAC also tackles Google's claim that because "www.okcaller.com" occasionally appears in a direct navigational search (i.e., searching the literal URL "www.okcaller.com"), Google has not fully "removed" OkCaller. It explains that removing a critical mass of phone listings ended OkCaller's viability. Millions of OkCaller-specific pages previously generated user traffic and ad revenue for OkCaller and for Google through relevant keyword queries (SAC ¶¶ 27–28). By ignoring or de-indexing these millions of specific directory pages, Google effectively deprives OkCaller of 99.9% of its former distribution, terminating its function as a phone directory.

In *Aspen Skiing*, the monopolist operator attempted to rationalize severing the Highlands partnership by offering Highlands-only tickets. The Supreme Court was unmoved, noting that token or partial cooperation that fails to preserve the prior profitable collaboration can amount to a constructive refusal to deal. *Aspen Skiing*, 472 U.S. at 603–06. Hence, Google's partial indexing (just zero or one references if someone literally types the domain, rather than a phone number as hundreds of millions previously did) does not cure the refusal to deal. "Zero or near-zero pages" for practical keyword queries remains tantamount to severing the prior arrangement. If *Aspen* had allowed zero or one legacy lift ticket sales each day, rather than thousands, the outcome of the case would not change.

The SAC indicates Google provided no plausible pro-competitive reason for eliminating millions of OkCaller pages from its search index—especially considering their prior "profitable, preexisting partnership." (SAC ¶ 124.) *See also Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1073 (10th Cir. 2013) (noting refusal to deal is suspect if done "without a valid business reason" and with knowledge that "cooperation had been profitable"). Disabling the entire directory function thus

appears less like normal ranking and more like a "sacrifice of short-term profits" in order to punish or exclude OkCaller from the general search distribution ecosystem. Google again portrays a misleading version of facts that OkCaller's decline was caused by "copycats," ignoring the SAC's explicit data showing that *despite* some emulation around 2016, OkCaller's profitability and user reach stabilized and grew—right up until Google's abrupt delisting. Accordingly, the causal chain leading to OkCaller's collapse hinges on the deindexing event, not mere entry of low-level copycats.

While *Trinko* affirms that a firm generally may choose its business partners, the SAC's allegations surpass the routine exercise of "unilateral business judgment." The SAC specifically pleads that Google, in pursuit of greater profits from a handful of partners, is systematically compromising SERP quality and indexing fairness—an irrational short-term sacrifice of user satisfaction and developer goodwill to entrench its monopoly. Such conduct falls within *Aspen Skiing's* narrow exception, as Google is not merely refusing to deal but exploiting its gatekeeper role to exclude a longtime partner and degrade overall GSE results. That short-term profit sacrifice in favor of exclusionary aims is precisely what *Trinko* itself identified as the "outer boundary" of liability under *Aspen*. Hence, the refusal-to-deal claim is not foreclosed by *Trinko* because Plaintiffs plausibly allege conduct that "makes no economic sense" other than preserving monopoly power.

Rather than grappling with Plaintiffs' expanded evidence of revenue, traffic, and near-complete deindexing, Google simply repeats that "The SAC is no different from the FAC," and conclusory statements like "OkCaller was never actually removed." But these statements improperly rely on the old MTD. Merely citing "DE 41 at 7–10; DE 48 at 6–7" and concluding "nothing has changed" fails to inform the Court how the new data about ad revenue and near-total removal of directory pages is insufficient. As such, Google effectively forfeits a direct rebuttal of these revised allegations. *Westchester Day School v. Vill. of Mamaroneck*, 504 F.3d 338, 356 (2d Cir. 2007) (a motion relying on out-of-date arguments without addressing new allegations is inadequate).

Plaintiffs specifically plead that "Google parted with millions of dollars of OkCaller-based ad revenue," (SAC ¶¶ 23–24), which parallels the *Aspen Skiing* scenario wherein the defendant refused joint ski-lift tickets that were profitable. If Google's delisting was truly "no big deal," it would not have systematically ended a reliable revenue stream—an action supporting the "refusal to deal" theory that it acted contrary to its immediate economic self-interest to maintain monopoly control.

