Ayelet Faerman, Esq.
Faerman Law P.A.
3859 NW 124 Ave
Coral Springs, FL 33065
954-271-8484
ayelet@faerman.law
Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| GREENFLIGHT VENTURE CORPORATION<br>   *on behalf of themselves*<br>   *and all others similarly situated*<br><br>                Plaintiff,<br><br>vs.<br><br>GOOGLE LLC<br><br>                Defendant. | Case No. **24-cv-80395-RLR**<br><br>**PLAINTIFF'S SUR-REPLY TO GOOGLE'S MOTION TO DISMISS** |

TABLE OF AUTHORITIES ------------------------------------------------------------------------------ 2
INTRODUCTION ----------------------------------------------------------------------------------------- 3
ARGUMENT --------------------------------------------------------------------------------------------- 3
    I.   GREENFLIGHT HAS ALLEGED SHERMAN SECTION TWO CONDUCT --------- 3
    II.  GREENFLIGHT HAS ALLEGED SHERMAN SECTION ONE CONDUCT --------- 4
    III. GREENFLIGHT HAS ALLEGED AN ASPEN REFUSAL TO DEAL ----------------- 6
    IV.  STATE LAW CLAIMS UNDER THE UCL ARE PROPERLY PLED ----------------- 6
    V.   ANTICOMPETITIVE DUOPOLY CONDUCT VIOLATES SHERMAN ACT ------- 9
CONCLUSION ------------------------------------------------------------------------------------------10

## TABLE OF AUTHORITIES

<u>C</u>ASES

American Tobacco Co. v. United States, 328 U.S. 781 (1946) -------------------------------------------------------------------------------- 9
Aspen Skiing Co. v. Aspen Highlands Skiing Corp. (472 U.S. 585) ------------------------------------------------------------------- 6
Blue Shield of Virginia v. McCready, 457 U.S. 465 (1982) ---------------------------------------------------------------------------- 4
Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co., 20 Cal. 4th 163, 180 (1999) ----------------------------------------- 7
Drum v. San Fernando Valley Bar Ass'n, 182 Cal. App. 4th 247, 257 (2010) ----------------------------------------------------- 7
Feldman v. Jackson Mem'l Hosp., 571 F. Supp. 1000 (S.D. Fla. 1983) --------------------------------------------------------- 9
In re Flat Glass Antitrust Litig., 385 F.3d 350, 360 (3d Cir. 2004) -------------------------------------------------------------- 4
In re Tobacco II Cases, 46 Cal. 4th 298, 312 (2009) --------------------------------------------------------------------------- 8
JES Properties, Inc. v. USA Equestrian, Inc., 2005 WL 1126665 (M.D. Fla. May 9, 2005) ------------------------------------- 9
Levine v. Cent. Fla. Med. Affiliates, Inc., 72 F.3d 1538 (11th Cir. 1996) --------------------------------------------------- 4
Lombard's Inc. v. Prince Mfg. Inc., 583 F. Supp. 1572 (S.D. Fla. 1984) ------------------------------------------------------------- 5
Midwest Gas Servs., Inc. v. Indiana Gas Co., 317 F.3d 703 (7th Cir. 2003) ---------------------------------------------------- 9
Ohio v. American Express Co., 138 S. Ct. 2274 (2018) -------------------------------------------------------------------------------- 3

## GREENFLIGHT'S SUR-REPLY TO GOOGLE LLC'S MOTION TO DISMISS

### INTRODUCTION

Plaintiff Greenflight Venture Corporation ("Greenflight") respectfully submits this Sur-reply to matters raised by Defendant Google LLC ("Google") in its Reply brief.

### ARGUMENT

**I.   GREENFLIGHT HAS ALLEGED SHERMAN SECTION TWO CONDUCT**

Defendant's reply attempts to undermine Plaintiffs' standing by asserting that Greenflight is not a customer or competitor in the relevant antitrust market because Google's Webmaster Tools ("GWT") constitute a separate product from its general search engine ("GSE"). Defendant relies on cases—such as *Ohio v. American Express Co.*, 138 S. Ct. 2274 (2018)—purporting that the Amex decision concerns market contours and not standing. However, Plaintiffs contend that the central issue is not whether GWT is an independent market, but rather what the true contour of the GSE market is when one considers its multi-faceted nature. In this context, Greenflight's role as a developer who relies on GWT to obtain indexing and distribution is inseparably linked to the overall GSE ecosystem. Under the *Twombly* standard, Greenflight's pleading—that GWT is an integral, interdependent component of the multi-sided GSE market—is not only plausible, but must be accepted.

