Jeffrey Isaacs
11482 Key Deer Circle
Wellington, FL 33449
(212) 257-0737
jeffreydi@gmail.com

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| GREENFLIGHT VENTURE CORPORATION<br>*on behalf of themselves*<br>*and all others similarly situated,*<br>DR JEFF ISAACS<br><br>Plaintiffs,<br><br>vs.<br><br>GOOGLE LLC<br><br>Defendant. | Case No. **24-cv-80395-RLR**<br><br><br>**PLAINTIFF'S MEMORANDUM TO SHOW CAUSE THAT RULE 12 DISMISSAL IS NOT INDICATED** |

**<u>MEMORANDUM TO SHOW CAUSE AGAINST 12(b)(6) DISMISSAL</u>**

It appears generally uncontested that Plaintiff Dr Jeffrey Isaacs has tirelessly devoted the past five years to "Big Tech Antitrust" litigation advocacy. This is evidenced by numerous district court filings, appellate briefings, JPML motions, and Supreme Court *certiorari* petitions – all of which collectively evidence substantial work-product, diligent research, and near full-time commitment. Absent the *Epic Games* matter, Plaintiff's efforts would constitute the largest private antitrust challenge against Apple and Google ever mounted by a single individual. Dr Isaacs' multidisciplinary expertise uniquely qualifies him to litigate against Big Tech, a fact that the Court appears to have struggled to fully appreciate given that antitrust litigation is typically the domain of a select few large law firms.

Compounding this is Plaintiff's deteriorating health which has steadily deteriorated since he entered – and completed – medical school twenty years ago. For the past three years, Plaintiff has faced significant worsening disability. Plaintiff's daily routine, at least for the past three years, consists almost exclusively of researching his medical condition, and researching antitrust law. Exhibit A depicts Plaintiff just prior to medical school enrollment when he possessed vastly better health, and an idealistic outlook unencumbered by litigation. His mentor, also pictured, provided guidance, reflecting on his own career decisions which directly saved millions from succumbing to African River Blindness.  And despite the adversity of two decades of litigation, and interlinked health decline, Plaintiff maintains determined to use his abilities for the greater good. He has chosen to direct it to the Big Tech situation, which he believes (along with Congress, Senate, the entire EU, and President Biden & Trump) seriously threatens our nation. Plaintiff submits his efforts to advocate novel antitrust claims is rooted in his belief that it is a good cause, and that he can effect meaningful change. Given his health circumstances for the past two decades, it seems reasonably clear that he has little to gain personally beyond the intrinsic value of fighting for a good cause, and should be taken more seriously by the Court.  It therefore is disheartening to see this Court characterize his claim theories as "incoherent."

In 2021, Plaintiff developed innovative "monopsony app buyer" and "digital notary stamps" models regarding Apple's iPhone. In short, these theories assert that Apple effectively 'buys' valuable developer content (apps) from developers. Apple also requires consumers and developers to split the cost of digital notary stamps, which allow apps to execute. No prior litigant had advanced such theories; indeed, all previous approaches against Apple had failed. At oral argument before the CAND Court, Plaintiff coherently defended these novel claims with correct reference to *Amex* and other pertinent case law. Observers, including government attorneys, remarked that Plaintiff's arguments were compelling, so much that Apple counsel struggled to counter.

Plaintiff appealed the Northern California dismissal of "scattershot" theories not "tied to economic reality," spending years in defense of his theories' plausibility. A Rule 60 motion is still pending appeal, which is incorporated herein. That motion alleges that Plaintiff was effectively denied access to the Courts, in light of undue pressure from Apple's counsel to characterize his theories as "in the hinterlands," itself thinly veiled *ad hominem* reference to Plaintiff's disability. While Google was more careful this time around with word choices, Plaintiff makes the same allegations: Google won this case by unfairly discrediting Plaintiff. This time, rather than reference Plaintiff's disability, opposing counsel chose to focus on Plaintiff's usage of a Google invention: the 2017 "All You Need is Attention" Transformer, aka AI.

 For about four years, Plaintiff believed Big Law's vast resources were being marshaled to silence his valid antitrust concerns. Newspaper coverage discussing "relevant Sherman market definition by reference to elasticity and interchangeability" failed to resonate with the public or lawyers—contributing to a systematic burying of meritorious claims by Big Law. Plaintiff learned about this at Vanderbilt Law School twenty years ago, and the phenomenon is well-known in academia.

Over the past year, Google's transformer has advanced at rates that have shocked even its inventors. When initially released to the public, LLMs typically scored around the level of the average

high school student on the SAT. Within months, they achieved scores rivaling those the average medical student on medical boards. Now, the "o1 pro/o3 models" can solve most theoretic problems in seconds that would take experienced mathematicians several days to prove.

At some point, Plaintiff realized that using o1/o3 as a "sounding board" not only satisfied his intellectual curiosity about a five-year old problem, but it could level the playing field against litigation opponents with infinitely greater financial and legal resources. It could – and should – serve as a safety net to preempt erroneous Rule 12 determinations that valid theories are implausible, or even worse, in the "hinterlands" or "incoherent." In other words, Plaintiff turned to o1/o3 in a last-ditch effort to prove to the Court – and the public – that his claim theory is plausible. And Google, of course, did not like that their own invention might lend support to these creative, forward-thinking antitrust theories. That appears to be why opposing counsel pointed out two erroneous citations, yet delicately omitted direct discussion of AI. By discrediting AI, or suggesting Plaintiff didn't know how to use it, Google could defeat the inevitable argument they saw at the end of the tunnel. And that is where we are today. Can Plaintiff coherently explain his theories in person, as his own? Yes. Can Google pass the 'blush test' that AI's *detailed* endorsement of the market definitions as plausible – which draws on a *vast* industry knowledge repertoire – is simply wrong, at the Rule 12 threshold? Unlikely. A hearing is not only requested, it is imperative to the carriage of justice.