## IV.       Count IV States a California Unfair Competition Law Claim

The UCL prohibits "any unlawful, unfair, or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. Each prong—unlawful, unfair, and fraudulent—constitutes "a separate and

distinct theory of liability." *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007). Google dismisses all concerns about its conduct as frivolous, which should raise an eyebrow given the recent DOJ verdict. Google recycles the argument that if the Sherman Act claims fail, the UCL claim necessarily fails too. This oversimplifies Plaintiffs' allegations, however, because (a) the UCL "unlawful" prong can be grounded in *any* borrowed law—not merely antitrust law, (b) the SAC alleges other bases for "unfair" conduct beyond the Sherman Act, including retaliatory or unethical practices, and (c) the "fraudulent" prong can apply when consumers or developers are misled, irrespective of whether a Sherman violation is proven.

### A. "Unlawful" Prong

Contrary to Google's MTD, Plaintiffs do not exclusively rely on the Sherman Act as the predicate violation. The UCL's "unlawful" prong can incorporate any federal or California statutory or regulatory violation. California courts do not require a UCL plaintiff to enumerate every possible statutory violation with specificity. As long as the defendant is on notice that the plaintiff alleges "unlawful" practices under § 17200 and references facts supporting that theory, courts routinely allow the plaintiff to borrow additional statutes that may apply to the pleaded conduct.

Even setting aside the SAC's valid Sherman Act claims, other statutory laws cover GSEs. The Federal Trade Commission has issued guidance that search engines must clearly and prominently disclose paid placements or self-preferencing to avoid misleading users. Failure to comply with these guidelines may constitute an "unlawful" practice under the UCL. Fed. Trade Comm'n, "Enforcement Policy Statement on Deceptively Formatted Advertisements" (2015). If Google's results intermix paid or self-promotional placements with purportedly organic rankings without conspicuous disclosure, that can violate these FTC principles (even if not a *per se* Sherman Act violation).

The SAC points to additional wrongful conduct and specifically references 18 U.S.C. § 1512, among other statutes, alleging that Google retaliated against Plaintiffs (removing or demoting OkCaller) soon after Plaintiffs engaged in protected legal advocacy against Big Tech. (SAC ¶ 136). While Google dismisses these allegations as "speculative," nothing in the MTD refutes that such retaliatory conduct, if true, could violate 18 U.S.C. § 1512(b)–(d), or at minimum, reflect unlawful intimidation contrary to public policy. Under California law, evidence of a violation of a federal criminal statute can serve as a predicate for the UCL. The Eleventh Circuit, too, acknowledges the seriousness of alleged retaliation under 18 U.S.C. § 1512. *United States v. Kottwitz*, 614 F.3d 1241, 1261 (11th Cir. 2010) (recognizing broad scope of witness-tampering offenses). The SAC submits that temporal proximity evidences retaliation; this goes beyond 'mere speculation,' the SAC advances

well established elemental analysis of timing events. To the extent Google complains about lack of smoking gun evidence, antitrust scholars have observed that defendants frequently hold all of the relevant knowledge about their own decision-making. *Mayor & City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (highlighting that "defendants' possession of sensitive internal documents supports the need for discovery" where allegations are at least plausible). In complex litigation—especially involving algorithms, search rankings, or corporate intent—courts routinely permit discovery because the relevant evidence (internal emails, indexing protocols, communications about retaliatory motives) is not publicly available. *In re High-Tech Employee Antitrust Litig.*, 856 F. Supp. 2d 1103, 1117 (N.D. Cal. 2012) (acknowledging that key evidence of agreement or motive often lies in a defendant's internal files). Were courts to require plaintiffs to present conclusive proof of wrongdoing pre-discovery, *any bad actor* could cloak misconduct behind trade-secret or internal procedures and move to dismiss for "speculation."

Lastly, the SAC also alludes to Apple–Google "ISA" dealings or duopoly control which may implicate *incipient* antitrust or competition policy in California. (SAC ¶¶ 139–40). Even if the Court dismissed the Sherman Act claims for want of standing, the UCL can still attach to practices that violate the "policy or spirit" of antitrust laws. *Cel-Tech*, 20 Cal. 4th at 187.