Defendant's reply mischaracterizes Plaintiffs' allegations by conflating the issue of market definition with that of standing. The *Amex* decision, as cited by Defendant, addresses the interdependency of multi-sided platforms rather than providing a strict blueprint for determining standing. Plaintiffs have clearly set forth that GWT is not a separate market but a critical element of the overall GSE platform—one that developers use to purchase distribution services. The SAC explains that without access to GWT, Greenflight is deprived of the means to secure visibility in the GSE market. Consequently, the market contour inquiry inherently supports Plaintiffs' standing as a consumer on the developer side of a multi-faceted platform. To the extent Defendant argues that *Ohio v. Am. Express* does not address standing, such reliance is misplaced because the proper inquiry here is whether Greenflight's participation in GWT renders it an indispensable consumer of GSE services— a proposition that consistent with recognized multi-sided market analysis.

Defendant asserts that the mere inclusion of GWT in the complaint fails to establish standing, but as detailed in the SAC, Greenflight's reliance on GWT for indexing, visibility, and content distribution makes it a direct participant in the market that Google controls. The allegations that Google's practices have suppressed the traffic and revenue potential of Greenflight's specialized websites (e.g., OkCaller.com) are directly tied to its control over the GSE platform. Under *Twombly*,

3

the complaint states a claim that is not speculative; it is grounded in the concrete and interdependent relationship between GWT and the GSE market. Accordingly, Defendant's attempt to import a market-contour analysis from *Amex* to attack standing is a misapplication of *Twombly's* standard.

Defendant further argues that Greenflight must show that it is used as a "conduit" for Google's alleged anticompetitive harm toward competing search engines. But when a platform is multi-sided, its participants—whether end users or content providers—are inherently interdependent. The SAC clearly explains that Greenflight, by utilizing GWT, participates directly in the GSE market; thus, the "conduit" inquiry is inapplicable. Google's actions excluding Greenflight's content directly harm its ability to compete in the GSE market and are fully sufficient to satisfy the "inextricably intertwined" requirement as set forth in *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982).

Moreover, Defendant's reply fails to engage with several plain, factual allegations in the SAC that are critical to establishing Plaintiffs' standing. For example, Defendant's repeated emphasis on the speculative nature of Greenflight's claim that it could become a general search engine is a compelling admission that Google disputes the *facts* as alleged, not the claim theory itself.

## II.   GREENFLIGHT HAS ALLEGED SHERMAN SECTION ONE CONDUCT

Defendant's reply overlooks a crucial element of Plaintiffs' theory of injury: that the ISA agreement not only forecloses competition but also directly diminishes OkCaller's traffic and revenue. Plaintiffs have alleged—and the record supports—that if competing search engines were not hamstrung by the exclusive default arrangement, they would rank and deliver hundreds of thousands of pages for OkCaller (as Bing presently does in similar circumstances). This evidence of direct harm, which the Defendant fails to address, demonstrates that the alleged agreement restrains trade by preventing the natural competitive pressures that would otherwise benefit OkCaller. In contrast to Defendant's contention that mere speculation or conclusory allegations should preclude Plaintiffs' claim, the SAC's detailed narrative explains that the suppression of traffic is not incidental but is causally linked to the enforcement of the ISA agreement. This clear causation supports the sufficiency of the "plus factor" allegations under *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004), and reinforces that Plaintiffs have adequately pleaded an agreement inferred from the totality of the circumstances.