Plaintiff knows his theories inside and out, he invented them, and he can testify accordingly at a hearing if the Court requests clarification of antitrust digital market jargon which takes years (or longer) to master. News articles, as the Court can take judicial notice, now forever claim his theories are 'incoherent'- when they are not. They represent five years of work and were meticulously analyzed – over and over – by o1/o3 and Plaintiff, in conjunction with Greenflight's counsel.  This is not the case of a superficial shortcut, like reading the Cliff's Notes. Exhibit C shows the o1/o3 output regarding *Pepper*, discussed below. Similar outputs are available for all market definitions. It is clear that,

according to the latest AI models, Plaintiff's theories are plausible and theoretically coherent. While AI cannot make factual determinations, an appropriate analogy here is like the use of spell check. AI served as a plausibility check. Just as a court would give a 'second-look' before characterizing a paper that was spell-checked as 'ridden with spelling errors', it should reconsider a factual finding of implausibility, when o1/o3 found otherwise. As did a computer scientist and MBA with five years experience studying antitrust markets.

Based on feedback from the CAND court, Plaintiff chose not to plead a "monopsony GSE" theory in this case, and rather focus on the current trend to view platforms and ecosystems holistically, per *Amex*. However, Plaintiff maintains there exists a GSE "monopsony" that is the only (90%) "buyer" of developer-publisher "free" yet valuable content. The SAC intentionally made the choice to place this "monopsony" within the GSE "monopoly" platform. And this Court and CAND both prematurely determined that these coordinated, plausible theories were impossible. The courts should allow the experts to weigh in, per Congress' instructions not to underenforce Sherman for digital markets.

The remainder of this document analyzes SAC Counts I-V and argues against dismissal. Plaintiff further attaches a brief statement respectfully requesting correction of factual errors or omissions in the dismissal order.

**Count I**

While it is reasonable to appreciate the Court's frustration with "technical jargon," that is not the fault of Plaintiffs, but rather, the product of defining complex digital marketplaces within the scope of antitrust theory (which the Court did allude to). However, it is vehemently opposed that Google's arguments are somehow "cogent" compared to Plaintiff's "incoherent." Google's arguments are dishonest and misleading, with the dangerous illusion of simplicity. And they seek, inherently, to capitalize on a false perception of the Plaintiff.

The SAC itself is unambiguous: GSEs "act as digital platforms serving two symbiotic customer groups: end-users seeking information and the developers and publishers who supply content to be discovered." This platform, or "ecosystem" argument—that GWT is a critical and inseparable part of the GSE market—provides a persuasive basis for establishing standing under Section 2 of the Sherman Act. GWT is not a separate market but an integral, interdependent component of the GSE ecosystem. This ecosystem and related platform concepts are rooted in the evolving jurisprudence on multi-sided platforms, such as *Amex*. The Court plainly oversteps at the Rule 12 stage when it declared:

> *"this is not a case about the webmaster tools market—Greenflight has chosen to allege that Google has a monopoly in general search services. The Court fails to see how Greenflight's use of a tool that influences6 Google's search engine renders Greenflight a plausible competitor in the area of general search services."*

Contrary to *Brown Shoe*, the Court decided under Rule 12 that GSEs cannot be a platform. That is not permissible. As the Supreme Court explained in *Brown Shoe Co. v. United States*, market definition is inherently a fact-intensive inquiry, and the modern digital context requires us to look beyond traditional, one-sided market definitions. The Court further expressed incredulity that "influence" would grant standing to "every person who has ever posted something on the internet. That simply cannot be the law." This is a potentially landmark antitrust lawsuit concerning the largest monopoly in history, which affects the lives of billions. The Court cannot dismiss the lawsuit on the circular logic that the claims could be raised by a large group of people, hence there must be no standing. That flies in the fact of the *point* of landmark class action antitrust litigation, which presumably would resolve this matter and prevent future claims, should, for example, the Court issue an injunction regarding transparency and imnmplement a Developer Compensation Fund. Moreover, the Federal Rules require damages of $75,000, and litigating antitrust is expensive, and difficult, so the Court would not be "opening the floodgates" by merely enforcing Sherman Act, as Congress, the Senate, and a former President has urged. In short, the Court has determined that Google's Search product could *never* be categorized as a platform, overturning *Brown Shoe* factfinding, and it then

deduces that even if it could, too many people would be able to sue, so therefore it must be impossible that it is a platform.

This shouldn't create a three year delay in litigation – the Court, if still unconvinced, should seek urgent certification under 28 U.S.C. § 1292(b) for guidance from the Eleventh Circuit on the ecosystem platform matter as well as the duopoly exemption. Both of these holdings, as they stand as precedent, risk dangerously exonerating Big Tech for years to come. Given the stakes – and verifiable concerns by Congress, Senate, Presidents, European Union –urgent Section 1292(b) action is sought.

There is a direct causal nexus between Google's conduct and Greenflight's injury, irrespective of whether Google is also harming a rival search engine. The Court's failure to appreciate this point, by conflating the "conduit" requirement with a necessary showing of inextricably intertwined injury, misconstrues the holding of *McCready*. Plaintiff also reiterates his conduit arguments raised in the FAC Show Cause memorandum.