**B.   "Unfair" Prong**

In California, the concept of "incipient violation" likewise appears under the UCL's "unfair" prong, where a practice violates the policy or spirit of antitrust laws even if it has not yet consummated a full monopoly. *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999) ("When a plaintiff who claims to have suffered injury from a direct competitor's 'unfair' act or practice invokes section 17200, the word 'unfair' in that section means conduct that threatens an incipient violation of an antitrust law."). The SAC contends that Google quietly steers queries to its own or favored properties, depriving users of neutral, comprehensive results. Even if not an antitrust violation under *Microsoft* or *Trinko* standards, such conduct can be "unfair" if it subverts user and developer expectations of a "neutral search engine." This parallels how courts address moral fairness: if consumers believe they are receiving objective info, while Google systemically privileges itself, that mismatch can be "substantially injurious" under the UCL. *Camacho v. Auto. Club of S. Cal.*, 142 Cal. App. 4th 1394, 1403 (2006).

The "unfair" prong forbids business practices that "offend an established public policy," or are "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Cel-Tech*, 20 Cal. 4th at 186–87; *Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 257 (2010).

Courts have allowed "unfair" UCL claims to proceed where a dominant platform's opaque policies injure smaller businesses. *See Dreamstime.com, LLC v. Google LLC*, 470 F.Supp.3d 1082 (2020) (noting that while the plaintiff in that case failed on summary judgment, the fundamental theory that Google's ranking changes could be "unfair" was not foreclosed as a matter of law). Hence, "unfairness" under UCL is broader than Sherman Act legality; it can capture unethical conduct that undermines free access to courts, fostering open competition, etc.

The MTD quotes SAC ¶¶ 133–34, which describes, generally, the unfairness of opaque and non-transparent rankings on developers, and the harms and losses it causes. Through sleight of hand, Google concludes that these alleged non-transparency practices equate to "failed and inadequately pleaded federal antitrust claims." Google knows better. The UCL is not bound by antitrust thresholds, and the SAC's claims about transparency are hardly novel concerns. It becomes clear Google has no Rule 12 defense to this claim, hence it attempts to equate and bury it with Sherman claims. It tries to salvage its argument by arguing that lack of transparency couldn't "significantly impact competition." But that is inherently flawed, if not incredulous. Logically if developers invest time in creating superior products, and non-transparent rankings fail to reward them, over time competition will be harmed as fewer developers will participate in the GSE system. The SAC makes the point, and Google's efforts to deflect plain truth should not be endorsed by the Court.

Even if Plaintiffs do not prove a fully defined Sherman Act market, the notion that Google unilaterally and oppressively removes or suppresses certain websites without notice or legitimate justification can still be deemed "unfair." *South Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861, 886 (1999) ("Unfair" includes business practices that offend public policy or are unethical and injurious to competition or consumers). Courts sometimes consider fairness from the standpoint of whether the practice is "immoral, unethical, oppressive, unscrupulous or substantially injurious," *Cel-Tech*, 20 Cal. 4th at 182–83. Instantly yanking a developer's visibility—despite years of cooperation—could qualify. Similarly, Plaintiffs allege that Google's dominance effectively forces developers to rely on its "webmaster tools," but that usage is subject to hidden or arbitrary indexing standards. *See* SAC ¶¶ 132–34. ] Imposing obscure guidelines while reaping data and ad revenue from developers arguably subverts public policy favoring open and transparent competition. *Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 257 (2010) (recognizing the "unfair" prong can apply where a stronger party exploits weaker parties by withholding crucial information or imposing unreasonable constraints).

**C.  "Fraudulent" Prong**

17

Under the UCL, "fraudulent" merely requires likely deception of consumers or other targeted groups. Plaintiffs allege Google publicly markets itself as a neutral search engine—"organizing the world's information"—while secretly self-preferencing or penalizing certain sites for non-technical reasons, including retaliation or strategic advantage. (SAC ¶¶ 132, 135). Unlike common law fraud, the UCL "fraudulent" prong does *not* require proving actual reliance by each consumer in the classical sense, so long as the misleading conduct is likely to deceive members of the public. *In re Tobacco II Cases*, 46 Cal. 4th 298, 312–13 (2009). Google's MTD fails to rebut Plaintiffs' basic allegation that the entire "Google is neutral" representation is belied by hidden manipulative or retaliatory practices. The UCL "fraudulent" prong simply requires that Google's conduct is likely to deceive members of the public—not that Google necessarily violates an antitrust law.