Defendant asserts that Plaintiffs fail to plead a specific "agreement" to restrain trade, relying on the principle articulated in *Levine v. Cent. Fla. Med. Affiliates, Inc.,* 72 F.3d 1538 (11th Cir. 1996) and related decisions. However, Plaintiffs' Second Amended Complaint (SAC) clearly alleges that the "ISA Agreement" with Apple functions as an anti-competitive arrangement that not only renders Google the default search engine on Apple devices but also precludes competing search engines from

4

gaining traction. Plaintiffs have demonstrated that this agreement directly disadvantages specialized content providers such as OkCaller by channeling search traffic exclusively through Google's platform. As detailed in SAC ¶¶ 113–116, the ISA arrangement has the effect of suppressing alternative market channels—as evidenced by the fact that competing search engines (for example, Bing) rank hundreds of thousands of OkCaller pages. If the ISA Agreement were not in place, Plaintiffs assert that OkCaller would benefit from higher traffic and greater revenue, as alternative channels would function effectively. Defendant's conspicuous silence on this critical point, and its dismissal of our detailed allegations regarding the causal connection between the agreement and Plaintiffs' antitrust injury, further demonstrates that its reply is deficient. In the absence of the ISA agreement, these competitors would likely deliver greater traffic to OkCaller derived from their respectively increased market share. Defendant's failure to engage with this core evidentiary link between the ISA agreement and the direct anticompetitive injury sustained by Plaintiffs renders its reply incomplete and unpersuasive.

Defendant argues that the ISA Agreement fails to demonstrate an agreement "to restrain trade" and that any alleged impact on competition is speculative. Plaintiffs, however, have tied the ISA agreement directly to its broader market effect: namely, that Google's default placement on Apple devices is a central component of the U.S. Internet Content Access Market. The SAC establishes that this market comprises not only general search engine services but also smartphone app distribution—which, when combined, create a duopolistic structure that leaves little room for meaningful competition. As Plaintiffs have detailed, the absence of competing channels, evidenced by the stark contrast between Google's 90% market share and the hypothetical traffic increases that could be achieved by Bing or other competitors, shows that the ISA Agreement is at the heart of the anticompetitive conduct. Defendant's reliance on abstract arguments about market contours is misplaced; the SAC's factual allegations demonstrate that the exclusionary effects of the ISA Agreement are concrete and directly injurious to Plaintiffs.

Defendant contends that Plaintiffs' reliance on "plus factors" and inferences drawn from case law—such as the "conduit" requirement in *Blue Shield of Va. v. McCready*, 457 U.S. 465 (1982)—is insufficient to establish an agreement under Section 1. In truth, the SAC explicitly and adequately alleges that Google's practice of preferencing large advertisers, in violation of its own economic self-interest, is a plus factor indicative of collusive, concerted action. Moreover, Defendant's selective citation of cases such as *Lombard's Inc. v. Prince Mfg. Inc*., 583 F. Supp. 1572 (S.D. Fla. 1984) ignores the full context in which antitrust jurisprudence permits the inference of an agreement based on a pattern of conduct. The SAC provides detailed factual allegations—supported by internal evidence and

external market data—that show the ISA Agreement effectively restrains trade by precluding competition from alternative search engines. Defendant's failure to address this precise causal mechanism renders its reply unavailing.

### III. GREENFLIGHT HAS ALLEGED AN ASPEN REFUSAL TO DEAL

Google's latest arguments mistakenly pivot on labeling Plaintiffs' ten-year collaboration as an insufficient "joint venture," thereby implying that *Aspen Skiing* requires something more formal or elaborate than a consistently profitable, preexisting business relationship. This newly minted "joint venture" label, which Google introduced to minimize the lawsuit, runs contrary to *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.* (472 U.S. 585) and relevant refusal-to-deal jurisprudence.

Aspen centers on whether a monopolist abruptly terminated a profitable, preexisting course of dealing with a partner—i.e., whether a monopolist sacrificed short-term gains to drive out or punish a competitor. It does not hinge on formalistic definitions of a "joint venture" or partnership. See *Aspen*, 472 U.S. at 603–06. Indeed, a "joint venture" label is irrelevant if factual allegations show the monopolist willingly set aside short-term profits to exclude a smaller entity. Plaintiffs have pled precisely that: Google parted with millions of dollars of stable revenue in order to disadvantage OkCaller. (SAC ¶¶ 23–24.)