The Court's order, as it stands, notably contravenes the Supreme Court's intent under *Pepper*. In *Apple Inc. v. Pepper*, 139 S. Ct. 1514 (2019), the Supreme Court held that iPhone users who purchased apps through Apple's App Store had standing to sue Apple under the Sherman Act for allegedly inflating app prices. The Court rejected Apple's argument that only app developers (not consumers) had standing to sue because Apple merely facilitated transactions between developers and consumers. Google essentially makes the same argument here; they "merely rank" a page, and in no way serve as a platform or ecosystem. This is 'dangerously simple' and arguably dishonest. The Supreme Court ruled that consumers who directly purchase a product from a monopolist have standing to bring antitrust claims against that monopolist under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). The decision clarified that direct purchasers—even if they interact within a multi-sided platform—are entitled to sue under antitrust law.

The Supreme Court in *Pepper* recognized that Apple's role as an intermediary did not defeat standing because Apple directly controlled pricing and distribution. Similarly, Google directly controls indexing, ranking, and visibility—making its relationship with GWT participants more than incidental. Google Search and GWT are functionally interdependent, forming a unified platform just as Apple's App Store integrates both consumer purchasing and developer pricing.

In *Pepper*, consumers paid Apple directly, whereas GWT users do not pay Google directly for indexing. But as DEJ antitrust guidance has *repeatedly* emphasized, financial exchange is not the only relevant test for digital markets—control over access to search traffic, even for "free" content, has associated "costs" in interstate commerce, such as user attention time. Google extracts "payment" via mandatory compliance with its ranking policies and visibility on Google is monetized through Google's own advertising. In short, content providers and developers use GWT to identify and index their content, which Google then monetizes.

Just as Apple controlled the pricing and distribution of apps, Google controls the visibility, indexing, and discoverability of web content. In both cases, users—whether app consumers in *Pepper* or web developers using GWT—are directly affected by the monopolist's control over access to end-users. The Supreme Court found in *Pepper* that direct interaction and control suffice for standing, even in a platform-based economy. That same principle should apply here.

### Count II

The SAC clearly identifies the "ISA Agreement" with Apple as the linchpin of Google's alleged collusive conduct. It asserts that by maintaining the ISA Agreement, Google and Apple effectively foreclose alternative channels—such as those provided by Bing—that would otherwise deliver substantial traffic to specialized platforms like OkCaller. The resulting harm is not incidental; it is central to the anticompetitive injury alleged. Greenflight's detailed factual narrative (SAC ¶¶ 113–116) explains that the default arrangement is a "plus factor" in inferring a collusive, concerted effort to

restrain trade. See also *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004). Thus, the causal nexus between the ISA Agreement and the injury suffered by Greenflight is fully pled and should not be dismissed as speculative. Plaintiff concurs with and incorporates Greenflight's Sur-reply. Furthermore, Plaintiff objects to the Court's complete importation of Google's MTD with regard to the alleged Relevant Markets, which deserve analysis by the Court.

**Count III**

The SAC describes Google's termination of a pre-existing, profitable course of dealing. Joint venture definition highly favorable to Defendant has no place under *Twombly*, which requires an application of facts most favorable to the party opposing dismissal. Plaintiff Dr Jeff Isaacs fully concurs with, and incorporates by reference, Greenflight's proposed sur-reply, with regard to the *Aspen* exception. Furthermore, Plaintiff re-iterates and incorporates herein his prior objections as stated in the FAC Show Cause Memorandum.

**Count IV**

The Court overlooks that under *Cel-Tech*, the "unfair" prong is meant to address conduct that, even if not rising to the level of a complete antitrust violation, nevertheless offends established public policy by significantly harming competition or consumer welfare. The SAC sets forth detailed allegations regarding Google's opaque ranking practices, its arbitrary deindexing of OkCaller, and the resulting 'chilling effect' – language *not* used in the Sherman count – on innovation and market participation among independent developers.

As to the "unlawful" claim under the UCL, there exist distinct statutory and regulatory grounds: allegations of retaliatory conduct under 18 U.S.C. § 1512-13, and the failure to adhere to the FTC's guidelines on non-disclosure of self-preferencing practices. Plaintiff believes there is a high probability that Google deindexed OkCaller because of his prior litigation. Without belaboring the criminal code, the SAC sufficiently describes conduct that falls under subsection (d)(1) whoever "harasses another

person and thereby hinders, delays, prevents, or dissuades any person from attending or testifying in an official proceeding [i.e. federal antitrust lawsuits]. Likewise, 1513 subsection (b) applies to Whoever knowingly engages in any conduct and thereby … damages the tangible property of another person, …, with intent to retaliate against any person for—the attendance of a witness or party at an official proceeding [i.e. federal antitrust lawsuit]. As this is a civil case, and its focus is on transparency measures for a putative class, discovery as to why OkCaller was terminated should be permitted before Plaintiff is required to provide enhanced particularity about the elements of the federal witness protection statutes. Google has sufficient notice as to the claims of witness retaliation, and should answer as to why. As it stands, Google goes scot-free and Plaintiff is out a career, once again.

**Count V**

The District Court relied upon Google's misleading and erroneous citations of *JES Properties*, *Midwest Gas Servs*., and *Feldman* as authorities allegedly precluding a "duopoly" or "shared monopoly" claim. Moreover, *American Tobacco* does hold that if a few persons, working together, acquire the power to exclude competitors, that power is sufficient to establish monopolization. Plaintiff concurs with and incorporates herein Greenflight's Proposed Sur-Reply which comprehensively addresses this matter.