If Google, for instance, places self-promotional links or paid partner links in positions typically reserved for "organic" results but fails to disclose that distinction, a consumer could be misled. *Comm. on Children's Television, Inc. v. Gen. Foods Corp.*, 35 Cal. 3d 197, 214 (1983) ("Likely to mislead" suffices to show fraudulent conduct under the UCL). Even absent a relevant antitrust market, knowingly misrepresenting search results as purely merit-based could be deemed a fraudulent practice—"likely to deceive" the public. The SAC references Google's public branding (e.g., "We're a neutral platform," "don't be evil"). If these statements lead consumers or developers to believe they will be treated fairly, while in reality Google engages in arbitrary or self-beneficial ranking manipulation, that is plausibly "fraudulent" under the UCL.

## V.      Duopoly Control of U.S. Internet Content Access Violates Sherman Act § 2

Count V alleges that Google, in concert with Apple, constitutes a "duopoly" over the U.S. Internet Content Access Market—defined as the major channels by which American consumers discover and utilize online content. Plaintiffs assert that Google's 20% share of consumer time (via its general search engine monopoly) combines with Apple's 80% share of consumer attention (via smartphone app distribution) to corner virtually 100% of content "on-ramps." Google's MTD argues that "shared monopolies" or "duopolies" are not cognizable under Section 2 and that Plaintiffs lack standing.

The SAC alleges a concerted, interdependent arrangement between Google and Apple that plausibly maintains exclusionary power across virtually all forms of internet distribution. Case law does not categorically immunize "duopoly" arrangements under Section 2, particularly if the two firms act in concert to protect a mutual monopoly or otherwise ensure no third party can enter. Rule 12(b)(6) standards counsel that complex factual disputes about market structure, barriers to entry, and alleged Apple–Google collaboration be tested in discovery rather than disposed of prematurely.

Google's MTD contends that, as a matter of law, two firms cannot be liable under Section 2 absent a "single firm" possessing 100% share in a given market. This argument oversimplifies the case law and overlooks the possibility of multiple firms acting together to maintain a quasi-monopoly or effective duopoly. Although most Section 2 cases concern single-firm monopolies, courts have recognized that coordinated or collaborative conduct by a small number of dominant firms can effectively replicate the exclusionary effects of a single-firm monopoly. *American Tobacco Co. v. United States*, 328 U.S. 781 (1946) recognized that a small group of dominant firms could violate Section 2 if they combine or coordinate to restrain competition. That is precisely what Google and Apple have done, lobbying together against antitrust regulation, and locking in their market power through ISA. A "duopoly" can unlawfully maintain market power if there is evidence of an agreement or parallel exclusion. *US Airways, Inc. v. Sabre Holdings Corp*., 938 F.3d 43, 63–64 (2d Cir. 2019) (discussing coordinated conduct among concentrated platforms).

While some opinions (e.g., *Midwest Gas Servs., Inc. v. Indiana Gas Co.,* 317 F.3d 703 (7th Cir. 2003)) have used the shorthand that Section 2 "is about a single firm's conduct," those statements typically arise where no agreement or joint strategy was plausibly alleged. Here, Plaintiffs specifically allege a purposeful, exclusionary arrangement between Apple and Google—i.e., "two hands working together" to dominate 100% of practical internet content access. Even if two firms do not literally merge, their combined market conduct can replicate a monopoly's effects—especially if they have structural or contractual agreements to foreclose entry by potential rivals. The SAC details how the "ISA Agreement" between Apple and Google effectively cements Google as the default (and sometimes exclusive) search option on Apple's massive iOS ecosystem, ensuring no competitor can meaningfully challenge Google's control over web search. (SAC ¶¶ 85–90, 146–49). Accordingly, the fact that two firms share market power does not automatically insulate them from Section 2 liability. If a small group of players enforce artificial barriers to maintain their lock on distribution, the resultant harm to competition can be every bit as severe as a single-firm monopoly. *American Tobacco*, 328 U.S. at 810 ("The power that controls the market by destroying competition . . . is a monopoly . . . though it be shared by three persons acting in concert."). That court expressly recognized that a "combination or conspiracy to monopolize a market" can be reached under Section 2. In short, it is an oversimplification to treat Section 2 as applying only to single-firm conduct. Apple and Google, working together, wield monopoly power in the "U.S. Internet Content Access Market." (SAC ¶ 85.) That is a cognizable theory at the Rule 12(b)(6) stage.