Google's claim that no "joint venture" existed—or that the relationship fails Aspen's requirement—is, at best, a factual defense. On a Rule 12(b)(6) motion, Plaintiffs' allegations of a profitable, longstanding course of dealing must be taken as true—particularly given that Aspen requires no more than that "the monopolist terminated a voluntary and presumably profitable course of dealing." 472 U.S. at 601. Aspen specifically condemns such abrupt terminations that do not serve a legitimate business interest yet serve to exclude or punish. Whether that is the case here is quintessentially a fact-laden question and cannot be dismissed on the pleadings. In short, Defendant's attempt to recast Aspen as demanding proof of a formal "joint venture" is incorrect.

### IV. STATE LAW CLAIMS UNDER THE UCL ARE PROPERLY PLED

Defendant's reply commits multiple errors of law and mischaracterizes the SAC, which properly alleges violations under the "unlawful" prong, including 18 U.S.C. § 1512 and relevant FTC guidance. Defendant's efforts to collapse the "unfair" prong into the Sherman Act are contrary to California law, and moreover, the "fraudulent" prong is independently valid because the SAC alleges deception likely to mislead both developers and consumers.

First, Defendant's reply argues that Plaintiffs cannot satisfy the "unlawful" prong because the statutory violations are vague and the FTC guidance is inapplicable. This is incorrect. As *Cel-Tech*

*Commc'ns, Inc. v. Los Angeles Cellular Tel. Co*., 20 Cal. 4th 163, 180 (1999) explains, a UCL claim under the "unlawful" prong "borrows" other legal violations. Here, Plaintiffs incorporate Sherman Act violations alongside additional statutory grounds, including 18 U.S.C. § 1512 (witness retaliation) and the FTC's policy statements on deceptive or undisclosed self-preferencing. The SAC (¶¶ 131, 136, 139) explicitly references these statutory or regulatory provisions and sets forth facts indicating that Google's abrupt deindexing of OkCaller can reasonably be viewed as retaliatory conduct in violation of 18 U.S.C. § 1512(b)–(d), and also as a breach of public policy if Google has failed to disclose self-promotional placements in "organic" results. Defendant's contention that the FTC's Enforcement Policy Statement on Deceptively Formatted Advertisements is wholly irrelevant is belied by the underlying rationale: this guidance forbids undisclosed promotions that may confuse users into believing they are receiving unbiased results. Plaintiffs' claim is not that Google placed "banner ads" in violation of the FTC policy but that Google intermingled its own content or partner content with purportedly "organic" results in a deceptive manner. That falls under the FTC's admonition that dominant online platforms must clearly disclose any paid or self-preferential arrangement. Moreover, Defendant's position that Plaintiffs "cannot amend the SAC through briefing" is misplaced because the SAC already pleads undisclosed self-preferencing (¶ 135), which is precisely the conduct addressed by the FTC policy. The fact that Google chose to characterize the policy as limited to "advertising" alone demonstrates its own refusal to acknowledge how hidden promotional practices can operate. This is therefore a disputed set of facts regarding the promotional nature which SERPs have evolved into. Plaintiffs thus properly allege an "unlawful" claim grounded in the Sherman Act, federal retaliation statutes, and FTC directives on non-disclosure of self-interest.

Second, Google insists that the "unfair" prong fails because it supposedly duplicates the Sherman Act. That argument contravenes settled California law. Under *Cel-Tech*, 20 Cal. 4th at 186–87, a plaintiff can maintain an "unfair" UCL claim if a defendant's conduct offends established public policy, including "incipient" antitrust violations or other oppressive practices. The SAC does not merely restate Sherman Act allegations but details distinct unfairness—namely, Google's opaque indexing and ranking, its arbitrary delisting of OkCaller, and its chilling effect on smaller competitors' ability to innovate or inform the public (¶¶ 57, 62, 133–36). Numerous courts recognize that a UCL "unfair" claim may survive even where antitrust theories exist in parallel. See *Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 257 (2010) (upholding that a UCL claim can proceed if conduct is incipiently anticompetitive or contrary to public policy). Certainly a well known recent example is the Hon. Yvonne Gonzales Rogers' bench trial finding in *Epic* that Apple violated UCL