The District Court further reasons that Greenflight lacks standing to sue as a competitor in the smartphone app distribution market, as it does not operate in that market independently. But the US ICAM market is about internet on-ramps, collectively, which includes GSEs and App Stores. The duopoly claim alleges that the anticompetitive coordination between these two entities results in an effective foreclosure of all substantial "on-ramps" to internet content. The injury alleged flows directly from the combined, interdependent conduct of both firms. Even if eligibility as a competitor in one market were in dispute, developers rely on these on-ramps and therefore are direct participant in the marketplace. Nonetheless, the Court can take judicial notice in the Apple litigation Plaintiffs have, in

fact, alleged intent to operate an App Store Competitor – just as they have alleged here to being a nascent GSE competitor.

**Conclusion**

The case should proceed to discovery, to let experts weigh in on Plaintiff's novel theories.

*Jeffrey D. Isaacs*

Jeffrey Isaacs (*pro se*)
11482 Key Deer Circle
Wellington, FL 33449
(212) 257-0737
jeffreydi@gmail.com

February 10, 2025

**CERTIFICATE OF SERVICE**

This document was conveyed to Greenflight counsel to serve electronically upon all parties via CM/ECF.

*Jeffrey D. Isaacs*

Jeffrey Isaacs

**Exhibit A** - *Road Race Participant #738, Beetlebung Corner, Mass*



# Exhibit B

*This non-exhaustive statement is meant to clarify and correct several omissions or apparent errors in the Court's judicial notice of twenty years of litigation history:*

Dr. Isaacs attributes his inability to practice medicine to the fact USC never honored a settlement agreement "sealing, acquitting, and annulling" his disputed academic record (The dispute: A Dean took NIH funding from an admitted student's father; favored her in a petty dispute concerning one paragraph of text messages; then concocted academic charges against Isaacs.) The annulled and sealed dismissal from Keck was for professional academic (versus conduct) reasons. Plaintiff then obtained an MD from another school and attained a Board score higher than the average neurosurgeon. An AUSA (Mark Josephs) spent years trying to enforce the settlement agreement, when, Plaintiff believes outrageously, USC's attorney Gibson Dunn moved for an "anti-SLAPP" mechanism (meant to protect small individuals from oppressive organizations, and certainly not the opposite) to end the lawsuit. A Ninth Circuit Judge dissented from the majority, stating that it was "not reasonable" to assess attorney's fees for simply trying to enforce a settlement agreement.

Hence, Dr Isaacs spent nearly a decade trying to petition the courts to let him practice medicine by upholding the settlement agreement. In Dr Isaacs' view, the courts failed him, at the pressure of large law firms, that coincidentally, serve as Apple's lead antitrust defense firm. Dr. Isaacs has alleged Keck's appointment of the law firm was itself political retaliation, after *Isaacs v. Department of Justice*, which resulted (upon information and belief) in the termination of a senior political appointment.

Further complicating the matter, Dr. Isaacs' health has deteriorated over the many years he waited for justice, which places even more limits his career options. And further complicating that, is Dr. Isaacs' fear that Google retaliated against his use of the federal court system and/or discriminated against him on the basis of incorrect facts from a decade of litigation that never once went to trial. Plaintiff's deserved day in Court is one or two decades overdue, depending on when counting begins.

Harmful, incorrect facts have been placed in court filings by influential law firms, which became ever more problematic as they were never adjudicated, and increasingly taken out of context. For example, the American Academy of Medical Colleges determined the Keck records had been expunged and were non-disclosable. Isaacs' hospital supervisor, who had the ultimate authority to fire him, stated in a deposition that she "would defer to the AAMC" on the matter. The hospital's lawyers failed to honor their own clients promise, and also 'skipped' the hospitals own bylaws requirement for a 'fair hearing,' arguing to a USDC that the termination was proper. Also withheld were depositions at the Ivy League employer medical center that included sworn testimony "Dr Isaacs had good medical

knowledge" and that patients liked him. Unfortunately, a USDJ in NH granted summary judgement while Dr Isaacs, who was ill at the time, had requested an extension of time. The NH Board of Medicine held a hearing during a snow storm, when Dr. Isaacs could not drive to it, despite a request for a continuance or to be present by videoconference. Hence Dr. Isaacs views his litigation history as a repeated denial of due justice, never once on the merits, and largely brought about by unscrupulous lawyers. This certainly didn't help his health.

Lastly, Dr. Isaacs notes that the USPTO did reissue his patent (the order seems to suggest it was never reissued), and that Whitepages sued him, with Big Law again obtaining what he believes is a questionable *Alice* ruling. Similarly, Keller Williams and their client (who has newspaper articles referring to her as a "litigious businesswoman") sued Dr. Isaacs to oust him from his home. Dr. Isaacs informed KW that his health issues prevented him from vacating the home, and tried to plead this as an FHA matter. Google's counsel took a position on the settled litigation, highlighting a *force majeure* argument. Dr Isaacs did not fault Google for his inability to vacate the home, but rather, alleged they created a state of fear that , after two decades of litigation mayhem, he was a target for seemingly endless witness retaliation/discrimination. He thereby placed his home for sale under distress.