At the heart of Count V is the assertion that Google and Apple's "ISA Agreement" (allegedly paying Apple $15–$20 billion annually to keep Google Search as the default) is not merely a vertical distribution deal but a strategic alliance ensuring the two "duopolists" remain entrenched. (SAC ¶ 9, referencing the "ISA" or "Default Search" arrangement). Unlike a purely unilateral act—where each firm acts on its own—this agreement signals a mutual commitment to lock out potential challengers to either platform. The fact that Apple could have permitted or facilitated other search engines by default (e.g., Bing, DuckDuckGo, or a new entrant) but instead cements Google's place strongly suggests more than "independent parallel behavior." *Interstate Circuit*, 306 U.S. at 226–27.

Plaintiffs argue that Apple's gating of iPhone and iOS app distribution meets Google's gating of web-based distribution, combining to exclude would-be rivals who might need to operate effectively across both channels. (SAC ¶¶ 85–88). Apple excluded OkCaller from the app store, and Google excluded it from SERPs. This "parallel exclusion" concept has gained traction in antitrust scholarship, wherein a few dominant firms in adjacent markets coordinate or reinforce each other's blocking strategies to the same end: preventing new entry of tech competitors. See C. Scott Hemphill & Tim Wu, "Parallel Exclusion," 122 Yale L.J. 1182 (2013). At the very least, such factual questions about the synergy between Apple's and Google's exclusionary practices warrant discovery. Under Rule 12(b)(6), the complaint need only "plausibly" state that Apple and Google act in ways that go beyond happenstance or purely independent business judgments.

Google of course insists that "app distribution" and "web search" are separate[3], but the SAC alleges a single integrated function: how the vast majority of U.S. consumers discover and utilize internet content. (SAC ¶¶ 85–89.) Combining these channels is not baseless. *Brown Shoe* instructs that market definition depends on "practical indicia" of substitutability and real-world conditions. Today's consumer environment often requires both an app-based route and a web-based route to distribute content effectively. The Court should allow fact development on whether these two distribution channels are so interrelated that no third party can effectively bypass them.

## CONCLUSION

The Court should deny the motion in its entirety.

---

[3] They shouldn't be, under recognized computer science precedent. Web applications and smartphone apps are both computer software applications. Apple locks SDK access of web applications, preventing them from accessing native smartphone functionality, thereby artificially differentiating apps from web applications. Beyond the scope of this motion, it is nonetheless widely alleged anticompetitive conduct. Together they form the US Internet Content Access Market.

DATED this 21st day of JANUARY 2025.

Respectfully submitted,

/s/Ayelet Faerman                           /s/ Keith Mathews
AYELET FAERMAN, ESQ.                        Keith Mathews
FBN: 102605                                 Attorney for Plaintiff
Faerman Law, P.A.                           *Pro Hac Vice*
3859 NW 124th Ave                           NH Bar No. 20997
Coral Springs, FL 33065                     American Wealth Protection
Tel: (954) 271-8484                         Manchester, NH 03105
Fax: (954) 271-8474                         Ph. 603-622-8100
ayelet@faerman.law                          keith@awplegal.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Objection to Motion to Dismiss has been served on this 21st day of January, 2025, to all parties of record, including GOOGLE LLC counsel of record, via electronic mail as per the Federal Rules of Civil Procedure and Local Court Rules.

/s/Ayelet Faerman
AYELET FAERMAN, ESQ.
FBN: 102605
Faerman Law, P.A.
3859 NW 124th Ave
Coral Springs, FL 33065
Tel: (954) 271-8484
Fax: (954) 271-8474
ayelet@faerman.law

/s/ Keith Mathews
Keith Mathews
Attorney for Plaintiff
*Pro Hac Vice*
NH Bar No. 20997
American Wealth Protection
Manchester, NH 03105
Ph. 603-622-8100
keith@awplegal.com