with an incipient antitrust violation. In short, Google's suggestion that the "unfair" prong "overlaps entirely" with the Sherman Act is factually incorrect: Plaintiffs have pled separate injuries, such as the detrimental impact on developer transparency and the unethical nature of Google's black-box indexing (SAC ¶ 137). Indeed, one crucial difference is that the "unfair" prong of the UCL focuses on whether the practice is contrary to established public policy or "substantially injurious," a standard broader than strict antitrust law. Google's reliance on case law such as *South Bay Chevrolet* is unpersuasive because it cited archaic or abrogated definitions of unfairness. The modern *Cel-Tech* framework, as well as subsequent decisions, clarify that a plaintiff can raise a valid "unfair" UCL claim even absent a full antitrust violation, particularly where (as alleged) user or developer reliance on the platform is near inelastic and Google's selective deindexing is wholly opaque.

      Third, Defendant's claim that Plaintiffs do not plausibly allege a "fraudulent" UCL violation overlooks both the pleadings and the relevant standard. Under *In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009), a UCL fraud claim need only show that the alleged misrepresentation is likely to deceive the public—not that each consumer individually relied on it. The SAC (¶¶ 135, 139) explains how Google publicly portrays itself as a neutral conduit to "organize the world's information" while internally penalizing or removing content like OkCaller with no legitimate explanation, effectively misleading both developers and end users who believe they are receiving an unbiased set of results. Nor can Google evade liability merely by claiming it owes "no duty" to disclose its self-preferencing. The UCL's fraudulent prong does not require a contractual or fiduciary duty; it merely mandates that a business not conceal material information that, if disclosed, would prevent consumers (or developers) from being misled. Defendant's effort to reduce the standard to requiring "actual reliance" by specific consumers ignores that (1) reliance is adequately alleged through developers and consumers who used Google search trusting in neutral ranking, and (2) the "likely to deceive" standard is satisfied by factual allegations showing Google's public pronouncements sharply conflict with its concealed manipulation.

      Finally, Defendant's selective citation of older or inapplicable case law conflates the UCL jurisprudence. *Cel-Tech* and its progeny have established that each prong—unlawful, unfair, and fraudulent—can provide an independent basis for liability. Defendant's suggestion that the entire UCL claim is doomed if Sherman Act allegations fail overlooks the principle that incipient or "policy-based" UCL claims may succeed even in the absence of a final determination of an antitrust violation. Moreover, the suggestion that "the FTC policy cannot apply to organic search" or that 18 U.S.C. § 1512 allegations are "wholly speculative" misstates the SAC's actual content, which is replete with facts indicating a plausible retaliatory motive and plausibly deceptive undisclosed manipulations.

## V.     ANTICOMPETITIVE DUOPOLY CONDUCT VIOLATES SHERMAN ACT

Google's Motion relies on statements that the Eleventh Circuit "has never recognized" a shared monopoly or "duopoly" theory of liability under Section 2. In so doing, it cites *JES Properties, Inc. v. USA Equestrian, Inc.*, 2005 WL 1126665 (M.D. Fla. May 9, 2005), *Midwest Gas Servs., Inc. v. Indiana Gas Co.*, 317 F.3d 703 (7th Cir. 2003), and *Feldman v. Jackson Mem'l Hosp.*, 571 F. Supp. 1000 (S.D. Fla. 1983). A closer reading of those cases, however, reveals significant limitations and does not affirmatively bar Plaintiffs' "duopoly" theory.

In *JES Properties*, the district court indeed stated that the Eleventh Circuit "has never recognized a claim under the Sherman Act for a duopoly or 'shared monopoly.'" 2005 WL 1126665, at *18. But a correct reading shows that the Eleventh Circuit on appeal ultimately decided JES on other grounds, without squarely addressing—certainly not rejecting—the concept of two dominant firms combining or conspiring to maintain monopoly power. Similarly, *Feldman*, noted that a shared monopoly, even if proven, would *not necessarily* violate § 2. This is not tantamount to ruling that a shared-monopoly scenario *never* violates Section 2. Rather, it reiterates that a mere showing of "collective bigness" may be insufficient unless there is coordinated exclusionary conduct among the small number of dominant entities. It does not prohibit a plaintiff from alleging and proving that two (or more) firms have engaged in a concerted scheme tantamount to monopolization.