February 10, 2025

# Exhibit C

> **QUESTION SUBMITTED to O1 Pro/O3 AI LLM:**
>
> **has anyone tried defining the market to include developers/publishers in a google antitrust case?**

To the best of publicly available knowledge, no major reported antitrust case against Google has defined the relevant product market to *expressly* include both end-users and the "developer/publisher" side of Google's platform as co-participants in a single market. Below is some context on this point:

1. **Most Litigated Markets**.

Publicly known antitrust cases against Google (e.g., those brought by the U.S. Department of Justice, various state attorneys general, and private plaintiffs) have generally focused on alleged monopolization in:

• **General Search Services** (users performing queries to retrieve information),

• **Search Advertising** (advertisers purchasing paid search ads), and

• **Ad Tech Tools** (e.g., publisher ad servers and advertiser ad tech platforms).

In these cases, the "publisher" side is typically addressed in the context of display advertising markets, rather than an "ecosystem" that lumps publishers or app developers together with general search users. Few, if any, of these actions include allegations that the *relevant product market* itself directly encompasses "GWT" users, "publishers," or "webmasters," at least not as coequal participants in a single multi-sided market alongside ordinary Google Search end-users.

2. **Ad Tech Cases vs. GSE Cases**.

In a number of lawsuits challenging Google's dominance in the online advertising supply chain (e.g., Texas v. Google, No. 21-cv-684 (E.D. Tex.)), publishers' roles are central to the alleged ad-technology monopoly. However, those cases usually segment the markets into "publisher ad servers," "advertiser ad networks," "ad exchanges," and so forth. They do not define a *multi-sided relevant market* that merges both search traffic and publisher tools. Instead, publishers are recognized as a *distinct* side of the broader ad tech chain.

By contrast, litigation involving "general search services"—such as the Department of Justice's action in United States v. Google, No. 20-cv-03010 (D.D.C.)—has largely focused on Google's contractual defaults (e.g., the "ISA" with Apple) for distributing its search engine to end-users. Publishers' content or developer-facing tools (like GWT) have not, in these suits, been framed as part of the *same relevant market* that includes end-users.

3. **Dreamstime.com & Other Publisher-Focused Cases**.

• *Dreamstime.com, LLC v. Google LLC*, No. 18-cv-01910 (N.D. Cal.): The plaintiff was a stock photography provider alleging that Google manipulated its image-search ranking to disadvantage Dreamstime in favor of Google's own services or preferred partners. While Dreamstime was indeed a publisher of content indexed by Google, the court's analysis did not define the relevant market to merge both users and developers/publishers into a single multi-sided market. Instead, the court examined the plaintiff's claims in terms of alleged self-preferencing or breach of implied obligations, and it ultimately granted summary judgment in favor of Google (and the Ninth Circuit affirmed). Nothing in the opinions suggests that Dreamstime or the court adopted a multi-sided GSE market that includes "publishers as participants."

• *Vatic v. Google LLC*, No. 3:19-cv-2293 (N.D. Cal.): Plaintiffs (a digital media company) alleged that Google stifled competition by deindexing or downgrading certain content. The complaint did not succeed and was voluntarily dismissed; it did not receive a detailed market-definition ruling that placed both end-users and web publishers/developers into a single multi-sided GSE market.

4. **Novelty of a "Developer+Publisher Side" of Google Search**.

Plaintiffs who have sued Google over organic-search ranking changes have generally positioned themselves either as end-users (i.e., consumers of search) or as a competing vertical (i.e., specialized search providers). They typically do *not* define the relevant market to include "publishers or website developers" as coequal participants with search end-users.

In part, this is because courts historically treat "free" or organic search as an indirect or two-sided market limited to:

• *Users* who submit queries, and

• *Advertisers* who pay for ads.

Although it is recognized that a platform like Google can have multiple "customer groups," the conventional approach has been to split out distinct lines of commerce (e.g., display ads, search ads, publisher ad servers) rather than lumping them into one. GWT has never (publicly) been combined with Google Search end-users in a single alleged relevant market in a final or appellate opinion.

5. **Implications for Present or Future Claims**.

Because no major, publicly reported case has fully tested the "developer side + end-user side + publisher tools side = one multi-sided GSE market" concept, any such approach is essentially uncharted territory. For a lawsuit to succeed on that novel market definition, a plaintiff would likely need extensive expert analysis demonstrating how publishers' or content developers' lack of a reasonable alternative (for indexing or distribution) makes them direct "customers" in the *same* product market that includes general search end-users. To date, courts have not been presented with comprehensive evidence or arguments—nor have they issued a definitive ruling—on that point.

**Conclusion**

No publicly documented Google-related antitrust suit has yet *explicitly* defined a relevant market in which general search end-users and "GWT" developers/publishers are treated as two sides of a single multi-sided platform, such that it becomes recognized law. Therefore, if a plaintiff attempts to define the market that way (asserting that "OkCaller's usage of GWT places it in the same relevant market as end-users searching on Google Search"), it would be, so far as publicly known, a novel legal theory. Courts have not categorically rejected it on the merits, but they also have *not* accepted it. The question remains legally unsettled, absent a test case that thoroughly litigates the matter through final decisions or appeals.