Defendant's reply improperly seeks to discredit the *American Tobacco* citation, and then falls back to the aforementioned, inapt case citations. The Supreme Court has recognized that a conspiracy to monopolize under Section 2 can arise from concerted action by more than one entity. *American Tobacco Co. v. United States*, 328 U.S. 781 (1946), recognizing "few persons, acting together … control ... interstate commerce." Many courts therefore allow "combination or conspiracy to monopolize" claims where two or more firms jointly wield monopoly-like power through exclusionary agreements or parallel-exclusion tactics. If Plaintiffs plausibly allege a scheme by which Apple and Google coordinate to foreclose all meaningful distribution in the U.S. Internet Content Access Market, that claim may proceed even if it is "two firms" rather than a single firm. The essential question is whether the combination itself engages in exclusionary conduct sufficient to violate Section 2, not whether a single firm alone has 100% share.

Google highlights the Seventh Circuit's statement in *Midwest Gas,* 317 F.3d at 713, that "§ 2 claim[s] can only accuse one firm of being a monopolist." However, *Midwest Gas* dealt with allegations that multiple local gas companies each possessed high market shares in separate territories, not that they combined or conspired in a single relevant market. The passage Google cites is typically

9

read to refute the notion that two independent, non-coordinating firms can be individually liable for "joint monopoly" unless there is a meeting of the minds or coordinated scheme. If, however, the plaintiff pleads that the dominant firms act in concert—through explicit agreements or other cooperation—to exclude rivals and maintain artificially high barriers to entry, courts do allow a Section 2 "conspiracy to monopolize" claim. Thus, *Midwest Gas* does not categorically foreclose Plaintiffs' contention that Apple and Google, acting together, effectively control 100% of relevant "on-ramps" to online content in the U.S. Internet Content Access Market.

Plaintiffs' duopoly claim does not hinge on a pure "shared monopoly" label but rather on the combined exclusionary power Apple and Google wield—through specific coordination such as the ISA Agreement or parallel platform restrictions—to shut out alternative content distribution channels. If two large firms form an alliance or continuous arrangement that amounts to a "combination" in restraint of trade (and that sustains their combined monopoly-like power), that scenario fits comfortably within the recognized bounds of a "conspiracy to monopolize" under Section 2: The SAC alleges that Apple and Google each "control" separate segments (app distribution and general search) but together foreclose every meaningful distribution path; The SAC also alleges that Google's GSE dominance is actively fortified by default distribution deals with Apple (the ISA), ensuring no rival GSE can expand on iOS. Consequently, developers like Plaintiffs have no meaningful alternative to reaching users at scale aside from navigating both Apple's App Store and Google's SERPs.

Together, these factual allegations show not a mere "shared bigness," but concerted or interlocking conduct that allows them to maintain supra-competitive conditions, consistent with a "combination or conspiracy to monopolize" claim. The Eleventh Circuit has never categorically repudiated the possibility that two firms can be held jointly liable under Section 2 if they coordinate or conspire to maintain market power and exclude competition. The case law Google cites does not provide a *per se* rule barring such claims; rather, it simply requires concerted, exclusionary conduct. Here, Plaintiffs' allegations surpass that threshold by detailing how Apple and Google coordinate to dominate the U.S. Internet Content Access Market and thereby harm competition. Accordingly, Google's repeated invocation of *JES Properties*, *Midwest Gas*, and *Feldman* does not undermine Plaintiffs' duopoly count at the Rule 12(b)(6) stage.

## CONCLUSION

For the foregoing reasons, Google's Motion to Dismiss should be denied in its entirety.

Respectfully submitted on this 3rd day of February 2025.

| | |
|---|---|
| /s/Ayelet Faerman | /s/ Keith Mathews |
| AYELET FAERMAN, ESQ. | Keith Mathews |
| FBN: 102605 | Attorney for Plaintiff |
| Faerman Law, P.A. | *Pro Hac Vice* |
| 3859 NW 124th Ave | NH Bar No. 20997 |
| Coral Springs, FL 33065 | American Wealth Protection |
| Tel: (954) 271-8484 | Manchester, NH 03105 |
| Fax: (954) 271-8474 | Ph. 603-622-8100 |
| ayelet@faerman.law | keith@awplegal.com |