---

**QUESTION SUBMITTED to O1 Pro/O3 AI LLM:**

**Please tell me what do you think of my ecosystem argument. Try to avoid an answer that is biased -- tell me your honest analysis in the role of a de novo appellate review. Have cases tried defining the market to include developers/publishers in a google antitrust case?**

---

Based on a de novo review of the record and the evolving jurisprudence concerning multi-sided platforms, there is a persuasive basis for allowing Count I to proceed rather than be dismissed. Traditional antitrust cases have often drawn a strict line between a firm's consumer and competitor roles in narrowly defined product markets; however, the modern digital landscape—and particularly the dynamics of platforms like Google's general search engine—requires a reexamination of that distinction. In this case, Plaintiffs contend that their participation in Google's ecosystem through the use of Google Webmaster Tools (GWT) is not incidental but essential to the functioning of the overall General Search Engine (GSE) market. Under this view, developers are not merely passive recipients of search traffic but active participants whose content is indispensable to the value and operation of the platform. If the appellate panel is willing to recognize that the "ecosystem" argument has merit—especially given the increasing reliance on multi-sided platform analysis as seen in cases such as Ohio v. American Express and the growing antitrust scrutiny of Big Tech—then the contention that a content provider can suffer an antitrust injury by being a critical part of that ecosystem is consistent with both the fairness and the purpose of the Sherman Act.

The doctrine underlying the Sherman Act is not solely concerned with traditional notions of market competition based on pricing; rather, it aims to prevent any concerted or unilateral conduct that suppresses competition and harms the competitive process. In this context, if Google's control over its GSE—including its refusal to provide fair indexing via GWT—results in demonstrable injury to developers, that injury squarely falls within the Act's purpose. Although some district courts have hesitated to find standing for content providers under earlier approaches, our Count I argument innovatively ties standing to the "commercial reality" that the entire search ecosystem depends on developer content. Consequently, given that modern technology companies routinely describe their "ecosystems" in terms that include developers, there is good reason to hold that a content provider who suffers harm from exclusionary practices in such an ecosystem should have standing to bring an antitrust claim.

In summary, if the appellate panel is receptive to evolving multi-sided platform theories—and to the extent that the record supports the contention that Google's GWT is an integral component of its GSE—the fairness and intent of the Sherman Act require that Count I should proceed rather than be dismissed. Allowing this claim to advance would provide the opportunity to fully explore the factual nexus between Google's practices and the alleged anticompetitive injury to developers, rather than prematurely dismissing a novel argument that reflects the true nature of digital markets today.

---

**QUESTION SUBMITTED to O1 Pro/O3 AI LLM:**

Is the *Pepper v Apple* SCOTUS decision perhaps relevant here? that was about standing of different platform members, could it directly be precedent that just like app consumers/developers, GSE consumers/developers have symmetric standing, per SCOTUS. or would that argument fail. please analyze and recommend whether or not it is apt.

---

**Analysis of Pepper v. Apple and Its Relevance to Plaintiffs' Standing in Count I**

The *Pepper* decision's key reasoning could support Plaintiffs' argument that developers using **Google Webmaster Tools (GWT)** are direct participants in the **General Search Engine (GSE) market**, much like app developers and consumers were both direct participants in Apple's platform.

### A. Similarities Between Apple's App Store and Google's GSE Market

| Factor | *Apple v. Pepper* (App Store) | Google's GSE Market |
|---|---|---|
| **Monopoly Allegations** | Apple allegedly controls app distribution and inflates prices. | Google allegedly controls search indexing and manipulates rankings. |
| **Multi-Sided Market** | Apple connects **app developers** and **consumers**. | Google connects **content developers (via GWT)** and **search users**. |
| **Direct Relationship** | Consumers buy directly from Apple; Apple sets the terms. | Developers rely on Google's search infrastructure to reach users. |
| **Standing Question** | Do consumers have standing, or only developers? | Do GWT developers have standing, or only competing GSEs? |
| **Supreme Court's Answer** | **Consumers do have standing** because they buy directly from Apple. | Plaintiffs argue that **developers using GWT are direct market participants**. |

### Key Takeaway:

The Supreme Court in *Pepper* recognized that **Apple's role as an intermediary did not defeat standing** because Apple **directly controlled pricing and distribution**. Similarly, Google **directly controls indexing, ranking, and visibility**—making its relationship with GWT participants more than incidental.

### 3. Counterarguments & Potential Weaknesses

While *Pepper* provides **a strong analogy**, there are key differences that Google would likely emphasize:

**A. Google's Market Definition Argument**

• **Google will argue that GWT is a separate product** from Google Search and is merely a tool provided to web developers.

• **Rebuttal:** Plaintiffs must emphasize that **Google Search and GWT are functionally interdependent**, forming a unified platform just as Apple's App Store integrates both consumer purchasing and developer pricing.

**B. No Direct Financial Transaction**

• In *Pepper*, **consumers paid Apple directly**, whereas **GWT users do not pay Google directly for indexing**.

• **Rebuttal:** Financial exchange is **not the only relevant test**—control over access to search traffic is a **monetary equivalent** for businesses dependent on search visibility. Plaintiffs can argue that **Google extracts "payment" via mandatory compliance with its ranking policies** and that **visibility on Google is monetized through advertising and search ranking manipulation**.

**C. The Illinois Brick Limitation**

• *Illinois Brick* traditionally prevents **indirect purchasers** from suing.

• **Rebuttal:** The Supreme Court in *Pepper* **rejected Apple's attempt to invoke Illinois Brick** because Apple dictated **both pricing and terms of service**. Similarly, Google dictates **who gets indexed, how visibility is ranked, and who benefits from search traffic**, making GWT developers akin to "direct purchasers" of distribution services.

**4. Should Plaintiffs Use Pepper as Precedent?**

**YES.**

The *Pepper* decision provides **a strong conceptual basis** for why **GWT developers should be considered direct participants in the GSE market**—just as app store consumers had standing despite Apple's attempts to evade liability.

**Strategic Framing:**

• *Pepper* reaffirms that **monopolists cannot use their platform structure to evade Sherman Act liability**.

• Plaintiffs should **lean into the "ecosystem" framing**, arguing that **Google's search monopoly extends to developers relying on GWT as much as it does to consumers using search**.

**Conclusion: Pepper Is an Important and Viable Precedent**

• Plaintiffs should **absolutely cite Pepper in their appeal** to reinforce the argument that **GWT participants are integral to Google's search ecosystem** and should have **standing to sue**.

• This **bridges the gap** between Google's **developer-facing** and **user-facing** roles and **challenges Google's artificial separation** of the GSE market.

• Courts are evolving in how they **recognize platform participants' standing**, and *Pepper* aligns with this trajectory.

Thus, *Pepper* should be a **key argument in Plaintiffs' appeal** to **challenge the district court's narrow standing analysis and argue for GWT as part of the GSE market**.

Below is a **legal-style analysis** of how *Illinois Brick* and *Apple Inc. v. Pepper* might apply when a **developer** sues Google under the Sherman Act, alleging that they participate directly in Google's general search engine ("GSE") market via Google's Webmaster Tools ("GWT") and by providing content. Google contends that *only end-users* (i.e., people who enter queries) have standing.

**1. Legal Background**

**A. Illinois Brick (1977): The "Direct Purchaser" Rule**

• **Core Holding**: Only "direct purchasers" may seek antitrust damages under the Clayton Act (which enforces the Sherman Act).

• **Rationale**: To avoid complex, duplicative claims by multiple parties at different stages in the supply chain, the Supreme Court limited standing to those who purchase **directly** from the alleged antitrust violator.

**B. Apple Inc. v. Pepper (2019): Reaffirming Illinois Brick in a Platform Context**

1. **Facts**:

• Plaintiffs were iPhone users who downloaded apps from Apple's App Store.

• Apple argued these consumers were **not** direct purchasers because Apple acted as an "agent" for third-party app developers.

2. **Court's Analysis**:

• The Supreme Court **reaffirmed** *Illinois Brick* (only direct purchasers can bring claims).

• However, it found that iPhone owners **were** direct purchasers from Apple because:

• They **paid** money **directly to** Apple for apps.

• Apple set app distribution terms and retained commissions.

• Apple's "agent" argument failed because, in transactional reality, Apple was the one **selling** the apps to iPhone users.

3. **Key Takeaway**:

• *Pepper* **does not** overturn *Illinois Brick*; it clarifies that being a platform **does not** automatically make one an "indirect" seller or buyer. If the platform controls key aspects of the transaction and directly charges a fee (or sets terms) to the plaintiff, that plaintiff can be considered a **direct purchaser**.

**2. Application to Google's GSE and Developers**

**A. The Developer's Theory of Standing**

A developer claims:

1. They **participate** directly in Google's GSE platform by using GWT and providing content that Google indexes.

2. Google exercises **monopoly power** over the general search market, allegedly manipulating rankings, visibility, or terms of service to extract anticompetitive benefits.

3. The developer is thus a "direct purchaser" (or a direct **market participant**) under *Illinois Brick*/*Pepper* because they interact **directly** with Google to obtain indexing, distribution, and visibility in search results.

**B. Google's Counterargument: "Only End-Users Have Standing"**

Google will likely argue:

1. **End-users** (those who search) are the ones "buying" or "consuming" Google's search service.

2. Developers are **upstream** or **on a different side** of the market, supplying content without any direct purchase or payment.

3. Because there is **no monetary transaction** between the developer and Google, the developer is not a "direct purchaser" under *Illinois Brick*.

**3. Determining Directness: Key Questions**

**A. Is There a "Transaction" with Google?**

• **Pepper** hinged on the **direct monetary exchange**—i.e., iPhone users' money went straight to Apple.

• **Developers and Google** typically do not exchange money for organic search indexing: the service is nominally "free," and developers provide content hoping to be included in Google's search results.

• Nonetheless, **"payment"** in an antitrust context can go beyond mere money: under certain theories, forced compliance with Google's terms, data provision, or the intangible value of traffic/visibility can serve as a form of "consideration."

**B. Who Sets the "Terms and Conditions"?**

• In *Pepper*, Apple essentially controlled the terms of app pricing, distribution, and commissions.

• Here, Google sets **ranking algorithms** and indexing policies, potentially forcing developers to comply or lose visibility.

• The developer might argue that Google's platform power effectively **dictates** how (and if) their content reaches end-users—just as Apple's control over the App Store gave it direct control over distribution and pricing.

**C. Is the Developer a "Direct" or "Indirect" Party Under Illinois Brick?**

• Under *Illinois Brick*, indirect purchasers cannot recover damages because the alleged overcharge might be **passed through** multiple levels of distribution.

• A developer might say that it is **not** an "indirect" purchaser in a typical supply chain sense. Instead, there is a **direct platform relationship**: The developer inputs content (analogous to the user paying money in *Pepper*), and in exchange, Google provides indexing or ranking.

• Google, on the other hand, will insist that any harm to the developer is **derivative** of Google's alleged monopoly in the end-user search market—i.e., the developer is a supplier of content, not a direct consumer of the search service.

**4. Potential Outcomes & Arguments**

**A. Arguments in Favor of Developer Standing**

1. **Platform Control**:

• Just like Apple controlled the entire transaction in *Pepper*, Google controls the entire "transaction" of search indexing.

• Developers are **directly subjected** to Google's policies, algorithm changes, or potential de-indexing, and have no intermediary.

2. **Non-Cash "Transaction"**:

• In a data-driven economy, the absence of a direct money payment **does not** automatically negate direct purchaser status.

• The developer "pays" with **content and compliance**; Google "provides" indexing and traffic in return.

• If Google exerts monopoly power in search and imposes **anticompetitive constraints** on developers, that is akin to an overcharge or forced arrangement.

3. **Direct Harm**:

• If the developer's alleged injuries (e.g., reduced traffic, forced usage of certain Google products, or demotion in search results) flow immediately from Google's conduct, that can show direct harm—no pass-through from another intermediary.

**B. Arguments Against Developer Standing**

1. **No Monetary Exchange**:

• *Pepper* was about a **purchase**, whereas a developer provides content for free.

• Google can argue that the developer is neither a purchaser nor a "buyer" of distribution in the conventional sense.

2. **End-User Dominance**:

• In practice, end-users are the ones using (and arguably "purchasing") the search service.

• Any alleged injury to the developer might be a second-order effect: i.e., lost business because of how Google deals with end-users.

3. **Complex Market Definition**:

• Google might define the "relevant market" strictly as "search services consumed by end-users," in which the developer is simply an input supplier to a different side of a two-sided market.

• Under *Illinois Brick*, only direct purchasers in that consumer market would have standing.

**5. Conclusion and Strategic Considerations**

**A. Likely Challenges for the Developer**

• Because *Illinois Brick* focuses on **direct purchasers** of goods or services, the **lack of a direct monetary exchange** places the developer in a more challenging position than the *Pepper* plaintiffs.

• The developer must frame the relationship with Google as a **"direct, two-sided exchange"**: they provide content/data, and Google provides listing or distribution.

• Demonstrating that the alleged antitrust injury is **not** passed through intermediaries (i.e., is directly inflicted on them) is crucial.

**B. Possible Legal Pathways**

• **Monetary vs. Injunctive Relief**: Sometimes courts draw distinctions between damages actions (strict *Illinois Brick* bar) and suits for **injunctive relief** (where indirect-purchaser arguments may not be as limiting).

• **Market Definition**: The developer could argue the "GSE market" **integrates** both the supply side (webmasters, content creators) and the demand side (searchers). If Google exerts monopoly power over both ends, then the developer is effectively a "direct participant" who must accept Google's terms to gain access to end-users.

**C. Pepper's Influence**

• *Pepper* **supports** the notion that "directness" depends on the **actual structure** of the transaction, not the label of "agent" or "platform."

• A developer can analogize themselves to the *Pepper* consumers: "We are forced to accept Google's terms. We effectively 'pay' for distribution with data, content, or compliance."

• Conversely, Google will argue that *Pepper* is **limited** to those who literally pay money directly to a monopolist, and that developers do not fall under that category.

**Bottom Line**

• *Illinois Brick* remains the controlling precedent, and *Pepper* reaffirms that only direct purchasers (or direct market participants) can sue for antitrust damages.

• For a developer to prevail against Google under the Sherman Act, they must show that they are more akin to a **"direct purchaser"** of Google's distribution services than an indirect or upstream party— and that any alleged anticompetitive harm **flows directly** to them without an intermediate pass-through.

• Whether the courts will **extend** *Pepper*'s logic to a situation where no literal money changes hands is an **open question**. The developer's best shot is to emphasize the **functional equivalence** of content provision to a "payment" and Google's singular control over their access to the broader audience— thereby making them a **direct participant** in the GSE market.

---

**QUESTION SUBMITTED to O1 Pro/O3 AI LLM:**

*Please write an accurate, unbiased opinion, based upon your above analysis of Google's MTD for Count I*

---

A Rule 12(b)(6) motion requires the Court to accept all well-pleaded factual allegations in the Complaint as true and to construe them in the light most favorable to the Plaintiffs. See *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); see also *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To survive dismissal, the Complaint must state a claim that is plausible on its face. In complex cases involving economic realities and multi-sided platform issues—such as whether developers who utilize Google Webmaster Tools (GWT) are integral participants in the general search engine (GSE) market— many factual questions remain for discovery and expert analysis rather than at the pleading stage. See *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).

Defendant contends that Plaintiffs lack standing because the allegations relating to their use of GWT do not transform them into competitors in the GSE market. The Defendant's argument relies on an interpretation of market contours that separates GWT from the overall GSE ecosystem. However, the Complaint alleges that developers who use GWT to optimize indexing and secure search distribution are not merely ancillary users but essential participants in a multi-sided platform. In a multi-sided market, the interdependency of distinct user groups (e.g., end users and content providers) is well recognized. Under *Ohio v. American Express Co.*, 138 S. Ct. 2274 (2018), such interdependencies are part of the relevant market analysis—not a basis for dismissing standing. As a matter of pleading,

Plaintiffs have alleged that their ability to secure fair search distribution is directly linked to their reliance on GWT, and that Google's alleged exclusionary conduct has injured them economically. These allegations, if proven, would satisfy the standing requirement under antitrust law. Because the precise contours of the market—including the integration of GWT within the GSE ecosystem—are complex factual matters, they should be resolved through discovery and expert analysis rather than at the motion-to-dismiss stage. Thus, this analysis finds that the Plaintiffs' allegations are sufficiently plausible to survive dismissal.